**\*\*\*CAPITAL CASE\*\*\***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION

No. 4:20-CV-1046-SEP

VINCENT McFADDEN,                                                Petitioner

v.

PAUL BLAIR, Warden,

   Potosi Correctional                                          Respondent

---

## PETITION FOR A WRIT OF HABEAS CORPUS

---

LAURENCE E. KOMP, MO Bar 40446
Capital Habeas Unit, Chief
Federal Public Defender
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-471-8282
laurence_komp@fd.org

SCOTT W. BRADEN, AR Bar 2007123
JOHN C. WILLIAMS, AR Bar 2013233
Assistant Federal Public Defenders
Federal Public Defender's Office
Eastern District of Arkansas
1401 West Capitol, Suite 490
Little Rock, AR 72201
501-324-6114
scott_braden@fd.org
john_c_williams@fd.org

*Counsel for Vincent McFadden*

TABLE OF CONTENTS

Procedural History ...................................................................................1

Jurisdiction ........................................................................... 11

Statement on Defenses............................................................ 11

Claims for Relief.................................................................... 13

Claim 1 Improper denial of a racially pretextual peremptory challenge exercised by the State of Missouri......................................................... 13

Claim 2 The prosecutor withheld evidence in violation of *Brady v. Maryland* ..................................................................................................... 19

Claim 3 McFadden was denied the effective assistance of counsel when his trial lawyers called his co-defendant, Michael Douglas, to testify ............................25

Claim 4 Trial counsel admitted McFadden's Guilt to the Jury..........................32

Claim 5 Counsel was ineffective at sentencing ..................................................38

Claim 5-1 Counsel was ineffective for failing to present a PET scan ................38

Claim 5-2 Counsel was ineffective for failing to call Dr. Gelbort.......................43

Claim 5-3 Counsel was ineffective for failing to present a trauma expert .........46

Claim 5-4 Counsel was ineffective for failing to introduce expert testimony describing McFadden's childhood landscape....................................................50

Claim 5-5 Counsel was ineffective for failing to present evidence of cultural condition of Pine Lawn as part of the case in mitigation .................................58

Claim 5-6 Counsel was ineffective for failing to present an expert related to McFadden's inability to process and verbalize, and his untreated learning disability ............................................................................................65

Claim 5-7 Counsel was ineffective for investigate McFadden's educational history ..............................................................................................71

**Claim 5-8 Counsel was ineffective for failing to call a lead expert to discuss McFadden's lead exposure and its long-term effects** .........................................76

**Claim 5-9 Counsel was ineffective for not objecting to the State's appeal to racial bias as a basis for death** ....................................................................79

**Claim 5-10 Counsel was ineffective for failing to present a gang expert to contextualize the aggravating gang evidence presented to the jury**..................84

**Claim 5-11 Counsel was ineffective for failing to call lay witness cultural mitigation** ............................................................................................87

**Claim 5-12 Counsel was ineffective for failing to furnish Dr. White's findings to Dr. Draper**.........................................................................................97

**Claim 5-13 Counsel was ineffective for failing to present evidence that McFadden didn't assault or seriously injure Daryl Bryant and Jermaine Burns** ...................................................................................................104

**Claim 5-14 Counsel was ineffective for failing to disprove the Addison offense**... ...................................................................................................108

**Claim 5-15 Counsel was ineffective for failing to prepare lay and expert witnesses for their testimony** ...........................................................................112

**Claim 5-16 Counsel was ineffective for failing to refer the case to different attorneys who could have performed a competent defense**...............................115

**Claim 5-17 Counsel were ineffective for failing to prepare a social history premised upon an adequate mitigation investigation**.......................................118

**Claim 6 Trial counsel's failure to object to the admission of letters from both Douglas and McFadden denied McFadden a fair trial and the effective assistance of counsel** ...........................................................................130

**Claim 7 The exclusion of potential juror Mark Kerr violated the Sixth Amendment** ........................................................................................133

**Claim 8 Jury precluded from hearing relevant evidence** ...................................135

Claim 9 The failure to impeach Douglas with a sworn statement contradicting his trial testimony deprived McFadden the effective assistance of counsel .................................................................................................141

Claim 10 Prosecutorial misconduct during trial violated due process ............ 144

Claim 11 Failure to rebut inaccurate Franklin portrayal with available evidence ... 159

Claim 12 Mr. McFadden was denied the effective assistance of counsel when his trial counsel failed to object tonumerous instances of prosecutorial misconduct .................................................................... 166

Claim 13 Evidence and argument about the motive for the prior murder violated the Double Jeopardy Clause .......................................................... 168

Claim 14 Improper presentation of prejudicial other acts evidence at the guilt phase ................................................................................... 173

Claim 15 Improper jury instructions increased the number on a list of statutory aggravators skewing the weighing process ...................................... 176

Claim 16 Improper jury instructions allowed the jury to sentence McFadden for the actions of another person.......................................................... 178

Claim 17 Improper death sentence when the jury failed to apply the narrowing construction of the heinous, atrocious and cruel ("HAC") aggravator; and even if it did, the narrowing construction fails to narrow......................................... 180

Claim 18 The jury rejected the depravity of mind limiting instruction in Franklin-1 thus jeopardy attached as to that factor in Franklin-2................................... 183

Claim 19 The jury never made a required finding of an element of an aggravating circumstance.............................................................................. 186

Claim 20 Instructions 19 and 21 violate *Ring v. Arizona*, 536 U.S. 584 (2002), and *Apprendi v. New Jersey*, 530 U.S. 466 (2000) ......................................... 188

Claim 21 *Apprendi* and *Ring* Violation.......................................................... 192

**Claim 22 McFadden was denied the effective assistance of trial counsel when they failed to object to the admission and argument regarding a Wanted Poster with McFadden's photo. and to argument about this poster** .......................... 194

**Claim 23 The failure to compel Douglas to answer deposition questions denied McFadden a fair post-conviction proceeding** ................................................... 197

**Claim 24 Prosecutorial misconduct during the postconviction proceedings denied McFadden a fair postconviction proceeding** ........................................ 200

**Claim 25 Abandonment by post-conviction counsel deprived Mr. McFadden of a fair post-conviction proceeding** ................................................... 204

**Claim 26 Counsel was ineffective for failing to retain a fingerprint expert** ..... 209

**Prayer for Relief** ................................................................................................ 211

**Certificate of Service** ........................................................................................ 212

iv

## PETITION FOR A WRIT OF HABEAS CORPUS

Mr. Vincent McFadden petitions the Court for a writ of habeas corpus under 28 U.S.C. § 2254. He asks the Court to vacate the judgment of the St. Louis County Circuit Court, under which he was (1) convicted of first-degree murder, acting in concert with Michael Douglas; and (2) sentenced to death.

This petition is filed within the one-year statute of limitations set forth in 28 U.S.C. § 2244(d). Additional claims and additional facts in support of the claims stated herein may emerge as investigation of this case continues. If necessary, McFadden will move to amend this petition.

## PROCEDURAL HISTORY

This case arises from the shooting of Todd Franklin on July 3, 2002. McFadden was twice convicted and twice sentenced to death for the Franklin murder, first at a March 2005 trial and again at a July 2007 retrial occasioned by the State's perpetration of racism – the commission of a *Batson* violation. An aggravator asserted by the State against McFadden related to a subsequent murder of Leslie Addison. As in the first Franklin trial, the State again acted in a racially unconscionable manner and violated *Batson*. This petition concerns only the conviction and sentence arising from the Franklin murder. As of this filing, the Addison case remains pending on federal review in *McFadden v. Preycyth*, Case No. 4:18-cv-1559-AGF (E.D. Mo.).

1

In the Franklin case, the State charged McFadden with first-degree murder, acting in concert with Michael Douglas, and armed criminal action. It sought the death penalty for first-degree murder. McFadden pleaded not guilty. Trial counsel were Karen Kraft and Sharon Turlington, who also represented McFadden in the Addison matter. Excluding jury selection, the first trial was held on March 7, 2005 through March 11, 2005, under case number 03CR-000005. McFadden did not testify. The jury found McFadden guilty on all counts and recommended the death penalty. The trial court's judgment imposing death was entered on April 22, 2005. The Missouri Supreme Court vacated the judgment on direct appeal because the prosecutor committed *Batson* violations. *McFadden v. State*, 191 S.W.3d 648 (Mo. Banc 2006) (*McFadden I*); *see also McFadden v. State*, 216 S.W.3d 673 (Mo. Banc 2007) (reversing Addison-1 convictions and death sentence for similar racism in jury selection).

Retrial in the Franklin case was held under case number 03CR-000005-02 on July 2, 2007 through July 13, 2007, including voir dire proceedings. Kraft and Turlington again served as trial counsel. McFadden again did not testify. The State lodged the same charges as before and again sought the death penalty. The jury found McFadden guilty and recommended a death sentence, which the trial court duly imposed in a judgment entered on September 14, 2007.

2

McFadden appealed his conviction and sentence to the Missouri Supreme Court under case number SC88959. He was represented by Janet M. Thompson in that appeal. He raised the following 14 points in the appeal (paraphrased here):

I.      The trial court erred when it precluded McFadden from presenting to the jury, at either culpability or penalty phases, that Michael Douglas pled guilty and was sentenced to twenty years.

II.     Error in allowing evidence and the submission of evidence on an aggravating factor rejected by the previous jury.

III.    Improper granting of the challenge of cause of Venireperson Mark Kerr, who could follow and apply all applicable law.

IV.     The State violated *Batson* and the trial court erred in overruling a *Batson* objection to the removal of Venirewoman Wanda Bryant in the face of a pretextual reason, when the State in the retrial attempted to improperly remove three other minority jurors.

V.      The trial court erred in allowing the admission of other crime evidence through argument and testimony.

VI.     The trial court erred in submitting Instruction 18 submission of the aggravators as separately numbered paragraphs, heightening their weight.

VII.    The trial court erred in submitting Instruction 18 that allowed the jury to impose death for the conduct of another, Michael Douglas.

3

VIII.   The trial court erred in accepting a death verdict that did not employ the required narrowing construction of the depravity of mind aggravator, as they were instructed. Alternatively, the narrowing construction does not adequately narrow a vague aggravator.

IX.   The trial court erred in accepting a death verdict when the jury made no finding on the depravity of mind aggravating factor in its failure to employ the required narrowing construction of the depravity of mind aggravator.

X.   The trial court erred in accepting a death verdict when the jury received no evidence related to the "serious assaultive conduct" aggravator.

XI.   The trial court erred in submitting instructions and rejecting sufficient instructions that did not violate the unanimity problems considered in *Ring*, *Apprendi* and *Whitfield*.

XII.   Prosecutorial misconduct occurred from voir dire through the penalty phase, violating McFadden's rights to due process, a fair trial before a properly selected jury, reliable sentencing, and freedom from cruel and unusual punishment.

XIII.   Admission of taped evidence containing hearsay without a proper foundation violated McFadden's rights to due process, a fair trial, confrontation and cross examination, fair and reliable sentencing, and freedom from cruel and unusual punishment.

XIV.   Trial court erred in requiring the State comply with *Apprendi*.

4

On May 29, 2012, the Missouri Supreme Court affirmed the convictions and sentence. *State v. McFadden*, 369 S.W.3d 727 (Mo. Banc 2012) (*McFadden II*). On August 28, 2012, McFadden filed a petition for writ of certiorari in the United States Supreme Court. He was represented by Janet M. Thompson in this proceeding. The Supreme Court denied the petition on November 5, 2012. *McFadden v. Missouri*, 568 U.S. 999 (2012).

On October 26, 2012, McFadden filed a *pro se* motion for state post-conviction relief (Rule 29.15) in St. Louis County Circuit Court under case number 12SL-CC04870. The *pro se* petition raised the following allegations:

1. Ineffective assistance of trial counsel for failing to show the jury Michael Douglas's charge and sentence and the prosecution opened the door to this type of evidence.

2. Ineffective assistance of trial counsel for failing to object to uncharged crimes and bad acts.

3. Ineffective assistance of trial counsel for failing to object to improper prosecutorial arguments.

The Office of the State Public Defender, Appellate/PCR Division, was appointed and filed an amended Rule 29.15 motion on December 9, 2013. Valerie Leftwich, Jeannie Willibey, and Robert Lundt represented McFadden in these proceedings. The petition presented sixteen grounds for relief (paraphrased here):

1. The trial court's failure to compel Michael Douglas to answer questions during his deposition violated McFadden's rights to due process, equal protection, a fair trial, and freedom from cruel and unusual punishment.

2. Counsel was ineffective for failing to object and adequately preserve issues for appeal at voir dire and the guilt trial of trial.

3. Counsel was ineffective at the guilt phase for calling the co-defendant Michael Douglas as a witness.

4. Counsel was ineffective at the guilt phase for failing to object to evidence of uncharged crimes that the state presented through Heather Burke, a latent print examiner.

5. Counsel was ineffective at the guilt phase for failing to object to evidence of uncharged crimes that the state presented through witness testimony related to references to a wanted poster.

6. Counsel was ineffective at the guilt phase for failing to impeach state's witnesses Dr. Raj Nanduri and Michael Douglas.

7. Appellate counsel was ineffective in failing to pursue the preserved issue regarding the admission and playing of a tape recording during re-direct examination of Mark Silas.

8. Counsel was ineffective at sentencing for failing to call Dr. Norman White or a similarly qualified expert who could present a social profile of McFadden and his upbringing.

9. Counsel was ineffective at sentencing for failing to call Dr. Michael Gelbort or a similarly qualified neuropsychologist.

10. Counsel was ineffective at sentencing for failing to provide Dr. Wanda Draper with a full social history prior to having her testify.

11. Counsel was ineffective for failing to bring mitigation witnesses about McFadden's upbringing, to wit: Willibea Blackburn, Vicki Blackburn, Audrey Brown, James Clark, Kelly Crowder, Willie Crowder Janetta Hubbard, Shonta Hubbard, Lisa Hubbard, Tiffany (Hood) Huglie, Arnell Jackson, Brandon Johnson, Victor Johnson, Tanisha Kirkman, Johnny Kirkman, Terrence Lee, Sean Nichols, Thurman Shelton, Glenn Sykes, Lisa Thomas, Kenneth Watkins, Elwyn Wells, George Wells, Clara Wings, Andrian Wright, and Janet Wright.

12. Counsel was ineffective for failing to obtain a PET brain scan.

13. Counsel was ineffective for failing to investigate and rebut the statutory aggravators of prior serious assaultive convictions for first-degree assault and armed criminal action against Daryl Bryant and Jermaine Burns.

14. Counsel was ineffective for failing to investigate and rebut non-statutory aggravation regarding the murder of Leslie Addison.

15. Counsel was ineffective for failing to rebut the good character evidence of Todd Franklin.

16. Counsel was ineffective for failing to adequately object to the prosecutor's improper closing argument at the penalty phase.

The motion court denied relief in an order dated January 14, 2019.

McFadden appealed denial of the Rule 29.15 motion under Missouri Supreme Court case number SC97737. McFadden was represented by William J. Swift in that appeal. The brief stated the following twenty points on appeal (paraphrased here):

I.     Counsel was ineffective for calling Douglas at the guilt phase.

II.    Counsel was ineffective for failing to rebut the good character evidence of Todd Franklin.

III.   Counsel was ineffective for failing to object to the Douglas letters introduced at guilt phase.

IV.    Counsel was ineffective for failing to object to the McFadden letters introduced at guilt phase.

V.     Counsel was ineffective for failing to impeach Douglas with his 24.035 motion.

VI.    The trial court erred in not compelling Douglas to testify at his post-conviction deposition.

VII.   Counsel was ineffective for failing to object to the wanted poster that introduced other inadmissible bad acts evidence.

VIII.  Counsel was ineffective for failing to object to the fingerprint evidence examiner's testimony that introduced other inadmissible bad acts evidence.

IX.    Counsel was ineffective for failing to object to the prosecutor's closing argument at sentencing that (1) McFadden would have killed Eva Addison,

8

(2) earlier wronged families would have had the chance to obtain personal retribution; (3) asking jurors to put themselves in the terror of the victims; (4) McFadden believes in the death penalty; and, (5) the jury should hold, hug, and love Leslie Addison and Todd Franklin so as not to let them down.

X.     Counsel was ineffective for failing to call Dr. Norman White to present a cultural and social profile of McFadden and his upbringing.

XI.    Counsel was ineffective for failing to call witnesses Tanesia Kirkman-Clark, Elwynn Walls, Sean Nichols, and Willabea Blackburn to testify about McFadden's upbringing.

XII.   Counsel was ineffective for failing to provide Dr. Wanda Draper a complete social history prior to testifying about McFadden's upbringing.

XIII.  The trial court erred when it recalled a writ based on the false allegations of the prosecutor and in refusing to recuse the St. Louis County prosecutor's office after making those false representations.

XIV.   Counsel was ineffective for failing to call Dr. Ruben Gur or a similarly qualified expert, to testify as to the PET scan results.

XV.    Counsel was ineffective for failing to call Dr. Michael Gelbort or a similarly qualified expert to testify about McFadden's brain limitations.

XVI.   Counsel was ineffective for failing to present evidence to rebut the prior assaults on Daryl Bryant and Jermaine Burns.

9

XVII. Counsel was ineffective for failing to call Maggie Jones, Margaret Walsh, and Arnell Jackson to discredit Eva Addison's account of Leslie Addison's death.

XVIII.    The trial court erred in treating a memorandum of law as an untimely amendment of the postconviction claims related to Drs. Gur and Gelbort.

XIX. The trial court erred in not finding that McFadden has been abandoned by postconviction counsel.

XX.    Counsel was ineffective for calling Douglas, whose testimony conceded McFadden's guilt.

On April 14, 2020, the Missouri Supreme Court affirmed denial of the Rule 29.15 motion. *McFadden v. State*, 619 S.W.3d 434 (Mo. Banc 2020) (*McFadden III*). Rehearing was denied and the mandate issued on June 30, 2020. On February 22, 2021, the United States Supreme Court denied cert from those proceedings. *McFadden v. Missouri*, 141 S.Ct. 1399 (2021). Laurence Komp represented McFadden in the certiorari proceedings.

The United States District Court for the Eastern District of Missouri appointed the Federal Public Defender's Office for the Western District of Missouri to represent McFadden as federal habeas-corpus counsel on August 24, 2020. ECF No. 3. The same court appointed the Federal Public Defender's Office for the Eastern District of Arkansas as additional habeas-corpus counsel on December 11, 2020. ECF No. 6.

## JURISDICTION

Under 28 U.S.C. § 2254, a district court has jurisdiction to entertain an application for a writ of habeas corpus on behalf of a person in custody under the judgment of a state court. McFadden petitions for a writ of habeas corpus to vacate his convictions and sentences because they were obtained in violation of the United States Constitution. The Court thus has subject-matter jurisdiction under § 2254.

The proper respondent to a habeas-corpus petition is a person who has custody of the petitioner. *See* 28 U.S.C. § 2243; Section 2254 R. 2(a). Paul Blair, Warden, Potosi Correctional Center, has custody of McFadden and is the proper respondent in this case.

Under 28 U.S.C. § 2241(d), a state prisoner in custody under the judgment of a state court may bring a habeas-corpus petition in "the district court for the district within which the State court was held which convicted and sentenced him." Because McFadden was convicted and sentenced within the Eastern District of Missouri, venue is proper.

## STATEMENT ON DEFENSES

In its scheduling order (ECF No. 4), the Court directed McFadden to address the following: (a) the federal constitutional provision(s) under which the claim arises; (b) whether the claim is exhausted, with specific citation to the state-court record; (c) whether the claim is procedurally defaulted; (d) whether McFadden seeks an evidentiary hearing and, if so, whether 28 U.S.C. § 2252(e)(2) permits a hearing; (e)

11

whether 28 U.S.C. § 2254(d) governs the claim; (f) whether *Teague v. Lane*, 489 U.S. 288 (1989), bars the claim; and (g) the claim's merits.

McFadden addresses (a), (d), and (g) in each individual claim below. For the remaining issues McFadden states as follows:

- **Exhaustion.** Each claim in the petition is exhausted, whether because McFadden fairly presented the claim in state-court proceedings or because there is no longer an available avenue in state court for reviewing the claim. Record citations are provided below for those claims that McFadden fairly presented to the state courts.

- **Procedural default**. Unless otherwise noted below, McFadden asserts that his claims are not procedurally defaulted.

- **AEDPA review**. The standard of review stated at 28 U.S.C. § 2254(d) governs claims that were "adjudicated on the merits in State court proceedings." For claims that were fairly presented to the state courts, McFadden states his position on applicability of this standard of review below. Otherwise the claim was not adjudicated on the merits in state court proceedings and AEDPA review does not apply.

- **Retroactivity.** None of the claims in this petition are *Teague*-barred.

## CLAIMS FOR RELIEF

For the following reasons, the Court should grant the petition for a writ of habeas corpus and vacate McFadden's convictions and/or death sentence.

**Claim 1:  Improper denial of a racially pretextual peremptory challenge exercised by the State of Missouri.**

Exclusion of a juror on the basis of their race is anathema to a fair trial. Just as they did in the first Franklin trial, Missouri did it again here. While the trial court denied three of the four peremptories, the fourth peremptory was equally for pretextual reasons. The trial court clearly erred in overruling McFadden's *Batson* objection to the State's peremptory strike of African-American juror Wanda Bryant; that action deprived McFadden and juror Bryant of equal protection and deprived McFadden of due process, a fair, impartial jury, and freedom from cruel and unusual punishment under the Sixth, Eighth and Fourteenth Amendments. *Batson v. Kentucky*, 476 U.S. 79 (1986).

The Constitution forbids striking even a single prospective juror for a discriminatory reason. As in the first Franklin trial, the prosecution attempted to remove all black jurors that had the potential to serve, exercising four peremptories against juror Sandy Robinson, juror Kevin Slaughter, juror Anderson Banks, and juror Wanda Bryant. (T. Tr. 924-25). The trial court sustained McFadden's *Batson* challenges to juror Robinson, juror Slaughter and

13

juror Banks. (T. Tr. 921-51). Thus, the prosecution acted with a purposeful discrimination in this case.

In this context, the trial court erred when it denied McFadden's *Batson* challenge as to juror Bryant. (T. Tr. 951-54). The trial court's previous ruling and the trial prosecutor's pattern of questioning revealed racially-motivated bases for all of his strikes, including juror Bryant. The prosecution's challenge to juror Bryant was racially motivated and removing her violated *Batson*.

In determining whether purposeful discrimination has occurred, a court's chief consideration should be the plausibility of the prosecutor's explanations in light of the totality of the facts and circumstances surrounding the case. *Miller-El v. Cockrell*, 537 U.S. 322, 339 (2003) (*Miller-El I*). As noted in *Miller-El v. Dretke*, "A *Batson* challenge does not call for a mere exercise in thinking up any rational basis. If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false," *Miller-El v. Dretke*, 545 U.S. 231, 252 (2005) (*Miller-El II*) (internal citations omitted).

Juror Bryant unequivocally stated that nothing would keep her from considering either sentence; she could vote for death in the proper case; could serve as foreperson and sign the verdict; and could announce it in open court. (T Tr. 484-86). Juror Bryant also stated she would never require more than proof beyond a reasonable doubt. *Id.* pp. 503, 526-27. The trial court noted her ability to

14

follow the law: "[U]ltimately, she indicated that she could follow the instruction of law, would not hold the State to a greater burden of proof. I agree she said she would lean towards life without parole, but she said she could consider the death penalty." (T. Tr. 527).

The prosecutor moved to strike Juror Bryant peremptorily because she would require more than proof beyond a reasonable doubt and would "lean toward life without parole." *Id.* p. 953. He noted her twenty-second hesitation before she stated she could vote for death and her statement that she favored life without parole. *Id.* The trial court recalled Juror Bryant's reservations, that she favored life without parole, and was hesitant about the death penalty. *Id.* p. 954. He found the reasons for the strike were race-neutral. *Id.*

As to the first reason offered by the prosecution, the trial court had made a specific finding that was not the case. (T. Tr. 527). That a reason offered by the prosecution is untrue demonstrates the pretextual nature of the reason. *Batson* does not countenance that the prosecution throw up any reason and hope one sticks. However, when that does happen as it did herein, this demonstrates the reasons offered are indeed pretextual.

The prosecution alleged juror Bryant, the first in her panel to be questioned, "hesitated" twenty seconds before affirming she could impose death. *Id.* p. 953. The trial prosecutor also only asked other black veniremembers regarding hesitation:

15

Juror Kevin Slaughter whether, in a "proper case," he could impose death, and, after juror Slaughter responded affirmatively, asked "any hesitation on that?" (T. Tr. 195).

When questioning juror Mark Kerr, also the first in his panel to be questioned, the prosecution "noticed [he] hesitated about 20 seconds" before affirming he could impose death. *Id.* p. 405.

Also, with both juror Bryant and juror Kerr, first in their groups to be questioned and thus first to formulate answers, the prosecution clocked their supposed hesitation at twenty seconds. Viewed together, the voir dire reveals a "broader pattern of practice" to exclude African-Americans through patterns of questioning. *Miller-El II*, 545 U.S. at 253; *Snyder v. Louisiana,* 552 U. S. 472, 481-84 (2008). *Miller-El II* and *Snyder* condemned a state's use of disparate lines of questioning with white and black veniremembers and that disparate questioning.

In *Miller-El II,* the "reasonable inference" from different questioning was because race was the major consideration in the way they exercised their strikes. *Id.* at 260. Just as in *Miller-El II*, the disparate questioning herein was "to prompt some expression of hesitation to consider the death penalty and thus to elicit plausibly neutral grounds for a peremptory strike of a potential juror subjected to it, if not a strike for cause." *Id.* at 255.

16

The strike of juror Bryant must also be viewed within the broader context of the St. Louis pattern and history of ensuring all-white juries make life and death decisions. That Office has "manipulate[d] the racial composition of the jury in the past." *Miller-El II*, at 254; *Miller-El I*, 537 U.S. at 346. Despite being reversed twice for *Batson* violations in proceedings against McFadden, the trial prosecutor nonetheless did it again.

*Miller-El II* requires consideration of "the totality of the relevant facts" about a prosecutor's conduct during the defendant's own trial when a peremptory strike is subjected to a *Batson* challenge. 545 U.S. at 232. The Supreme Court therefore required the trial court to consider the prosecutor's prior conduct—conduct which sustained three *Batson* objections in the most recent case and twice invalidated a court's judgement *ex ante*. Because only black venirepersons were questioned about arbitrary hesitations when posed with undeniably serious questions, McFadden's counsel easily established a *prima facie* case of discriminatory jury selection. The trial court was then obligated to determine if the State's neutral explanation was sufficient to overcome a showing of purposeful discrimination in light of "all relevant circumstances." *Id* at 232. Within this backdrop of malfeasance, the trial court clearly erred by allowing the prosecutor's pretextual, arbitrary, and racially-motivated lines of questioning to justify a peremptory strike. In doing so, the court allowed the

17

prosecution to again deny McFadden that which the Constitution has secured for him in the Sixth Amendment right to an impartial jury.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 67–72. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 739–740. The merits determination is contrary to and/or an unreasonable application of the facts and law. McFadden may seek an evidentiary hearing on this claim. Discovery, in the form of the prosecutor's voir dire notes, would enable this Court to fully and fairly consider this claim.

**Claim 2:  The prosecutor withheld evidence in violation of *Brady v. Maryland*.**

The prosecution violated *Brady* by not disclosing details of Gregory Hazlett's violent criminal charges, including forcible rape and sodomy, and subsequent dismissals to McFadden's post-conviction counsel. *Brady v. Maryland*, 373 U.S. 83 (1963). For a prosecutor's suppression of evidence to violate *Brady*, the evidence must (1) be favorable to the defendant, either as exculpatory evidence against guilt or impeachment evidence against a witness, (2) have been suppressed intentionally or inadvertently by the state, and (3) have caused the defendant prejudice due to its suppression. *Brady*, 373 U.S. at 87-88. In this case, the state suppressed evidence regarding the repeated dismissal of Hazlett's violent charges, including two rapes, which could have potentially been used to impeach Hazlett as a witness. Considering that Hazlett was the state's key witness, the suppression of this evidence prejudiced McFadden.

The state primarily relied on the testimonies of Hazlett and Silas to prove McFadden's guilt. During his trial testimony, Hazlett claimed to have watched Douglas and McFadden shoot Mr. Franklin in front of Hazlett's house. (T. Tr. 1193). Hazlett testified that when he talked to detectives the night of Mr. Franklin's murder, he told them he would not immediately reveal who he saw shoot Mr. Franklin, as he did not want to be identified as a "snitch." *Id.* pp. 1203-1204.

Hazlett admitted during this testimony that the prosecution refused to charge him with driving while intoxicated and possession of a weapon while intoxicated as a

19

favor for his testimony. (T. Tr. 1229). Hazlett also admitted that he was arrested on July 22, 2002 and June 17, 2004, but that all charges were dismissed. *Id.* p. 1230. Hazlett's record demonstrates that the July 22, 2002 charges were for forcible rape, forcible sodomy, and two counts of armed criminal action. (Attachment A). The June 17, 2004 charge was for unlawful use of a weapon. (Attachment B). Hazlett's unlawful use of a weapon charge could have carried up to five years in prison, while his forcible rape and sodomy charges could have carried up to a life sentence in prison. (T. Tr. 1231-32).

While Hazlett testified that the dismissal of 2002 and 2004 charges had nothing to do with his cooperation in the McFadden case, the prosecution never disclosed the consideration provided to Hazlett. Not only did the charges disappear, Hazlett never had to register as a sex offender. Whatever the consideration was, the prosecution never informed McFadden's trial counsel why Hazlett's rape, sodomy, and unlawful use of a weapon charges were dismissed.

Hazlett has had additional charges dismissed since 2004, including peace disturbance in 2007; unlawful use of a weapon twice in 2010; and two counts of forcible rape, two counts of forcible sodomy, display of a deadly weapon, two counts of attempted forcible sodomy, two counts of kidnapping, and armed criminal action in 2012. (Attachment C). The details of these dismissals were not released to McFadden's post-conviction team.

20

The prosecution's duty to disclose exculpatory and impeachment evidence does not end at the commencement of trial, but rather is an ongoing obligation throughout the post-conviction process. *See Pennsylvania v. Ritchie*, 480 U.S. 39, 60 (1987) ("the duty to disclose is ongoing"); *Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) ("[A]fter a conviction the prosecutor. . . is bound by the ethics of his office to inform the appropriate authority of after- acquired or other information that casts doubt upon the correctness of the conviction.") (citing ABA Code of Professional Responsibility § EC 7-13 (1969)); ABA Standards for Criminal Justice, Prosecution and Defense Function § 3.11 (1971); *see also Brady*, 373 U.S. at 87; *Giglio v. United States*, 405 U.S. 150, 153-56 (1972); *United States v. Bagley*, 473 U.S. 667, 676 (1985); *Banks v. Dretke*, 540 U.S. 668 (2004); *Jimerson v. Payne*, 2020 WL 2050657 (8th Cir. 2020).

Missouri had a duty to disclose to McFadden's post-conviction counsel any potential exculpatory or impeachment evidence regarding Hazlett. The pattern of dismissing charges levied against Hazlett casts doubt on the reliability of his testimony; if at trial Hazlett had any reason to believe that his present and future liberty was somehow contingent on the incriminating value of his recollections, his version of events could have and should have been challenged on these grounds.

The St. Louis County prosecutor's office also failed to disclose any information related to Douglas, their key witness. Douglas received a substantially reduced sentence and as a result is currently out of prison. Douglas had a pending charge on his adult record of forcible rape that occurred on November 13, 2003 seen in his

Family Court Certification Investigation report. (Attachment D). Knowledge of Douglas' involvement in a rape would have been crucial to McFadden's defense. This information would have made effective counsel investigate Douglas further. This investigation would have helped determine if they should have made their ill-fated decision to put Douglas on the stand at trial. *See* Claim 3.

Prosecution also suppressed witness information that tended to be exculpatory. Police reports identified Vaughn Shivers as a witness to two adult men running near the crime scene the day of the crime. Shivers heard a sound similar to firecrackers. He was behind Pine Lawn Elementary school when he saw two men. These two men saw Shivers then ran in opposite directions. Shivers proceeded into his car and drove around the corner onto Lexington. This is where he witnessed Mr. Franklin dead and called the police.

Shivers recalls speaking to someone from law enforcement months later. Provided a line up, Mr. Shivers was unable to identify the two individuals he saw in a lineup. Mr. Shivers told the law enforcement officers that too much time had passed and he could not recall what the two men looked like.

Detective Edwin Menzenwerth testified at his deposition that Shivers did not speak to anyone at St. Louis County Police Department about being a witness. (Attachment JJ). In the St. Louis County prosecutors file, there is a notation with Shiver's email and telephone number. This is corroborated by Edward Magee's interview report dated March 2, 2004. (Attachment E). Neither this report nor the

22

line-up was provided to trial counsel during the first or second trial of the Franklin case.

The above suppressed evidence was favorable to McFadden. However, the State failed to turn it over to defense counsel in violation of *Brady*, 373 U.S. at 87. If impeachment evidence or affirmative evidence that McFadden did not commit the offense existed, there is a reasonable probability that the result of the proceeding would have been different. Further, the State was under an obligation to turn over exculpatory evidence related to sentencing. If the State suppressed evidence material to the penalty phase, there is a reasonable probability that the result of the sentencing proceeding would have been different.

Alternatively, if any of the above evidence was available to defense counsel if they had exercised reasonable effort, then McFadden's trial counsel were ineffective in failing to exercise that effort. Trial counsel's failure to obtain this evidence constituted deficient representation and there is a reasonable probability that the result of the guilt and/or sentencing proceeding would have been different

*****

This claim is procedurally defaulted consequent to the State's failure to turn over constitutionally required materials. McFadden requests an evidentiary hearing to determine whether he can establish cause and prejudice to forgive the default. *See Strickler v. Greene*, 527 U.S. 263 (1999). Section 2254(e)(2) permits a hearing. *See Barrientes v. Johnson*, 221 F.3d 741 (5th Cir. 2000).

Alternatively, the alternative claim that trial counsel were ineffective is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez v. Ryan*, 566 U.S. 1 (2012). Section 2254(e)(2) permits a hearing. *See Sasser v. Hobbs*, 735 F.3d 833, 853–54 (8th Cir. 2013); *Harris v. Wallace*, 984 F.3d 641 (8th Cir. 2021). 2254(d) has no application to this claim.

**Claim 3:**    **McFadden was denied the effective assistance of counsel when his lawyers called his co-defendant, Michael Douglas, to testify.**

McFadden was denied the effective assistance of trial counsel when his counsel called Douglas to the stand. Trial counsel knew, or should have known, that Douglas would not deviate from his earlier sworn testimony that implicated McFadden in Mr. Franklin's death. Indeed, consistent with his plea of guilty, Douglas testified that he and McFadden shot Mr. Franklin. McFadden was denied the effective assistance of counsel under the Sixth Amendment in calling Douglas and presenting his damaging testimony to the jury. McFadden's trial counsel's performance also denied him a fair trial under the Eighth and Fourteenth Amendments.

The jury already heard testimony from Silas that McFadden did not shoot Mr. Franklin. This testimony provided McFadden with a defense that he did not shoot Mr. Franklin. At the same time, trial counsel knew Douglas would not change his earlier testimony from Douglas's plea hearing. Douglas' counsel specifically told McFadden's trial counsel that Douglas would not alter his earlier under oath testimony that McFadden was the shooter. Knowing that Douglas would not change his earlier testimony, trial counsel performed deficiently in calling Douglas and presenting affirmative evidence of McFadden's guilt.

The state has argued that the decision to put Douglas on the witness stand was a reasonable strategy, and that Douglas was called to show that Kyle Dismukes was the actual shooter, not McFadden. Even if this is true, the decision was still

25

unreasonable given that they also knew that Douglas would not testify to such and the previous inconsistent statement could not be considered substantive evidence. Further, McFadden and his counsel did not need to prove to the jury who the actual shooter was; they merely needed to show that McFadden was not the shooter.

Trial counsel was aware of how damaging Douglas' testimony would be and incredibly presented it anyway. In 2005, Kim Freter represented Douglas on the charge for Mr. Franklin's murder. Douglas entered a guilty plea to having acted in concert with McFadden to kill Mr. Franklin. (29.15 Tr. 245).

Ms. Freter represented Douglas when he was called to testify at McFadden's retrial for the Franklin murder. *Id.* p. 247. Ms. Freter told McFadden's attorneys that Douglas would never testify inconsistently with his plea agreement - that he and McFadden shot Mr. Franklin. *Id.* pp. 250-53.

Mark Silas testified at trial that he was walking with Mr. Franklin in front of Franklin's house on July 3, 2002. (T. Tr. 1042, 1044-45). He recalled running away after somebody pulled out a gun. *Id.* pp. 1043-44.

Officer Stone took a recorded statement from Silas on July 3, 2002. (T. Tr. 1414-16). Provided a transcript to follow along (T. Ex. 78C; T. Tr. 1101-03), the state played for the jury Silas' recorded statement. (Tr. Ex. 78A). Silas reported a tall, slim, light-complexioned African-American male shot Mr. Franklin, followed by McFadden shooting Mr. Franklin. (T. Ex. 78A, 78C).

26

Silas testified to the jury that he fabricated everything in his recorded statement so that the police would allow him to leave. (T. Tr. 1109, 1118). Silas testified that he did not know why he said McFadden shot Mr. Franklin. *Id.* p. 1119. The jury was aware that the state's key evidence showing McFadden had been the shooter was disproven.

Reasonable counsel would have known following Silas's admissions that they did not need to show who the shooter was, but rather that the shooter was not McFadden. Silas was the State's own witness. Silas's testimony established that McFadden was not the shooter. Douglas' anticipated testimony rebutted it. Thus, reasonable counsel would not have called Douglas.

Not only did McFadden's trial lawyers act unreasonably under the prevailing professional norms, but their actions prejudiced McFadden by placing Douglas on the witness stand. The testimony was affirmatively prejudicial to McFadden.

On direct examination, Douglas testified that on the day Mr. Franklin was shot, he was with McFadden and his brother, Kyle Dismukes. (T. Tr. 1624-27). Franklin was with two other people, and one of them shot at Douglas in front of Greg Hazlett's house. *Id.* pp. 1626-29. After the shooter got away, Douglas shot Mr. Franklin in the head. *Id.* pp. 1627, 1629-30. Douglas claimed that he shot Mr. Franklin three to four times before passing the gun to McFadden, who shot Franklin again. *Id.* pp. 1630-31).

27

Douglas testified that Kraft and Turlington, McFadden's counsel, both talked to him on February 7, 2007 at the jail about his involvement. (T. Tr. 1623). When Douglas talked to McFadden's counsel, he told them that McFadden was present when Mr. Franklin was shot, but did not shoot Mr. Franklin. *Id.* pp. 1631-32, 1637. Douglas told counsel that the second shooter was Douglas' brother, Dismukes. *Id.* pp. 1631-32. Douglas also wrote a letter to Kraft on the same day they met, admitting that he killed Mr. Franklin with Dismukes while McFadden was present, but that McFadden had nothing to do with Mr. Franklin's death. *Id.* pp. 1632-33, 1637.

On April 19, 2007, McFadden's counsel, the prosecutor, and a court reporter were present for a phone deposition conducted with Douglas. (T. Tr. 1633-35, 1637-38). During that phone conversation, Douglas admitted that Dismukes was the second shooter. *Id.* pp. 1634-35. Douglas again stated that McFadden was present, but did not shoot Mr. Franklin. *Id.* Later, when Douglas' deposition was taken, he declined to swear to tell the truth because he was afraid to say anything different from his guilty plea. *Id.* pp. 1638-39.

Douglas told the jury that he had pled guilty to killing Mr. Franklin and swore to tell the truth at the plea. (T. Tr. 1638). Douglas stated that he did not want to be charged with perjury and get up to a life sentence. *Id.* pp. 1639-40. When Douglas testified that he could get up to a life sentence, the prosecution objected that life was not possible because perjury was a Class C felony with a maximum of seven years. (T. Tr. 1639). Douglas did not get the maximum sentence on his guilty plea. *Id.* p. 1640.

28

On cross-examination, Douglas testified that Dismukes did not shoot anyone. He further stated that the letter he had sent McFadden's counsel was untrue. (T. Tr. 1648-51). Douglas testified that he was the first to shoot Mr. Franklin, followed by McFadden. *Id.* p. 1673. Douglas testified that Dismukes did not shoot Mr. Franklin. *Id.* pp. 1648, 1651, 1673. The prosecution cross-examined Douglas about the letter and read from it to the jury. *Id.* pp. 1650-71.

On re-direct examination, Douglas testified that all his statements, including his letters, were lies. He testified that all statements he made that McFadden did not shoot Mr. Franklin were lies. (T. Tr. 1674).

On a second redirect examination, Douglas testified that when he pled guilty, he was under oath and testified truthfully. *Id.* p. 1680. Douglas said that he was also testifying truthfully when he stated he shot Mr. Franklin first, followed by McFadden shooting Mr. Franklin second. *Id.* This damaging testimony sunk an already presented, viable defense. There was no reason to present this testimony.

The Missouri Supreme Court held that trial counsel's performance was reasonable because Douglas' harmful statements could be impeached by his prior statements. However, the state did not call Douglas as a witness; Douglas was a *defense witness*, making impeachment difficult if not impossible. Furthermore, Douglas's testimony was under oath, while his prior statements were not under oath. Moreover, even if Douglas' prior statements were under oath, impeachment evidence can only impeach – it is not substantive evidence.

29

The Missouri Supreme Court also unreasonably found that Douglas's testimony was the only way to demonstrate that Douglas's brother might have been the second shooter. However, McFadden does not need to prove who committed the crime, but rather that he did not commit the crime. Silas's testimony already served this purpose. Thus, the court's decision was an unreasonable application of the law to the facts.

The Missouri Supreme Court also unreasonably held that Douglas's testimony that he did not receive the maximum sentence served as mitigation evidence for McFadden's sentencing. However, Douglas was not testifying in the penalty phase of this trial. The jury had yet to decide McFadden's guilt. To show a sentencing disparity might be reasonable if Douglas was called to testify at sentencing. But considering Douglas' damaging testimony was presented during the guilt stage of trial, the decision of the Missouri Supreme Court was unreasonable.

*****

Mr. McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 44–53. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 619 S.W.3d at 445-46. The Missouri Supreme Court's merits determination is contrary to and/or an unreasonable application of the law based on the facts presented. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim. This

30

Court should grant habeas corpus relief on both the guilt and sentencing stage of

McFadden's trial.

**Claim 4:      Trial counsel admitted McFadden's guilt to the jury.**

McFadden's trial counsel effectively admitted McFadden's guilt when they called Michael Douglas to testify. *See* Claim 3 (incorporated by reference as if fully set out herein). The Sixth Amendment guarantees McFadden the right to choose the objective of his defense and present a claim of innocence, even when the defense counsel may believe confessing guilt offers the best chance of avoiding a death sentence. Calling Douglas was tantamount to trial counsel conceding McFadden's guilt in violation of the Sixth, Eighth, and Fourteenth Amendments. *McCoy v. Louisiana*, 138 S.Ct. 1500 (2018).

Michael Douglas pled guilty to murder second, for which he was sentenced to twenty (20) years in prison prior to testifying in McFadden's trial. Douglas's attorney, Kim Freter, represented Douglas on his 2005 guilty plea to having acted in concert with McFadden to kill Franklin and she explicitly told McFadden's attorneys that Douglass would never testify inconsistent to his plea agreement statement that he and McFadden shot Franklin. (29.15 Tr. 245; 250-53). Rather than accept that Douglas would indicate McFadden's guilt and not call him, counsel intended to call Douglas as a witness but use his prior, unsworn, out-of-court statements as "valid impeachment" if Douglas testified other than that he and Dismukes shot Franklin. (T. Tr. 1579).

It also appeared counsel intended to use the fact of Douglas' plea agreement to murder and the lesser sentence he received as evidence in support to impeach Douglas' credibility by showing bias. Before McFadden's counsel called Douglas as a

32

witness, Larner made an oral motion in limine to exclude evidence of the crime Douglas plead to and the term of imprisonment he received in exchange for his plea, stating there was "[n]o favorable treatment" given to Douglas in exchange for his testimony. *Id.* pp. 1578-79. Turlington asserted in response that Douglas "made prior statements to myself and Ms. Kraft and a recorded statement over the phone with Ms. Kraft, myself and Mr. Larner, in which he stated that the only reason he pled guilty and implicated Mr. McFadden was because he wanted to get the 20 years." *Id.* p. 1579. The Court permitted Turlington to question Douglas whether he understood what perjury is and what the term of prison is for perjury, but sustained the State's motion in limine with regard to asking Douglas what he pled to and the term of imprisonment he received. (T. Tr. 1583).

The colloquy between the parties and the Court regarding the State's motion in limine provide absolute certainty that counsel knew they were expressly prohibited from asking questions dealing with what Douglas pled to and the sentence he received. Accordingly, counsel knew they had little if any impeachment material if Douglas testified in alignment with his plea, contrary to McFadden's interest in maintaining his innocence.

The arguments made by defense counsel in this colloquy demonstrate counsels' awareness that Douglas would not testify contrary to his plea statement. Despite knowledge of the absolute certainty of negative testimony from Douglas and that

33

counsel's impeachment strategy was dead in the water, McFadden's counsel still put Douglas on the stand. (T. Tr. 1624).

While on the stand, Douglas testified to shooting Franklin "three or four times" and then passing the gun to McFadden so McFadden could shoot Franklin, after which Douglas "kept running." *Id.* pp. 1630-31; 1648. He testified that "[a]s far as [Douglas knew McFadden] did" shoot Franklin. *Id.* p. 163. Douglas confirmed testifying under oath when he plead guilty that he committed the crime with McFadden and that both he and McFadden shot Franklin. *Id.* p. 1647. Douglas specifically testified that Dismukes did not shoot anyone and that he lied in the February 7, 2007 letter. (T. Tr. 1648-49; 1657, 1663). Douglas essentially stated that the only part of the letter that was true was that he—Douglas—was there at the time of the shooting; regarding everything else in the letter, he stated "a lot of it is just a lie." (T. Tr. 1663-64). He then agreed that he was telling the truth on the stand that McFadden was the second shooter, that Kyle did not shoot Franklin and that he had not been promised anything by the State in exchange for his testimony. *Id.* p. 1673.

When the defendant maintains his innocence, counsel is prohibited from conceding guilt in a capital case is hopes that said concession will avoid the death penalty. *McCoy v. Louisiana*, 138 S. Ct. 1500 (2018). The defendant's autonomy includes the right to maintain his innocence and counsel cannot override that decision by conceding guilt. *McCoy*, 138 S.Ct. at 1509. The *McCoy* Court recognized "a defendant has the right to insist that counsel refrain from admitting guilt, even when

34

counsel's experienced-based view is that confessing guilt offers the defendant the best chance to avoid the death penalty." *McCoy*, 138 S. Ct. at 1505.

Because conceding guilt against a defendant's stated wishes to maintain his innocence is contrary to the defendant's autonomy over his case, *Strickland* prejudice is not required to be shown. *McCoy*, 138 S.Ct. at 1510-11. Violation of a defendant's Sixth Amendment-secured autonomy right is the kind of structural error not subject to harmless-error review, but requiring a new trial. *McCoy*, 138 S.Ct. at 1511.

Douglas' counsel told McFadden's counsel that Douglas would never testify contrary to his guilty plea that he and McFadden shot Franklin. (29.15 Tr. 250-53). Therefore, counsel knew Douglas would testify in accordance with his plea agreement statement that McFadden shoot Franklin. Additionally, counsel knew they could not impeach Douglas regarding what crime he plead guilty to and what term of imprisonment he received. Counsel called Douglas to testify contrary to the defense McFadden wanted, which was the defense that he did not shoot Franklin. *Id.* pp. 58, 113-14. *See McCoy*, 138 S.Ct. at 1508 (Decisions on whether to assert a defense of innocence are "not strategic choices about how best to achieve a client's objectives; they are choices about what the client's objectives in fact are.") (internal citations omitted).

In light of McFadden's chosen innocence defense, counsel should not have called Douglas knowing that his testimony would implicate McFadden in the killing, and thereby, concede McFadden's guilt. Under these facts, it was patently

35

unreasonable to call Douglas to testify, and McFadden was denied effective assistance of counsel during trial when counsel called a witness counsel knew would testify contrary to McFadden's interests.

Calling Douglas to testify under the circumstances constituted structural error requiring a new trial. This decision was not strategic; it was an impermissible override of McFadden's right to plead a defense of innocence. McFadden was denied his rights to due process and effective counsel under the Sixth Amendment. He was denied a fair trial under the Eighth and Fourteenth Amendments. This Court should grant habeas corpus relief and require a new trial on both the guilt and sentencing stage of McFadden's trial.

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Post-Conviction Appeal Brief at 51. This issue should be reviewed *de novo* because although this claim was presented to the state court, the court refused to consider the issue because it had not been raised in the initial state post-conviction proceedings. *McFadden III*, 619 S.W.3d at 446.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d) has no application to this

36

claim. This Court should grant habeas corpus relief and remand this matter to the state court for a new trial.

**Claim 5:       Counsel was ineffective at sentencing.**

For the reasons stated in the following sub-claims, McFadden's counsel performed deficiently at his sentencing trial and in a manner that prejudiced him, thus depriving him of the right to effective counsel guaranteed by the Sixth Amendment.

**Issue 5-1:       Counsel was ineffective for failing to present a PET scan.**

McFadden alleged trial counsel ineffectiveness for failing to call Dr. Preston, or a similarly qualified expert, in penalty mitigation to present PET scan evidence demonstrating McFadden's brain deficits. (29.15 L.F. Doc. 131 pp. 93-101). McFadden alleged the PET evidence would have provided concrete support for Dr. Draper's and Dr. Gelbort's testimony such that the testimony of all three experts considered collectively would have resulted in a life sentence. *Id.* p. 97-99.

On December 27, 2017, 29.15 counsel moved to endorse Dr. Gur. (29.15 L.F. Doc. 152 pp. 1-3) (29.15 L.F. Doc. 145 pp. 1-2). While Dr. Preston would have been available to review PET scans and to testify during the Franklin retrial, he was now 82 years old and retired, so he was no longer doing PET scan interpretations. (29.15 L.F. Doc. 152 pp. 1-2). The motion court granted the motion to endorse Dr. Gur. (29.15 L.F. 175 p. 1); (29.15 L.F. Doc. 100 p. 18).

At the postconviction hearing, Dr. Gur, a licensed neuropsychologist, analyzed McFadden's 2015 PET scan. (29.15 Tr. 370-72, 424). McFadden's PET was abnormal in the brain cortex, which is responsible for information-processing and decision-

38

making. *Id.* pp. 379-80, 385-86. McFadden's PET results are consistent with those of someone with a history of head trauma. (29.15 Tr. 390, 410).

Dr. Gur noted that the PET scan revealed abnormalities in McFadden's cortex, the part of the brain designed to "process the information and decide on the course of action," including information related to emotional interpretation. *Id.* p. 380. The parietal and auditory cortices send these signals to the frontal lobe, the "chief executive of the brain, " which then uses the information from the cortex to contextualize an individual's "needs, motivations, [and] long-term plans" *Id.* pp. 380-81.

Dr. Gur additionally noted that McFadden's PET scan revealed abnormalities in his frontal lobe, specifically the amygdala and hippocampus – the parts of the brain "connected to information coming from the body, as well as from other senses…" (29.15 Tr. 383). Dr. Gur described McFadden's hippocampus and amygdala as "hypoactive," meaning they operate at more than two standard deviations below the normal level of activity. *Id.* p. 382. When information is new and dangerous, the hippocampus and amygdala communicate before the amygdala sounds a fight or flight alarm. *Id.* p. 385 However, considering that McFadden's amygdala is operating at a lower level of activity, Dr. Gur stated that McFadden's amygdala is more easily activated when challenged or threatened, resulting in often impulsive responses. *Id.* p. 385-86.

Dr. Gur described the frontal lobe as the part of the brain that understands "the whole big picture" of an individual's motivations and regulates the signals from the amygdala and hippocampus. (29.15 Tr. 384-85). Dr. Gur noted that for McFadden specifically, his amygdala over-activates to such an extent that the "thinking part" of his brain shuts down; as a result, McFadden is less able to regulate his own impulses. *Id.* pp. 385-86.

Dr. Gur noted that McFadden's PET scan was similar to that of an individual with Kluver-Bucy syndrome, a condition often present in war veterans. *Id.* pp. 388-89. Individuals with Kluver-Bucy syndrome have damage in both the frontal lobe and amygdala; as a result, sometimes nearly anything can trigger a "rage response" in these individuals. *Id.*

Counsel testified to obtaining a brain MRI that was normal. (29.15 Tr. 105-06, 499). The MRI results were sent to Dr. Preston. (*Id.* pp. 106-07, 499-500; 29.15 Ex. 33). Dr. Preston's November 11, 2004 letter to counsel indicated a person can have a normal MRI, but have an abnormal PET. (29.15 Ex. 33). Dr. Preston recommended obtaining a PET scan. (29.15 Tr. 107-08). Counsel decided not to get a PET done because they had an MRI with normal finding results and obtaining a normal PET would have undermined Dr. Gelbort's opinions. (29.15 Tr. 108-09, 572-73).

Counsel are obligated to discover and present all substantial, available mitigating evidence. *Wiggins v. Smith*, 539 U.S.510, 524-25 (2003); *Williams v. Taylor*, 529 U.S. 362, 395-96 (2000); *see also Strickland*, 466 US at 690-691 ("[S]trategic choices

40

made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.'").

Reasonable counsel who were advised by Dr. Preston to obtain a PET would have done so. *See Strickland; Wiggins*. Counsels' stated reasons for not doing a PET was fear that it would come back normal, and thereby, undermine Dr. Gelbort's findings of McFadden's brain dysfunction. (29.15 Tr. 108-09, 572-73). But counsel also testified they had decided not to call Dr. Gelbort because of problems they had with his delivery of his prior testimony. (29.15 Tr. 73-76, 180-83, 479-81, 566). *See* Claim 5-2. Thus, the failure to get a PET scan because of concerns that a normal PET would undermine Dr. Gelbort's findings was unreasonable because counsel had decided not to call Dr. Gelbort.

Likewise, Dr. Gur and Dr. Gelbort could not be cumulative because Dr. Gelbort did not testify. Because trial counsels' reasons for not obtaining a PET scan were unfounded, their failure to investigate McFadden's brain dysfunction upon receiving a reasonable recommendation to obtain such a scan cannot be justified as trial strategy. Rather, it was a breach of counsels' obligation to present all available mitigation evidence. Counsel then compounded this error by failing to offer any expert evidence regarding McFadden's brain dysfunction in lieu of the forgone PET scan. *See* Claim 5–2.

Accordingly, McFadden was rendered ineffective assistance of counsel when counsel failed to call Dr. Gur, or a similarly qualified expert, in penalty mitigation to

41

present PET scan brain evidence showing McFadden's brain's functional limitations. This prejudiced McFadden because the jury did not hear he has brain dysfunction impacting impulse control and judgment consistent with head injuries, information which would have increased the likelihood the jury would have sentenced him to life. (29.15 Tr. 379-80, 385-86). *See Strickland.* Moreover, McFadden was prejudiced because the PET findings reinforced Dr. Gelbort's findings. *Id.* pp. 391-92. *See* Claim 5–2.

Trial counsel were ineffective in failing to secure and present tangible evidence of McFadden's damaged brain. If this available evidence had been presented, there is a reasonable probability of a different result. This court should grant habeas corpus relief and grant a new penalty phase.

\*\*\*\*

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 107–110. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *See McFadden III*, 619 S.W.3d at 453-54. This decision was contrary to and/or an unreasonable determination of the law and facts in light of the evidence presented. 28 U.S.C.A. § 2254 (d)(1)(2).The Missouri Supreme Court clearly erred in affirming the lower court in finding counsel was not ineffective for failing to call Dr. Gur, or a similarly qualified expert, in penalty mitigation to present PET scan brain evidence showing McFadden's brain's functional limitations—evidence which, if presented as

42

penalty phase mitigation to support life, would have been reasonably likely to compel a juror to render a life vote.

**Claim 5-2:        Counsel was ineffective for failing to call Dr. Gelbort.**

Dr. Gelbort testified at the post-conviction hearing as a clinical neuropsychologist. (29.15 Tr. 591). He found deficits as to McFadden's abstract reasoning, problem solving abilities, verbal abstract reasoning and comprehension, decision-making, impulse control, and academic skills needed to function as an adult. *Id.* pp. 606-07, 617-20, 638. These deficits are specific to McFadden's frontal lobe executive functioning and thereby effectuate abnormal, impaired brain functioning. *Id.* pp. 606-08. Individuals with McFadden's deficits have an increased tendency to misunderstand and difficulty with planning and functioning. *Id.* pp. 621-22.

At the post-conviction hearing, trial counsel averred that Dr. Gelbort was not called because they felt his testimony was not persuasive and he did poorly on cross-examination. (29.15 Tr. 73-76, 180-83, 479-81, 566). However, both trial counsel felt that Dr. Gelbort's opinion in McFadden's prior trials had been "beneficial" mitigation testimony. *Id.* pp. 74-75, 480. In addition to the mitigation, no consideration was given to calling Dr. Gelbort to support a pretrial motion to prohibit Respondent from seeking death (*Id.* pp. 77-78, 481) or to support a jury instruction requiring the jury find that McFadden had the intellectual maturity of someone over eighteen before recommending death. *Id.* pp. 78-79, 481-83.

Counsel are obligated to discover and present all substantial, available mitigating evidence. *Wiggins*, 539 U.S. at 524-25; *Williams*, 529 U.S. at 395-96. Evidence of impaired mental capacity is mitigating. *Wiggins*, 539 U.S. at 535.

In *Roper v. Simmons*, 543 U.S. 551, 569, 574 (2005), the Court recognized the Eighth Amendment prohibits executing juveniles for acts committed when they were less than eighteen. Because of the diminished culpability of juveniles, "the penological justifications for the death penalty apply to them with lesser force than to adults." *Id.* at 571. Dr. Gelbort's testimony—or another similarly qualified expert—would have supported the jury finding McFadden's mental age was not 18 or older such that imposing the death penalty would have been presumptively unjustified under current Eighth Amendment jurisprudence. *See Simmons.*

There is no question Dr. Gelbort was available to present a meaningful mitigation theory: brain damage. Additionally, Dr. Gelbort's testimony would have benefited McFadden's defense either to support a pretrial motion to preclude death or as mitigating evidence coupled with an instruction requiring the jury find McFadden was mentally over 18 before imposing death. Further, there was no assertion from counsel that no other neuropsychologist had been searched for and could not be found.

While defense counsel felt Dr. Gelbort came short previously, they recognized a benefit to Dr. Gelbort's abnormally functioning brain findings—evidence tending to support that McFadden had mental deficits—neither testified to attempting to

44

rehabilitate Dr. Gelbort's testimony or seeking another expert who could better articulate the helpful neuropsychological findings. Thus, counsel forfeited the presentation of objective evidence of deficits and abnormal functioning in McFadden's brain gained from Dr. Gelbort's neuropsychological testing. A decision to forego mitigation evidence of mental deficits because a particular expert fell flat (when that jury was chosen in a racially discriminatory manner), is an objectively unreasonable action by trial counsel.

McFadden was prejudiced because the mitigation would have made a difference and led to a lesser sentence. Additionally, either a pretrial motion based on Dr. Gelbort's findings or the jury hearing Dr. Gelbort's mitigating findings coupled with an instruction requiring the jury find McFadden was mentally 18 or older before imposing death would have been reasonably likely to result in a life sentence. *See Strickland.* McFadden was denied his rights to due process, freedom from cruel and unusual punishment, and effective assistance of counsel under Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. This court should grant habeas corpus relief and grant a new penalty phase.

****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 111–14. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *See McFadden III*, 619 S.W.3d at 452-53. This decision was contrary to and/or an

45

unreasonable determination of the law and facts in light of the evidence presented. 28 U.S.C.A. § 2254 (d)(1)(2). The Missouri Supreme Court clearly erred in affirming the lower court's finding that counsel was not ineffective for failing to call Dr. Gelbort, or a similarly qualified expert, to testify about McFadden's brain limitations pretrial to bar the death penalty and/or in penalty phase as mitigation to support a life sentence coupled with an instruction requiring the jury find McFadden was mentally 18 or older before imposing death.

**Claim 5-3:    Counsel was ineffective for failing to present a trauma expert.**

At trial, the jury learned nothing about McFadden's traumatic upbringing and development of PTSD. Professionally reasonable counsel would have presented the testimony of an expert like Dr. Frederic Sautter, who could explain how years of living in a "war zone" neighborhood affected McFadden's behavior. Without this information, the jury was unable to fully comprehend the circumstances surrounding McFadden's actions and mental state. Understanding McFadden's history of neglect and development of a mental health disorder is necessary in order to fully contextualize McFadden as a human being.

Dr. Sautter conducted a preliminary review and assessment based on records. (Attachment F). Dr. Sautter, or a similarly qualified expert, would have been able to contextualize Dr. Draper's conclusion regarding McFadden "never bond[ing] with a parent," *Id.* p. 1., within the greater traumatic landscape of Pine Lawn. Dr. Sautter could have particularly focused jurors on McFadden's preoccupation with survival,

46

given that Pine Lawn has "one of the highest homicide rates in the country." *Id.* Dr. Sautter could have discussed the significance of the "adversity throughout his childhood and adolescence. . ." and how it ". . .points to the chronic exposure to traumatic stressors." *Id.* p. 2. This testimony would have explained why McFadden was focused first and foremost on surviving, even at the expense of other needs jurors might take for granted, and consider McFadden's mitigation evidence.

For instance, an expert such as Dr. Sautter could have illuminated how "frontal lobe and limbic system shortcomings may have impaired McFadden's ability to control strong emotions that limit his ability to adapt to an environment that is compromised by crime, violence and homicide." (Attachment F). "During Mr. McFadden's first twelve years of life, he was exposed to familial and environmental adversities and an often life-threatening and violent community environment that contributed to the development of brain abnormalities and reinforced trauma-related behavioral dysfunction that created the psychological problems." *Id.* Dr. Sautter could have shared research findings that "poverty and stress increase the chances of premature birth…or low birthweight…" and how "[t]his adversity affected the early development of Mr. McFadden's brain..." *Id.* p. 4. The lack of stability, poverty, nurturance, and bonding affected McFadden's future behavioral health. *Id.*

McFadden "fell down several stairs and sustained a head injury that required treatment at the emergency room" when he was two years old. (Attachment F p. 4). Neighbors "complained Mr. McFadden had been left unattended; when relatives

47

investigated, they found Mr. McFadden and his siblings were left unattended in his home with doors to the outside left unlocked and, in some cases, wide open." *Id.* "Mr. McFadden was introduced to stress and emotional deprivation [at] a young age." *Id.* McFadden was left very few opportunities to develop coping skills or a positive self-image that would model love and self-love. *Id.* "No one was available to teach him problem solving or teach him how to develop healthy relationships, interpersonal boundaries or social skills." *Id.* McFadden began drinking alcohol at age twelve due to a lack of support and positive mentoring. McFadden began to "experienc[e] mood swings and was becoming angry and defiant when asked to control his emotions. No one taught him to tolerate negative emotions and nurture positive emotions." *Id.* pp. 4-5.

Dr. Sautter in particular, as a specialist in mental health care for military veterans with PTSD, could have discussed the similarities between "violent deteriorating neighborhoods" such as Pine Lawn and "war zones in Iraq." (Attachment F p. 5). Many trauma survivors in warlike situations lack the coping skills to persevere through the experienced violence, and cope by engaging in further violence and self-destruction. *Id.* Dr. Sautter could have explained how McFadden "tried to survive his emotional pain by using drugs and his PTSD and addiction gained power while the lack of access to mental health treatment left [him] desperate for survival…" *Id.* p. 5. McFadden suffered a gunshot wound in 2001 due to an altercation. In the same year, three of his friends died from gun violence. Dr. Sautter,

48

or a similar expert, could have discussed how McFadden was "unable to regulate his own emotions during a time of intense grief [the deaths of three of his friends]," leading him to " [act] out against authorities and by [becoming] self-destructive." *Id.* In 2002, McFadden lost more friends from gun violence in the Pine Lawn community. In the same year, McFadden's "partner was pregnant and due to give birth to twins. He hoped it would be an opportunity for change but one of the twins died during birth," adding to the death toll. *Id.* Dr. Sautter noted St. Louis was plagued with gun violence and hundreds of children died as a result of it.

Numerous psychological studies have found a link between PTSD and criminal activity. *See generally* Laura E. Gibson et al., *An Examination of Antecedent Traumas and Psychiatric Comorbidity Among Male Inmates with PTSD*, 12 J. TRAUMATIC STRESS 473 (1999); Tina Maschi, Carolyn A. Bradley, & Keith Mogren, *Unraveling the Link Between Trauma and Delinquency*, 6 YOUTH VIOLENCE AND JUVENILE JUSTICE 136 (2008). Numerous other studies have found a link between PTSD and criminal activity specifically among military veterans returning from violent situations. *See generally* Jarle Eid, *The Course of PTSD Symptoms Following Military Training Accidents and Brief Psychosocial Interventions*, 35 PERSONALITY AND INDIVIDUAL DIFFERENCES 771, (2003); Oscar I. Gonzalez & Raymond W. Movaco, *Anger Intensification with Combat-Related PTSD and Depression Comorbidity*, 8 PSYCHOLOGICAL TRAUMA: THEORY, RESEARCH, PRACTICE, AND POLICY 9 (2016); Janet C. Blodgett et al., *Prevalence of Mental Health Disorders Among Justice-Involved Veterans*, 37 EPIDEMIOLOGIC REVIEWS 163 (2015). An

expert such as Dr. Sautter would have been able to portray McFadden's life experiences and actions through this lens, contextualizing his behavior as manifestations of trauma he had internalized from his environment.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests discovery and/or an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d) has no application to this claim.

**Claim 5-4:** **Counsel was ineffective for failing to introduce expert testimony describing McFadden's childhood landscape.**

At trial, the jury learned nothing about how generations of systemic racism led to the struggling and oppressive conditions of Pine Lawn. Professionally reasonable counsel would have presented the testimony of an expert like Dr. Colin Gordon, who could explain how generations of segregation and uneven resource distribution resulted in the precarious landscape McFadden grew up in. (Attachment G). Without this information, the jury was unable to fully comprehend the circumstances surrounding McFadden's childhood development and mental state. Understanding the segregated history of St. Louis is necessary to assign responsibility to the institutional actors perpetuating inequality, as well as combat the racist assumption that low-

50

income black populations are under-resourced due to their own behavior. McFadden's culpability could not be properly ascertained in a vacuum—this historical analysis of St. Louis was necessary context for the jury in this inquiry.

At sentencing, Dr. Gordon or a similar expert could have testified on the policies causing the continued segregation of St. Louis, the impact of these policies on Pine Lawn specifically, and the resulting consequences for the black community of Pine Lawn, which would have allowed the jury to reach an informed decision as to McFadden's relative responsibility.

Dr. Gordon could have illuminated that in the early and middle twentieth century, various property stakeholders created complex barriers to black property ownership and occupancy, which were gradually formalized as guiding policy principles. Early on in the World War I era, the realty industry advocated for racial zoning. Later in the century, racially restrictive covenants expressly burdened estates. After the Supreme Court declared racial covenants to be illegal, they evolved into the more subtle "residential security rating" system, which precluded housing desegregation by marking areas with higher black populations as less secure. (Attachment G p. 6). Organizations such as the Home Owners Loan Corporation (HOLC) and Federal Housing Administration (FHA) further formalized the assumption that neighborhoods "invaded" by black people lost all value by including the racial makeup of neighborhoods in their property ratings. (Attachment G p. 8).

51

These policies left few neighborhoods available to black communities at the height of African-American movement to St. Louis, with local zoning as a primary engine of segregation. Outside of central St. Louis, limits on land usage ensured that the outer suburbs remained low-density, single-family and, as a result of racial wealth disparities, white. Meanwhile, St. Louis and other older cities did not have the authority to zone until after other institutional actors had already designated land for particular uses; because this left central St. Louis unable to compete with the high-end housing of the suburbs, the city instead cleared low-income, low-return residential areas in order to make space for commercial and industrial use properties. (Attachment G).

As fewer resources were afforded to the predominantly black, low-income central St. Louis, structural and living conditions decayed. Eager city planners observed this development and capitalized on the opportunity by condemning "blighted" residential areas, allowing for the constitutional taking of property in the name of "urban renewal." *Id.* p. 10. City planners repurposed these seized properties for commercial development, thus displacing thousands of families, who were predominantly black. While some families moved into public housing, most moved west and north, away from the hands of urban renewal. *Id.*

Among the neighborhoods where those displaced relocated was Pine Lawn, McFadden's home suburb outside of northwest St. Louis. Pine Lawn, originally a predominantly white suburb, was subject to the same discriminatory strategies that

52

plagued many St. Louis suburbs of the twentieth century; yet educational opportunities, jobs, and affordable, older housing attracted many of the black families displaced by the urban renewal of central St. Louis. As black families came in, white families feared the loss of their property values and left, a phenomenon known as "white flight." As property values declined due to racially biased rating systems, so did the presence of public goods and services, which are often paid for by property taxes. (Attachment G).

Dr. Gordon would have pointed out four elements of Pine Lawn's story that are particularly relevant to McFadden's life:

(1) the systemic housing discrimination of St. Louis created the increasing disparity between black and white wealth, which is particularly present in Pine Lawn;

(2) property development in St. Louis was unevenly concentrated, focusing primarily on the outer suburbs while leaving inner suburbs such as Pine Lawn to decay;

(3) urban renewal, the simultaneous disinvestment from the north side and investment in commercial redevelopment in the central city and outer suburbs, displaced many black families and increased demand for affordable housing in the inner suburbs; and

(4) this displacement, marked by "white flight" into the southern, wealthier St. Louis suburbs and "black flight" into the northern, less-resourced suburbs, created

53

the stark black-white divide between north and south St. Louis that persists today. (Attachment G p. 15).

Dr. Gordon, or a similar expert, could have highlighted the wealth gap between white and black Americans. Nationally, black net worth is stagnant at 10 percent of white net worth. *Id.* p. 15-16. This gap in net worth, compounded with discrimination in private realty and lending, has translated into an additional gap in homeownership between black and white Americans. Yet, this gap goes beyond homeownership— black families are disproportionately excluded from certain benefits of homeownership, such as the accumulation of equity and wealth, public services, and access to good schools. These benefits are typically passed on to other generations— resulting in disproportionately lower generational wealth for black families. When the housing market opened up in the 1970s, segregation persisted as the wealth gap limited where black families could afford to live. *Id.* p. 16.

Dr. Gordon could have further explained how uneven housing development exacerbated the differences between black and white economic capital. As private developers expanded further into the suburbs faster than regulatory controls could keep up, zoning laws ended up merely codifying segregationist development schemes. While developers built new homes in newer suburbs, older communities such as Pine Lawn watched their housing structures crumble with age and decay. As such, these Pine Lawn homes were a prime target for working-class white families. Yet, as black families came to Pine Lawn after being displaced from central St. Louis, these

54

working-class white families fled the area. After undergoing such a dramatic racial transition, going from 70 percent white to 80 percent black in a decade, Pine Lawn continued to be ignored by private and governmental actors as property values plunged. (Attachment G, p. 19).

Dr. Gordon or a similar expert could have additionally demonstrated that urban renewal plans worsened this erratic shuffling of black families outside of central St. Louis, thus deepening existing segregation. Many urban renewal plans were designed for the purpose of pushing black communities back into the central city by clearing "blighted" suburban properties, where many black communities lived, for development. *Id.* p. 23. This movement drove even more white residents, who feared lost property value, out of the central city into the growing suburbs, while heightening the demand for urban development as more black residents reentered the city. Yet, because not all displaced black residents could fit within the central city, many were pushed into segregated, lower-resourced inner suburbs such as Pine Lawn. The urban renewal that focused so intently on central St. Louis ignored Pine Lawn and similar suburbs, leaving them to further decay. As urban renewal programs subsided, future development investments continued to bypass communities like Pine Lawn and focused on commercial development in the outer, whiter suburbs. *Id.* p. 34.

Dr. Gordon could have explained how these cyclic patterns of white and black flight have disadvantaged black communities in central St. Louis and the inner suburbs. As displaced black residents fled the north side for central St. Louis and the

55

inner suburbs, poverty became concentrated in central St. Louis and the inner suburbs. As the black middle-class eroded, so did the public institutions which black communities relied on, such as schools and hospitals. Economic decline and uneven investments in development exacerbated these difficulties. Even as formal racial restrictions subsided, cyclic poverty kept black communities in the lower-resourced areas they could afford to live in. Later, the deindustrialization of St. Louis and corresponding job loss hit black communities harder; while the white unemployment rate from 1990 to 2000 hovered around 3 percent, the black unemployment rate was 11.5 percent.  (Attachment G, p. 29).

Dr. Gordon could have characterized Pine Lawn's condition as a result of uneven development and the subsequent, persistent segregation. Pine Lawn's poverty is a direct consequence of years of governmental neglect, and has resulted in a variety of other social problems for its residents: increased crime, poor public health, and worse school districts, just to name a few. Furthermore, as property values in communities like Pine Lawn plunged, so did the available property tax dollars for public services. As a result, public services decreased in quality *and* local tax rates increased. What remains clear in all of this: generations of racism in property development have created a symphony of forces designed to keep black communities in poverty. (Attachment G pp. 29-35). Moreover, the housing discrimination forces at work are particularly heavy in St. Louis, evidenced by the origination of three landmark civil rights cases from the United States Supreme Court: *Shelley v. Kraemer*,

which prohibited state enforcement of racially restricted covenants, *Jones v. Mayer*, which banned racial discrimination in real estate agreements, and *Black Jack v. United States*, one of the first cases on exclusionary zoning. *Id.* p. 13; *Shelley v. Kraemer*, 334 U.S. 1 (1948); *Jones v. Mayer*, 392 U.S. 409 (1968); *Black Jack v. United States*, 508 F.2d 1179 (8th Cir. 1974).

McFadden entered this world into a community that had suffered generations of economic and racial oppression that devastated normal institutional supports—civil structures which outer suburban jurors are likely to believe are present and exist for everyone. Presented with the above evidence, a jury could not help but consider whether the lack of opportunity, or the vast disparity in community resources, was responsible for some of McFadden's development and thus his ultimate culpability.

In short, the racial wealth gap, persistent racial segregation in St. Louis, and racially disparate consequences of "urban renewal" programs cannot be separated from McFadden's life story; they are intertwined. McFadden is a product of his childhood landscape, which itself bears the scars of centuries of racial injustice. Significantly, McFadden's landscape is one that a white jury would be separate from and thus unfamiliar with as a byproduct of St. Louis's history. Without the benefit of Dr. Gordon's testimony, the jury was unable to appreciate the years of emotional and physical trauma off-shooting from the financial desperation of his immediate circle – a residual consequence from generations of socially irresponsible St. Louis policies.

*****

57

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests discovery and/or an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d) has no application to this claim.

**Claim 5-5:    Counsel was ineffective for failing to present evidence of cultural condition of Pine Lawn as part of the case in mitigation.**

McFadden was denied the effective assistance of trial counsel when counsel failed to call Dr. White, or some other similarly qualified expert witness, to testify about the cultural conditions of Pine Lawn, where McFadden was raised. Dr. White had specific clinical opinions, which could have explained to the jury the cultural conditions in Pine Lawn and enhanced the testimony of Dr. Draper. Dr. White had been previously featured in a mitigation video, and if called, he would have explained the cultural atmosphere in Pine Lawn, which included violence, guns, and poverty.

Counsel's failure to call Dr. White and present his testimony to the jury denied McFadden his right to a fair trial protected by the due process clause, freedom from cruel and unusual punishment, and right to effective assistance of counsel under the Sixth, Eighth, and Fourteenth Amendments. McFadden was prejudiced by trial counsel's deficient performance because there is a reasonable probability the jury

58

would have voted for a life sentence had they heard Dr. White's testimony alone or in combination with Dr. Draper's testimony.

Dr. Norman White is a criminologist who focuses on the factors that cause young people, such as McFadden, to become involved in crime. (29.15 Ex. 43 p. 459). Dr. White's work centers on urban at-risk communities and the effects of poverty and the exposure to daily existence in at risk communities on children. *Id.* pp. 459-60.

Dr. White studied Pine Lawn and the surrounding communities during the 1980s and 1990s, a time when McFadden was growing up. *Id.* pp. 466-67. Dr. White conducted numerous interviews with people connected to Pine Lawn. Based on these interviews and historical information, he drafted a report discussing how this environment affected McFadden. *Id.* pp. 470-71.

Dr. White's investigation revealed that in McFadden's adolescent years, Pine Lawn resembled a "war zone." *Id.* pp. 487-88. Dr. White could have explained to the jury how the living conditions of low-income black communities are predictors of crime, violence, and other social problems. *Id.* pp. 473-75. Lack of education, poverty, and teen pregnancy are predictive of high crime rates for young black children (adolescents and teens). *Id.* pp. 473-74. Dr. White noted that almost 200 years of research demonstrates that a turbulent social and economic environment, such as the one where McFadden was born, poses a high risk for criminal activity. (29.15 Ex. 32A p. 36). Because McFadden was born in 1980, Dr. White focused his review to conditions within Pine Lawn from the late 1980s through the 1990s. (29.15 Ex. 43 pp.

59

476-77). In that time frame, especially in black communities, there was an exploding crack epidemic fueling gang proliferation and violence. (29.15 Ex. 43 p. 477).

Dr. White testified Pine Lawn and the surrounding North County communities were hyper-segregated, impoverished, predominantly African American, and characterized by high unemployment, high crime, single-parent households, and illiteracy. *Id.* pp. 478-83, 492-93. Men in McFadden's age group from Pine Lawn and nearby were disproportionally dead or in prison compared to other communities. *Id.* p. 494. According to Dr. White, McFadden was at greater risk for committing the offenses at issue because of having been raised in Pine Lawn's environment. *Id.* pp. 630-32, 669.

Dr. White participated and produced a video about Pine Lawn life during this time period. (29.15 Ex. 43 pp. 468, 497). In the Pine Lawn video, Dr. White interviewed a number of Pine Lawn residents. These individuals explained the cultural atmosphere in Pine Lawn and how the culture of drugs and poverty touched everyone in the community.

Jamala Rogers was interviewed at the Rowan Community Center, where she worked. (29.15 Ex. 37 at 0:01-0:22). Rogers described how in the 1980s and 1990s, people moved out of Pine Lawn if they had the financial means; those who did not were "penalized and sentenced to a life in Pine Lawn." *Id.* Rogers described how when drugs arrived in the 1980s, communities like Pine Lawn and North St. Louis were decimated. *Id.* at 15:49-17:23. Rogers explained that whether individuals got

60

caught up in Pine Lawn criminal activity was dependent on the strength of their support system. (29.15 Ex. 37 at 18:49-19:54). Families without a support system were "left in the cold." *Id.*

Lisa Hubbard described that by the time she moved out of Pine Lawn, twenty people she knew from the area had been killed. (29.15 Ex. 37 at 1:41-1:54). In the 1990s, Pine Lawn was riddled with crimes connected to the drug explosion. *Id.* at 9:21-10:08. Ms. Hubbard explained that Pine Lawn was like a ghost-town hit by a tsunami. *Id.* at 25:28-26:06.

Taneisha Kirkman-Clark described growing up in Pine Lawn in the 1990s as rough; young men saw drugs as a means to make money, which created a struggle for control of various city blocks. (29.15 Ex. 37 at 4:41-6:11; 18:15-18:43). Pine Lawn police were brutal, and no one called them for help. *Id.* at 14:22-15:48. Pine Lawn officers were officers kicked-off other police forces, sometimes for police brutality and racial misconduct. *Id.*

Kelly Crowder described how in the 1980s, many youths from single parent households sold crack, became involved with shootings, and fought to make money. (29.15 Ex. 37 at 6:12-6:29; 7:20-7:38; 8:23-8:50).

Clara Wings, an elderly Pine Lawn resident, recounted how crack and PCP were everywhere. *Id.* at 7:38-8:22. Wings said that with a few exceptions, the Pine Lawn young men of McFadden's generation are in jail. *Id.* at 26:08-26:20.

James Hubbard explained that drugs in Pine Lawn changed the character of the community, whether a person was involved with them or not. (29.15 Ex. 37 at 10:10-10:42).

Trial counsel's failure to provide this cultural history deprived McFadden of the opportunity for the jury to view him as human. It additionally disadvantaged experts who did testify at trial, such as Dr. Draper, who may have benefitted from background information on McFadden's upbringing.

Trial counsel testified in post-conviction proceedings on their mitigation theory - that McFadden came from a poor home life and grew-up in neighborhoods where drugs, violence, and poverty were predominant. (29.15 Tr. 70, 72, 477). However, trial counsel did not consider hiring an expert to gather information on drugs, violence, and poverty in Pine Lawn and the surrounding areas to support their mitigation case. *Id.* p. 72. They also did not provide this evidence to Dr. Wanda Draper.

Under the prevailing professional norms at the time of McFadden's trial, McFadden's trial counsel performed deficiently by failing to present a cultural mitigation expert to the jury. It would have been error for the trial court to have excluded this cultural mitigation. *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982).

Not only does the relevant case law expound trial counsel's duty to investigate and present mitigating evidence, but professional guidelines present this duty as well. The American Bar Association states that counsel should consider including expert

62

and lay witnesses with supporting documentation "to provide medical, psychological, sociological, cultural or other insights into the client's mental and/or emotional state and life history that may explain or lessen the client's culpability for the underlying offense(s)…." AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES Guideline 10.11 (F) (2) (rev. ed. 2003).

To the extent trial counsel had any strategy on this issue, it was objectively unreasonable and unsound. It was unreasonable to not present Dr. White's evidence for fear of the jury learning of McFadden's supposed gang affiliation because the jury already learned about any such affiliation from the letters between McFadden and Douglas. (29.15 Tr. 589-90). Additionally, the jury likely already inferred gang association based on the circumstances surrounding the shooting of Mr. Franklin. *Id.* pp. 588-90. It was additionally unreasonable to not present Dr. White's testimony because it would have countered the prosecutor's over-simplified argument that others grew-up in Pine Lawn and did not commit acts like McFadden's acts. (29.15 Tr. 71-73, 87, 477-78; T. Tr. 2383). Dr. White's testimony would have provided an opportunity to contextualize what appears as a negative and rebut known available arguments the State intended to present.

Finally, trial counsel was ineffective for failing to provide Dr. White's report, or a similar report, to Dr. Draper, who testified about McFadden's child development. Dr. Draper was not made aware of Dr. White's investigation or video interviews.

63

There is a reasonable probability that had the jury been given a comprehensive picture of McFadden's childhood environment - poverty, teenage pregnancy, single parent households without positive male role models, police brutality, fighting, crimes of all kinds, easy access to guns, shootings, and drug dealing - he would not have been sentenced to death. The failure to present this evidence prejudiced McFadden.

The Missouri Supreme Court considered this claim on the merits and held that McFadden's counsel presented ample evidence related to McFadden's childhood development through other witnesses. The Missouri Supreme Court incorrectly concluded that the state lower court did not err by finding that trial counsel was not ineffective for not introducing Dr. White and his findings into evidence. *McFadden III*, 619 S.W.3d at 451.

Trial counsel's failure to investigate and present mitigating evidence violates that constitutional guarantee. *Lockett v. Ohio*, 438 U.S. 586 (1978) and *Eddings v. Oklahoma*, 455 U.S. 104 (1982). This Court should grant habeas corpus relief.

****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 84–92. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *See McFadden III*, 619 S.W.3d at 451. The decision of the Missouri Supreme Court is contrary to and/or an unreasonable application of the law to the facts presented here. 28 U.S.C.A. § 2254 (d)(1)(2).

64

**Claim 5-6:** **Counsel was ineffective for failing to present an expert related to McFadden's inability to process and verbalize, and his untreated learning disability.**

At trial, the jury learned nothing about McFadden's brain injuries and alcohol exposure, and how they may have affected his cognition and behavior. Professionally reasonable counsel would have presented the testimony of an expert like Dr. Shameka Stanford, who could explain how McFadden's childhood experiences affected his brain functioning. Without this information, the jury was unable to fully comprehend the circumstances surrounding McFadden's actions and mental state. Understanding McFadden's cognition and executive functioning is necessary in order to fully contextualize McFadden's actions.

Dr. Stanford found three areas of significant concern: McFadden's head injuries, alcohol use, and low IQ score. (Attachment H p. 2). McFadden has a history of multiple head injuries, which may have caused a significant Traumatic Brain Injury (TBI). McFadden additionally has a history of alcohol use from a very young age, which likely impacted his brain development and overall cognitive skills. McFadden also has a moderately low IQ score, which impacts his language and learning skills. These three significant areas of concern led Dr. Stanford to find that McFadden suffers from an underlining cognitive and communicative disorder. This impacts his processing, problem-solving and decision-making skills. Dr. Stanford noted McFadden's "history of impaired development from birth." (Attachment H p. 2). This would support a finding that McFadden suffers from "brain development impairments significantly early in life, that were then compounded by other

65

environmental factors (TBI, learning impairments/retention)." *Id.* This would impact McFadden's cognitive ability, culpability, ability to recognize and appreciate consequences and his actions.

At birth, St. Louis County Hospital diagnosed McFadden with positive core blood. This would indicate McFadden "was not getting enough oxygen secondary to complications with the umbilical cord" or a blood infection. *Id.* p. 3. "The presence of positive core blood…has been demonstrated to impact brain development, especially in the areas of expressive and receptive language, cognition and learning skills. Even the smallest amount of lost oxygen during birth can result in brain damage that will persist well into an individual's adulthood affecting functional social, vocational, academic, and overall behavioral abilities." *Id.*

Academic records corroborate Dr. Stanford's opinion because those records also show McFadden's "cognitive and communication impairments." *Id.* p. 4. Such impairments relate to "judgment, consequential thinking, and decision-marking skills. They additionally can impair his inability to functionally regulate emotions and respond in what is considered a typical manner during emergency situations." *Id.*

Dr. Stanford notes McFadden "did not malinger. He presented with maximum test effort throughout the assessment process." (Attachment H p. 6). McFadden "demonstrates difficulty[ ]utiliz[ing[] consequential thinking, as well as problem solving and decision-making skills rationally and consistently. (Attachment H p. 21). McFadden "processes information in concrete terms and demonstrated limited

66

capacity to weigh the impact and multitude of factors necessary to make complex decisions when engaged in heightened situations."

"Mr. McFadden['s] demonstrat[ed] difficulty verbalizing his emotions or feelings, functional problem-solving, impulsivity, and 'rigid in his thinking', should be noted as salient features that can be experienced in someone experiencing traumatic brain injury (TBI)." (Attachment H, p. 9). McFadden "currently demonstrates difficulty making age-appropriate decisions and consistently using age-appropriate problem-solving, consequential thinking, and verbal reasoning to avoid potentially adverse situations." *Id.* p. 21. McFadden "lacks the adequate capacity to make complex decisions, utilizing age appropriate social communication and cognitive-communication (executive functioning) skills, and access and use vocabulary terms that he consistently understands the meaning and impact of consistently and independently." *Id.*

McFadden has not received intervention to address his language related cognitive and communication disorders. Without this intervention, McFadden continues to "express himself in ways that are considered averse to societal norms for his age." (Attachment H pp. 21-22).

Defense counsel deficiently failed to engage and present expert testimony to explain to the jury how McFadden's circumstances led to a substantial verbal and language deficit in all categories. Defense counsel failed to investigate and explain to the jury that a language impairment impeded McFadden's development of a critical

67

tool which drastically impacted his ability to communicate and, in turn, behave. McFadden's impairments negatively impacted his ability to understand and express language. As a result, this deficit affects McFadden's ability to comprehend meaning and to recall and relate information.

McFadden's prefrontal and temporal cortices of his brain that would respond to and utilize good judgment and consequential thinking are not activated consistently and automatically when problem-solving and consequential thinking is needed. There may be areas of his brain that are not fully developed or adequately formed which can contribute to his inability to comprehend and functionally problem-solve.

Available expert testimony could have explained how McFadden's language impairments, in an invasive and insidious manner, disrupted his ability to personally develop, learn, control and adapt his behavior, engage in adequate decision-making, understand consequences, and meaningfully communicate with others. In short, McFadden's impairment rendered him unable to interpret and respond to what was going on around him and cognitively process it.

Language impairments impact the ability to regulate negative emotions, self-regulate and problem-solve. High stress and complicated situations exacerbate the impairment. An expert could have explained that without those skills, McFadden would act impulsively and, at times, aggressively due to his inability to access alternatives. McFadden could not begin to process or comprehend the complexity of events occurring around him. Trial counsel could have presented how the language

68

disorder radically affected multiple aspects of McFadden's life. Further, reasonable counsel armed with knowledge of this deficit could have explained to a jury how this could have been addressed throughout his life and in prison. Given the obvious red flags, reasonable trial counsel would have engaged the appropriate expert.

The experts trial counsel did engage were not properly consulted with to discuss McFadden's language disorder. Had trial counsel adequately explored the facts of McFadden's language barriers and framed the question to these experts in a timely manner, they would have evaluated the effects of McFadden's language disability, accurately diagnosed him, and testified at trial. This would have opened the door to further neurocognitive deficits.

Trial counsel's shortcomings prejudiced McFadden. The jury that sentenced McFadden to death was deprived of expert testimony that would have humanized McFadden and explained how his language impairment posed reverberated throughout his life on a daily obstacle and impediment to his success. The language disability impacted McFadden's decision-making ability his entire life, including at the time of this offense and at trial. The jury's failure to learn of that information undermines confidence in the death sentence.

Not only is it a source of affirmative mitigation, trial counsel could have emphasized McFadden's impairment and utilized this unique trait of McFadden to address and minimize the effect of the State's non-statutory aggravation. The State implored the jury to impose death on the mistaken view that McFadden's obstinacy

69

was the reason he had not taken advantage of opportunities afforded him. Trial counsel could have explained how language deficiencies impaired McFadden's ability to understand and comply with the terms of his probation and to complete programs successfully. Rather than being recalcitrant or defiant, McFadden actually had an insurmountable language impairment that prevented his comprehension and his ability to effectively verbalize his concerns. Given these shortcomings, McFadden could not succeed. The jury's failure to learn of this information undermines confidence in the death sentence.

There exists a substantial question as to whether Kraft and Turlington failed in this responsibility. Therefore, this Court should permit a full vetting of this claim via discovery and/or a hearing.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests discovery and/or an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d) has no application to this claim.

70

**Claim 5-7:       Counsel was ineffective for failing to investigate McFadden's educational history.**

Counsel in a capital case have a duty to conduct a thorough investigation of their client's background and to present that evidence at sentencing. This evidence would include McFadden's educational history. Without educational history evidence, counsel cannot humanize their client or explain his circumstances to the jury. And without humanizing their client, counsel cannot hope to obtain a life sentence. Here, counsel failed investigate and present evidence about McFadden's educational history. Had they done so; the jury would have considered the below.

Mr. Thomas Zeitz, principal of Pine Lawn Elementary school, paddled children as punishment. This was a common form of punishment at Pine Lawn Elementary school. Eight-five to ninety percent of Pine Lawn Elementary School children were on the free lunch program like McFadden. The schools were built to hold twenty children per class but had 28-30 kids in each class.

When teachers believed a child needed to be placed in special education classes, the process was extensive. It took three months for a child to settle after being enrolled in Pine Lawn and for a teacher to identify issues a child had with learning. It then took three months for the state to approve the child to be tested to see if they qualify for an IEP. Then there were 30 pages of forms for a parent to fill out. By the time everything was done, most children had already left the school.

The racial demographic of Pine Lawn was 100% African American. A teacher reported the oldest children in a family had to help care for the younger kids. These children were born in charge like McFadden. Teachers recognized their home lives were really bad and it was hard to send the children home. Teachers at Pine Lawn Elementary were discouraged from calling the Child Protective Services hotlines. Some teachers would call when they got home if they knew the child's home lives were really bad.

Children at Pine Lawn Elementary school were usually academically behind other white kids of their age. Many kids in 5th grade could not read or write. They had to be taught verbally because they were unable to read the material provided to them. Many of the kids at Pine Lawn Elementary school needed help academically and should have qualify for special education services.

Pine Lawn Elementary school was described as a physical school. Most children often resorted to fighting. A teacher recalled kids would be in a circle while two children fought in the middle on the playground daily. These kids lacked stable African American role models. Many of the parents were mentally ill, drug addicted, addicted to alcohol, and were out running the streets.

All schools McFadden attended were underfunded and had limited resources. Considering McFadden has a learning disability, it is highly likely that he did not receive the educational care he needed during his formative years. Knowing this about McFadden's mental state, McFadden's trial counsel should have investigated

72

McFadden's educational history and consulted with educational and child development experts, which is within their duties set out by professional standards. Information on McFadden's educational history would have been readily available to trial counsel at the time of trial.

McFadden attended Tarkio Academy, a juvenile boys' boarding schooling for delinquent children, between the years of 1995 and 1996. McFadden's performance and grades improved dramatically at Tarkio, where he was provided an adequate opportunity in a structured, stable, non-violent environment. This Tarkio environment provided a routine for McFadden, which he did not have in any other part of his life.

Upon McFadden's arrival, he was given a Woodcock-McCrew-Merdner Mini Battery of Achievement, a standardized test. This standardized test measured a child's skills in reading, writing and math. McFadden scored in the fourth percentile, which the examiner noted was comparable to a third grader's score. McFadden was 15 years old at the time of his first standardized test. McFadden completed this test two more times prior to leaving Tarkio. (Attachment I).

During McFadden's time at Tarkio, he made the honor roll, which was documented in the local newspapers. (Attachment J). McFadden took the Woodcock-McCrew-Merdner Mini Battery of Achievement test again in May of 1996, right before leaving Tarkio. McFadden scored in the eighty-eighth percentile, a dramatic

improvement from his original score. (Attachment I). McFadden was discharged from Tarkio on May 16, 1996. (Attachment K).

After being discharged from Tarkio, McFadden was thrown back into Pine Lawn without any support from the juvenile courts. Richard Nelson, McFadden's juvenile probation officer, did not provide McFadden with any supportive resources. Nelson documented this in his discharge affidavit. (Attachment K p. 2). Nelson stated "[McFadden] has received no subsequent referrals since his discharge from Tarkio Academy." *Id.* This is not common practice in juvenile cases now, as juveniles are now generally discharged with services in place.

Even though McFadden has a learning disability, McFadden excelled at Tarkio because he had a proper support system in place. Tarkio Academy offered children daily peer group meetings, daily counseling, a structured routine, and smaller class sizes. These daily activities and routines made it possible for McFadden to succeed in an environment like Tarkio.

The St. Louis County public schools were already questionable prior to McFadden's attendance in Pine Lawn Elementary School. St. Louis County and City schools were extremely segregated, had little resources, and were underfunded (and remain so until this day). The achievement data from 1993 to 1995 showed that

74

African American students were scoring significantly lower than students of other races in reading, mathematics, science, and social studies.[1]

Racial gaps in standardized test scores widened from 1981 to 1994.[2] African-American children who attended nonintegrated, virtually all-African-American schools, like McFadden did, scored considerably lower than children at integrated public schools in St. Louis. St. Louis public schools also had a lack of staffing, making it difficult to address students' emotional and behavioral problems. Non-integrated public schools in St. Louis had a higher rate of children dropping out and not attending school. This mirrored McFadden's academic life. (Attachment I p. 5). St. Louis public schools reached a settlement in 1983 after *Liddell v. Missouri*, 731 F.2d 1294 (8th Cir. 1984), resulting in an inter-district transfer program for bussing, magnet school programs, and educational and capital improvements programs for St. Louis public schools. Magnet schools in St. Louis, such as Ladue, had higher rates of attendance and students finishing school. McFadden's sisters attended Ladue magnet schools, which may be why they performed better academically than McFadden.

Trial counsel for McFadden was ineffective for failing to investigate his educational history, as the role of mitigating evidence is crucial in capital cases. Trial

---

[1] Stringfield, Sam, Research on Effective Instruction for At-Risk Students: Implications for the St. Louis Public Schools, *The Journal of Negro Education, Summer* 1997, Vol. 66 No. 3, The Role of Social Science in School Desegregation Efforts: The St. Louis Example (Summer, 1997), pp. 258-288

[2] *Id.*

counsel always have a professional obligation to thoroughly investigate a defendant's background.  *See Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Williams*, 529 U.S. at 396 (2000); AMERICAN BAR ASSOCIATION, GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF DEFENSE COUNSEL IN DEATH PENALTY CASES 927 (rev. ed. 2003).

\*\*\*\*\*

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests discovery and/or an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d) has no application to this claim.

### Claim 5-8:    Counsel was ineffective for failing to call a lead expert to discuss McFadden's lead exposure and its long-term effects.

At trial, the jury learned nothing about how years of lead exposure may have impacted McFadden's childhood growth and development. Reasonable effective counsel would have presented the testimony of an expert like Dr. Aaron Specht, who could have tested McFadden's bone lead in order to determine the extent of his lead exposure, as well as explain how lead exposure affects the long term mental and physical health of an individual. (Attachment L). Without this information, the jury was unable to fully comprehend McFadden's childhood development and mental state., and an understanding the history of lead poisoning in low-income St. Louis and how long-term lead exposure affects development. Trial counsel could have provided

the jury an environmental factor outside of McFadden's control that prevented him from reaching his full potential.

St. Louis has had ongoing lead poisoning issues for decades, with over 3,300 children in St. Louis having toxic levels of lead in their blood.[3] In 2014, 1,123 children tested for lead poisoning had five milligrams of lead per deciliter of blood; this is the threshold for federal government intervention.[4] Even more children, over 2,600, had measurable levels of lead in their blood in 2019.[5] These high levels of lead in the blood of St. Louis children are the direct result of consistent and widespread lead exposure: a 2016 investigation revealed that eighty-eight water fountains in St. Louis schools were contaminated with lead.[6] Additional exposures happen at home, where many of St. Louis' older houses contain lead paint[7] and use lead service lines to access water.[8] Proximity to a demolition site, which is a characteristic of many low-income

---

[3] Blythe Bernhard, *St. Louis' Stubborn Lead Poisoning Problem*, ST. LOUIS TODAY (Mar. 7, 2016), https://www.stltoday.com/lifestyles/health-med-fit/health/st-louis-stubborn-lead-poisoning-problem/article_5783af6a-06fc-5a6d-8b82-7202a16739b3.html.

[4] *Id.*

[5] Blythe Bernard, *St. Louis Demolitions Bring Renewed Risk for Lead Poisoning*, ST. LOUIS DISPATCH (Jan. 7, 2019), https://www.stltoday.com/news/local/metro/st-louis-demolitions-bring-renewed-risk-for-lead-poisoning/article_e220afea-8a6d-5476-86fa-48eb695ab9b2.html.

[6] Lily Sanborn, *It's Not the Pencils, It's in the Pipes: Lead in St. Louis Schools*, FRONTIERS (Oct. 31, 2016), https://frontiersmag.wustl.edu/2016/10/31/its-not-the-pencils-its-in-the-pipes-lead-in-st-louis-public-schools. Lead is also prevalent in the paint of St. Louis' older housing.

[7] Bernard, *supra* note 3.

[8] Bryce Gray, *About 30,000 Missouri American Water Customers Have Lead Service Lines. Why Will Replacing Them Take Ten-Plus Years?*, ST. LOUIS DISPATCH (July 15, 2019), https://www.stltoday.com/business/local/about-30-000-missouri-american-water-customers-have-lead-service-lines-why-will-replacing-them/article_a3ba51f1-4b9b-51f3-83e1-87b60db625c5.html

areas due to urban renewal, is another factor that increases exposure to lead poisoning, again due to high volumes of lead paint.[9]

Chronic lead exposure has been shown to have significant long-term effects on exposed individuals' physical and mental development. A 2018 study demonstrated that third graders who were exposed to lead were more likely to receive lower scores on standardized tests.[10]

An expert such as Dr. Specht would have likely tested McFadden's bone lead by using x-ray fluorescence (XRF), the least invasive form of bone lead testing. By generating a photon beam that displaces an electron in the sample graft, the professional performing the test causes the other electrons in the sample move around and release fluorescence. Using a radiation spectrometer, the professional can then analyze the secondary X-rays in order to determine the level of bone lead in the sample. (Attachment L, pp. 2-3). Dr. Specht or a similar expert would likely use a portable version of the XRF device, which uses a small radiation exposure to test the sample. The portable XRF device is handheld and low-weight, and would be used to test McFadden's mid-tibia. McFadden would merely need to stretch his leg between two chairs while the professional scanned his mid-tibia for three minutes, a procedure that could be easily completed where McFadden is currently incarcerated. *Id.* pp. 4-5.

*****

---

[9] *Id.*

[10] Anna Aizer et al., *Do Low Levels of Blood Lead Reduce Children's Future Test Scores?*, 10 AM. ECON. J. APPLIED ECON. 307, 334 (2018).

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests discovery and/or an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d) has no application to this claim.

**Claim 5-9:**     **Counsel was ineffective for not objecting to the State's appeal to racial bias as a basis for death.**

McFadden's jury trial was tainted with racism; this includes both the explicit racism of prosecutor Keith Larner, as well as the implicit racial bias of the jury, which Larner's statements preyed upon. Larner flagged racist sentiments during the trial by eluding to McFadden's gang membership, mischaracterizing McFadden's use of a racial slur, and using racial tropes to portray McFadden as dangerous. Larner's actions likely influenced McFadden's jury by encouraging them to lean into their own implicit racial biases. Considering this racism prejudiced McFadden, his sentence should be vacated and case remanded for retrial.

Larner employed various coded terminology to imply McFadden's gang affiliation, which was inadmissible within the circumstances of the case. Evidence of gang membership is only admissible if it is (a) relevant to a disputed issue, *United States v. Lemon*, 239 F.3d 968, 971 (8th Cir. 2001), (b) demonstrated by a preponderance of evidence, (c) similar to the charged offense, (d) recent in relation to the charged

79

offense, *United States v. Sills*, 120 F.3d 917, 920 (8th Cir. 1997), and (e) not unfairly prejudicial. *Lemon*, 239 F.3d at 971 (citing *United States v. Roark*, 924 F.2d 1426, 1434 (8th Cir. 1991)). For evidence of gang membership to be unfairly prejudicial, the resulting unfair prejudice must outweigh the probative value of the evidence, *Id.* (citing *United States v. Sparks*, 949 F.2d 1023, 1026 (8th Cir. 1991), and create an "undue tendency to suggest decision on an improper basis" *United States v. Johnson*, 28 F.3d 1487, 1497 (8th Cir. 1994), *cert. denied*, 513 U.S. 1098, 130 L. Ed. 2d 664, 115 S. Ct. 768 (1995) (quoting Fed. R. Evid. 403, Adv. Comm. Note).

In McFadden's case, his gang affiliation was not related to the charges of Mr. Franklin's murder and created an unfair prejudice, which any alleged probative value did not outweigh. As such, Larner was obligated to not bring in inadmissible evidence of McFadden's gang affiliation. *Dawson v. Delaware*, 502 U.S. 159 (1992).

However, Larner found a way around this obligation by using coded language, which he knew the majority-white jury would infer to mean membership in a black gang. Larner at various times throughout the trial referred to McFadden as being a member of a "group," and argued that McFadden shot Franklin because he testified "against two of his buddies, the defendant's buddies, two guys that he hangs out in the same group of friends." (T. Tr. 993). The jury likely saw through Larner's choice of words and inferred that a group of friends with that type of loyalty was a gang. This suggestion to the jury that McFadden was involved in group criminal activity prejudiced McFadden.

80

Larner additionally mischaracterized McFadden's usage of a racial slur during closing argument, attempting to convey McFadden's language as aggressive to the jury. McFadden often refers to other black men as "n\*\*\*a" or close friends as "my n\*\*\*a," as seen in a letter to Douglas. (T. Tr. 1035). Gary Lucas testified that McFadden used this language during the Franklin confrontation, stating to Douglas, "'n\*\*\*a ain't dead yet,'" (T. Tr. 1149). However, in closing argument, Larner pronounced the word as "n\*\*\*er" when quoting McFadden's statement:

> Todd was still alive during all five bullets because the defendant grabbed the gun so fast and came over and kicked him, kicked him, and said – excuse my words, but they're not mine. They're his. They're his? This guy's words: Nigger ain't dead. . . Unt-uh. Not my words, folks. Bang. Bang. Bang. Those are the words from the man that went bang, bang, bang.

(T. Tr. 1736-37).

Various linguists have identified reclamation of the word "n\*\*\*a/er" within African-American communities. Targeted groups often reclaim and self-define slurs in order to build group solidarity and "hatelessly deliver words of hate." Gregory Coles, *The Exorcism of Language: Reclaimed Derogatory Words and Their Limits*, 78 COLLEGE ENGLISH 424, 425-26, 438 (2016). The use of these words among other group members is often informal and implies a level of familiarity with each other. *Id.* at 435. However, when members outside of targeted groups use the slurs, they are more likely to evoke derogatory racial stereotypes. *The N Word: Its History and Use in the African American Community*, 40 JOURNAL OF ENGLISH LINGUISTICS 137, 142-43 (2012).

Further, some African-American people have noted a clear difference between the "n***er" and "n***a" forms; one individual described "n***er" as the "slave form," suggesting it as more derogatory than the colloquial "n***a." *Id.* at 138. Thus, Larner's choice to use the word "n***er" in closing was not only a clear example of dog whistle racism; it also characterized McFadden as more aggressive than Lucas' testimony portrayed him to be, twisting his words from the colloquial into the antagonistic.

Larner's comparison of McFadden and Mr. Franklin to animals, a typical racist caricature of blacks, is another example of Larner's racism at trial. In describing McFadden, Douglas, and Dismukes's pursuit of Franklin, Larner stated that, "They both wanted part of the kill. They both wanted to kill the deer. That's all this man is to them is a deer. This is an – They don't look at him as a human being. They don't look at life that way." (T. Tr. 1781). By comparing Mr. Franklin to a deer, Larner implicitly compared McFadden, Douglas, and Dismukes to predatory animals who hunt deer. Larner furthered this comparison by stating, "They don't think the way we think," (T. Tr. 1782), suggesting his belief that black men are different in mental cognition from white men, such as himself and most of the jury.

Larner further tried to portray McFadden as "dirty" in order to evoke repulsion from the jury. Larner described the gun used as "Dirty-Harry" style, emphasizing repeatedly that the gun used "dirty" and "nasty" bullets. (T. Tr. 1730). This argument,

82

taken in context with Larner's previous statements comparing McFadden to an animal, further demeans McFadden through racist stereotypes.

Larner used his trial arguments to paint McFadden not only as an animal, but as an unsanitary animal, in an attempt to prejudice the jury against McFadden. Larner's own racism during trial did not exist in a vacuum; his choice of language invited the jury to lean into their own biased assumptions of McFadden.

In his dissenting remarks in *Turner v. Murray*, Justice Brennan argued a jury member's own racial bias can affect their decision-making not only at the sentencing phase, as the majority suggested, but also during the trial stage. *Turner v. Murray*, 476 U.S. 28, 42 (1986) (Brennan, J., dissenting) ("Might not those same racial fears that would incline a juror to favor death not also incline a juror to favor conviction?"). Brennan argued that racially biased jurors are unable to make the discretionary decisions that are required throughout trial, such as evaluating which witnesses are credible, because their vision is blurred with racism. *Id.* at 43. Brennan's words are particularly potent when considering the implicit bias of McFadden's predominantly white jury members.

Reasonably effective counsel would have objected to these racial overtones. Because Larner's racist language throughout the trial painted McFadden as a racist caricature, and likely swayed some jury members, McFadden was prejudiced. This court should vacate McFadden's sentence and remand for a new trial.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests discovery and/or an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d) has no application to this claim.

**Claim 5-10:     Counsel was ineffective for failing to present a gang expert to contextualize the aggravating gang evidence presented to the jury.**

Terminology implying McFadden's gang affiliation, which was inadmissible within the circumstances of this case, littered the proceedings. As noted in Claim 5-9, evidence of gang membership is generally inadmissible and prejudicial. *Dawson*, 502 U.S. 159; *Lemon*, 239 F.3d at 971. However, reasonably effective counsel would have recognized the inevitability that this evidence would be before the jury and retained a gang expert to answer such non-statutory aggravation. *Wiggins*; *Rompilla v. Beard*, 545 U.S. 374, 393 (2005).

Initially, Larner's opening statement implicated gang divisions when discussing that Mr. Franklin testified "against two of [McFadden's] buddies, the defendant's buddies, two guys that he hangs out in the same group of friends, two close friends of the defendants: Corey and Lorenzo Smith," which invited the jury to draw the inference that McFadden was in the same gang as the Smith brothers. (T. Tr. 993).

84

Larner stated this crime was "pay back [that] had to occur" for Mr. Franklin testifying against the Smith brothers. *Id.* p. 994.

During Eva Addison's direct examination, she agreed with Larner's leading question about the Smith brothers being in a tightly knit group and same group of friends. (T. Tr. 1376). Eva later stated the Mr. Franklin did not hang out with the same group of people. *Id.* p. 1391. This would imply that Mr. Franklin is in a different gang than McFadden or the Smith brothers.

Gang inferences also came out in Hazlett's testimony:

Q. Was [Mr. McFadden] a buddy of yours?

A. We ain't affiliated at all.

(T. Tr. 1194). The Court stated to Larner if he was going to ask gang related questions that he must approach a side bar prior to asking. In this case, Larner did not ask to approach the bench. Hazlett stating that he was not "affiliated" implies that McFadden was affiliated or that McFadden's affiliation is different than that of Hazlett's, which is why Hazlett is not a buddy of his. *Id.*

Larner also admitted letters written between McFadden and Douglas into the record. (T. Ex. 401-403, 407, 409, 502-506, 509). It was agreed upon prior to trial that the word "gang" would not be used. (T. Tr. 978-9, 979). Larner also stated to the trial court that he would not get into any gang evidence. *Id.* pp. 976-977. However, the letters Larner introduced were gang evidence. The words "gang related" were contained in the letters used as exhibits. (T. Ex. 403, 407, 505).

85

Another letter included the words "Bino Gang – R – Nothing." (T. Ex. 509). After the jury had already drawn inferences from prior testimony, this evidence of gang membership was introduced to confirm the jury's suspicion. These letters introduced other gang evidence, such as gang language like "bool." (T. Ex. 503, 506). There was also evidence of gang unity phrases such as "love & loyalty," "loyalty is royalty," "bino in bino out," "love is love," "fambino," and more. (T. Ex. 401-403, 407, 409, 502-506, 509).

Although McFadden's trial counsel agreed upon the word "group" with Larner, they should not have. (T. Tr. 979). The words "group" or "same close-knit group of friends" implied to the jury that McFadden belonged to a gang. *Id.* In *Dawson*, the Court held that "the inference which the jury was invited to draw in [Dawson's] case tended to prove nothing more than the abstract beliefs of the Delaware chapter." *Id.* Similarly in McFadden's case. The evidence in McFadden's case, like in *Dawson*, "was employed simply because the jury would find these beliefs morally reprehensible." *Dawson*, 503 U.S. at 167.

Given the above was coming in, reasonable trial counsel should have secured a gang expert to contextualize the meaning of affiliation and gangs. The reality of gangs in that community, and the grooming of children into that lifestyle. Reasonable counsel would have armed themselves to answer this aggravation. However, as noted by the Supreme Court in *Andrus v. Texas*, 140 S.Ct. 1875, 1877-1878 (2020), due to McFadden's trial counsel "none of this mitigating evidence reached the jury. That is

86

because [] defense counsel not only neglected to present it; he failed even to look for it. Indeed, counsel performed virtually no investigation of the relevant evidence. Those failures also fettered the defense's capacity to contextualize or counter the State's evidence… ."

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests discovery and/or an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d) has no application to this claim.

### Claim 5-11:  Counsel was ineffective for failing to call lay witness cultural mitigation.

Testimony from multiple witnesses at the post-conviction hearing detailed what life was like in Pine Lawn. The lay witnesses speaking on this issue were Tanesia Kirkman-Clark, Elwynn Walls, Sean Nichols and Willabea Blackburn.

Tanesia Kirkman Clark testified to having lived in Pine Lawn most of her life though it had been a while since she had lived there. (Addison 29.15 Tr. 156).[11] She "pretty much grew up" with McFadden whose grandmother "stayed like around the

---

[11] The testimony from the Addison post-conviction hearing was received by the Franklin post-conviction trial court via judicial notice. (29.15 Tr. 21-22).

corner" from her mom. *Id.* Though Pine Lawn is "supposed to be county" everyone calls it the city because "[i]t's more like the city, the bad part of the city." *Id.* p. 157.

In the mid-1980's and 1990's, there was the "big boom where drugs started coming to the area more" and "gangs became more popular"; Pine Lawn became more "Ghetto" about that time though it had once been a "beautiful county." (Addison 29.15 Tr. 158). Kirman-Clark testified that it became "pretty hectic" in Pine Lawn between communities fighting; people beginning to use crack cocaine, which had become "popular"; stealing; robbery and killing. *Id.* p. 159.

She noted an ever-present problem with police brutality. Addison 29.15 Tr. 160. The Pine Lawn Police Department was known for brutality and employing officers discharged from other forces after reports of racism. *Id.* pp. 159-60. The Pine Lawn Police had a reputation for planting drugs on arrestees and stealing from them. (Addison 29.15 Tr. 162-63).

She stated that "[m]ost of the young kids in the neighborhood either got shot or killed." She referred to the rate of shooting and/or killings "as like an every day thing;" she thought someone from Pine Lawn was shot "predominately every week." (Addison 29.15 Tr. 160). There was a lack of positive male role models with most fathers being "just not present," alcoholics or on crack cocaine. *Id.* p. 161. It was a small community where "everyone kind of knows everyone" so everyone was affected by the environment. Pregnant sixth grade girls were common; they simply "were not caring about themselves." *Id.* p. 164. Young men wanted to run away. *Id.* Again, there

88

was just a feeling of hopelessness. *Id.* There was not just a feeling of poverty, "[t]hey knew they were living in poverty"; the boarded-up houses evidenced that fact. *Id.* pp. 164-65.

Kirman-Clark testified that being in Pine Lawn "watching all the death, it takes something out of you." (Addison 29.15 Tr. 164). "It makes you feel hopeless" and is still hard to deal with "especially when you know there's no one going to help." *Id.*

Elwynn Walls lived in Pine Lawn, grew-up in the areas surrounding Pine Lawn (Velda City), owned a barber shop in Pine Lawn, and attended Normandy schools. (29.15 Tr. 434-35, 443). Commencing in the 1980s and going forward, Walls witnessed increased crime, violence, drug dealing, gang related activity, abusive police behavior, and government corruption in Pine Lawn. *Id.* pp. 436-45. He described the sale and use of drugs as "prevalent." (Addison 29.15 Tr. 198). He described the negative change in the community as "catchy." *Id.* Noting that the youth were "probably observing" the negative changes environment, he believed the negativity "catches from one generation to another[.]" *Id.* There was a lack of positive male role models in Pine Lawn. (29.15 Tr. 444). Walls had become active in then recent years in investigating police corruption and policing policies. (Addison 29.15 Tr. 199).

Sean Nichols is African-American and a St. Louis City Public Schools administrator, specifically a principal and an educator, who had worked with children from elementary school age all the way to twenty-one years of age. *Id.* pp. 353-54. One hundred percent of the children in the schools at which he taught were from at-

89

risk communities. *Id.* p. 354. His work focused on high-risk north St. Louis students. (29.15 Tr. 256-60, 262). Nichols highlighted that he believes that his students who come from at-risk communities lack positive male father role models. *Id.* pp. 262-64. Based on his experience in working with children from at-risk communities, specifically as an African-American male, he believed there were challenges that "can be very difficult to avoid" when coming from certain at-risk communities, to the point it being "almost like you are a prisoner in your own community." (Addison 29.15 Tr. 356).

These challenges include drugs, gangs, absent fathers, violence, and poverty. *Id.* pp 356-60, 362-63. The impact of violence and gangs was exemplified by Nichols's acknowledgement that his own brother,  who lost his life in gang activity, was the first to express to Nichols that he could not safely walk in certain neighborhoods—"which may be three or four blocks"—because people from an opposing community may attack him. *Id.* p. 361. Violence and gangs are an outgrowth of being raised in at-risk communities and undermine opportunities for learning at school for there is "no way learning is going to take place" when a child doesn't feel safe. (29.15 Tr. 264-65, 269-70).

Willabea Blackburn has, since 1970, lived in Velda Village Hill, adjacent to Pine Lawn. (29.15 Ex.44 p. 386-87). Velda Village Hill's proximity to Pine Lawn—"[i]t's on the same street" that "[j]ust changes names"—she's very familiar with Pine Lawn. *Id.* She testified that the area had never been an "excellent area" due to the police in Pine

Lawn and Velda Village Hill targeting African-Americans for mistreatment. *Id.* p. 388. Starting in the 1980s, gang presence became a prevalent Pine Lawn problem. *Id.* p. 389.

Blackburn's children and grandson attended Normandy High School which was known as especially violent, having to have police and guards. (29.15 Ex.44 pp. 390-91). McFadden and Blackburn's grandson were friends. *Id.* p. 392. Blackburn's grandson was killed in Pine Lawn. *Id.* pp. 388-89.

Counsel testified to failing to investigate calling community leaders or persons who were working to address socioeconomic issues in Pine Lawn at the time McFadden was growing up; Kraft did not recall even considering interviewing community leaders. (29.15. Tr. 487). Kraft testified that they only attempted to find friends of McFadden; they did not attempt to find other people who lived in Pine Lawn at the same time as McFadden. (Addison 29.15 Tr. 529). Counsel would have considered calling Kirkman-Clark (29.15 Tr. 96-98, 492), Walls (*id.* p. 104-05, 498-99), Nichols (*id.* p. 98-99, 492-93), and Blackburn. (*Id.* p. 91, 488).

Counsel are obligated to discover and present all substantial, available mitigating evidence. *Wiggins*, 539 U.S. at 524-25; *Williams*, 529 U.S. at 395-96. That mitigating evidence includes: "'medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences.'" *Wiggins*, 539 U.S. at 524. Foregoing presenting evidence because it contains something harmful is unreasonable when its harm is

91

outweighed by its helpfulness. *See Williams*, 529 U.S. at 395-96 (counsel ineffective in failing to present evidence of severe abuse and defendant's limited mental capabilities where not all the evidence was favorable to defendant).

The lay witnesses called by counsel failed to give the detailed picture the jury needed to understand growing up in Pine Lawn for McFadden. We need only compare the testimony of the lay witnesses at the 29.15 hearing above, to the testimony of the lay witnesses called at trial.

Fay McFadden, paternal aunt to McFadden testified that McFadden basically bounced around from person to person (T. Tr. 2084), was left home alone because his mother spent "[n]ot a lot of time at home" due to working, (*Id.* p. 2086), and would get "picked on" by other kids who would "run him home" on a "regular basis" due to his being small in size. *Id.* p. 2089. McFadden's father had a "serious alcohol problem," so much so that she would classify him as an alcoholic. (T. Tr. 2090). He "didn't have time" for McFadden because of it. *Id.* p. 2091. Minnie Lee McFadden testimony confirmed Fay's testimony in that McFadden bounced around (*Id.* p. 2105) and his father had an alcohol problem. *Id.* p. 2108. She testified that his mother would be gone for "[q]uite a while"—sometimes months— during which she did not know where his mother was or when she planned to return. *Id.* pp. 2106-07.

The testimony of Lisa Northern, maternal aunt of McFadden, added very little. She too confirmed that McFadden was picked on. (T. Tr. 2123). Additionally, she testified that she'd requested to keep McFadden, but his mother said no, only to give

92

custody of him to Tarkio. *Id.* pp. 2125-26. Don Northern's testimony[12] gave a picture of what McFadden's life was like during the short periods of time he was at the Northern home; what his life could have been like ultimately. Northern had no problems with McFadden when McFadden was in his home. *Id.* pp. 2142-43.

Despite a mitigation theory to show the jury McFadden's neglected upbringing in the rough and violent neighborhood of Pine Lawn through the familial lay witnesses discussed above, not one accomplished this goal. Their brief testimony[13] provided minimalist statements. Very few if any examples were given. Blanket statements that McFadden was picked on, without how and how often, was left home alone to care for himself and his siblings, without a description of the home and how often, had an alcoholic father, without examples of his alcoholic ways, are not enough. Blanket statements without discussions of how it impacted McFadden—how did he appear emotionally when he called and was pick up after being left home alone, how did he respond when he expected to see his father, but his father didn't show up, etc., do not show the jury what life was like for McFadden. Further, despite their testimony being the main evidence of what it was like living in Pine Lawn when McFadden grew up, not one of them discussed Pine Lawn's environment.

---

[12] His testimony from trial was read into the record as he was deceased.

[13] Fay's testimony was 23 pages, Minnie's testimony was 15.5 pages, Lisa's testimony was 16 pages and Don's testimony was 11 pages.

Further lay witness testimony came from neighborhood friend of McFadden, Lynette Elaine Hood. Her only pertinent testimony, which was very short,[14] was as follows:

> Q:   What kind of neighborhood was it that you were living in in Pine Lawn? How would you describe it?
> A:   Violent.
> Q:   Did you hear gunshots?
> A:   All the time.
> Q:   And what would you do when you heard these gunshots?
> A:   Hit the floor.
> Q:   It would concern you?
> A:   Uh-huh.

(T. Tr. 2154-55). This was the entirety of Hood's testimony regarding the environment of Pine Lawn. Her testimony otherwise contributed nothing of substance to a picture of McFadden's childhood growing up in Pine Lawn.

Nelson, a deputy juvenile officer for McFadden, gave similarly brief answers when describing Pine Lawn. He described it as a violent, "high crime", "economically depressed" neighborhood that was difficult to live in, the same as he described the neighborhood McFadden's mother lived in. (T. Tr. pp. 2172-73). Otherwise, the most he contributed to counsel's mitigation theory was that he came to determine that McFadden's mother's boyfriend was causing the problems in the household, though McFadden was the one who ended up leaving. *Id.* p. 2181. Finally, Vincent Sr.'s testimony contributed nothing that had not already been said.[15]

---

[14] It was 12 pages in the transcript.
[15] His testimony was 11 pages.

The testimony of the lay witnesses counsel chose to call did very little to support their own mitigation theory. They provided short answers to questions intended to give the jury a sense of McFadden's life. Their testimony, when focusing on just the issues that were pertinent to counsel's mitigation theory, was almost non-existent. While in some instances, their testimony was cumulative to one another, it was not cumulative to the testimony of the lay witnesses' testimony at the 29.15 hearing.

What these witnesses had to say about gang involvement was merely an aside to all the weighty problems youthful African-American males encountered growing-up in Pine Lawn. Moreover, as discussed in Claims 5-10 and 6, the jury heard about gang evidence from the letters exchanged between McFadden and Douglas. (29.15 Tr. 588-90). Additionally, counsel acknowledged that from the evidence the jury heard at the Franklin trial, the jury would have inferred gang association. *Id.*

The additional lay witnesses could have presented a comprehensive picture of the deprivation that characterized everyday life in Pine Lawn: poverty, teenage pregnancy, single parent households without positive male role models, police brutality, racist police targeting, fighting, crimes of all kinds, easy access to guns, shootings, drug dealing, and exploitive government corruption. Counsel could not have made a strategic decision not to call Kirkman-Clark, Walls, Nichols and Blackburn when their investigation had been limited to finding McFadden's friends and did not include any consideration of finding an expert to provide analysis of the

95

impact of growing up in Pine Lawn as a child. *See* Claims 5-4 & 5-5.  These uncalled witnesses, in addition to an expert detailing the experience of growing up in Pine Lawn—including objective measures—would have provided a more vivid picture of how much of a struggle growing up in Pine Lawn was, especially for an African-American male.

Reasonable counsel would have called these witnesses to testify about what life was like for African-American male youths growing-up in Pine Lawn. *See Strickland, Wiggins, Williams v. Taylor, Rompilla; Andrus*. McFadden was prejudiced because had the jury heard these lay witnesses alone, or in conjunction with Dr. White (Claim 5-5), then McFadden would have likely been sentenced to life. *See Strickland; Wiggins; Williams*. This Court should grant habeas corpus relief and grant a new penalty phase.

****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 93–98. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *McFadden III*, 619 S.W.3d at 451. This decision was an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C.A. § 2254 (d)(1)(2). The Missouri Supreme Court clearly erred affirming the lower court's finding that counsel was not ineffective for failing to call penalty mitigation lay witnesses Taneisha Kirkman-Clark, Elwynn Walls, Sean Nichols, and Willabea Blackburn as cultural mitigation witnesses

96

to testify about the all-encompassing, adverse, hostile disadvantaged social conditions of growing-up in Pine Lawn and neighboring North St. Louis County communities.

**Claim 5-12:    Counsel was ineffective for failing to furnish Dr. White's findings to Dr. Draper.**

At trial, Dr. Wanda Draper described how McFadden lacked nurturing and emotional stability because he was shuffled between households. (T. Tr. 2234-37, 2244). Dr. Draper described McFadden growing-up in a very violent neighborhood and becoming involved in alcohol and drugs at a young age. *Id.* pp. 2240-42. McFadden's ability to make good decisions was compromised by his overall unstable living situation. *Id.* pp. 2251-52. McFadden's unstable living situation produced a severe attachment disorder. *Id.* p. 2235.

Dr. Draper testified that McFadden was born early at eight months, though he was able to "go home right away" where "his care was very sporadic in terms of who had the time to hold him and cuddle him and nurture him", actions that are "[a]bsolutely necessary in order for a person to grow and to develop normally[.]" (T. Tr. 2233). McFadden lived from "place to place" and was "extremely neglected"; he and his sisters were "left alone without any care" at their mother's house "many times." *Id.* p. 2234. His mother, Theresa, was not available due to "working a great deal" and having numerous boyfriends and other people "coming and going" from

97

the house so that McFadden was still neglected even in her presence.[16] *Id.* pp. 2237-38. Theresa ultimately gave custody of McFadden away, leading to further deterioration in McFadden's behavior. (T. Tr. 2243). Notably, the "very sporadic kind of care" he received, in which "[t]he nurturing wasn't there," McFadden developed "an attachment disorder: a severe, disorganized attachment, which did not undergird him at all for his future development." *Id.* p. 2235. Dr. Draper testified "that undergirding, that basis for love and attachment, mutual relationship between that consistent parent and the baby, are all undergirding factors to the roots of morality." *Id.* p. 2237.

Living in a "very violent neighborhood" where fighting was "a way of life"[17] in addition to exhibiting early disorganized attachment, McFadden "never felt secure and safe in and of himself" and "became very defensive in his behaviors." (T. Tr. 2240). He also began using alcohol and drugs by the time he was eleven and twelve years old, another activity in which it "was not unusual for a lot of kids to get involved" at an

---

[16] Dr. Draper testified that there were "some altercations and beatings and various behaviors. A lot of drug activities going on. People coming in and out of the house. Sometimes there could be twelve or fourteen people in the house. And it was very chaotic." (T. Tr. 2246).

[17] McFadden was shot in the leg as some point. Dr. Draper testified the incident "caused [McFadden] to become even more defensive and more vigilant, perhaps to the extreme that he became involved in more unlawful behaviors." (T. Tr. 2248). Several of his friends from school/neighborhood had been murdered. (*Id.* p. 2326). In addition to his mother living in a violent neighborhood, Draper testified that both sets of his grandparents, with who he stayed sometimes, also lived in high crime, violent areas. (*Id.* p. 2253).

early age in his neighborhood. *Id.* p. 2241. Further, "his ability to make good decisions was compromised by his overall development from day one." *Id.* p. 2251. Dr. Draper testified that before being arrested, McFadden had not had a stable environment at any point in his life. *Id.* p. 2323.

Of note, Dr. Draper testified that the purpose for evaluating McFadden was to "study Vincent's development from the time he was a very young child to the current time" in order to "get a picture of Vincent." (T. Tr. 2230). In the list of things, she was to study to get this "picture" was where he lived. *Id.* She never received that information, even though it was reasonably available.

In post-conviction, Dr. White examined Pine Lawn to "paint a picture of what …life was like for [McFadden] growing up and what that could have meant and what impact that might have had on [McFadden] as an individual." (29.15 Ex. 43 p. 466). His focus was to be the environment that McFadden and many other kids were growing up in as residents of Pine Lawn during the time of McFadden's developmental years. *Id.*

Turlington described counsel's theory of mitigation was McFadden's upbringing: "come from a very bad background. He had a very, very poor home life. He basically did not have a chance in life." (29.15 Tr. 70). McFadden grew up in a community with drugs, violence and poverty. (*Id.* p. 72, 167). Kraft described the theory of mitigation as "That Vincent had had quite a rough childhood filled with abuse and neglect and had been raised in a pretty difficult and violent environment."

99

(*Id.* p. 477). Kraft noted there was not a tactical reason for not calling an expert like Dr. White. (*Id.* p. 479).

Turlington described counsel's theory of mitigation was McFadden's upbringing: "come from a very bad background. He had a very, very poor home life. He basically did not have a chance in life." (29.15 Tr. 70). McFadden grew up in a community   the issues that he dealt with growing up in terms of neglect, possibly abuse, that he grew up in a rough neighborhood, that he had family that still cared about him." (Addison 29.15 Tr. 524). Turlington described counsel's theory of mitigation as "[b]asically Vincent had had a very, very chaotic childhood in which he did not have consistent parenting. He grew up in poverty and he really didn't have like a consistent education or consistent role model[.]" *Id.* pp. 697-98.

Kraft, who didn't know Dr. White at the time of the trial, testified that counsel did not conduct any investigation on the impact that growing up in a neighborhood; they had "probably talked" to Dr. Draper about that "somewhat"; however, "her focus was more on the child development aspect of Vincent's background." (Addison 29.15 Tr. 526, 529). Turlington testified that counsel's investigation into the impact on McFadden in growing up in such a Pine Lawn was to talk to family members and hire Draper. *Id.* p. 701. Turlington went on to state that counsel didn't consider hiring a specific expert on the effects on children of growing up in at-risk communities like Pine Lawn and the surrounding communities. *Id.* p. 702.

100

Counsel testified Dr. Draper's testimony did not address the particularized problems at-risk communities pose for individuals like McFadden. (29.15 Tr. 82-83). Accordingly, counsel would have shared Dr. White's findings with Dr. Draper so that Dr. Draper could have provided a more detailed assessment of McFadden's development. *Id.* p. 83, 484-85. Counsel would have presented through Dr. Draper how the factors White identified placed McFadden at greater risk for becoming involved in criminal activity. *Id.* p. 84.

Trial counsel were ineffective for failing to furnish Dr. Draper with Dr. White's findings, or a similar expert, because his findings viewed in conjunction with Dr. Draper's findings would have explained for the jury the magnitude of McFadden's traumatic childhood. Dr. Draper testified regarding her reliance and incorporation of the reports of other experts when formulating her opinions. (29.15 Tr. 298). Dr. White's risk immersion analysis chronicling Pine Lawn's at-risk "war zone" factors highlighted the special vulnerabilities McFadden encountered that lead to his drug and gang association, and thereby, supported Dr. Draper's findings presented at trial (29.15 Tr. 294, 301-19). Dr. White's Pine Lawn analysis supported Dr. Draper's findings regarding McFadden's tumultuous life and the attachment disorder findings. (29.15 Tr. 319-25, 327-28, 341; 29.15 Ex. 45).

Counsel are obligated to discover and present all substantial, available mitigating evidence. *Wiggins*, 539 U.S. at 524-25; *Williams*, 529 U.S. at 395-96. Mitigating evidence includes: "medical history, educational history, employment and

101

training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences." *Wiggins*, 539 U.S. at 524 (italics in original).

Counsel did very little personal investigation into McFadden's upbringing in Pine Lawn. By their own admission, they failed to even consider the possibility of obtaining an expert on at-risk communities, a well-trod path. There can be no credible assertion Dr. White's research is new or novel. While Dr. White's label may have been unique, "risk immersion" (29.15 Ex. 43 pp. 483-484), at-risk communities have been studied for decades from any number of perspectives. Counsel admitted that Dr. Draper's report was supposed to cover the topics discussed in Dr. White's report, the socioeconomic impact of growing up in Pine Lawn (29.15 Tr. 82-83), but did not.

Upon noticing this absence of information, counsel admitted failing to consider other avenues of obtaining the required social history information, like a similarly qualified expert as Dr. White. Counsel ultimately provided nothing more than limited anecdotal evidence from lay witnesses because they did not even call Dr. Draper at the second trial. There was no strategic reason for failing to obtain Dr. White, or a similarly qualified expert, to provide Dr. Draper with the environmental information she did not have. "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Wiggins*, 539 U.S. at 528 (citing *Strickland*, 466 U.S., at 690-691).

Reasonable counsel would have obtained Dr. White's Pine Lawn cultural conditions findings and supplied them to Dr. Draper to corroborate her findings. At a minimum, counsel would have considered and found a similarly qualified expert to provide to Dr. Draper findings on Pine Lawn's cultural and environmental conditions. By doing so, counsel would have cast doubt upon the State's counter-example that many children who grow up in neighborhoods like Pine Lawn, but turn out fine. It would have explained why McFadden was different from everyone else (T. Tr. 2303-04), which is a requirement of individualized sentencing.

McFadden was prejudiced because there is a reasonable probability that had counsel supplied Draper with White's findings the jury would have imposed life once they could attribute McFadden's attachment disorder to Pine Lawn's cultural and environmental conditions. *See Strickland*. This court should grant habeas corpus relief and grant a new penalty phase.

****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 99–102. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *McFadden III*, 619 S.W.3d at 452. This decision was contrary to and/or an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C.A. § 2254 (d)(1)(2). The Missouri Supreme Court clearly erred affirming the lower court's finding that counsel was not ineffective for failing to furnish Dr. Draper

103

with Dr. White's Pine Lawn cultural mitigation analysis for Dr. Draper to corroborate and incorporate into her findings.

**Claim 5-13:** **Counsel was ineffective for failing to present evidence that McFadden didn't assault or seriously injure Daryl Bryant and Jermaine Burns.**

During the penalty phase, the State presented through Trial Exhibit 101 that McFadden was convicted on February 4, 2005, and sentenced regarding an assault of Daryl Bryant and Jermaine Burns: (1) first degree assault - 15 years; (2) armed criminal action - 30 years; (3) first degree assault - 10 years; and (4) armed criminal action - 10 years. (T. Tr. 2027-29). The jury found as aggravators all four of the Daryl Bryant/ Jermaine Burns convictions. (D.A. L.F. pp. 684-85). Trial counsel unreasonably failed to minimize the effect of this statutory aggravation of which they had notice.

Butch Johnson's deposition was admitted at the 29.15 hearing regarding the Bryant/Burns events (29.15 Ex. 36 p. 5-6, 20; Addison 29.15 Ex. 35 p. 112-85). Johnson reviewed Bryant/Burns crime scene photos, hospital medical reports and police reports arising from the Bryant/Burns events. (29.15 Ex. 36 p. 20-21). Police reports described what happened as McFadden having jumped out of his car to shoot at the minivan Burns drove while McFadden stood at the minivan's right front: the passenger side of the van. *Id.* p. 23. Johnson's investigation, however, reflected that in order for Bryant to have gotten shot in his buttocks the shooter would have had to have been standing towards the back of the minivan when he fired since Bryant was sitting in the front passenger seat. *Id.* p. 24.

104

Johnson testified Douglas, brother of Dismukes, completed an affidavit on September 26, 2006, recounting that Dismukes told Douglas that Dismukes shot Bryant/Burns. (Addison 29.15 Ex.18; 29.15 Ex. 36 pp.25, 28-29). Johnson testified that Bryant's hospital records reflected he sustained a superficial right buttocks abrasion. (29.15 Ex. 36 p. 31; 29.15 Ex. 21). Bryant's medical records reflected he **walked** into the hospital, did not have significant bleeding, and was there less than two hours. (29.15 Ex. 36 pp. 31-33; 29.15 Ex. 21). Johnson later personally turned over all his Bryant/Burns 29.15 postconviction investigation, including the Douglas affidavit, to McFadden's counsel responsible for the trial of this case. (29.15 Ex. 36 pp. 27-28).

At the 29.15 motion hearing, counsel testified to knowing McFadden testified at the Bryant/Burns assault trial that Dismukes, not McFadden, was the shooter. (29.15 Tr. 112, 503-04). Counsel confirmed receiving a packet of materials from investigator Johnson relating to the Bryant/Burns case (*Id.* pp. 112-13, 504) and having received information from Douglas that Dismukes was the Bryant/Burns shooter. *Id.* pp. 112-13.

In spite of that, counsel chose not to contextualize the Bryant/Burns convictions at the Franklin retrial. (29.15 Tr. 113). Counsel testified that the State presenting certified documents evidencing the Bryant/Burns convictions avoided live witnesses to testify about them. *Id.* pp. 192-95, 504-05, 573-74.

The Franklin 29.15 trial court reviewed the trial court's 29.15 findings from the Bryant/Burns assault case. (29.15 L.F. Doc. 222). It unreasonably relied upon them to deny relief.

Mo. Ann. Stat. § 565.050.1 states, in pertinent part, that a person commits the offense of assault in the first degree if he knowingly causes or attempts to cause serious physical injury to another person. "Serious physical injury" is defined, in turn, as physical injury that causes serious disfigurement or protracted loss or impairment of the function of any part of the body. Mo. Ann. Stat. § 556.061(44). A conviction on paper without an explanation of the details surrounding the conviction leaves the jury to assume the worst. The jury could have reasonably found Bryant's injuries were not a "serious physical injury" if the evidence provided to counsel by Johnson, specifically the hospital records showing he had a superficial right buttocks abrasion with little bleeding, had been presented to them. Such a conclusion, in turn, could have led the jury to reject these two convictions as aggravating circumstances. *Wiggins*; *Rompilla*.

Likewise, "any person who commits any felony under the laws of this state by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon is also guilty of the offense of armed criminal action." Mo. Ann. Stat. § 571.015.1. Johnson's investigation concluded McFadden could not have shot Bryant in the buttocks from the position the police report claims he was in and that another person, Dismukes, was responsible for the shooting. Again, the details, which were in dispute, give context to the charge and involve issues of credibility, which is

106

determined by the jury as factfinder. The explained conviction could have led the jury to reject these two counts as aggravating circumstances. *Wiggins; Rompilla.*

One of the primary duties of counsel at a capital sentencing proceeding is to neutralize the aggravating circumstances advanced by the state and present mitigating evidence. *Wiggins,* 539 U.S. at 524 (counsel has duty to investigate and rebut aggravation); *Parker v. Bowersox,* 188 F.3d 923, 929-31 (8th Cir. 1999) (counsel was ineffective for failing to present evidence rebutting aggravation that victim was potential witness against Parker). The Sixth Amendment requires a trial counsel to prepare to challenge aggravation. *Rompilla,* 545 U.S. at 393.

Reasonable counsel would have presented the available evidence that McFadden did not shoot Bryant/Burns. Reasonable counsel would have relied on Bryant's Barnes medical records showing Bryant sustained superficial injuries. (29.15 Ex. 36 p. 32; 29.15 Ex. 21). McFadden was prejudiced because presenting all the available evidence would have neutralized four of the five aggravators that the jury found. (D.A. L.F. pp. 684-85). There is a reasonable probability he would not have been sentenced to death had counsel presented evidence rebutting that this aggravation evidence that McFadden committed assaults on Bryant and Burns and rebutting that Bryant was seriously injured. This Court should grant habeas corpus relief and grant a new penalty phase.

****

107

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 115–118. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *See McFadden III*, 619 S.W.3d at 454-55. This decision was contrary to and/or an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C.A. § 2254 (d)(1)(2). The Missouri Supreme Court clearly erred in affirming the lower court's finding that counsel was not ineffective for failing to present evidence rebutting that McFadden committed assaults on Bryant and Burns and that Bryant was seriously injured.

**Claim 5-14:**     **Counsel was ineffective for failing to disprove the Addison offense.**

The State's penalty evidence included testimony from Eva Addison that she hid behind bushes and saw McFadden shoot her sister, Leslie Addison. (T. Tr. 1851-53). Eva further testified that she, Leslie, and McFadden had argued at Maggie Jones's house (31 Blakemore) shortly before McFadden shot Leslie. *Id.* pp. 1842-48, 1885. She stated Arnell "Smoke" Jackson was present for the argument and had traveled there in a car separate from McFadden. *Id.* pp. 1845, 1849. Stacy Stevenson testified to hearing a gunshot at 11:45 p.m. in the area where Leslie was shot and calling 911 to get Leslie help. *Id.* pp. 1979-83.

During the Franklin trial, Jeff Hunnius, St. Louis County Police Department crime scene detective, testified to taking photos of the crime scene shortly after

108

midnight on the morning of May 16, 2003. (T. Tr. 1959). There were no street lights on the side of the street where items of evidence were found. *Id.* p. 1971. He agreed that that it was so dark, he would have had difficulty doing his investigation without the use of artificial light: he used artificial light from flash on his camera. *Id.* While he had measured the distance from the corner to the shooting location, he did not measure from the bushes to the shooting location. *Id.* p. 1976).

During the Franklin trial, Stevenson testified to living in an apartment near the Addison shooting. (T. Tr. 1979). He heard a male and a female arguing. *Id.* p. 1980. He saw them both (*Id.* p. 1985), but not after they passed the stop sign, which was beyond his line of sight. *Id.* p. 1988. He testified that after hearing the shooting, it was so dark that he couldn't tell there was a body on the ground when he first looked outside. *Id.* p. 1990. It was so dark that he couldn't see there was a body on the ground until the lights from an SUV shined on it. *Id.* p. 1991. He confirmed there are no lights on the side of the street where the shooting took place and that the only other light was "up on Naylor." *Id.* p. 1992.

At the 29.15 motion hearing, counsel testified to deposing Jones who testified that she did not hear any fighting at her 31 Blakemore home nor did Eva tell her she was in a fight with anyone the night Leslie Addison was killed. (29.15 Tr. 118, 509). However, despite having called Jones at the first Addison trial to testify she did not hear any fighting at her 31 Blakemore home on the night Leslie Addison was killed (29.15 Tr. 509), counsel asserted that calling Jones would have resulted in

109

corroborating Eva's emotional response to McFadden's allegedly shooting Leslie. (29.15 Tr. 199-200, 577-78).[18] Counsel further testified the lack of blood on McFadden's clothing would not have helped because he was not arrested for shooting Leslie until two days after Leslie was shot. *Id.* pp. 208, 510. Counsel interviewed Jackson and concluded he had nothing helpful. *Id.* pp. 203-05. Counsel went to the scene where Leslie was shot and concluded Eva's reporting was plausible. *Id.* pp. 207-08.

Arnell "Smoke" Jackson was at 31 Blakemore (Jones' house) and observed an argument involving McFadden, Leslie, and Eva. (29.15 Ex. 10A pp.7-9, 12-13, 48-51, 53-54). McFadden left in a car that was followed by another car containing Jackson. *Id.* pp.8-10, 12, 53, 55, 60. Jackson did not see McFadden get out of the other car to pursue Leslie. *Id.* pp.13-14.

Emergency records showed an ambulance arrived to provide care to Leslie at night at 11:44 p.m. (29.15 Ex. 25 p. 2). Photo exhibits supporting limited lighting around where Leslie was shot and the distance Eva reported viewing the shooting of Leslie from were relied on. (29.15 Tr. 27-30; 29.15 Exs.11, 12, 13, 14, 15, 16, 17A-17G, 24, 36 pp.10-19). When Officer Hunnius responded to the call where Leslie's body was found, it was dark and he used a flashlight to investigate. (29.15 Ex. 41 pp.319-22, 342). Hunnius had to use a camera flash to take pictures. *Id.* pp. 341-42.

---

[18] Kraft previously testified to not recalling a reason for not calling Jones to testify in the second trial. (Addison 29.15 Tr. 517).

110

One of the primary duties of counsel at a capital sentencing proceeding is to neutralize the aggravating circumstances advanced by the state and present mitigating evidence. *See Rompilla*, 545 U.S. at 393; *Wiggins*, 539 U.S. at 524 (counsel has duty to investigate and rebut aggravation); *Parker*, 188 F.3d at 929-31 (counsel was ineffective for failing to present evidence rebutting aggravation that victim was potential witness against Parker).

Eva's identification of McFadden was a major issue. Reasonably effective counsel would have called the jury's attention to the weight of circumstantial evidence making positive identification unreliable at best.

For example, reasonable counsel would have called Jones, Margaret Walsh and Arnell "Smoke" Jackson and presented lighting conditions and distance measurements evidence all to neutralize Eva Addison's aggravating evidence. The need to contradict Eva's asserted ability to see McFadden far outweighed any fear on the effect on the jury of an emotion response from her. When taken together with testimony from Hunnius, and Stevenson that is was too dark to see at the time of the shooting, choosing not to call Jones and Jackson is objectively unreasonable. Further, any strategy argument is unsound where the evidence had already been put on in a trial and a failure to put the evidence on would result in less evidence in support of McFadden's position that he was innocent. Effective counsel would have presented all this evidence. McFadden was prejudiced because there is a reasonable probability, he

111

would not have been death sentenced had counsel sought to minimize the aggravating evidence. This Court should grant habeas corpus relief and grant a new penalty phase.

****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 119–123. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *See McFadden III*, 619 S.W.3d at 455-56. This decision was contrary to and/or an unreasonable determination of the law and facts in light of the evidence presented. 28 U.S.C.A. § 2254 (d)(1)(2). The Missouri Supreme Court clearly erred in affirming the lower court's finding that counsel was not ineffective for failing to call certain witnesses and to minimize the aggravation presented by the State through Eva Addison's testimony.

### Claim 5-15:  Counsel was ineffective for failing to prepare lay and expert witnesses for their testimony.

Counsel has a duty to adequately prepare any witness prior to testifying at sentencing proceedings. In breach of this duty, Kraft and Turlington failed to prepare Dr. Gelbort for his testimony at the first Addison trial. They also failed to prepare Dr. Draper for her testimony at the first Addison trial or the second Franklin trial. Similarly, a lay witness had no idea what they would be asked until they heard it from trial counsel in the courtroom. (Attachment M ¶ 5-6). This failure had an adverse impact on the second Franklin trial because it caused counsel to take a negative view

112

of their witnesses and to omit powerful mitigating testimony altogether, and to present witnesses in a weak fashion. Had counsel actually prepared their witnesses, they would have presented testimony that is reasonably likely to have led the second Franklin jury to a life sentence.

Dr. Gelbort possesses no recollection of having been prepared by either Turlington or Kraft. If he received any preparation, it would have been very terse or minimalistic, and occurred right before the trial. Dr. Gelbort prefers to start prep weeks before testifying. Trial counsel did not engage in extended prep. Any preparation would have been a general overview of expectations, with a minimal review of expected questions. Counsel did not conduct a mock cross-examination.

Counsel likewise failed to prepare Dr. Draper for her testimony at the second Franklin trial. According to Dr. Draper, she flew in and met Turlington and/or Kraft for dinner. After dinner, they spent no more than an hour going through her potential testimony. Dr. Draper does not consider this adequate preparation. Trial counsel did not engage in extended prep. Any preparation would have been a general overview of expectations, with a minimal review of expected questions. Counsel did not conduct a mock cross-examination. Counsel prepared Dr. Draper no more thoroughly before the first Addison trial than before the second Franklin trial.

Had Dr. Gelbort given testimony supported by adequate preparation, it's reasonably likely that the jury at the first Franklin and Addison trials would have voted for a life sentence because he would have more convincingly presented the

113

evidence of McFadden's brain damage. Likewise, had Dr. Draper given testimony supported by adequate preparation, it's reasonably likely that the jury at the first Franklin and Addison trials would have voted for a life sentence because she would have more convincingly presented the evidence concerning the lifelong impact of his impaired child development.

Further, trial counsel's shortcomings also appear to have tainted an already anemic mitigation presentation. According to Lamika Covington, she was not prepared before her testimony. (Attachment M ¶ 5-6, 8). She had no idea why she was testifying or what they wanted her to say. *Id.* She did not know what she would be asked until she heard the questions from trial counsel at the actual trial. *Id.*

Alternatively, failure to prepare these experts from the outset undermines confidence in the outcome of the second sentencing. In the Rule 29.15 hearing, the attorneys testified that they did not call Dr. Gelbort at the second Franklin trial because Dr. Gelbort performed poorly at previous hearings. But if Dr. Gelbort (and Dr. Draper) performed poorly, that was the direct result of their under-preparation. Had the attorneys adequately prepared the experts in the first place, their performance wouldn't have underwhelmed them and they would have used them again effectively at the second Franklin trial. And, as discussed in Claims 5-1 through 5-3, failure to present the second jury with adequate (or any) testimony about brain dysfunction or childhood development undermines confidence in the death verdict. Finally, lay

114

witnesses need to also be prepared in order to effectuate the chosen mitigation strategy.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests discovery and/or an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d).

**Claim 5-16:** **Counsel was ineffective for failing to refer the case to different attorneys who could have performed a competent defense.**

Attorneys in capital cases must seek to advance the client's best defense—and best case for life—in a reasonably competent manner. Before the Franklin retrial, trial counsel Kraft and Turlington had exhausted their ability to represent McFadden competently. Their failure to cede the representation to attorneys who could perform a competent defense amounts to ineffective assistance of counsel.

The 2007 retrial was McFadden's third capital-sentencing hearing in a three-year span. McFadden was tried and convicted in 2005 for the Franklin murder and in 2006 for the Addison murder. The Missouri Supreme Court reversed those convictions because of state misconduct—the exclusion of racial minorities from jury service.

115

Kraft and Turlington represented McFadden at each of these proceedings. They did no additional or original work. They presented less and less. They performed no investigation before the 2007 retrial. They rested on what had failed before and did nothing original.

But criminal defense attorneys have a duty to investigate carefully all reasonably available mitigation, and failure to obtain a life sentence at a previous trial does not absolve counsel of that responsibility. In a capital case, less is not more. Counsel's failure to secure a life sentence in the earlier trials suggested that more needed to be done, not less.

Kraft and Turlington also omitted important mitigation that they'd pursued before. While they had no problem with the substance of any expert's previous testimony—they just didn't like the way the expert delivered the message. Yet, in spite of the extra time allotted to them by virtue of the retrial, they never obtained a substitute expert to present testimony consistent with their stated mitigation theory. Their negligence caused them to completely abandon mitigation based on McFadden's brain dysfunction. An attorney looking at the case afresh would not have given up on a damaged brain as a theory mitigation—indeed, she would have developed them further and would have come up with other mitigation besides.

Resignation that they could not win—and should do less than before—ignored their duties as McFadden's advocates. Trial counsel should have known that their continued representation would result in the incompetent representation. Kraft and

116

Turlington were responsible to investigate and present mitigation. Their inaction directly caused an abbreviated mitigation presentation that simply regurgitated lay testimony previously rejected by a jury. By remaining on the case, their performance fell below an objective standard of reasonableness.

A lawyer must act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. *See* Missouri Rule of Professional Conduct 4-1.7, cmt. ("Even where there is no direct adverseness, a conflict of interest exists if there is a significant risk that a lawyer's ability to consider, recommend, or carry out an appropriate course of action for the client will be materially limited as a result of the lawyer's other responsibilities or interests."). Kraft and Turlington failed in this responsibility. They should have known that they could no longer represent McFadden effectively.

Had counsel acted reasonably by allowing new, motivated counsel to represent McFadden, there's a reasonable likelihood that the outcome of sentencing would be different. As demonstrated in Claim 5, numerous areas of available mitigation were unexplored, available, yet not presented. Had counsel received the full mitigation presentation that new counsel could have given him—and not just the nub of a defense his flummoxed attorneys actually provided—it's likely that the jury would have found a life sentence more appropriate for McFadden than a death sentence. As a result, the Court should order a new sentencing trial.

*****

117

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54. 2254(d) has no application to this claim.

### Claim 5-17:  Counsel were ineffective for failing to prepare a social history premised upon an adequate mitigation investigation.

Counsel in a capital case have a duty to conduct a thorough investigation of their client's background and to present that evidence at sentencing. Without a thorough life history, counsel cannot humanize their client or explain his circumstances to the jury. And without humanizing the client, counsel cannot hope to obtain a life sentence. Here, counsel failed to adequately investigate and present evidence about McFadden's background. Further, such investigation yields information to provide to experts. Had they done so; experts could have considered and the jury would have heard the following:

McFadden was born on March 25, 1980, to Theresa Brown at St. Louis County Hospital. Theresa was twenty years old. The birth certificate contained a question mark where the father's name would usually go. McFadden was undersized as an infant, weighing five pounds, seven ounces. (Attachment GG p. 5). McFadden tested positive at birth for core blood. *Id.* p. 11. This indicated McFadden was not getting enough oxygen secondary to complications with the umbilical cord.

118

To his paternal cousin, Yolanda Johnson, he "looked like a rat" and "didn't look like he was real." He compared negatively to another baby born into the family just three weeks earlier, Cortez McFadden. The family notices a striking difference between Cortez and McFadden in their developments. Family members recognized that at some point McFadden stopped growing physically, emotionally, and mentally.

For the first six months of McFadden's life, McFadden and Theresa lived with Theresa's parents, David Lee Brown ("David Lee") and Glenda Brown. McFadden's father, Vincent McFadden, Sr. ("Vince"), came into the picture when McFadden was six months old. Unfortunately for McFadden, as a family member describes: "their dad was no good and their mom was not better."

Vince met Theresa in high school. Vince, the son of Arkansas sharecroppers who moved to Missouri when their children were young, joined the military in 1977. While in the military, he participated in a remedial reading course, was disqualified for an assignment for a nuclear-duty position, and faced warnings from his supervisor for failing to regularly attend medical appointments. (Attachment II). He was stationed in Germany when his son was born and didn't return home until McFadden was six months old. Upon Vince's return he was unprepared to be a father. Rather than living with Theresa and his newborn son, Vince lived with his mother. Though Vince was an alcoholic and would develop a raging drug addiction, Theresa left him to care for McFadden by himself for prolonged periods. (Attachment N ¶ 13). A family member explains that while "some men are proud to have sons, not Vince."

119

Theresa was no more equipped to care for McFadden than Vince was. She lacked a nurturing nature and did not so much as hug her children (who also included McFadden's younger sisters, Shawn'ta McFadden and Rochelle Brown). A young mother, Theresa had been the victim of abuse in her childhood at the hands of her father.

Theresa often picked her boyfriends, such as Robert Reid, over her children. (Attachment N ¶ 11). She would make McFadden and his sisters sleep on the floor while her boyfriends' kids slept in the children's beds. McFadden was six years old at the time. (Attachment N ¶ 11-12). The family's time with Reid was short but brutal. Reid beat the children with an extension cord. Shawn'ta remembers that Reid would tie her to a chair. Just for a laugh, Reid lied to Theresa about McFadden's bad behavior and provoked his mother into whipping him

Theresa worked long hours and often wasn't home to take care of her children. Glenda and David Lee were perhaps McFadden's most consistent caretakers, but that was hardly a stable situation, particularly when David Lee was in charge. (Attachment N). On one occasion, Glenda came home to find that her husband had kicked McFadden out of the house. It was cold out. McFadden was on the porch, huddled in a blanket, waiting for his grandmother to return and let him in. Sandra Boles, a paternal cousin, recalled a time when McFadden told her "he hoped Mr. Brown wasn't home." *Id.* ¶ 7.

120

Family members report that David Lee did not like his male grandchildren—he felt they would grow up to be bad. The Brown home dynamic was fraught. Glenda fought depression over David Lee's treatment of her. While Glenda was sick, David Lee would not care for Glenda. It was reported "[David Lee] wouldn't feed her or change her." *Id.* ¶ 6.

David Lee serially cheated on Glenda and has several other children outside their marriage. It was widely known within the family that "[David Lee] would cheat on Mrs. Brown with young girls." *Id.* Sandra Boles recalled David Lee going to jail for fooling around with them. *Id.* This was confirmed by David Lee's police report confessing to having a sexual relationship with a minor. (Attachment HH) Sandra Boles believes David Lee did not like McFadden because McFadden saw David Lee with girls in the street. (Attachment N ¶ 8).

Theresa constantly moved her small children between family members, to the point that McFadden could not recognize who he belonged to. Often, Theresa did not even bother to drop them off with other family members, instead leaving them at home to fend for themselves. On one occasion, a neighbor called Glenda to report that Theresa had abandoned her children at the house. Family members report that Theresa consistently abandoned and neglected all of her children. One family remember says, "I never saw much of Theresa; whenever the kids were around, she wasn't."

Yolanda recalls that when McFadden was eight, Theresa got mad at him and kicked him out of the beauty shop where she was working. Yolanda found him walking down the highway by himself. She frequently witnessed the poor conditions in which Theresa raised her children and offered to take in McFadden. Theresa responded that he would "be dead or in jail before I give him to you." Nor was this the only time Theresa rejected help from family members in raising McFadden. While she was happy to leave him at a family member's house temporarily, she was never to accept help in nurturing him, though she was unable to perform that duty herself.

Theresa and Vince got back together for a period of a few years when McFadden was a toddler and in elementary school. Theresa was hard on her children during this time and gave what Vince characterizes as "whoopins." Multiple family members report that all the children were beaten with extension cords. McFadden would receive the beating on his genitals. Vince confronted Theresa about these punishments because they were so aggressive.

His complaints about Theresa's treatment of his son aside, Vince also beat McFadden. As Vince admitted at trial, he and his son lived together for a time when McFadden was older but it did not work out. What counsel neglected to elicit was that Vince beat McFadden. Counsel could have called Karen Holmes, his stepmother, who heard Vince beating his son in the bathroom on at least one occasion.

Vince eventually left for good. Vince sat McFadden down and told him that he was the man of the family now and needed to look after his sisters. Even with Theresa

122

in the home, albeit sporadically, family members described McFadden as the leader of the house.

Though Vince would not remain totally absent from his son's life, he was not a functional father. Vince simply was not around McFadden much. Addiction afflicted multiple generations of the McFadden family; Vince did not escape the disease and was frequently drunk. Vince also became entrapped by a crack addiction. Once McFadden saw his father using crack in the street. This stripped the Vince of any moral authority over his son when it came to lessons about drug use.

Once his father left, nine-year-old McFadden developed new responsibilities, particularly given his mother's frequent absences. He would get up early to make breakfast for his siblings. He had to find money for lunches and would come home with bags of clothes for his sisters to wear. But when Theresa was around, she beat McFadden even harder than before. According to McFadden's cousin Yolanda, Theresa hated McFadden because he reminded her of Vince; when she would beat McFadden, she repeated the mantra, "You're just like your father."

In truth, Vince had been little more of a parent than Theresa. His alcohol problems and crack addiction continued. McFadden's cousin Lisa Thomas recalls thinking that Vince always smelled like fish—her childhood perception of the smell of alcohol. Vince simply was not there for his son. Glenda and others remember that McFadden would wait futilely for his father to come over and do things with him. He cried in Glenda's lap when his father failed to show.

123

On those occasions that Vince did interact with McFadden, he showed McFadden no encouragement. One family member, Darlene Loftis, reports that Vince would do anything for his girls but would not respond to McFadden. Vince marginalized his own, thus carrying on family tradition of choosing favorites. Growing up, Vince's twin brother, Spence—who received his father's name despite being second-born—was their mother's favorite. McFadden's sister Shawn'ta remembers how this dynamic worked in her household. Vince thought his son was a failure at a young age. Shawn'ta recalls an incident in which Vince bought her and Rochelle a backpack with school supplies but did not buy one for McFadden. The message was clear: McFadden was not going to be successful in school, so why bother?

In fact, McFadden was not successful in school, but that was due in large part to lack of support at home and constant movement between schools and family members. His cousin Yolanda recalls that, as a kindergartener, McFadden thought his birth name was "J.R."—a sobriquet given to indicate that he was a junior—and didn't even realize that his real name was McFadden. To Yolanda that was the first sign that his parents were teaching him nothing. Unlike his sisters, McFadden never got a chance to go to magnet schools, where he was more likely to be successful. Before he turned fifteen, he attended Pine Lawn Elementary, Clark Elementary, Langston Middle School (twice), Pruitt Middle School, King Middle School, Stevenson Middle School, and Tri A Academy.

124

At Pine Lawn, the principal, Mr. Zietz, was well known for paddling the students. McFadden's Aunt Denise pulled his cousin David out of the school after one such beating. Children at Pine Lawn Elementary would fight each other from a very young age. A teacher described Pine Lawn Elementary as a "very physical school." At Clark Elementary, the danger came from the students rather than the administrators. According to Shawn'ta, the children bullied each other; the bullying would begin as verbal but would progress into "assault." Children would have their shoes and coats stolen. Clark Elementary essentially served as an introduction into gang life—Shawn'ta recalls that children would be attacked if they wore the wrong colors.

McFadden was frequently bullied as a child. Glenda recalls that he had particular problems with a boy named Mane Bolden, who would intrude on the porch and "just smack [McFadden]." He presented an easy target because he was so small. That remained true even as he got older. Glenda recalls that as a teen he was jumped by three older boys who hit him with a bat and caused his eye to become swollen shut.

McFadden's exposure to gangs and his frequent need to fight to survive led him to legal trouble. In 1995, he received probation for unlawful use of a weapon. At this time, he was living with his grandparents, the Browns, and had minimal supervision. His probation officer, Richard Nelson, recognized his need for structure and recommended that be sent to Tarkio Academy, a boys' boarding school in Tarkio,

125

Missouri. He attended the school from 1995 to 1996. His performance there illustrated his promise if he had only been given an adequate opportunity in a stable, non-violent environment. (Attachment I, pp. 2-3).

In May 1995, soon after his arrival, he was given a Woodcock-McGrew-Werdner Mini-Battery of Achievement, a standardized test of skills in reading, writing, and math. He scored in the fourth percentile; the examiner noted that his performance as a fifteen-year-old was comparable to that of a third-grader. *Id.* p. 7. Seven and a half months later he took a similar test and achieved a score in the twenty-first percentile. *Id.* p. 8. By May 1996, when he was tested a third time, he was able to score in the eighty-eighth percentile. *Id.* p. 9. He made the honor roll in September 1995 and was otherwise recognized for his achievements. (Attachment J). McFadden's parents were wrong—he was not a hopeless case. He had just never before been placed in an environment where he was given a chance to succeed.

Unfortunately, McFadden had only a yearlong stay at Tarkio and was discharged in May 1996. (Attachment K). Leaving Tarkio meant an end to the services and supervision that allowed him to excel. (Attachment K). He returned to Pine Lawn—as a family member puts it, "not a place you wanted to be. You'd lock your cars when you'd drive though there." He attended Normandy High School, which returned him to the war zone he was living in before. Normandy drew its students from different municipalities within St. Louis County—each of which had multiple

126

gangs. Fighting among the various gangs was incessant at the school and there was no safe and secure environment in which to learn.

McFadden enrolled in Normandy by listing his maternal grandparents' Pine Lawn address. But at this time, he was staying more with his mother in St. Louis City than in Pine Lawn. His grandfather, David Lee, took exception and reported McFadden to the school board. McFadden was then kicked out of Normandy for attending school in the wrong district. From that point on, he no longer attended school.

McFadden's post-Tarkio problems ranged beyond school and into his home life. During his teen years, his mother took up with several different boyfriends with whom McFadden constantly battled and who abused the children. When McFadden returned from Tarkio, Theresa was living with Darrell Jackson. Darrell Jackson cared nothing about the children and routinely beat them. He especially disliked McFadden. Jackson kicked McFadden out of the house because, according to Jackson's recollection, Jackson "didn't want to have to shoot him." McFadden went back to staying with his grandparents. Not long thereafter, Jackson lost patience with the younger children's messes and evicted the rest of the family as well.

Out of school, with no real home to speak of, and no positive role model to rely on, McFadden found himself alone on the streets. The traumatic violence he witnessed and experienced was constant and unrelenting. McFadden's friends were killed on a routine basis. To name just a few:

127

- Mikey Lock, one of McFadden's best friends, died on February 3, 1997, at the age of twenty-one. McFadden was sixteen at the time. Lock's cause of death was gunshot wounds to the head and chest. The death gave McFadden nightmares, and he routinely woke up screaming Mikey's name.

- Another friend, Casey Cuffie, died a few weeks later, on February 28, 1997, at the age of twenty-two. Cuffie's death certificate lists his cause of death as "assault by firearms."

- A week later, on March 5, 1997, McFadden's friend Lenney Robinson died, also the result of "assault by firearms." He was only fifteen at his death. Robinson attended Tarkio with McFadden. (Attachment J).

- On July 20, 2002, when McFadden was twenty-two, his friend Ollie Bellamy died of a "gunshot wound to the head and a gunshot wound to the right thigh." Bellamy was twenty-four.

- On March 2, 2003, Charles Hudson died at age twenty-eight of a "gunshot wound of thorax."

Constantly besieged by violence, McFadden was pulled deeper and deeper into a life that threatened him physically and offered no way out. On August 24, 2001, when he was twenty-one years old, McFadden was shot in the leg. Though no one was ever prosecuted for the crime, the shooter was Daryl Bryant—the person who McFadden was convicted for targeting in the assault that would provide an aggravating factor in

this case. After Bryant shot him, McFadden became increasingly paranoid because so many of his friends had been killed.

The jury heard essentially none of this evidence about abuse, violence, lack of stability, and neglect in McFadden's upbringing. Instead, counsel provided only sketchy details about McFadden's upbringing through five family members and a friend. Counsel never investigated outside of St. Louis. They failed to interview numerous family members in Arkansas, Mississippi, Texas, and California. They never interviewed anyone with any connection to Tarkio. They failed to request all available records, some of which now have been destroyed due to the passage of time. Had counsel performed a thorough investigation into McFadden's upbringing and presented their findings to the jury, it is reasonably likely that he would have received a life sentence.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54. 2254(d) has no application to this claim.

129

**Claim 6:**      **Trial counsel's failure to object to the admission of letters from both Douglas and McFadden denied McFadden a fair trial and the effective assistance of counsel.**

The prosecution admitted irrelevant letters from both McFadden and Douglas into evidence. McFadden's trial counsel's failure to object to these letters denied McFadden the effective assistance of counsel and a fair trial as guaranteed by the Sixth, Eighth, and Fourteenth Amendments.

Douglas, McFadden's co-defendant, wrote McFadden several letters before trial. These letters were then seized by the jail staff. (T. Exs. 502, 503, 504, 505, 506). These letters were admitted into evidence with no objection from McFadden's trial counsel. (T. Tr. 1520-34,1541-45, 1564-69). In state post-conviction proceedings, these letters were readmitted as 29.15 Exs. 57, 58, 59, 60, 61.

Douglas's letters to McFadden were hearsay and contained irrelevant inadmissible evidence to which effective counsel would have objected. The failure to object on these grounds prejudiced McFadden. These letters brought gang affiliation evidence before the jury, which McFadden sought to keep out.

Douglas's letters contained repeated references to gang activities and affiliations. (T. Exs. 502-506; 29.15 Exs. 57-61). Those references included: such lines as (1) "Love & Loyalty" and "Love is Love Loyalty is Royalty" (29.15 Ex. 57); (2) "Lawn Life" (29.15 Ex. 58); (3) "Love is Love Loyalty is Royalty" and "Lawn In Lawn Out" (29.15 Ex. 59); (4) "Love is Love Loyalty is Royalty" (29.15 Ex. 60); and (5) "Love and Loyalty" (29.15 Ex. 61).

This evidence caused extreme prejudice to McFadden. During rebuttal argument, the prosecution referred to the gang references found in McFadden's and Douglas's letters, "Love-N-Loyalty" and "Loyalty Is Royalty," were "their motto[s]" (T. Tr. 1787, 1791). The prosecution relied on these letters to support their argument for McFadden's death sentence.

Trial counsel was also ineffective for failing to object to the admission of letters from McFadden to Douglas. (T. Exs. 401, 402, 403, 405, 407, 409; T. Tr. 1520-34, 1541-45, 1551-64). In state post-conviction proceedings, these letters were readmitted as 29.15 Exs. 51-56). With no objection, the court admitted these letters into evidence, and the prosecution also relied on them in arguing for a death sentence.

Before the prosecution rested its guilt case, it read some of McFadden's letters to Douglas. (T. Tr. 1571-76). The prosecutor again noted McFadden's writings included repetition of the phrases: "Love -N-Loyalty. Love is love. Loyalty is royalty. Yung Hood." *Id.* pp. 1574-76.

In 29.15 proceedings, McFadden's trial counsel testified that they worked hard to keep out gang evidence. (29.15 Tr. 171, 557). In pursuing this strategy, reasonable counsel would have sought to keep out the letters between McFadden and Douglas, which contained numerous references to gang affiliation. Moreover, counsel's strategy to demonstrate that McFadden did not tell Douglas how to testify was unreasonable, *Id.* pp. 145, 545, McFadden's letters focused on "Loyalty." Therefore they suggested McFadden was directing Douglas to stay loyal to their gang when he testified. This

131

evidence prejudiced McFadden, as the jury considered McFadden's irrelevant gang involvement and raised the idea of prison gangs during the guilt phase of the trial.

McFadden's trial counsel testified that they wanted Douglas's letters before the jury, as they believed these letters showed McFadden did not tell Douglas what how to testify. *Id.* However, trial counsel acknowledged that the jury could use these letters to infer McFadden's gang association. *Id.* pp. 588-90.

These letters were inadmissible hearsay, and their admission harmed McFadden. McFadden's trial counsel was ineffective by failing to object to the admission of these hearsay letters. The admission of these letters denied McFadden due process, as he was denied a fair trial and the effective assistance of counsel. This court should vacate Mr. McFadden's death sentence and remand this case to the State of Missouri.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 61–67. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 619 S.W.3d at 447-48 The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

132

**Claim 7:** **The exclusion of potential juror Mark Kerr violated the Sixth Amendment.**

Exclusion of black juror Mark Kerr violated McFadden's right to a fair and impartial jury under the Sixth and Fourteenth Amendments. A death sentence is invalid "if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." *Witherspoon v. Illinois*, 391 U.S. 510, 522 (1968). The governing standard is whether a juror's views substantially impair their ability to follow the law. Venirepersons may be struck for cause **only** if their views prevent or substantially impair their ability to abide by their oath and the instructions. *Wainwright v. Witt*, 469 U.S. 412, 424 (1985). Absent substantial impairment, exclusion of jurors for doubts about capital punishment violates the defendant's rights.

Kerr told the prosecution he believed in the death penalty, could sign the death verdict as jury foreman, and could announce a death verdict in open court. (T. Tr. 407, 409). According to the State, Kerr hesitated "20 seconds" *Id.* p. 405 when he began answering the prosecution and acknowledged giving answers "some thought." *Id.* In response to convoluted questioning (something the trial court routinely noted throughout voir dire), Kerr expressed concern that the prosecution's hypothetical questions sought commitments. *Id.* p. 410.

133

The trial court interceded and asked, "In a proper case, in a case where you believe there are all of these circumstances, is there a case like that where you could vote for the death penalty?" (T. Tr. 411-12). Kerr responded "yes." *Id.* p. 412.

The trial prosecution then asked if Kerr would require more than proof beyond a reasonable doubt since this was a death case. *Id.* Kerr initially responded he would "[i]f that's the only choice you're giving me." *Id.* p. 415. Kerr, echoing the actual requirement of law, then stated he only need be "firmly convinced that the person is guilty and the person should receive a death sentence," and thus would apply the correct standard. *Id.* pp. 438-39. The prosecution challenged Kerr for cause (T 440-42), which the trial court erroneously granted. *Id.* pp. 444-45.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 62–66. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 738–739. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 8:**     **Jury precluded from hearing relevant evidence.**

The trial court erred in precluding McFadden from eliciting that Douglas pled guilty to second-degree murder and was sentenced to 20 years imprisonment, depriving McFadden of due process, the right of confrontation, a fair trial, reliable sentencing and freedom from cruel and unusual punishment pursuant to the Sixth, Eighth, and Fourteenth Amendments. Douglas's extremely light sentence for shooting a person in the head and heart was relevant to his credibility and to McFadden's appropriate sentence.

Douglas shot Todd Franklin in the head, fatally wounding him, (T Tr. 1507,1515-16), and only after inflicting these fatal shots, handed the gun to McFadden. Although the State made a deal with Douglas for a guilty plea to second-degree murder and a 20-year sentence, the State successfully precluded McFadden's jury from hearing the results of the favorable treatment.

At trial, Larner argued that the defense should be precluded from presenting evidence about Douglas's plea and sentence. *Id.* p. 1578. Larner stated Douglas received nothing for his testimony and thus his charge and sentence were irrelevant. *Id.* p. 1579. Douglas stated he implicated McFadden solely to receive 20 years and, if he testified McFadden was not the second shooter, his fears about perjury made charge and sentence relevant. *Id.*

The trial court erred in limiting Douglas's testimony to his receiving a deal, but in not fully allowing disclosure of the actual terms of the deal. (T Tr. 1580,

135

1582-83). The trial judge told counsel they could elicit only that Douglas did not get the maximum punishment and pled guilty to murder. *Id.* pp. 1586, 1588.

Douglas testified he shot Franklin after one of Franklin's cohorts shot at him and McFadden; Douglas thereafter gave his gun to McFadden, who shot Franklin again. *Id.* pp. 1625-31. However, on February 7, 2007, Douglas told McFadden's counsel his brother, not McFadden, was the second shooter. *Id.* pp. 1631-32. He then in April of 2007 told counsel and the prosecutor that McFadden was not the second shooter. *Id.* pp. 1633-35. Douglas never stated under oath that McFadden was not the second shooter because, after his guilty plea, he did not want to be charged with perjury. *Id.* pp. 1638-40. When he pled guilty, he did not receive the maximum sentence. *Id.* p. 1640.

On cross, Douglas discussed his plea and said he lied when he stated his brother was the second shooter. (T. Tr. l648). The following exchange occurred when questioned by the prosecutor:

> Q: The time you wrote that letter, that's what you were going to come into court and say?
>
> A: No, sir.
>
> Q: Well, you wrote that letter saying that Kyle was the second shooter. Is that correct?
>
> A: I just said that because I don't think it's fair that you putting all the weight on him.

136

Q: I didn't ask you what was fair.  I asked you a question.

(T Tr. l648-49).  Thereafter the prosecutor asked about correspondence between Douglas and McFadden. *Id.* pp. 1658-59.

Q: And what did you mean by "I'll put some of the weight on my shoulder to take the weight of the world off yours?"

A: I mean, I'm-I know what I did and I'm telling what I did.

Q: All right. Now, would it-did you state that, "We gonna see the streets again sooner than later"? What did you mean by that?

A: I mean, I got an out date.

(T. Tr. l661).

After Douglas testified, defense counsel made an offer of proof regarding Douglas's admission that he implicated McFadden solely to receive the consideration for his deal. *Id.* p. 1686. Defense counsel asked the trial court to reconsider the earlier ruling, *Id.* p. 1687, when the prosecutor opened the door through its questioning and a jury would not necessarily know what an "out-date" meant. *Id.* p. 1691.

The trial court refused to alter his earlier ruling, finding "the extent of the bargain, that he got 20 years on murder second, is not relevant." *Id.* p. l694. Noting, "the only reason, from the Court's view, that you would want to ask about the 20 years on murder second would be to mitigate punishment. And if you want to, if we reach a punishment phase, get into that, we can talk about that, because it may be relevant in a penalty phase to mitigate the punishment. But it's not relevant on the

truthfulness or bias or prejudice of this witness. The only thing that affects the truthfulness goes to the credibility of bias or prejudice of the witness is that he got a benefit, which is the plea bargain ...  So there is no reason for the Court to reverse its ruling." (T Tr. 1694-95).

Despite recognizing the need for this testimony at the mitigation phase, the trial court again failed to allow its submission during the penalty phase. The prosecution successfully moved to have it excluded from the penalty phase. *Id.* pp. 1809, 1811. The trial court went further, denying McFadden the opportunity to mention Douglas's plea deal and lesser sentence. *Id.* pp. 1812-14.

At the close of the penalty phase, defense counsel requested the court reconsider its ruling. *Id.* pp. 2334-35. The trial court flip-flopped from the earlier statement and denied the request. *Id.* pp. 2337-38.

Evidence tending to show a witness's bias, prejudice or motive to lie is never collateral, but rather exculpatory, and can be established either through extrinsic proof or impeachment. *United States v. Abel*, 469 U.S. 45, 52 (1984). Prohibiting a criminal defendant from examining a witness on relevant evidence of bias and motive may violate the Confrontation Clause, if the jury is precluded from hearing evidence from which it could appropriately draw adverse inferences on the witness's credibility. *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986). Witnesses may be cross-examined about any motivation to distort or exaggerate (or downplay in the case of a co-defendant) the facts.

138

Capital defendants must be allowed to introduce any relevant mitigating evidence about their character, their record, or any circumstances of the offense. That evidence is constitutionally indispensable to the process of deciding whether to impose death. *California v. Brown*, 479 U.S. 538 (1987). "States cannot limit the sentencer's consideration of any relevant circumstance that could cause it to decline to impose the death penalty," *McCleskey v. Kemp*, 481 U.S. 279, 306 (1987).

This is especially true then the prosecution presents the issue of relative blame to the jury. The prosecutor did just that, when it argued:

> He draws others into his web of violence. Look who he drew in: Michael Douglas, 16 years old at the time. He's 22. So he ruins Michael Douglas's life as well… He's the strong man. He's the leader in this killing. He's the one.

(T. Tr. 2384).

Although courts have authority "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense," *Lockett v. Ohio*, 438 U.S. 586, 604 n. 12 (1978), the trial prosecution implicated both Douglas's and McFadden's character, and the circumstances of the offense, by comparing their relative culpability. Thus, the jury should have been allowed to consider the full extent of the grace Missouri provided Douglas when deciding whether McFadden's actions deserved death.

*****

139

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 43–52. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 736–737. The Missouri Supreme Court failed to consider the CEFL from the United States Supreme Court; therefore, this Court's review is *de novo*. Alternatively, the merits determination is contrary to and/or an unreasonable application of the law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 9:**      **The failure to impeach Douglas with a sworn statement contradicting his trial testimony deprived McFadden the effective assistance of counsel.**

The failure of McFadden's trial counsel to impeach Douglas with his own handwritten motions denied McFadden the effective assistance of trial counsel, his right to a fair trial as guaranteed by the due process clause, and his right to be free from cruel and unusual punishment, all in violation of the Sixth, Eighth, and Fourteenth Amendments. In support of this claim, Mr. McFadden alleges the following facts, in addition to those that will be presented after a full investigation, additional time, discovery, access to this Court's subpoena power, expansion of the record, and an evidentiary hearing.

Mr. Douglas filed a *pro se* motion on June 12, 2006, which amounted to an attestation of his lack of veracity regarding the substance of his testimony from Franklin-1. (T. Ex. 500; 29.15 Ex. 67). This motion was readily available to McFadden's trial counsel because it was contained in Trial Exhibit 500, moved to be admitted by the prosecution.

The trial court was asked to take judicial notice of Douglas's *pro se* 24.035 motion. (T. Tr. 1703). In this motion, Douglas alleged his counsel had been ineffective in failing to contact witnesses to "prove my innocence." *Id.* Douglas's own handwritten motion further alleged there was "no substantial evidence" to prove he had anything to do with shooting Franklin. Douglas stated he had alibi witnesses who

would account for where he was when Franklin was shot. Douglas asked to withdraw his guilty plea and go to trial. *Id.*

Once Douglas testified that he had witnessed McFadden shoot Franklin, this *pro se* pleading became relevant. Douglas attestations rebutted his testimony because Douglas asserted in this document that he had not been in Pine Lawn and could not have been a witness to whomever shot Franklin.

Reasonable trial counsel would have moved to impeach Douglas with his own handwritten court attestations, which contradicted his testimony. Had trial counsel used Douglas's inconsistent statement, his credibility would have been put into serious doubt. Instead, the jury was told by this purported eyewitness that McFadden had fired the shots that killed Franklin. Trial counsel could have challenged Douglas' statement about what he saw that day with his own inconsistent statement that this crucial witness was not even present that day.

Trial counsel did not choose one good and reasonable strategy over another. Instead, they made the unreasonable decision to call Douglas initially; then, when his testimony was harmful, they sought no remedy. This deficient performance harmed McFadden. This Court should grant habeas corpus relief.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 68–70. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 619

142

S.W.3d at 446. The Missouri Supreme Court failed to consider the CEFL from the United States Supreme Court; therefore, this Court's review is *de novo*. Alternatively, the merits determination is contrary to and/or an unreasonable application of the law and of the facts. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 10:**        **Prosecutorial misconduct during trial violated due process.**

Prosecutorial misconduct started at the first trial and has marched ceaselessly accompanied with racial overtures since. The first Franklin trial was vacated due to the prosecutor's racism. The first Addison trial  was similarly vacated as a result of racial improprieties. In this case, the prosecutor again tried to strike all black jurors— only to be stopped by the trial court. The prosecutorial misconduct herein permeates proceedings from voir dire through sentencing.

The closing arguments by Larner at the guilt and penalty phases impermissibly evade the constitutional requirements of prosecutorial conduct in capital cases. Among other things, Larner's statements relied on facts not in evidence; commented negatively on McFadden's exercise of his constitutional rights; injected his own personal opinions about the propriety of death and the worthlessness of mitigation; urged the jury to "send a message"; and appealed to the jury's most negative emotions through impermissible attacks on McFadden and/or his counsel.

The role of the prosecutor is not merely to pursue convictions, but to pursue justice. *Berger v. United States*, 295 U.S. 78, 88 (1935). "It is as much [a prosecutor's] duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one." *Id.* Accordingly, prosecutors have a duty to refrain from inserting into closing argument misleading suggestions, insinuations, or assertions of personal knowledge as well as their personal views or opinions. *Id.*; *United States v. Young*,

144

470 U.S. 1, 8 (1985). The prosecution also cannot use a defendant's exercise of specific fundamental constitutional guarantees against the defendant at trial. *See, e.g., Griffin v. California*, 380 U.S. 609, 615 (1965) (holding that the prosecution is prohibited from using a defendant's exercise of constitutional right to remain silent against the defendant); *Darden v. Wainwright*, 477 U.S. 168, 181-82 (1986) (recognizing that a prosecutor's argument manipulating or misstating the evidence or implicating specific rights of the accused, such as the right to counsel or the right to remain silent, are improper and may deprive the defendant of a fair trial); *Burns v. Gammon*, 260 F.3d 892, 896 (8th Cir. 2001) (same). Appeals to the passion, prejudice, or sympathy of jurors also are improper. *Viereck v. United States*, 318 U.S. 236, 247 (1943).

When a prosecutor fails to adhere to the duties described above, reviewing courts evaluate whether the improper argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974). Furthermore, because the average juror believes that a prosecutor adheres to the duty to refrain from improper methods calculated to produce a wrongful conviction, such comments carry "the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Young*, 470 U.S. at 18-19.

145

Because the arguments violated McFadden's Fourteenth Amendment right to due process and his Eighth Amendment right to a reliable capital sentence, the Court should vacate the conviction or, at the very least, require a new sentencing trial.

**Misconduct During Voir Dire**

Voir dire is an opportunity to probe for the potential biases a juror may possess. It permits parties to make challenges for cause and peremptory challenges to ensure that a jury selected is fair and impartial. *Morgan v. Illinois*, 504 U.S. 719, 729 (1992). In addition to racism during jury selection, which the trial court called out, the prosecutor, Larner, took numerous other improper actions that prejudiced the voir dire process.

**A.** Larner improperly emphasized his role of working for McCulloch, the elected prosecutor, for whom they may have voted. "I represent the people of St. Louis County. I represent the victims of St. Louis County. I work for Bob McCulloch. He's the elected prosecutor in St. Louis County. Many of you may have heard from him – of him and even voted for him from time to time through the years. That's who I work for." (T. Tr. 42, 125, 184, 238, 303, 398, 476, 553, 616). The jurors are people of St. Louis County; Larner does not represent them. The victims are people of St. Louis County; Larner does not represent them. McFadden is a person from St. Louis County; Larner does not represent him. The justice system is adversarial, and the prosecutor cannot co-opt the jurors into

146

being on the same side as the prosecutor. Larner would later tell them, "You represent St. Louis County." (T Tr. 1775).

**B.** Larner improperly told jurors that their answers did not matter. Larner instructed two jurors that he was going to skip over and not talk to them. *Id.* pp. 124-25, 195. Jurors should not be told that they do not matter and will be skipped over.

To Juror Middleton, Larner stated, "I'm not going to talk with you, ma'am, because of matters we've discussed when you came into court earlier…You're not going to be on this jury, ma'am." *Id.* p. 737. The trial court interjected and informed Larner he misidentified a juror. *Id.* pp. 737-38. Larner then discussed generally how the State picks out jurors, which again prompted the trial court to instruct Larner to ask a question of Juror Middleton. *Id.* p. 739. Juror Middleton responded: "Well, it's irrelevant, whatever my question is, so." *Id.*

Adequate voir dire ensures the constitutional requirement of an impartial jury. *Morgan*, 504 U.S. at 729-30. Larner's statements created the impression that jurors would be skipped and that any of their thoughts were "irrelevant." Such a consequence undermines the jury's function in this case. *Gray v. Mississippi*, 481 U.S. 648, 668 (1987).

**C.** Larner continuously misstated the law regarding the unanimity requirement for the life without parole sentence. Larner wrongly stated "for a life

147

without parole result, the jury must be unanimous." (T. Tr. 51, 150-247, 256, 427, 578, 623). While death must be unanimous, there is no unanimity requirement for life. To state that it only took one juror to keep death on the table, the prosecutor misstated the law on a critical question that would be before the jury.

**D.** Larner referred to facts not in the evidence and relied on other hypothetical cases where the State lacked evidence. Specifically, Larner asked, "[C]an you think of a case where someone might throw the weapon into the Mississippi River, for example? How many guns do you think are in the bottom of the Mississippi River? Not going to find those. So it's not required." (T. Tr. 765).

**Misconduct Guilt Phase Opening & Closing**

**A.** Larner injected other acts evidence by arguing that Silas identified McFadden from a wanted poster hanging in the police station. *Id.* p. 1007. Thus, Larner groomed the jury to convict and punish McFadden for other acts different from the charged offenses.

**B.** Larner misstated and encouraged the jury to ignore the law by stating, "It doesn't matter what Silas says in court. His statement has been set in stone." *Id.* p. 1747. According to the law from the founding of our country, evidence is what comes out in a courtroom. Larner groomed them to disregard sworn testimony in favor of unsworn testimony that more fully supported the State's theory of guilt. In short,

148

Larner encouraged the jury to ignore evidence and personally vouched for the truth of the out-of-court statements.

**C.** Larner improperly and repeatedly vouched for witnesses by averring that he believed them. Although it is telling as to the weakness of their case if they have to vouch, prosecutors cannot vouch for their witnesses. *Berger*, 295 U.S. at 88. Over the trial court's admonition, Larner told the jury his witnesses had no reason to lie. (T. Tr. 1031-33). Regarding Hazlett, the key eyewitness who received generous treatment of his sexual crime charge ((forcible rape and armed criminal action knocked down to unlawful use of a weapon) (Franklin-1 D.A. L.F. p. 436); (Franklin-1 T. Tr. pp. 1229-32), Larner stated, "He is not lying. I don't care what Hazlett's criminal record or whatever, It's not that bad. I did him a favor. I didn't charge him with a DWI." (T. Tr. 1743). Not only was this vouching, but it misled the jury about the serious nature of Hazlett's criminal record.

As to another eyewitness, Larner continued the improper vouching. Larner vouched, "Lucas might not be the smarter (sic) guy in the world, but he's probably one of the most credible guys in the world." *Id.* p. 1794.

**D.** Larner improperly personalized arguments and encouraged the jury to premise their consideration on emotion rather than evidence. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Larner argued, "You represent St. Louis County. *Id.* p. 1775.

149

He encouraged the jury to put themselves into the action, thus creating the likelihood they would decide on emotion, not facts and common sense.

**E.** Larner read from letters in Douglas's cell that were not admitted into evidence. (T. Tr. 1033-37). In closing, Larner then stated, "I don't think you're going to get all the letters. There's all kinds of stuff in the letters that may not be admissible or relevant. And so the judge may or may not give you all of the letters. Ask for them. You'll get what the judge will give you." *Id.* p. 1726. Larner improperly referred to evidence that had not been admitted and encouraged jurors to request inadmissible evidence during deliberations.

**F.** Larner denigrated McFadden and speculated on his thought processes, again arguing with no evidentiary support to make a patently emotional argument. Specifically, Larner argued, "They both wanted to kill the deer. That's all this man is to them is a deer... They don't look at him as a human being. They don't look at life that way... They look at the victim as an animal... This Todd Franklin is animal to them. It's like killing a deer." (T. Tr. 1781-82). Referring to the victim as a racial trope and importing that image to McFadden was highly prejudicial.

Consistent with his dehumanization of McFadden, Larner created an us against "them" division: "You got to understand the mentality of what we're talking about in this case. I think you understand the mentality here. **They don't think**

150

**the way we** think." *Id.* p. 1782 (emphasis added). The "they" or "them" being referred to was two black young men.

**G.** Larner sarcastically denigrated defense counsel and opined on their arguments in an improper and personal manner, and additionally asked the jury to ignore the law. "Defense counsel makes a very good point. Why in the world would we want to convict people-why would the people of St. Louis County want to convict someone for this? Why would anyone want to convict someone for this? Why in the world would St. Louis County want to protect its citizens?" (T Tr. 1775). Larner suggested defense counsel did not want St. Louis County to protect its citizens.

**H.** Larner argued contrary to the facts and the law when he argued, "No matter who you believe in this case, you cannot come back with murder second degree. That's absurd. That would be-that's what they want. Huge victory. That's what they want." *Id.* p. 1780.

**I.** Larner again argued contrary to the facts and the law when he argued, "If you have a reasonable doubt about that - so do I- I don't care." (T. Tr. 1783). It was an improper opinion and contrary to law to tell jurors that Larner had reasonable doubt about some evidence, but it did not matter to the conviction anyway. He allied himself with the jurors by saying, "You got to understand the mentality of what we're talking about in this case. I think you understand

the mentality here. **They don't think the way we** think." *Id.* p. 1782. (emphasis added).

**J.** Larner denigrated McFadden through epithets: "You never know with these guys. They're killers. They're cold-blooded killers. You  never know what someone like Michael Douglas is going to say." (T. Tr. 1752). Name calling is irrelevant and is improper personal opinion.

**K.** Larner denigrated defense counsel and the assertion of constitutional rights when he suggested McFadden's rights to a jury trial and confrontation of Douglas were "B.S." Specifically, Larner argued: "What was all the B.S. about-this trial about cross-examining all these people about these inconsistent statements about Michael Douglas?" *Id.* p. 1734. Larner is referring to rights secured by the Constitution, as ensconced in the Bill of Rights since our Nation's founding.

**L.** Larner referred to and encouraged jurors to base their verdict on evidence not from the courtroom. Larner asked them to speculate on how it would feel to fire a .44 gun. The prosecution presented no evidence related to the firing of a .44, yet argued about the same even after a sustained objection. Over initially-sustained and later-overruled objections, Larner argued, "If you've ever fired a .44, when you pull that trigger, bam, there's a kick... " (objection sustained) "... All right. Bang." (objection overruled). "Bang. You got to refocus, retrain that gun on that same spot." (T. Tr. 1737).

152

**M.** Larner reenacted certain portions of the crime during his opening and closing statements. In his opening argument, Larner described the scene of McFadden shooting Franklin, stating, "Bang, bang, bang, Same line. Through the body. Next to each other. In line." (T. Tr. 1012-1013). Larner reenacted this shooting again in his closing argument, stating, "I mean, he had that gun trained, that gun, a .44. if you've ever fired a .44, when you pull that trigger, bam, there's a kick." *Id.* p. 1737. This line of argument was designed to invoke emotion in the jury, and was not based in any admitted evidence.

**Misconduct Penalty Phase Closing**

Penalty phase closing arguments undergo a "greater degree of scrutiny." *Caldwell v. Mississippi*, 472 U.S. 30, 329 (1985); *California v. Ramos*, 463 U.S. 992, 998-99 (1983). The prosecutor made the following improper arguments.

**A.** Larner created prejudice by personalizing, making himself an unsworn witness to whom the jury should listen in deciding punishment. Offering his opinion as to sentence:

> "there wasn't anything redeeming or mitigating about this defendant that came up in this trial. I didn't hear anything. I listened to the mitigation." (T. Tr. 2377).

> "The killing of Leslie is evidence in aggravation... That evidence, in and of itself, after you've opened that second door, the fact that he killed a second person, is probably what's going to tip over the edge and get him the death penalty. That's my feeling on it." *Id.* p. 2379.

**B.** Larner attempted to improperly inflame the jurors' emotions by speculating and simply making things up when arguing:

> "It's as if it was a deer that he's killing. He has no - there is no sanctity for human life in this man." (T. Tr. 2376).

> "He wants to kill [Eva]. He just didn't get a chance to kill her because he got caught in St. Charles. That's aggravating. He's not done killing." *Id.* p. 2380.

> "...he draws others into his web of violence. Look who he drew in: Michael Douglas, 16 years old at the time. He's 22. Big Bro. So he ruins Michael Douglas's life as well. You know how you know he's not the one being influenced? Because he goes out and shoots Darryl Bryant and Jermaine by himself. See, he's willing to kill by himself...He's the strong man. He's the leader in this killing. He's the one." *Id.* p. 2384.

> "There was no stopping that guy. He doesn't care. It's like stomping a beetle. Those people meant nothing to him." *Id.* p. 2387.

Larner argued McFadden "kills for power, control, status. Those are his reasons to kill. You know, even animals don't kill for those reasons. What they do is they kill for food. He kills for pleasure." (T. Tr. 2389). By this emotionally charged, factually-barren argument, he likened McFadden to something worse than an animal – a tired but typical racial trope.

**C.** Larner improperly offered that McFadden believes in the death penalty. "Because, ladies and gentlemen, if there's one person that believes in the death penalty in this courtroom, it's that man." *Id.* p. 2404.

154

**D.** Larner improperly argued outside the evidence and also exceeded the proper scope of victim impact by telling the jury to consider the impact of McFadden's actions on people in other cases. *Payne v. Tennessee,* 508 U.S. 808, 830-31 (1991) (O'Connor, J., concurring). "Look at the lives he's ruined: Leslie, Todd, Darryl, Jermaine, their families. Look at the lives he has ruined and their families." (T 2384-85).

**E.** Larner improperly personalized matters with the jury. It is grossly improper to inflame, arouse fear, or encourage a juror to place themselves in the shoes of the victims, their families, and those Larner had speculated McFadden might kill because they were witnesses.

Larner argued: "Think about how horrible that is. Think about what that says about the criminal justice system which you all represent. And you are a huge part, the biggest part, of the criminal system. Because without juries, the criminal justice system doesn't work. And you know what? Without witnesses, it doesn't work either." (T. Tr. 2381). He continued (with speculation): "And why did Todd testify? Because Todd had faith in the criminal justice system ... That's Todd's faith in the criminal justice system. He's got faith in you." *Id.* p. 2383.

Then Larner rhetorically leaned into this theme and pulled the jury into the calculus: "Now, ladies and gentlemen, I want to tell you something. You are not just twelve individuals. You represent the-it's not just you or you or you standing alone.

You represent society. You represent the community ... You represent the community and you represent society and you represent what is good and decent about our community and about our society." (T. Tr. 2411-12).

Larner encouraged the jurors to feel the pain of the victims and their families. He argued: "Ladies and gentlemen, everyone who has a sister or brother hopes and prays they never had to endure the pain and suffering that the Addisons and Franklins have had to endure by someone with a cruel and evil intent that that man had, because you see now how fleeting innocent life can be. Think of the terror that Leslie went through. Think of the terror that Todd went through. Think of the terror that Ms. Franklin, when she came home, went through. Think of the terror that Eva went through when she watched her sister get killed. Think of that." *Id.* p. 2413. He concluded with: "Ladies and gentlemen, I leave you with Todd Franklin and Leslie Addison. Hold them. Hug them. Tell them you love them. But most of all, ladies and gentlemen, don't let them down." *Id.* p. 2414.

Larner consistently improperly relied on emotion, *see*, *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), to obtain a death verdict. Larner also speculated as to Leslie Addison's final thoughts, "Please don't shoot me. My God. My God. Please don't shoot me. I'm 18. I want to live. I haven't lived. I haven't had children. I didn't do anything. I'm a totally innocent victim. I'm a woman." (T. Tr. 2387).

156

**E.** Larner misstated the law, and mischaracterized and denigrated mitigation. Larner repeatedly converted mitigators into aggravators. *Zant v. Stephens*, 462 U.S. 862 (1983). The below opinion arguments misled the jury, and encouraged them to find, because McFadden is "normal," he deserved death.

"He has no mental disease, under the law. That's aggravating." (T. Tr. 2389);

"He's got no excuses. He's not sick in the head. I mean, he doesn't think like we think. There's no question that he's not. There's no mental disease or defect. He's not psychotic, schizophrenic, anything like that. That's aggravating." *Id*.;

"He has a supporting family, and he still kills. That's aggravating. Everyone tried to help him in his life: is aggravating." *Id*.;

"He has the intelligence to choose to do what is right. He's not retarded. His grades were average in school. That's aggravating." *Id*.;

"He has the capacity to know what was right from wrong. That's aggravating. If he didn't have the capacity to know what was right from wrong, that would be in his favor: he didn't know right from wrong. That's not the case here. It's aggravating." *Id*. p. 2390.;

"He was never beaten or abused or sexually molested by his family. He had every advantage. That's aggravating. And if he was beaten and sexually molested, that would be mitigating, wouldn't it? That would be mitigating. Well, that didn't happen. See, that's aggravating." *Id*;

"He was not molested. He was not beaten, abused by any member of his family at any time. He's not psychotic. He doesn't have any mental disease or defect, under the law. The best they could come up with, the best is that he didn't bond properly with his mother and father. And his strengths: He made an 'A' in Applied Math." *Id*. p. 2405;

157

"Now,-sometimes we hear people are too young to get the death penalty. That doesn't apply here. Too insane, too crazy, too retarded: that doesn't apply here. Even his own doctors say that he has no mental defect, under the law." (T. Tr. 2407).

Larner's improper arguments improperly skewed the weighing process by mischaracterizing mitigation and conflating with other legally inappropriate standards.

**F.** Larner introduced improper other acts evidence by mentioning McFadden's wanted poster in the Pine Lawn Police Department. Larner stated, ". . .the poster that was in the Pine Lawn Police Department that was picked out by Mark Silas was actually a 'wanted' poster for Vincent McFadden. He was wanted for shooting Darryl Bryant and Jermaine Burns." (T. Tr. 1819). This evidence was unrelated to Franklin's murder and was prejudicial to McFadden.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 116–133. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 745-52. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

158

**Claim 11:    Failure to rebut inaccurate Franklin portrayal with available evidence.**

Defense counsel was ineffective for failing to present a defense and for failing to confront the witnesses and evidence the prosecution used to present the victim, Franklin, to the jury as an upstanding citizen. Had trial counsel investigated, it could have presented a different picture of Franklin.

Trial counsel failed to present evidence of Franklin's second-degree trafficking guilty plea and failed to present Taneisha Kirkman-Clark's knowledge of Franklin's drug dealing, gun carrying, and involvement in a drive by shooting. This evidence would have countered the prosecution's portrayal of Franklin as an upstanding citizen. McFadden's defense counsel failed to rebut the prosecution's representation of Franklin as an upstanding citizen when trial counsel knew or should have known the prosecution's portrayal of the victim was inaccurate and in violation of the Sixth, Eighth, and Fourteenth Amendments.

During McFadden's penalty trial, the prosecution made the case to the jury that Franklin was an upstanding person. To support its argument that Franklin was a good citizen and person, the prosecution presented evidence to the jury from Franklin's mother. Patricia described her son as the man of the house she relied on because she was divorced. (T. Tr. 2039, 2041). She told the jury that when Patricia's mother died, Franklin moved in with her father, his grandfather, to help him cope. *Id.* pp. 2042-43.

159

Franklin's mother also testified to how as a young child; Franklin gave away his lunch at school for weeks to another student because he did not have a lunch. (T. Tr. 2046-47). Patricia also recounted how when a neighbor's mother died, he gave her his piggy bank money for the family to get food. *Id.* p. 2047. Patricia described Franklin as non-violent, "clean cut," a very friendly person who always kept a smile and made friends easily. *Id.* pp. 2047-48, 2052. The jury saw pictures of Franklin at Christmas and pictures that focused on his smile. *Id.* p. 2050-53. Franklin had obtained a GED and was attending a community college. *Id.* pp. 2048-49. Franklin was working at MCI. *Id.* p. 2049. On cross-examination, Patricia testified she did not know that Franklin had cocaine in his pocket when he was shot. *Id.* p. 2055.

Another witness for the prosecution, Candace Hosea, stated to the jury she was Franklin's girlfriend and worked with him at MCI. *Id.* p. 2057. Candace asked Franklin to go to Homecoming and fell in love with him. *Id.* pp. 2059-60. They had talked about getting married and having children. *Id.* p. 2057. Candace described Franklin as a happy, friendly person who was respectful and cared about everyone. *Id.* pp. 2057-58. Franklin had helped Candace's mother move and paint her house when Candace had only known Franklin for one month. *Id.* pp. 2058-59. Candace testified on cross-examination she did not know Franklin was involved in drugs. *Id.* p. 2060.

Franklin's sister, Tara, testified about what a good person her brother was. She was younger than Franklin and described him to the jury as a "father figure." *Id.* pp.

160

2062-63. Tara described Franklin as her best friend. *Id.* p. 2073. Because Franklin's middle name was Eric, Tara named her daughter Erica. *Id.* p. 2070.

Franklin taught Tara to skate, took her to cheerleading, and gave her money for her prom dress. (T. Tr. 2063-64). Franklin was proud of Tara for having graduated from high school and was supportive of her pregnancy. *Id.* p. 2065. Tara described Franklin as a non-violent person and recounted a time he talked to someone at school who was giving her trouble. *Id.* pp. 2064-65. When their father struck Tara, Franklin intervened. *Id.* p. 2066. Tara testified that Franklin always had a job. *Id.* p. 2067. They had planned to open a hair salon together. *Id.*

Tara described to the jury how their grandmother loved Pepsi and M&Ms and how Franklin always brought her both. (T. Tr. 2065). Franklin took their grandfather to play golf and introduced him to Michael Jordan shoes, which he still wears. *Id.* p. 2068. Their grandfather called Franklin "Hollywood" because he always dressed nicely. *Id.* When their grandmother died, Franklin moved in with their grandfather and took him everywhere, such as church on Sunday. *Id.* Franklin persuaded their grandfather to give away their grandmother's clothing to people who needed clothing. *Id.* p. 2069. When their grandfather wanted the freezer moved at 6:00 a.m., Franklin moved it. (T. Tr. 2069-70). Even though Franklin feared heights, he put tar on his grandfather's roof.  (T. Tr. 2071-72). Franklin and his grandfather were best friends. *Id.* p. 2069. Finally, Tara described how Franklin did chores for their grandparent's neighbor, Ms. Rogers, and was not paid for his work. *Id.* pp. 2070-71.

161

At the conclusion of the defense's penalty evidence, the jury heard a stipulation that when Franklin died, he possessed one gram of cocaine. (T. Tr. 2332).

At a 29.15 hearing, McFadden's lawyers testified. They stated that because they had tried the first Franklin murder trial, they knew about the state's presentation of Franklin's good character and expected that again. (29.15 Tr. 126-27, 132, 513-14, 517). They were aware they needed to rebut the prosecution's "good guy" testimony. The good character evidence presented by the state did not surprise them.

Had trial counsel acted within the prevailing professional norms for defense counsel or had they done what they purportedly intended to do, they would have investigated and presented evidence to rebut the "good guy" testimony about Franklin. Trial counsel should have obtained a certified copy of Mr. Franklin's guilty plea to the Class A felony of second-degree trafficking. (29.15 Ex. 46). Trial counsel noted this evidence would have been admissible and that the jury could have considered it. (29.15 Tr. 134, 518-19). There was no strategic reason for failing to investigate Franklin's criminal history and presenting such evidence to the jury. *Id.* pp. 517-18.

Trial counsel would have discovered other rebuttal evidence had they investigated Franklin. In 29.15 proceedings, Taneisha Kirkman-Clark recounted Franklin was a drug dealer, associate of a drug dealer named Pelle, and a gang member. (29.15 Ex.86 Ap. 13-15). Franklin carried a gun. (29.15 Ex.86, Ap.15). Franklin was part of a drive-by shooting directed at Kirkman-Clark's mother's house

162

with Arnell "Smoke" Jackson as the intended target. (29.15 Ex.86 Ap.15-16). Kirkman-Clark described Franklin as "nice" when he complied with her request not to deal drugs in her mother's yard. (29.15 Ex.86 Ap.13-14, 32).

Reasonable counsel acting under the prevailing professional norms would have presented Franklin's guilty plea and Kirkman-Clark's evidence to rebut how Franklin was portrayed. McFadden was prejudiced because the jury was left believing he was more deserving of death for killing someone who the State presented as of high moral character.

To undercut the State's representation of Franklin, it was critical for the jury to hear about Franklin's drug dealing, association with drug dealer Pelle, gang membership, and drive-by shooting involvement. (29.15 Ex.46; 29.15, Ex.86 Ap.13-16, 32). The jury only heard on cross-examination some non-descript evidence that Franklin was involved in drugs. (T. Tr. 2055, 2060) The jury also heard Franklin died possessing a single gram of cocaine. *Id.* p. 2332.

Counsel's failure to present evidence of Franklin's drug-dealing conviction was unreasonable. While counsel claimed they were attempting to avoid offending the jury, the jury was already exposed to similar evidence of Franklin's drug involvement through his mother's cross-examination (T. Tr. 2055), his girlfriend's cross-examination, *Id.* p. 2060, and the gram of cocaine he possessed at his death. *Id.* p. 2332.

By failing to rebut the prosecution's portrayal of Franklin, McFadden's counsel left the jury with the impression that McFadden was more deserving of death because he killed someone of especially high moral character. This failure prejudiced McFadden.

"One of the primary duties of counsel at a capital sentencing proceeding is to neutralize the aggravating circumstances advanced by the state and present mitigating evidence." *Wiggins*, 539 U.S. at 524 (counsel has duty to investigate and rebut aggravation); *Parker*, 188 F.3d at 929-31 (counsel was ineffective for failing to present evidence rebutting aggravation that victim was potential witness against Parker).

The trial counsel's failure to investigate and present evidence rebutting Franklin's character prejudiced McFadden. Had the jury known of Franklin's drug-dealing, gang-involved background, they would have been less likely to sentence McFadden to death.

The Missouri Supreme Court recognized that Franklin's possession of cocaine "is not the equivalent of evidence of a second-degree drug trafficking conviction." *McFadden III*, 619 S.W.3d at 449. However, the state Supreme Court found that McFadden had not presented evidence of prejudice. This Court should grant habeas corpus relief, vacate McFadden's sentence of death as being unconstitutional, and return this matter to Missouri for resentencing.

****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 54–60. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *See McFadden III*, 619 S.W.3d at 449. This decision was both (1) a contrary to or unreasonable application of clearly established Federal law to the facts presented and (2) an unreasonable determination of the facts, given the evidence. 28 U.S.C.A. § 2254 (d)(1)(2). The Missouri Supreme Court incorrectly held that there was no prejudice.

**Claim 12:    McFadden was denied the effective assistance of counsel when his trial counsel failed to object to numerous instances of prosecutorial misconduct.**

McFadden's trial counsel failed to object to numerous improper arguments the prosecution made to McFadden's jury. The prosecution argued that (1) McFadden would have killed Eva except he was arrested (29.15 Tr. 521; T. Tr. 2380); (2) in an earlier time, the Franklin and Addison families would have been given the opportunity for personal retribution, but instead McFadden got a fair trial (29.15 Tr. 525-26; T. Tr. 2409); (3) the jury should think of the terror that Franklin, Franklin's mother, Leslie, and Eva felt (29.15 Tr. 524-25; T. Tr. 2413); (4) if anyone believes in the death penalty, it is McFadden (29.15 Tr. 522-23; T. Tr. 2404); and, (5) the jury should "hold, hug, and love" Franklin and Leslie Addison and should not "let them down." (29.15 Tr. 525; T. Tr. 2414). The trial counsel's failure to object to these prejudicial arguments denied McFadden the effective assistance of counsel, the due process of law, a fair trial, and freedom from cruel and unusual punishment as guaranteed by the Sixth, Eighth, and Fourteenth Amendments. Under the prevailing professional norms, it was unreasonable that trial counsel failed to object to these arguments.

The prosecutor's arguments appealed to the jury's passion, prejudice, caprice, and emotion making the trial unfair in violation of the due process clause. McFadden was prejudiced by this failure because there is a reasonable probability had the jury not heard these arguments, McFadden would have been given a life sentence. Trial

166

counsel later testified that they had no reason for not objecting to these improper arguments. (29.15 Tr. 571).

The Eighth Amendment requires that any decision to impose death must be based on reason rather than passion, prejudice, caprice, or emotion. *Gardner v. Florida*, 430 U.S. 349, 358 (1977). Failure to make timely proper objections to such arguments constitutes ineffectiveness of trial counsel and a violation of the Sixth Amendment. This Court should grant habeas corpus relief.

****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 80–83. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *See McFadden III*, 619 S.W.3d at 457. This decision was both (1) a contrary to or unreasonable application of clearly established Federal law to the facts presented and (2) an unreasonable determination of the facts, given the evidence. 28 U.S.C.A. § 2254 (d)(1)(2). The Missouri Supreme Court incorrectly held that these prosecutorial arguments had been proper, and trial counsel had not been ineffective in their failure to object.

**Claim 13:**    **Evidence and argument about the motive for the prior murder violated the Double Jeopardy Clause.**

In McFadden's first trial for the homicide of Franklin, the State asked the jury to find, as an aggravating factor, that "Todd Franklin was a witness in a past prosecution of Lorenzo Smith and Corey Smith for robbery and assault of Todd Franklin and was killed as a result of his status as a witness." (Franklin 1 Tr. p. 1029). The jury *declined* to find this aggravating circumstance. Yet the State continued to pursue this issue at retrial. (Franklin 1 L.F. p. 375). That failure to find the statutory aggravator should have precluded the State from submitting that issue here.

Relitigating an issue that an earlier jury rejected violated McFadden's Fifth Amendment right to be free from Double Jeopardy. Because the first jury's decision is an acquittal - a merits ruling on that element of the State's case – jeopardy attaches. *See State v. Whitfield*, 107 S.W.3d 253 (Mo. banc 2003); *Apprendi v. New Jersey*, 530 U.S. 466 (2000); *Ring v. Arizona*, 536 U.S. 584 (2002). Indeed, if the required factual findings are **not** made unanimously beyond a reasonable doubt, the defendant is acquitted of that element of the offense.

The first jury's decision was a merits ruling, an acquittal of the "witness in a prior prosecution" statutory aggravator. Since this "capital sentencing procedure that resembles a trial on the issue of guilt or innocence [Missouri] *explicitly requires* the jury to determine whether the prosecution has proved its case," the failure to make a finding acts an acquittal. *Bullington v. Missouri*, 451 U.S. 430, 444 (1981)

168

(emphasis in original). Thus, the State should have been precluded from using that aggravator again since its use "'forced [McFadden] to run the gantlet'" again. *Id.* at 443, quoting *Green v. United States*, 355 U.S. 184, 190 (1957).

In McFadden's case, the parties and issues are the same. Thus, the State was collaterally estopped from presenting this evidence to this second jury and forced McFadden to re-defend against these accusations upon which he already won. The trial court's rulings are contrary to due process, a fair trial, freedom from cruel and unusual punishment and twice being tried for the same offense.

Collateral estoppel is part of the Fifth Amendment's guarantee against double jeopardy, *Ashe v. Swenson*, 397 U.S. 436, 445 (1970), which extends to the States through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794 (1969). "When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443. The "first trial [cannot be treated] as no more than a dry run for the second prosecution." *Id.* at 447. That is "precisely what the constitutional guarantee forbids." *Id.*

Such policies should have greater force when the prosecutor caused the second trial due to their racially discriminatory practices. "To permit a second trial after an acquittal. . . would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the

169

defendant." *Poland v. Arizona,* 476 U.S. 147, 156 (1986), quoting *United States v. Scott*, 437 U.S. 82, 91 (1978).

While the State did not re-submit that aggravator, it purposefully and consistently violated *Ashe*. Despite repeated objections, it permeated guilt phase argument and testimony that McFadden killed Franklin because he was a witness against McFadden's friends, Corey and Lorenzo Smith.

Pre-trial, defense counsel moved to preclude the State from presenting that this killing was related to Corey and Lorenzo's cases. (T. Tr. 977). The trial court overruled counsel's continuing objection, admitting the evidence. *Id.* pp. 978-81.

Freed of the constraints of the Constitution, the trial prosecution argued that in 2001, Franklin testified against McFadden's "buddies," Corey and Lorenzo, who were then convicted and sentenced. *Id.* pp. 993-94. He argued McFadden "wasn't going to let that go" and he and Douglas therefore killed Franklin. *Id.* pp. 994-95. After Franklin's death, McFadden intimated to Evelyn Carter he killed Franklin because "he snitched on my home boys." *Id.* p. 1031. The prosecution read McFadden's letter to Douglas and argued the motive in this case was Lorenzo and Corey. *Id.* p. 1038.

Though it was hearsay, Silas testified he heard Franklin was "a victim of Corey and Lorenzo Smith." (T. Tr. 1110). Upon objection, the prosecution moved on. *Id.* p. 1111. The trial prosecution called William Goldstein, Lorenzo Smith's lawyer. *Id.* p. 1363. Counsel lodged a continuing objection, arguing the

170

first jury's rejection of the statutory aggravator should preclude this evidence. (T. Tr. 1361). The Court overruled the objection. *Id.* p. 1362.

Goldstein testified Franklin was deposed and implicated Corey and Lorenzo, who pled guilty and were sentenced based on his testimony. *Id.* p. 1365-68. Goldstein testified Franklin "testified credibly" and Lorenzo pled guilty partially because of it. *Id.* p. 1371-72.

Eva Addison testified that Corey and Lorenzo were McFadden's friends. (T. Tr. 1375-76). Evelyn Carter testified that McFadden, Corey and Lorenzo were friends and McFadden intimated he killed Franklin because Franklin told on his "homies," who Carter assumed were Lorenzo and Corey. *Id.* pp. 1395-96, 1399. Larner offered Exhibit 409, a letter to Michael Douglas, "You must make sure you don't say anything about Zo N Corey in this case at all." *Id.* pp. 1575-76; (T. Ex. 409).

In closing, the prosecution argued Silas was afraid to testify because McFadden killed his friend for testifying against McFadden's friends. (T. Tr. 1745, 1789). "That's the motive." *Id.* p. 1789.

The Double Jeopardy Clause forbids the relitigating of issues that were resolved in favor of criminal defendants at a prior criminal trial. Here, the State continued to litigate an issue that a previous jury had expressly rejected when it failed to find, as a question of fact, that McFadden killed Franklin in reprisal for his testimony against the Smiths. This evidence was highly prejudicial in the Addison trial,

171

for it allowed the prosecutor to paint a portrait of McFadden as someone especially worthy of death because of repeated interference with the criminal-justice system. The Court should vacate McFadden's death sentence and order a resentencing at which McFadden's Double Jeopardy rights are honored.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 53–61. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 737–738. The Missouri Supreme Court failed to consider all of the pertinent CEFL from the United States Supreme Court; therefore, this Court's review is *de novo*. Alternatively, the merits determination is contrary to and/or an unreasonable application of the law and facts. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 14:**     **Improper presentation of prejudicial other acts evidence at the guilt phase.**

The trial court erred in allowing improper other acts in the guilt phase. The prosecution presented these arguments in an opening statement; the testimony regarding Silas's identification from Officers Menzenwerth and Stone (Silas identified McFadden from a photograph in the station); and Heather Burke's testimony that she compared McFadden's prints to those in the "master file." The admission of these improper arguments and evidence denied McFadden due process, a fair trial, trial for the charged offenses, and freedom from cruel and unusual punishment as protected by the Sixth, Eighth and Fourteenth Amendments. The admission of this evidence had a substantial and injurious effect on the guilt proceedings and a carryover effect to the penalty proceedings.

Through several witnesses, the prosecution argued and adduced evidence that, when Franklin died, McFadden's picture was already posted in the police station, suggesting he was "wanted" for other crimes. In the prosecutor's guilt phase opening, he stated, when Silas came into the station, he identified McFadden as the second shooter: ". . .by the way, there's a photograph on the wall of the room that I'm being interviewed in right there. That's the man. There he is. There's a photograph of him right here on the wall. That's him, Officer." (T. Tr. 1007).

On direct, Lamer repeatedly asked, "Isn't that the picture that you pointed to on the wall at the Pine Lawn Police Station and said, that's JR, the second

173

person that shot Todd? . . .[W]hile you were doing our initial interview, you pointed out a picture in this room, um-the picture you just-you-the picture you see on the wall, that's the same person that shot?" (T. Tr. 1059-60). When asked whether "something occur[red] with Mark Silas regarding a photograph on the wall of the room where the interview was occurring," Officer Stone recounted, "There was a picture of a subject, and Silas stated that was a person who shot Todd Franklin." *Id.* p. 1416. Officer Menzenwerth agreed Silas picked "out this photo from hanging on the wall. . . at the police department. . . in Pine Lawn. . . A photo of Vincent McFadden." *Id.* p. 1609.

Because Silas had already identified McFadden as the second shooter, these references to McFadden's photograph were solely designed to prejudice him. They lack logical relevance, having no legitimate tendency to establish his guilt of the charged offense. They lack legal relevance since their prejudicial effect far outweighed their probative value. Focusing on the photograph clearly attempted to emphasize McFadden's prior criminal activity.

Heather Burke, latent print examiner, compared a print on a cigar found near Todd's body to prints from "the Automated Fingerprint Identification System"— "master files." (T. Tr. 1310, 1312). She determined the cigar print "is an exact match to the right thumb of the fingerprint card with the name bearing 'Vincent McFadden.'" *Id.* p. 1315. She acknowledged one of the comparison cards was an

174

"older card," which existed before her analysis even began. (T. Tr. 1315, 1317). Burke's testimony about McFadden's prints on file was not logically relevant since it had no legitimate tendency to establish guilt of **this** offense. It also was not legally relevant. Since Burke could "match" the cigar print to McFadden because she took his prints while doing her analysis, the references to "master files," and "older card" and AFIS created enormous prejudice by suggesting McFadden's involvement in prior criminal activity.

The admission of this other acts evidence violated McFadden's rights to a fair trial and due process. McFadden was prejudiced in that the improper admission of this evidence had a substantial and injurious effect.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 73–77. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 740–42. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

175

**Claim 15:**        **Improper jury instructions increased the number on a list of statutory aggravators skewing the weighing process.**

The trial court erred in overruling McFadden's objections and submitting Instruction 18, patterned after MAI-CR3d 314.40, when the trial court failed to apply the applicable Notes on Use. This denied McFadden due process, a properly-instructed jury, and freedom from cruel and unusual punishment pursuant to the Sixth, Eighth and Fourteenth Amendments. The instruction had a substantial and injurious effect on the proceedings. Contrary to the Notes on Use, the Instruction improperly submitted 5 separate numbered paragraphs on statutory aggravators. McFadden was prejudiced because, when the jury weighed aggravators and mitigators, this instruction encouraged jurors to believe more aggravators were on the "death" side of the scales and that death was the appropriate punishment.

Contrary to MAI-CR3d 314.40's Notes on Use, Instruction 18, in separate numbered paragraphs, told the jury to determine whether five statutory aggravators existed. (D.A. L.F. pp. 654-55). Instruction 19 instructed they determine whether mitigators outweighed statutory and non-statutory aggravators. *Id.* p. 656. The jury found all five statutory aggravators and recommended death. *Id.* pp. 684-85. However, the trial court refused to follow Missouri's Notes on Use, even after reading the requirements and that the instruction the trial court was about to provide ran contrary to those requirements. (T. Tr. 2347).

176

By first instructing the jury they could find as many as five statutory aggravators and then instructing them to separately list each one found, the jury was encouraged to quadruple-count what should have been one statutory aggravator. *Id.* pp. 2343-44. Especially here, where Instruction 19 contained no statutory mitigators, expanding the statutory aggravators from two to five undoubtedly affected their decision to impose death. Consider, the jury was also instructed to "determine whether there are facts or circumstances in mitigation of punishment which are sufficient to *outweigh* facts and circumstances in aggravation of punishment." (D.A. L.F. p. 656)(emphasis added). Increasing the number of statutory aggravators placed a thumb on death's side of the scales and skewed the result toward death. *Stringer v. Black*, 503 U.S. 222, 232 (1992).

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 78–84. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 742. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

177

**Claim 16:**    **Improper jury instructions allowed the jury to sentence McFadden for the actions of another person.**

The trial court erred in instructing the jury that McFadden could be sentenced to death for the actions of his co-defendant Douglas. The "depravity of mind" aggravator submitted in Instruction 18 let the jury sentence McFadden to death based on Douglas's conduct. This denied McFadden due process, a fair trial, reliable sentencing and freedom from cruel and unusual punishment as guaranteed by the Sixth, Eighth and Fourteenth Amendments.

The jury must give individualized consideration to a defendant's argument for a sentence less than death. *Lockett*, 438 U.S. at 605. Instructing McFadden's jury to find one statutory aggravator based on Douglas's conduct is a patent affront to individualized sentencing.

Instruction 18 reads:

> ...Whether the murder of Todd Franklin involved depravity of mind and whether, as a result thereof, the murder  was outrageously and wantonly vile, horrible, and inhuman. You can make a determination of depravity of mind only if you find: That the defendant killed Todd Franklin after he was bound or otherwise rendered helpless by defendant or another acting with or aiding the defendant and that defendant thereby exhibited a callous disregard for the sanctity of all human life.

(D.A. L.F. pp. 654-55). The jury found "depravity of mind." *Id.* p. 685. Premised upon *Lockett*, the Notes on Use demonstrate that the instruction must make clear

178

that a finding of depravity of mind must be premised upon the acts and intent of the defendant, not those of any other.

Jury instructions setting out statutory aggravating circumstances - that, if found, justify the death sentence - must be unquestionably focused on the convicted murderer's own character, record and conduct. Although it is permissible to find a person guilty of murder for acts done in concert with another, it is never permissible to sentence a person to death for acts of another. *Lockett*, 438 U.S. at 605.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 85–89. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 742-43. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 17:**     **Improper death sentence when the jury failed to apply the narrowing construction of the heinous, atrocious and cruel ("HAC") aggravator; and even if it did, the narrowing construction fails to narrow.**

The trial court instructed the jury it could find the "murder of Todd Franklin involved depravity of mind" only if it found "the defendant killed Todd Franklin after he was bound or otherwise rendered helpless by defendant or another acting with or aiding the defendant and that defendant thereby exhibited a callous disregard for the sanctity of all human life." (D.A. L.F. p. 655). The trial court also directed the jury to write out the statutory aggravators they found "verbatim." *Id.* p. 680. Presumed to have followed the instructions, the jury did not apply the limiting construction. *Id.* p. 685.

The Constitution required the jury to make all factual findings upon which an increased penalty was premised. *Ring*, 536 U.S. 584; *Apprendi*, 530 U.S. at 490-94; *Whitfield*, 107 S.W.3d 253 *rev'd on other grounds State v. Wood*, 580 S.W.3d 566 (Mo. banc 2019). However, the jury made no required findings as to "limiting construction" of the "depravity of mind" aggravator. Without such, this aggravator could not be weighed.

A state's death penalty statute must be applied "in a manner that avoids the arbitrary and capricious infliction of the death penalty." *Godfrey v. Georgia*, 446 U.S. 420, 428 (1980), citing *Gregg v. Georgia*, 428 U.S. 153, 196 n.47 (1976) (Stewart, Powell, Stevens, JJ.). Death eligible crimes must be defined in a way that obviates

180

standardless sentencing discretion. *Id.* The sentencer's discretion "must be suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action." *Id.* at 189. Since capital sentencing systems could have standards so vague as to not adequately channel sentencing discretion, aggravators "must genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862, 877 (1983).

Missouri juries may consider, as a statutory aggravator, whether the murder "was outrageously or wantonly vile, horrible or inhuman in that it involved torture, or depravity of mind." Mo. Rev. Stat. § 565.032.2(7) (2017). It cannot be disputed that this language, without further definition, is too vague to provide adequate guidance. *Godfrey*, 446 U.S. at 428. The jury did not make a finding applying the required narrowing construction.

Alternatively, if the jury found the limiting construction, it is void for vagueness because, if the victim is "rendered helpless" by one shot, the limiting construction applies to any case involving more than one shot. Every multiple shooter case meets this criteria – there can never be a narrowing. If an aggravator is so broad it covers any fact situation, it "obviously cannot fulfill its constitutional responsibility to eliminate the consideration of impermissible

181

factors and to provide a recognizable and meaningful standard for choosing the few who are to die." *Newlon v. Armontrout*, 885 F.2d 1328, 1334 (8th Cir. 1989) (quoting *Cartwright v. Maynard*, 822 F.2d 1477, 1485 (10th Cir. 1987) (quoting Richard A. Rosen, *The "Especially Heinous" Circumstance in Capital Cases – The Standardless Standard*, 64 N.C. L. REV. 941, 954 (1986))).

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 90–95. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 743-44. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 18:**     **The jury rejected the depravity of mind limiting instruction in Franklin-1 thus jeopardy attached as to that factor in Franklin-2.**

The first jury did not find the "depravity of mind" limiting construction. It thus rejected that aggravator, precluding its re-submission at McFadden's second Franklin trial. By submitting it to this jury and accepting a death verdict premised upon a previously rejected basis, the trial court violated McFadden's rights to due process, freedom from cruel and unusual punishment, and violating double jeopardy principles.

Relitigating of an issue that an earlier jury rejected violated McFadden's Fifth Amendment right to be free from double jeopardy. The first jury's decision acted as an acquittal - a merits ruling on that element of the State's case – thus, jeopardy attached. S*ee Whitfield*, 107 S.W.3d 253; *Apprendi*, 530 U.S. 466; *Ring*, 536 U.S. 584. Indeed, if the required factual findings are **not** made unanimously beyond a reasonable doubt, the defendant is acquitted of that element of the offense.

The first jury's decision was a merits ruling, an acquittal of the limiting instruction applied to the depravity of mind aggravator. Since this "capital sentencing procedure that resembles a trial on the issue of guilt or innocence [Missouri] *explicitly requires* the jury to determine whether the prosecution has proved its case," the failure to make the finding constitutes an acquittal of that element. *Bullington v. Missouri*, 451 U.S. 430, 444 (1981) (emphasis in original). Thus, the State should have been precluded from using that aggravator again since

183

its use "'forced [McFadden] to run the gantlet'" again. *Id.* at 443 (quoting *Green v. United States*, 355 U.S. 184, 190 (1957)).

In McFadden's case, the parties and issues are the same. Thus, the State was collaterally estopped from presenting this aggravator to a second jury and forcing McFadden to re-defend against these accusations upon which he won.

Collateral estoppel is part of the Fifth Amendment's guarantee against double jeopardy, *Ashe v. Swenson*, 397 U.S. 436, 445 (1970), which extends to the States through the Fourteenth Amendment. *Benton v. Maryland*, 395 U.S. 784, 794 (1969). "When an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." *Ashe*, 397 U.S. at 443. The "first trial [cannot be treated] as no more than a dry run for the second prosecution." *Id.* at 447. That is "precisely what the constitutional guarantee forbids." *Id.*

Such policies should have greater force when the prosecutor caused the second trial due to their racially discriminatory practices. "To permit a second trial after an acquittal. . . would present an unacceptably high risk that the Government, with its vastly superior resources, might wear down the defendant." *Poland*, 476 U.S. at 156 (quoting *United States v. Scott*, 437 U.S. 82, 91 (1978)).

The Double Jeopardy Clause forbids the relitigating of issues that were resolved in favor of criminal defendants at a prior criminal trial. Here, the State

184

continued to litigate an issue that a previous jury had expressly rejected when it failed to find, as a question of fact, the limiting construction employed by the States. The Court should vacate McFadden's death sentence and order a resentencing at which McFadden's double jeopardy rights are honored.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 96–101. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 744. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 19:** **The jury never made a required finding of an element of an aggravating circumstance.**

The trial court erred in overruling McFadden's objections to Instruction 18, when the submitted instruction did not require any findings on the "serious assaultive convictions" elements of four statutory aggravators included. While the instructions nominally asked the jury to determine whether the convictions were "serious assaultive," no instructions or facts were presented regarding "serious assaultive" facts.

Any fact, other than prior conviction, that increases the maximum penalty must be charged in the indictment, submitted to, and found by the jury beyond a reasonable doubt. *Apprendi*, 530 U.S. at 476, 484, 490; *Ring*, 536 U.S. at 609; *United States v. Booker,* 543 U.S. 220, 317-18 (2000). When the State seeks death based upon the "serious assaultive criminal convictions" statutory aggravator, Mo. Rev. Stat. § 565.032.2(1) (2017), the jury must find the prior conviction and its "serious" "assaultive" nature. The Note on Use of MAI-CR3d 314.40 instructs, "[b]ecause of the United States Supreme Court decision in *Shephard v. United States*, 544 U.S. 13 (2005), the facts of the 'serious assaultive conviction' should be submitted to the jury." Further, since no evidence was adduced that the prior convictions were "serious" "assaultive," McFadden's sentence violates due process.

186

The trial court's Instruction 18 did not include those definitions. (D.A. L.F. p. 654). Defense counsel objected because the instruction did not require factual findings that the convictions were "serious assaultive." (T. Tr. 2343), and again argued the instructions should have been more specific on the factual question of what constitutes "serious and assaultive." *Id.* p. 2360. These objections and requests were denied.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 102–107. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 744. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 20:**     **Instructions 19 and 21 violate** *Ring v. Arizona*, **536 U.S. 584 (2002), and** *Apprendi v. New Jersey*, **530 U.S. 466 (2000).**

Over strenuous objection, (T 2352-54), the trial court erred in providing the following instructions to the jury:

> If you have unanimously found beyond a reasonable doubt that one or more of the statutory aggravating circumstances submitted in Instruction No. 18 exists, you must then determine whether there are facts or circumstances in mitigation of punishment which are sufficient to outweigh facts and circumstances in aggravation of punishment.
>
> In deciding this question, you may consider all of the evidence presented in both the guilt and the punishment stages of trial, including evidence presented in support of the statutory aggravating circumstances submitted in Instruction No. 18, and evidence presented in support of mitigating circumstances.
>
> You shall consider any facts or circumstances which you find from the evidence in mitigation of punishment.
>
> It is not necessary that all jurors agree upon particular facts and circumstances in mitigation of punishment. If each juror determines that there are facts or circumstances in mitigation of punishment sufficient to outweigh the facts or circumstances in aggravation of punishment, then you must return a verdict fixing defendant's punishment at imprisonment for life by the Department of Corrections without eligibility for probation or parole.

(D.A. L.F. p. 656). Instruction 21 provides:

> If you unanimously decide that the facts or circumstances in mitigation of punishment outweigh the facts and circumstances in aggravation of punishment, then the defendant must be punished for the murder of Todd Franklin by imprisonment for life by the Department of Corrections without eligibility for probation or parole, and your foreperson will sign the verdict form so fixing the punishment.

188

(D.A. L.F. p. 658).

Capital defendants are entitled, under the Fourteenth Amendment's Due Process Clause and the Sixth Amendment's notice and jury trial guarantees, to have a jury find, beyond a reasonable doubt, all facts upon which increased punishments are contingent. *Ring*, 536 U.S. at 600; *Jones v. United States*, 526 U.S. 227, 243 n.6 (1999). Facts increase the maximum punishment when their absence render the higher sentence unavailable. *Ring*, 536 U.S. at 600-01. All but the final step in Mo. Rev. State § 565.030 (2017) are eligibility steps, requiring jury findings of fact. *Whitfield*, 107 S.W.3d at 256, 261. Instruction 19's "weighing" step requires "factual findings that are prerequisites to the trier of fact's determination that a defendant is death-eligible." *Id.* at 261.

*Ring* and *Apprendi* require those findings be unanimous beyond a reasonable doubt. *Ring*, 536 U.S. at 602; *Apprendi*, 530 U.S. at 494. Since these death-eligibility findings are like an element of a greater offense, *Id.* at 494 n.19; *Ring*, 536 U.S. at 609, the State bears that burden of proof. *In re Winship*, 397 U.S. 358 (1970); *Jackson v. Virginia*, 443 U.S. 307 (1979).

Instruction 19's first paragraph violates *Ring*, *Apprendi*, *Whitfield*, and *Winship*. Despite being a death-eligibility step, it tells jurors to "determine" whether mitigators outweigh aggravators. Placing the burden of proof on McFadden, not the State as due process requires. It also does not require the finding

189

to be beyond a reasonable doubt. *Winship.*

The second paragraph injects capriciousness by informing the jury to consider anything from either phase, whether "found" or not. Although this is a death-eligibility step, whose "beyond a reasonable doubt" burden is on the State, it specifies no burden and never places it on the State. It lets the jury weigh evidence never found, under any legal standard, as aggravation. Since Larner told the jury he believed Leslie's death was why McFadden would receive death, that finding should have been made beyond a reasonable doubt. (T. Tr. 2379). Despite the critical importance of that evidence, the Instruction never told the jury how to consider it.

The Instruction also let the jury find evidence aggravating that it constitutionally may not. Larner focused the penalty phase on the Leslie Addison homicide, allegations McFadden possessed cocaine, victim-impact evidence, and allegations McFadden threatened witnesses. *Id.* pp. 1841-2062. Larner's closing argument during the penalty phase that the jury could consider McFadden's age, lack of intellectual disability, lack of mental disease or defect, and lack of abusive history as aggravating factors further prejudiced McFadden (T 2389-90, 2405, 2407), *Zant v. Stephens*, 462 U.S. 862 (1983).

Instruction 21 has similar problems. Instruction 21 places the burden on the defense, *Ring*, 536 U.S. 584; *Winship*, 397 U.S. 358, and heightens that burden

190

from a "conclusion" – e.g., any number of jurors – to a unanimous finding, contrary to Missouri's Death Penalty Statute. The trial court denied defense objections and refused proposed instructions (D.A. L.F. pp. 663-76) that remedied the shortcomings of the above instructions.

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 108–115. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 744-45. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 21:**        *Apprendi* and *Ring* **Violation.**

A jury must find any fact that increases the maximum penalty for a crime. *Whitfield.* 107 S.W.3d 253. Due Process and the Sixth Amendment's notice and jury trial guarantees also require those eligibility factors be charged to seek death. *Jones,* 526 U.S. at 243 n.6. Since McFadden's charging document never alleged eligibility factors, McFadden was only charged with the non-death-eligible offense of un-aggravated first degree murder. This capital prosecution violated his state and federal constitutional rights to due process, a fair trial, reliable sentencing and freedom from cruel and unusual punishment.

Before trial, McFadden moved to preclude the State from seeking death, to require jury findings, to quash the information, and to submit instructions that comply with *Ring* and *Apprendi.* (D.A. L.F. pp. 84-91, 97-111, 146-50, 151-53, 171-200, 207-17, 227-233). The trial court rejected his challenges. (D.A. L.F. pp. 257-59); (T. Tr. 4-6).

The State charged McFadden by indictment and substitute information with first degree murder. (D.A. L.F. pp. 9, 26-30). It never charged statutory and non-statutory aggravators but filed Notices of Evidence in Aggravation, alleging statutory and non-statutory aggravators. *Id.* pp. 38-41, 276-78, 456-59.

The Due Process Clause and the Sixth Amendment's notice and jury trial guarantees require "any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury,

192

and proven beyond a reasonable doubt." *Jones,* 526 U.S. at 243 n.6. That did not occur here. "[A] conviction upon a charge not made or upon a charge not tried" denies due process. *Jackson v. Virginia,* 443 U.S. 307, 314 (1979), *citing Cole v. Arkansas,* 333 U.S. 196, 201(1948); *Presnell v. Georgia,* 439 U.S. 14 (1978).

*****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* Direct Appeal Brief at 134–133. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden II*, 369 S.W.3d at 752-53. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 22:**   **McFadden was denied the effective assistance of trial counsel when they failed to object to the admission and argument regarding a Wanted Poster with McFadden's photo. and to argument about this poster.**

McFadden was denied the effective assistance of trial counsel when his counsel failed to object to the prosecution's argument that Silas identified McFadden from a Pine Lawn police wanted poster, and the introduction of this wanted photo into evidence. From this poster, Silas identified McFadden as the shooter.

Counsel's failure to object to this testimony and the prosecution's argument denied McFadden due process of the law, a fair trial, freedom from cruel and unusual punishment, and effective assistance of counsel, all in violation of the Sixth, Eighth, and Fourteenth Amendments. Counsel's failure to object to this evidence and argument allowed the jury to believe that McFadden's wanted photo implied that McFadden had a criminal record or was in trouble with the police.

During trial and in front of the jury, the prosecution asked Silas whether he had recognized McFadden from a photo on the Pine Lawn Police Station wall. According to the prosecution, Silas identified McFadden as the second shooter from this photograph. (T. Tr. 1059-60). Silas denied he had seen State's Exhibit 75-A, but the prosecution's questioning still contained the prejudicial information that McFadden's picture was on the wall of the Pine Lawn Police Station.

Later, Officer Stone testified to the jury that Silas identified the person in the picture on the Pine Lawn Police wall as having shot Franklin. *Id.* p. 1416.

194

Trial counsel testified in post-conviction proceedings that because of their earlier objections to the wanted poster for McFadden, the word "wanted" and the charge description were redacted. (29.15 Tr. 64-65). They explained there had been no direct references to the photo being a wanted photo. *Id.* pp. 161, 552-53. However, counsel did not object to the testimony that the photo had been on the wall of the Pine Lawn Police Department or the closing argument discussing when Silas originally saw the wanted photo. Counsel did not have a strategic reason for failing to object. *Id.* pp. 67, 475.

While trial counsel objected to the admission of the wanted poster into evidence and persuaded the trial court to redact the "wanted" heading and description of the crime, they did not object to testimony that McFadden's picture on the wall of the Pine Lawn Police Station was used to identify McFadden as the shooter. The defense again failed to object when the prosecution argued to the jury that Silas identified McFadden from a picture on the wall of the police station. (T. Tr. 1746-47). Reasonable trial counsel under the prevailing professional norms would have objected to these questions and to this argument.

Trial counsel's deficient performance prejudiced McFadden. By indirectly telling the jury that McFadden was wanted by the Pine Lawn Police Department for other crimes, counsel allowed the admission of evidence of McFadden's potential criminal history. This evidence would have been inadmissible. The failure to object allowed a jury to assume the worse. This Court should grant habeas corpus relief.

195

\*\*\*\*\*

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 75–77. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 619 S.W.3d at 448. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

**Claim 23:    The failure to compel Douglas to answer deposition questions denied McFadden a fair post-conviction proceeding.**

The state court's failure to compel Douglas to answer McFadden's deposition questions in preparation for a 29.15 hearing denied McFadden the opportunity to prepare fully for that evidentiary hearing. This denial deprived McFadden of a fair proceeding and due process of the law in violation of the Eighth and Fourteenth Amendments. *See Case v. Nebraska*, 381 U.S. 336 (1965).

McFadden was appointed Rule 29.15 counsel on September 10, 2013. (29.15 L.F. Doc. 100 p.11; 29.15 L.F. Doc. 125 p.1). An extension to file the amended motion was granted until December 11, 2013. (29.15 L.F. Doc. 122 pp.1-5).

To prepare for the amended petition, Douglas appeared for an October 24, 2013 deposition. (29.15 Exs. 48, 49; 29.15 L.F. Doc. 130 p.1; 29.15 L.F. Doc. 120 pp.1-3; 29.15 Tr. 284-85). On advice of counsel, Douglas invoked the Fifth Amendment as to all questions, including his name and even taking an oath to open the deposition. (29.15 L.F. Doc. 118 pp. 9-43).

The questioning propounded by McFadden's counsel in the 2013 deposition included but was not limited to: (1) whether Douglas pled guilty to murder second for killing Franklin and was sentenced to 20 years in December 2005 (*Id.* pp. 17-19); (2) whether lawyers Kraft and Turlington attempted to depose Douglas in April 2007 and whether he refused to be sworn (*Id.* p. 22); (3) whether a letter from McFadden was delivered to Douglas at the St. Louis County Jail before Douglas testified at the

197

Franklin retrial (29.15 L.F. Doc. 118 p. 25); (4) whether Douglas filed a 24.035 and what allegations he made in that application (*Id.* p. 19); (5) whether in February 2007 Douglas wrote a letter to McFadden's attorneys, and if he did, what were its contents (*Id.* pp.19-21); (6) whether lawyers Kraft or Turlington or anyone provided any information about potential perjury charges and punishments of seven years or life to Douglas (*Id.* pp. 25-27); (7) whether the prosecutor or his investigators talked to Douglas before testifying in the Franklin re-trial (*Id.* pp. 23-25); and finally, (8) whether Roderick Jones and Little Tony were present when Franklin was shot. (*Id.* p. 31).

On November 18, 2013, the trial court denied a motion to compel answers because answering would violate Douglas's Fifth Amendment right not to incriminate himself. (29.15 L.F. Doc. 100 p. 12; 29.15 L.F. Doc. 115 p. 1; 29.15 L.F. Doc. 118 p. 1-52). A renewed motion to compel answers was denied. (29.15 L.F. Doc. 178 p. 1; 29.15 L.F. Doc. 168 p. 1-5).

The Eighth Amendment and the due process clause of the Fourteenth Amendment apply to all stages of a capital case, including post-conviction discovery. *See Ford v. Wainwright*, 477 U.S. 399, 413-18 (1986) (as to competency to be executed the Eighth Amendment's reliability requirements apply and Florida statute was procedurally defective). Further, McFadden is entitled to an adequate protective process. *Case v. Nebraska*, 381 U.S. 336 (1965).

Douglas's claim and the lower court's finding about the Fifth Amendment are incorrect. The Fifth Amendment does not protect a person from being presented with the opportunity to commit possible future perjury. Under Missouri law a guilty plea waives the privilege against self-incrimination. *State v. Shafer*, 969 S.W.2d 719, 731 (Mo. banc 1998). Once a defendant such as Douglas pleads guilty, he can be forced to testify to the details of the crime to which he pled guilty. *Luckett v. State*, 845 S.W.2d 616, 618 (Mo. App., E.D. 1993). Setting that aside, many questions asked in the deposition had nothing to do with Douglas's guilt, but dealt with his actions during and after his guilty plea.

Failing to compel Douglas to answer these questions denied McFadden the fair proceeding he was guaranteed under the Eighth and Fourteenth Amendments. *Case v. Nebraska*, 381 U.S. 336 (1965). This court should grant habeas corpus relief and remand this matter to the state court to permit the full and fair proceeding that McFadden was deprived of.

\*\*\*\*\*

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 71–74. This claim is reviewed under 28 U.S.C. § 2254(d) because the Missouri Supreme Court adjudicated it on the merits. *McFadden III*, 619 S.W.3d at 459-60. The merits determination is contrary to and/or an unreasonable application of the facts and law. 28 U.S.C. § 2254(d)(1)(2). McFadden does not seek an evidentiary hearing on this claim.

199

**Claim 24:** **Prosecutorial misconduct during the postconviction proceedings denied McFadden a fair postconviction proceeding.**

In January 2018, a writ entered for McFadden to attend the May 21-24, 2018 postconviction evidentiary hearing. (29.15 L.F. Doc. 179 p. 1). On May 16, 2018, the prosecutor filed a motion to recall the writ; it was heard the next day. (29.15 L.F. 183 p. 1-2; 29.15 L.F. Doc. 185 p. 1; 29.15 L.F. Doc. 187 p. 1). The purported grounds for quashing the writ was McFadden was "remorseless" for the homicides he was convicted of, he "is one of the most dangerous felons in the State of Missouri," and "presents an unwarranted risk to the safety of jail personnel, court personnel, other inmates, and the attorneys in the case."(29.15 L.F. Doc. 183 p. 1).

At the May 17, 2018 hearing, the prosecutor (*falsely*) represented that when McFadden was previously writted in to St. Louis County in January 2017, that he assaulted a jail guard. (29.15 Writ Tr. 3-4). the prosecutor also represented that in 2017 McFadden assaulted a Department of Corrections guard. *Id.* p. 4. McFadden's counsel opposed the motion on the grounds that it prevented McFadden from meaningfully participating and assisting counsel at his 29.15 evidentiary hearing. *Id.* pp. 5-7, 9-10. Counsel also informed the court she had no knowledge of McFadden assaulting a Corrections guard (*id.* p. 6), and that there was no record of any alleged assaults. *Id.* p9. 6-7, 11-12.

Thereafter, the prosecution filed a supplement to its motion to recall the writ admitting that there were no documented assaultive incidents when McFadden was

200

held in the St. Louis County Jail in January 2017, and no records that he assaulted a Corrections guard (29.15 L.F. Doc. 188 p. 1). The Supplement asserted McFadden was in a fight with another inmate in September 2016, at the Department of Corrections. (*Id.*). On May 18, 2018, the trial court ordered McFadden's writ recalled. (29.15 L.F. Doc. 191 p. 1).

On May 18, 2018, 29.15 counsel moved to disqualify for bias the St. Louis County Prosecutor's Office for the unsupported and now known to be false representations. (29.15 L.F. Doc. 192). Rather than falsely asserted by the prosecution, no security issues were reported. *Id.* p. 2. McFadden argued that because of the false and misleading representations of the St. Louis County Prosecutor's Office represented personal bias that the office should be disqualified. (29.15 Tr. 12, 14). Further, McFadden would be denied the opportunity to meaningfully participate in his case were he to be not brought in for a hearing. *Id.* p. 14. On May 21, 2018, the court denied the motion (29.15 LF 196 p. 1; 29.15 Tr. 17).

Counsel requested on May 24, 2018, that the court direct that the 29.15 transcript be prepared so that McFadden could meaningfully participate and review it to decide whether his testimony was needed in light of not being allowed to attend the hearing and that was denied (29.15 L.F. Doc. 197; 29.15 Tr. 658-60). On May 25, 2018, McFadden filed a letter setting out his concerns with his lawyers representing him without him being present (29.15 L.F. Doc. 198).

In *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987), the Court recognized "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." In *Martinez v. Ryan*, 566 U.S. 1, 7-18 (2012), the Court recognized that ineffective assistance of postconviction counsel can establish cause for defaulting a postconviction claim. A defendant's right to be present is essential to a defendant's right to effective assistance of counsel. *U.S. v. Washington*, 705 F.2d 489, 497 (D.C. Cir. 1983). *Martinez*'s recognition of the right to effective assistance of postconviction counsel means that McFadden must be allowed to attend his hearing in order to consult with and assist his counsel so that counsel can be effective. McFadden was prejudiced by being disallowed from attending the hearing, which prevented him from consulting with counsel with was critical to the fairness of the hearing. Where his presence at the hearing was necessary in order to consult with counsel, McFadden's rights were denied in violation of the Sixth, Eighth and Fourteenth Amendments. This court should reverse and grant a new hearing where McFadden attends and the St. Louis County Prosecutor's Office is disqualified.

****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 103–06. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *See McFadden III*, 619 S.W.3d at 460. This decision was an unreasonable determination of

202

the facts in light of the evidence presented.  28 U.S.C.A. § 2254 (d)(1)(2).The Missouri

Supreme Court clearly erred in affirming the lower court's denial of McFadden's

presence at the 29.15 hearing and refusal to disqualify the St. Louis County

Prosecutor's office based on having made such false representations.

**Claim 25:    Abandonment by postconviction counsel deprived McFadden of a fair postconviction proceeding.**

A direct appeal was taken and the mandate of the appellate court was filed on July 31, 2012. McFadden had ninety (90) days from this date to file his pro se motion. *See* Mo. Sup. Ct. R. 29.15(b)(" If an appeal of the resulting judgment or sentence is taken after remand, then the motion shall be filed within 90 days after the date the mandate of the appellate court issues affirming the judgment or sentence entered after remand.").

Missouri Supreme Court Rule of Criminal Procedure 29.15(g) states the following regarding amended motions:

> If an appeal of the judgment sought to be vacated, set aside, or corrected is taken, the amended motion or statement in lieu of an amended motion shall be filed within 60 days of the earlier of the date both the mandate of the appellate court is issued and:
>> (1) Counsel is appointed, or
>> (2) An entry of appearance is filed by any counsel that is not appointed but enters an appearance on behalf of movant.
> The court may extend the time for filing the amended motion for one additional period not to exceed thirty day.
> Mo. Sup. Ct. R. 29.15(g).

The Missouri Public Defender was ordered to provide counsel for McFadden on September 10, 2013. Valerie Leftwich filed an entry of appearance on September 13, 2013. On October 3, 2013, Robert W. Lundt filed an entry of appearance and request for additional in which to file an amended motion, which was then due on November 11, 2013. The court granted the request extending the due date by thirty days.

Postconviction counsel therefore filed a timely amended motion on December 9, 2013. The amended motion raised two pertinent penalty phase claims: (1) claim 8(I) for ineffective assistance of counsel for failure to call Dr. Gelbort and (2) claim 8(L) for failure to obtain an FDG/PET brain scan in the penalty phase. As noted herein, those claims received a merits review.

In two December 27, 2017 memoranda of law filed in support of claims 8(I) and 8(L), counsel asserted (1) ineffectiveness claims 8(I) and 8(L) should have been pled to include ineffectiveness as to guilt phase to show (1) lack of deliberation/cool reflection or a mental disease or defect defense and (2) that McFadden's mental age was less than eighteen (18) years old for guilt deliberation and penalty mitigation under *Roper v. Simmons*, 543 U.S. 551 (2005) and *People v. House*, 72 N.E.3d 357, 386-90 (Ill. App. 1st Dist. 2015). (29.15 LF 164). Postconviction counsel alleged that they had constructively abandoned McFadden. *Id.*

The state moved to dismiss the memoranda specifically regarding claims 8(I) and 8(L) on the grounds of untimeliness. (29.15 LF 173). The trial court sustained the motion to dismiss without explanation, but granted McFadden leave to make offers of proof at the scheduled evidentiary hearing. (29.15 LF 178).

Counsel made offers of proof at the postconviction evidentiary hearing. Mitigation specialist Belinda Davis Long indicated that McFadden had requested his 29.15 amended motion include a guilt phase claim counsel was ineffective for failing to present evidence of brain deficiencies associated with incomplete brain

205

development. (29.15 Tr. 25-2) (29.15 Ex. 71). Dr. Gur testified that full, complete male brain development does not occur until the early twenties. (29.15 Tr. 392-96). Dr. Gelbort testified the male brain continues to develop until the mid-twenties. *Id.* pp. 620-21, 631-34. Turlington testified she gave no consideration to presenting evidence at either phase, through Dr. Gelbort ,of the studies the Supreme Court relied on in *Roper v. Simmons* showing that a young male's brain does not fully mature until his early to mid-twenties. *Id.* p. 81. Turlington would have considered for guilt brain abnormality evidence from Dr. Gur that McFadden could not deliberate *Id.* pp. 110-11. If a PET was obtained showing brain abnormalities, Kraft would have considered relying on it in guilt to show lack of deliberation. *Id.* pp. 501-02. Kraft would have considered for either phase evidence from Dr. Gur that the male brain does not fully mature until the early twenties. *Id.* pp. 502-03.

In *Martinez*, 566 U.S. at 7-18, the Court recognized that ineffective assistance of postconviction counsel can establish cause for defaulting a postconviction claim. Missouri has recognized "a total default in carrying out the obligations imposed" on 29.15 counsel constitutes abandonment. *State v. Bradley*, 811 S.W.2d 379, 384 (Mo. banc 1991). Rule 29.15(e) provides that if the pro se motion "does not assert sufficient facts or include all claims known to the movant, counsel shall file an amended motion that sufficiently alleges the additional facts and claims." If a court concludes that a movant was abandoned, then the proper remedy is to put the movant

in the place the movant would have been if abandonment had not occurred. *Riley v. State*, 364 S.W.3d 631, 636 (Mo. App., W.D. 2012).

Counsel failed to satisfy their Rule 29.15(e) duties to file an amended motion that sufficiently alleged the additional facts and claims as they were set forth in the two memoranda of law filed on December 27, 2017 (29.15 L.F. 162 pp. 1-8) (29.15 L.F. 164 pp. 1-15). McFadden was abandoned when counsel failed to carry out their obligations imposed under Rule 29.15(e). McFadden was denied effective assistance of postconviction counsel. *See Martinez.*

Counsel failed to timely allege the matters contained in the memoranda of law. This Court should grant habeas corpus relief and order the case remanded for a finding of abandonment while directing the 29.15 court to consider on the merits the claims set forth in the two December 27, 2017 memoranda of law and their supporting offers of proof.

****

McFadden exhausted this claim by fairly presenting it to the state courts. *See* 29.15 Appeal Brief at 124–32. Because the Missouri Supreme Court adjudicated this claim on the merits, it is exhausted and is reviewed under 28 U.S.C. § 2254(d). *See McFadden III*, 619 S.W.3d at 461-62. This decision was both (1) a contrary to or unreasonable application of clearly established Federal law to the facts presented and (2) an unreasonable determination of the facts, given the evidence. 28 U.S.C.A. § 2254 (d)(1)(2). The Missouri Supreme Court clearly erred in affirming the lower court's

207

finding that McFadden had not been abandoned by counsel, and therefore, had not been denied effective assistance of counsel who failed to timely plead certain claims later filed in memoranda of law.

**Claim 26:**      **Counsel was ineffective for failing to retain a fingerprint expert.**

The State's fingerprint expert testified that she stopped at eight points of comparison. (T. Tr. 1311). Additionally, the AFIS system produced fifteen candidates once the lift was made. (T. Tr. 1310). Both of these practices are not common or accepted practices in the field of fingerprint identification. Retention of an expert would have allowed a robust cross-examination, if not exclusion, of the State fingerprint expert's opinion – the only physical evidence implicating McFadden.

An expert could have noted that the State's fingerprint expert would not testify to the total number of fingerprint features found in order to make their identification, only saying eight-plus. An expert could have provided testimony that it appeared the St. Louis expert stopped once they reached eight, which is not a common or accepted practice in the field.

A defense expert could additionally testify that having more points of comparison is better for making an accurate fingerprint identification, and that eight points of comparison is typically the starting point rather than stopping point to make an identification. An expert could have testified that it would appear the State's fingerprint expert probably did not have more than eight points of identification and was attempting to make the comparison sound more robust that it scientifically was.

Trial counsel were deficient in the Franklin retrial in this regard. Given the paucity of non-bargained for testimony, this expert testimony could have undermined

confidence of the guilty verdict or carried over to the penalty phase, as well as led to a different sentencing result.

*****

This claim is procedurally defaulted by virtue of post-conviction counsel's failure to raise it in state court. McFadden requests an evidentiary hearing to determine whether ineffectiveness of post-conviction counsel serves as cause to forgive the default. *See Martinez*, 566 U.S. 1. Section 2254(e)(2) permits a hearing. *See Sasser*, 735 F.3d at 853–54; *Harris*, 984 F.3d 641. 2254(d).

## PRAYER FOR RELIEF

WHEREFORE, McFadden prays for the following relief:

1. Issue a show-cause order;

2. That discovery be granted as is necessary for a full and fair resolution of the claims contained in this petition;

3. That leave to amend this petition be granted as appropriate;

4. That an evidentiary hearing be conducted on all disputed issues of fact;

5. That he be granted a new state direct appeal and new state post-conviction proceeding;

6. That his convictions be vacated;

7. That his sentences be vacated; and

8. That all other appropriate relief be granted.

Dated:  June 28, 2020                                    Respectfully submitted,

/s/ Laurence E. Komp                            /s/ Scott W. Braden
Laurence E. Komp, MO Bar 40446        Scott W. Braden, AR Bar 2007123
Capital Habeas Unit, Chief                    John C. Williams, AR Bar 2013233
Federal Public Defender                        Assistant Federal Public Defenders
Western District of Missouri                   Federal Public Defender's Office
1000 Walnut, Ste. 600                            Eastern District of Arkansas
Kansas City, MO 64106                          1401 West Capitol, Suite 490
816-471-8282                                        Little Rock, AR 72201
laurence_komp@fd.org                          501-324-6114
                                                          scott_braden@fd.org
                                                          john_c_williams@fd.org

Counsel for Vincent McFadden

211

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2020, I filed the foregoing electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing and its viewing and downloading are hereby provided to all counsel of record by operation of the CM/ECF system.

/s/ *Laurence E. Komp*
Laurence E. Komp
Counsel for Petitioner