**\*\*\*CAPITAL CASE\*\*\***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION

No. 4:20-CV-1046-SEP

VINCENT McFADDEN,                                                      Petitioner

v.

PAUL BLAIR, Warden,
     Potosi Correctional Center                                 Respondent

---

### INDEX TO PETITION FOR WRIT OF HABEAS CORPUS

### VOLUME 1-4

---

LAURENCE E. KOMP, MO Bar 40446
Capital Habeas Unit, Chief
Federal Public Defender
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-471-8282
laurence_komp@fd.org

SCOTT W. BRADEN, AR Bar 2007123
JOHN C. WILLIAMS, AR Bar 2013233
Assistant Federal Public Defenders
Federal Public Defender's Office
Eastern District of Arkansas
1401 West Capitol, Suite 490
Little Rock, AR 72201
501-324-6114
scott_braden@fd.org
john_c_williams@fd.org

*Counsel for Vincent McFadden*

## TABLE OF CONTENTS

Attachment A.................................................Gregory Hazlett's Complaint 2002

Attachment B.................................................Gregory Hazlett's Complaint 2004

Attachment C................................................ Gregory Hazlett's Complaint 2012

Attachment D .................... Michael Douglas' Certification Investigation Report

Attachment E.................. Edward Magee's Interview Report on Vaughn Shivers

Attachment F............................................Dr. Fred Sautter's Preliminary Report

Attachment G ........................................................Dr. Collin Gordon's Report

Attachment H ................................................................... Dr. Stanford's Report

Attachment I......................................Youth Services International, Inc. Records

Attachment J...........................September 1995 – 121 Students on TA Honor Roll

Attachment K................................................Discharge Affidavit on JU594-00803J

Attachment L........................................................... Dr. Aaron Specht's Report

Attachment M................................................ Declaration of Lamika Covington

Attachment N .........................................................Declaration of Sandra Boles

Attachment O .................................................... Declaration of Loyce Hamilton

Attachment P.................................................... Declaration of Valerie Leftwich

Attachment Q ........................................................Declaration of Robert Lundt

Attachment R.................................................. Normandy High School Records

Attachment S ............................................................................ 29.15 Exhibit 4

Attachment T............................................................................ 29.15 Exhibit 5

1

Attachment U ......................................................................... 29.15 Exhibit 6

Attachment V......................................................................... 29.15 Exhibit 7

Attachment W......................................................................... 29.15 Exhibit 9

Attachment X........................................................................29.15 Exhibit 31

Attachment Y.....................................................................29.15 Exhibit 32A+B

Attachment Z........................................................................29.15 Exhibit 43

Attachment AA .....................................................................29.15 Exhibit 45

Attachment BB .....................................................................29.15 Exhibit 47

Attachment CC ............................................. Dr. Colin Gordon Curriculum Vitae

Attachment DD ........................................ Dr. Frederic Sautter Curriculum Vitae

Attachment EE.............................................Dr. Aaron Specht Curriculum Vitae

Attachment FF .....................................Dr. Shameka Stanford Curriculum Vitae

Attachment GG.............................................. Vincent McFadden's Birth Records

Attachment HH.........................................................David Lee's Police Reports

Attachment II .................................... Vincent McFadden Sr.'s Military Records

Attachment JJ ................. Detective Edwin Menzenwerth Deposition Page 10-11

# Attachment A

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

**FILED**

-VS-

JUL 2 3 2002

JOAN M. GILMER
CIRCUIT CLERK, ST. LOUIS COUNTY

Gregory Hazlett

██████████████

Pine Lawn MO   63121

**42 TH**

| | |
|---|---|
| RACE: Black | SSN: ████-9924 |
| SEX: Male | OCN: 99357843 |
| DOB: ██/66 | CASE ID: MC80135 |
| HT: 5' 08" | RPT NO: 02-1283 |
| WT: 160 lbs | CT. NO: 02CR-003754 |
| P.D.: Pine Lawn | |
| ORI NUMBER: MO956100 | |

**Defendant**

*250,000*

**CHARGES**

COUNT: 01   FORCIBLE RAPE - FELONY
COUNT: 02   ARMED CRIMINAL ACTION - FELONY
COUNT: 03   FORCIBLE SODOMY - FELONY
COUNT: 04   ARMED CRIMINAL ACTION - FELONY

**COMPLAINT**

*Grand Jury*

State of Missouri   )
                    ) SS
County of St. Louis )

    Comes now the undersigned complainant, being duly sworn upon oath, and under penalties of perjury, and states that there is probable cause to believe that the above-named defendant(s) committed the following crime(s):

COUNT 01: FORCIBLE RAPE - FELONY

        That Gregory Hazlett, in violation of Section 566.030, RSMo, committed the felony of forcible rape, punishable upon conviction under Section 566.030, RSMo, in that on or about Monday, July 22, 2002, at about 11:00 p.m., at ████ ████████ in the County of St. Louis, State of Missouri, the defendant knowingly had sexual intercourse with N.P. by the use of forcible compulsion.


        1101599.0

COUNT 02: ARMED CRIMINAL ACTION - FELONY

That Gregory Hazlett, in violation of Section 571.015, RSMo, committed the felony of armed criminal action, punishable upon conviction under Section 571.015.1, RSMo, in that on or about Monday, July 22, 2002, at about 11:00 p.m., at ███████████ in the County of St. Louis, State of Missouri, the defendant committed the felony of forcible rape charged in Count 01, all allegations of which are incorporated herein by reference, and the defendant knowingly committed the foregoing felony of forcible rape by, with and through the use, assistance and aid of a deadly weapon.

3101099.0

COUNT 03:  FORCIBLE SODOMY - FELONY

That Gregory Hazlett, in violation of Section 566.060, RSMo, committed the felony of forcible sodomy, punishable upon conviction under Section 566.060, RSMo, in that on or about Monday, July 22, 2002, at about 11:00 p.m., at ████ ███████, in the County of St. Louis, State of Missouri, the defendant knowingly had deviate sexual intercourse with N.P. by the use of forcible compulsion.

1107199.0

COUNT 04:  ARMED CRIMINAL ACTION - FELONY

That Gregory Hazlett, in violation of Section 571.015, RSMo, committed the felony of armed criminal action, punishable upon conviction under Section 571.015.1, RSMo, in that on or about Monday, July 22, 2002, at about 11:00 p.m., at ███████████ in the County of St. Louis, State of Missouri, the defendant committed the felony of forcible sodomy charged in Count 03, all allegations of which are incorporated herein by reference, and the defendant knowingly committed the foregoing felony of forcible sodomy by, with and through the use, assistance and aid of a deadly weapon.

3101099.0

The facts that form the basis for this belief are contained in the following statement of facts concerning this matter, which statement is made a part hereof and is submitted herewith as a basis upon which this court may find the existence of probable cause for the issuance of a warrant.

## Probable Cause Statement of Facts

I, Officer Moore, spoke to the victim who told me she had been raped by the def. at his residence at ▓▓▓▓▓▓▓▓▓

The victim claimed that she had been forced to take her clothes off at gunpoint and that the rape had occurred during a period of four to five hours.

The victim stated that eventually she was able to escape from the def's house and that as she ran he shot at her.

I, Officer Moore, made contact with the def. at his house where he was identified by the victim as the individual who raped her.

I, Officer Moore, arrested the def. and while doing a protective sweep at the inside at the house located at 410 gage shotgun that had been recently fired.

Complainant, Officer James Moore, Pine Lawn P.D.

Subscribed and sworn to before me this Twenty-third day of July, 2002

My Commission Expires: _____ Notary Public // Court Clerk

> MARY HOHENGARTEN
> Notary Public - Notary Seal
> STATE OF MISSOURI
> ST. LOUIS COUNTY
> MY COMMISSION EXP. SEPT 7, 2003

Ct.No. 02CR-003754    Div. 2R  Circuit Court of St. Louis County, Missouri

A202992

# Attachment B

IN THE CIRCUIT COURT OF ST. LOUIS COUNTY **FILED**
STATE OF MISSOURI

-VS-

**JUN 1 8 2004**

**JOAN M. GILMER**
**CIRCUIT CLERK, ST. LOUIS COUNTY**

| Gregory Hazlett | RACE: Black | SSN: ████-9924 |
|---|---|---|
| | SEX: Male | OCN: 99664562 |
| Pine Lawn, Mo.  63121 | DOB: ████66 | CASE ID: MC88711 |
| | HT:  5' 08" | RPT NO: 04-2873 |
| **33 W** | WT:  160 lbs. | CT. NO: 04CR-002535 |
| | P.D.: Pine Lawn | |
| | ORI NUMBER: MO956100 | 10/000 |
| Defendant | | |

**CHARGES**

COUNT: 01    UNLAWFUL USE OF WEAPON (EXHIBITING)-CLASS D FELONY

**COMPLAINT**

State of Missouri )
 ) SS
County of St. Louis )

Comes now the undersigned complainant, being duly sworn upon oath, and under penalties of perjury, and states that there is probable cause to believe that the above-named defendant(s) committed the following crime(s):

COUNT 01:  UNLAWFUL USE OF WEAPON (EXHIBITING)-CLASS D FELONY

That Gregory Hazlett, in violation of Section 571.030.1(4), RSMo, committed the class D felony of unlawful use of a weapon, punishable upon conviction under Sections 558.011 and 560.011, RSMo, in that on or about Thursday, June 17, 2004, at approximately 11:45 P.M., at ████████████ in the County of St. Louis, State of Missouri, the defendant knowingly exhibited, in the presence of one or more persons a Savage Arms 12 gauge shotgun, a weapon readily capable of lethal use, in an angry or threatening manner.

3102099.0

The undersigned Prosecutor informs the Court on information and belief that the above offense(s) herein charged were committed.

_____
Assistant Prosecuting Attorney   MBE 24 203

The facts that form the basis for this belief are contained in the following statement of facts concerning this matter, which statement is made a part hereof and is submitted herewith as a basis upon which this court may find the existence of probable cause for the issuance of a warrant.

### Probable Cause Statement of Facts

On 6/17/04 at approximately 11:45 P.M., the victim went to the residence of the defendant at ████████████ in order to speak to her step-mother. When the victim insisted she needed to talk to her step-mother, the defendant pointed a shotgun at her and told her he was going to shoot her.

The defendant and the shotgun have been identified.

The defendant was overheard to state to other inmates that he should have shot the 19 year old bitch for her being at his house.

The undersigned complainant states the facts herein are true and acknowledges that he/she has been notified that any false statements made herein are punishable by law.

_____
Complainant, Cpl. Cletis Mathis, Pine Lawn Police Department

Subscribed and sworn to before me this Eighteenth day of June, 2004

My Commission Expires:                    _____
                                          **Notary Public / Court Clerk**

Ct.No. 04CR-002535   Div. 3W  Circuit Court of St. Louis County, Missouri

A402096

# Attachment C



IN THE CIRCUIT COURT OF ST. LOUIS COUNTY
STATE OF MISSOURI

DEC 1 7 2012

**JOAN M. GILMER**
CIRCUIT CLERK, ST. LOUIS COUNTY

-VS-

| | | | | |
|---|---|---|---|---|
| GREGORY  HAZLETT | **3** | RACE:  Black | SSN:  ▌-9924 | |
| | | SEX:  Male | OCN: | |
| Saint Louis, MO 63136 | | DOB:  ▌/1966 | CASE ID: 189224648 | |
| | | HGT:  5'09" | RPT NO:  12-15633 | |
| **Aliases:** | | WGT:  165lbs. | CT. NO:  12SL-CR11244 | |
| | | P.D.:  Ferguson | | |
| | | ORI Number:  MO0952800 | | |

**Defendant**

**CHARGES**

Count: 01  FORCIBLE RAPE – FELONY
Count: 02  FORCIBLE SODOMY- DISPLAYS DEADLY WEAPON  - FELONY
Count: 03  ATTEMPT FORCIBLE SODOMY – FELONY
Count: 04  KIDNAPPING - CLASS B FELONY
Count: 05  FORCIBLE RAPE - FELONY
Count: 06  FORCIBLE SODOMY  - FELONY
Count: 07  ATTEMPT FORCIBLE SODOMY - FELONY
Count: 08  KIDNAPPING - CLASS B FELONY
Count: 09  ARMED CRIMINAL ACTION - FELONY

## INDICTMENT

State of Missouri   )
County of St. Louis  ) SS

The Grand Jurors of the County of St. Louis, State of Missouri, charge:

### COUNT: 01  FORCIBLE RAPE - FELONY

That Gregory Hazlett , in violation of Section 566.030, RSMo, committed the felony of forcible rape, punishable upon conviction under Section 566.030, RSMo, and subject to lifetime supervision under Section 217.735, RSMo, in that on or between September 14, 2012 and September 15, 2012, in the County of St. Louis, State of Missouri, the defendant knowingly had sexual intercourse with C.D., by the use of forcible compulsion, and in the course of such offense, the defendant displayed a deadly weapon in a threatening manner.
1100501.0

### COUNT: 02  FORCIBLE SODOMY- DISPLAYS DEADLY WEAPON - FELONY

That Gregory Hazlett , in violation of Section 566.060, RSMo, committed the felony of forcible Sodomy, punishable upon conviction under Section 566.060, RSMo, and subject to lifetime supervision under Section 217.735, RSMo, in that on or between September 14, 2012 and September 15, 2012, in the County of St. Louis, State of Missouri, the defendant for the purpose of arousing or gratifying the sexual desire of defendant had deviate sexual intercourse with C.D. by putting his penis in C.D.'s mouth by the use of forcible compulsion, and in the course of such offense, the defendant displayed a deadly weapon in a threatening manner.
1108210.

### COUNT: 03  ATTEMPT FORCIBLE SODOMY - FELONY

That Gregory Hazlett , in violation of Section 566.030, RSMo, committed the felony of attempted forcible sodomy, punishable upon conviction under Section 566.060, RSMo, and subject to lifetime supervision under

Section 217.735, RSMo, in that on or between September 14, 2012 and September 15, 2012, in the County of St. Louis, State of Missouri, the defendant for the purpose of arousing or gratifying the sexual desire of defendant the defendant moved to penetrate C.D.'s anus with his erect penis, and such conduct was a substantial step toward the commission of the crime of forcible sodomy of C.D., and was done for the purpose of committing such forcible sodomy.

1108807.

## COUNT: 04 KIDNAPPING - CLASS B FELONY

That Gregory Hazlett , in violation of Section 565.110, RSMo, committed the class B felony of kidnapping, punishable upon conviction under Section 558.011, RSMo, in that on or between September 14, 2012 and September 15, 2012, defendant unlawfully confined C.D. without her consent for a substantial period, for the purpose of facilitating the commission of the felony of forcible rape.

1602099.

## COUNT: 05 FORCIBLE RAPE - FELONY

That Gregory Hazlett , in violation of Section 566.030, RSMo, committed the felony of forcible rape, punishable upon conviction under Section 566.030, RSMo, and subject to lifetime supervision under Section 217.735, RSMo, in that on or between September 15, 2012 and September 16, 2012, in the County of St. Louis, State of Missouri, the defendant knowingly had sexual intercourse with L.A., by the use of forcible compulsion.

1100898.

## COUNT: 06 FORCIBLE SODOMY - FELONY

That Gregory Hazlett , in violation of Section 566.060, RSMo, committed the felony of forcible sodomy, punishable upon conviction under Section 566.060, RSMo, in that on or between September 15, 2012 and September 16, 2012, in the County of St. Louis, State of Missouri, the defendant for the purpose of arousing or gratifying the sexual desire of defendant had deviate sexual intercourse with L.A. by the use of forcible compulsion.

1108499.

## COUNT: 07 ATTEMPT FORCIBLE SODOMY - FELONY

That Gregory Hazlett , in violation of Section 566.030, RSMo, committed the felony of attempted forcible sodomy, punishable upon conviction under Section 566.060, RSMo, and subject to lifetime supervision under Section 217.735, RSMo, in that on or between September 15, 2012 and September 16, 2012, in the County of St. Louis, State of Missouri, the defendant for the purpose of arousing or gratifying the sexual desire of defendant the defendant moved to penetrate L.A.'s anus with his erect penis, and such conduct was a substantial step toward the commission of the crime of forcible sodomy of L.A., and was done for the purpose of committing such forcible sodomy.

1108899.

## COUNT: 08 KIDNAPPING - CLASS B FELONY

That Gregory Hazlett , in violation of Section 565.110, RSMo, committed the class B felony of kidnapping, punishable upon conviction under Section 558.011, RSMo, in that on or between September 15, 2012 and September 16, 2012, defendant unlawfully confined L.A. without her consent for a substantial period, for the purpose of facilitating the commission of the felony of forcible rape.

1602099.

## COUNT: 09 ARMED CRIMINAL ACTION - FELONY

That Gregory Hazlett , in violation of Section 571.015, RSMo, committed the felony of armed criminal action, punishable upon conviction under Section 571.015.1, RSMo, in that on or between September 14, 2012

and September 15, 2012, at ███████████, in the County of St. Louis, State of Missouri, the defendant committed the felony of kidnapping charged in Count 4, all allegations of which are incorporated herein by reference, and the defendant committed the foregoing felony of kidnapping by, with and through, the knowing use, assistance and aid of a deadly weapon.

3101099.

A TRUE BILL

_____
Foreman

NO TRUE BILL

_____
Foreman

_____
Prosecuting Attorney

September 2012 Term

As a condition of release for defendant Gregory Hazlett, bond is set in the amount of $ 250,000 .

_____
Judge

---

**WITNESSES**

Ms. L A
Prosecuting Attorney's Office
100 South Central Avenue
Saint Louis, MO  63105

Ms. C D
Prosecuting Attorney's Office
100 South Central Avenue
Saint Louis, MO  63105

Detective  Mark Leone
Ferguson Police Dept
222 So Florissant Rd
Saint Louis, MO  63135

# Attachment D

# FAMILY COURT OF ST. LOUIS COUNTY
## CERTIFICATION INVESTIGATION

**RE: MICHAEL DOUGLAS**

**D.O.B.:** ▮▮▮85

**AGE:** 18.5 years old

**S#:** 10049230-01

**CAUSE #:** 116198

**D.J.O.:** Laura Criscione

**SUPERVISOR:** Deb Woodside

**DATE OF REPORT:** 05.18.04

**HEARING DATE:** 05.19.04

**HEARING TIME:** 9:00 a.m.

## IDENTIFYING INFORMATION:

**Mother: Robena Douglas (deceased)**
Address:
Phone:

**Father: Kirk Douglas**
Address: ▮▮▮▮▮▮St. Louis, MO 63113
Phone: (314) 614-0681

## CUSTODY OF JUVENILE:

LEGAL - Michael is an adult; therefore, custody is not relevant.

PHYSICAL - Michael is in the physical custody of the St. Louis County Justice Center.

## JUVENILE LIVES WITH:

Prior to his detainment, Michael reported that he lived with his maternal grandfather, Lewis Keys.

## PENDING REFERRAL(S):

03    07.03.02    Murder in the First Degree, FA

## PRIOR COURT HISTORY:

02    10.12.02    Insufficient

01    11.15.99    Curfew (01:12 a.m.), C

## OTHER JUVENILE COURT(S):

None.

## ADULT RECORD:

10.21.03    Vagrancy/Loitering

*Michael was issued a summons and was released on bond.*

10.21.03    Failure to Appear

*Released on $1,000 bond.*

11.09.03    Tampering in the 2nd Degree

*Released pending application of warrants-warrant refused.*

11.13.03    Forcible Rape

*Released pending application of warrants.*

## DETENTION HISTORY:

Michael was detained at the Family Court of St. Louis County Detention Center on April 14, 2004 in connection with the pending offense. On April 19, 2004, his custody was transferred to the St. Louis County Justice Center due to his age of eighteen years old.

## RECOMMENDATION:

It is recommended that the Motion to Dismiss the Petition to Allow Prosecution of the Juvenile Under General Law be sustained. Furthermore, it is recommended that his custody be remanded to the Family Court of St. Louis County Detention Center for a period not to exceed twenty hours pending the transfer of this cause to the prosecuting authorities

## REASONS FOR RECOMMENDATION:

1.   The allegation filed in this cause, the class A felony of Murder in the First Degree is very serious in nature. It is alleged that on or about July 3, 2002, in St. Louis County, Missouri, said juvenile, acting with another, after deliberation, knowingly killed Todd Franklin by shooting multiple rounds of gunfire from a revolver into the head and body of Todd Franklin, thereby causing the said Todd Franklin to die on or about July 3, 2002. The protection of the community requires transfer to the Court of general jurisdiction.

2.   The alleged offense of Murder in the First Degree involved viciousness, violence and force.

3.   The alleged offense of Murder in the First Degree is a crime against persons.

4.   The alleged offense is not seen as a repetitive pattern of offenses. This is Michael's first sufficient referral to this Court. Furthermore, he has no known history with any other juvenile Courts.

5.   Michael's level of sophistication and maturity are average for someone who is eighteen years of age. At the time of his detainment, Michael indicated that he had been living with his grandfather, Lewis Keys for approximately the past year. He stated that prior to living with his grandfather he lived with his girlfriend, India Barton and his ten-month old daughter, Malaysia. The juvenile's father is Kirk Douglas who lives in St. Louis

City. His mother, Roberta Douglas passed away in 2001 from heart problems and Michael lived with his father for some time following his mother's death. Michael has two siblings: Lewis Douglas (25) who lives with his grandparents and J████ D████ (16) who lives with ██████. Michael reported a close relationship with his grandfather. Mr. Keys stated that he █████ tried to help Michael in any way possible since the death of his mother by providing ███ with financial support and his basic needs of food and shelter. Michael indicated that he assisted his grandfather in doing repairs on houses in the area in order to █████ money.

Michael indicated that ███ not been in school since 2003. The last school he attended was Sumner High School ███ City of St. Louis. Michael has not pursued getting his G.E.D.; however, █████ been at the Justice Center he has been taking G.E.D. preparation classes. █████ reported that he does not have a peer group with whom he associates. He stated █████ spends the majority of the time with his girlfriend and their daughter and family █████. Michael's father and grandfather stated that Michael is generally compliant █████ household rules and does what is requested of him. Michael acknowledged using █████ approximately two times per month for the past year. He denied any use of alcohol ███ any other illegal substance.

6. Michael Douglas is not ███ appropriate candidate for any of the treatment programs, resources or facilities █████ to the Court as dispositional options.

   a.) Jurisdiction and █████ on are not recommended due to the extremely serious nature of the allegations ███ and the potential risk that Michael poses to the community. Furthermore, Michael is an adult and is beyond the scope of services that are offered in the juvenile justice system.

   b.) Jurisdiction and █████ at Lakeside Center or a private residential facility are not appropriate █████ Michael's age. These facilities serve younger, less sophisticated youth.

   c.) Jurisdiction and █████ ment to the Missouri Division of Youth Services are not seen as appropriate █████ Michael's age. The Missouri Division of Youth Services only █████ until age eighteen and the juvenile code prevents him from being committed ███ DYS at this time.

   d.) Jurisdiction and █████ ment to the Missouri Department of Mental Health are not appropriate █████ juvenile code prevents such a commitment due to Michael being █████ years of age.

7. Race had no bearing on this officer's decision to recommend that the Motion to Dismiss the Petition to Allow Prosecution Under the General Law be sustained. The recommendation is based █████ on the facts of the case and the factors previously addressed in this report.

8. In summary, this officer █████ believe that any treatment or rehabilitative programs are available to the Family Court ███ St. Louis County that would benefit Michael. He is currently an adult and █████ scope of services and treatment that is available in the juvenile justice system. █████ ding offense is very serious in nature and represents a blatant disregard for ███ another human being. If Michael has committed the pending offense, he █████ held accountable for his actions through consequences administered by the adult █████ justice system.

# Attachment E

On March 1, 2004 I attempted to locate witness Vaughn Shivers at his residence to no avail.  A business card was left at the residence requesting someone to contact this investigator.

On March 2, 2004 at 11:00 A.M. I was contacted by Shivers.  Shivers was made aware of the purpose of this interview and he agreed to talk with this investigator.

Shivers stated he was at the Pine Lawn School on the day of this incident, loading old papers from his car into the recycling bin located on the south side of the school, near the alley from Lexington.  Shivers stated his father has a church in the area and he recycles his papers at the Pine Lawn School as a way of helping the neighborhood kids.

As he was moving papers from his car to the bin, he heard several pops coming from the south.  At first, he thought it might be fireworks due to the closeness of the 4th of July.

A short time later he observed two black males, early twenties, running north in the alley directly towards him.  Shivers stated he looked at the two men and noticed one holding his waistband as if he had something under his large white shirt.

The two subjects looked at Shivers with one running to the east and one running to the west until out of sight.

Shivers stated he believed something was wrong, so he got into his car and drove around the area where he saw the victim lying in a driveway on Lexington.  Shivers stated he called the police to report what he had seen.

Shivers stated he had not seen the subjects before or since but he is not in the area that often.  Shivers stated he talked with a couple of uniform officers, including one with a white shirt and gave them a description.  One was a little lighter complexed than he and both were around his height, 5'10".  The one in the white shirt was wearing khaki pants.  Shivers stated it has been some time, but he would be willing to look at a photo lineup.

Shivers responded to the Prosecuting Attorney's Office on March 3, 2004 at 12:30 P.M. and repeated his earlier statement to Investigators Magee and Hepler.

Shivers was then shown one photo lineup containing suspect Michael Douglas after being advised the subject might or might not be in the photos.  Shivers stated he was unable to make any identification.  Shivers was then shown a second photo lineup containing suspect Vincent McFadden.  On viewing this lineup, Shivers stated he would not be able to make an identification, again stating it had been a long time ago and did not want to guess.

Investigator Edward Magee

# Attachment F



**SCHOOL OF MEDICINE**
Department of Psychiatry and Behavioral Science
1440 Canal St., TB48
New Orleans, Louisiana 70112
Orleans Parish
(504) 988-5405  Fax (504) 988-4270

Preliminary Findings and Statement of Need to Conduct a Formal Evaluation Mr. Vincent McFadden

Honorable _____

RE:    Vincent McFadden

To Whom It May Concern:

I was contacted by the Federal Public Defenders of the Western District of Missouri to assist with the office's representation of Mr. McFadden. I was retained by Mr. McFadden's legal team for the purposes of determining his exposure to early life adversity, neglect, and trauma, and to render an opinion as to the cumulative impact of these adverse and traumatic events on Mr. McFadden's life and mental health. I was asked if and how these stressors could have impacted Mr. McFadden's state of mind at the time of his participation in the crimes as potential mitigating factors.

I am writing to note some of my initial observations as to why further psychological assessment of Mr. McFadden, along with potential collateral interviews, is an absolute necessity. Mr. McFadden was raised by a group of relatives who tried to compensate for the fact that neither of Mr. McFadden's parents were able to provide consistent care or competent parenting As a consequence, Mr. McFadden never bonded with a parent who filled the role of father or mother and he grew up being shuffled from one relative's home to another relatives home before taking to the streets living his adolescence with gang members and gang culture gradually taking control of his life. Instead of looking forward to becoming a responsible member of a community that nurtures its' own, Mr. McFadden looked forward to learning to survive in neighborhoods with one of the highest homicide rates in the country. The task of measuring adversity and trauma in someone who had lost numerous close friends to homicide by the time he was eighteen will require a careful interview and thorough clinical assessment. Knowing that one of the

leading neuroscientists in the world, Dr. Ruben Gur, served as an expert in a prior proceedings and identified brain changes that are usually associated with traumatic stress it is my responsibility to determine the impact of traumatic stress and social adversity on his ability to regulate his emotions and control his own behavior under conditions of great adversity. This will require at least two days of careful interviewing and assessment. Unfortunately, at this time, I am unable to move forward with important aspects of an assessment because of the restrictions put in place due to my underlying cardiac health vulnerabilities to COVID-19 during the current pandemic.

## Introduction:

I have over thirty years of experience conducting assessments of traumatic events and adversity and the range of debilitating mental health disorders, including PTSD, that are a frequent consequence of exposure to traumatic or otherwise overwhelming stress. I have worked as the Director of the Family Mental Health Program at a large VA Health Care System that provides services to over 5,000 veterans. During my thirty years of clinical experience, I have personally conducted trauma assessments (PTSD, TBI) with close to 1,000 patients. I am also Clinical Professor of Psychiatry at the Tulane University Medical School and have published approximately 100 professional papers in respected mental health journals. My research has been funded by the National Institute of Mental Health and the Department of Veterans Affairs. I have been qualified as an expert witness in mental health and trauma disorders and provided testimony in over twenty capital cases. A copy of my curriculum vitae is attached.

## Preliminary Assessment:

It is standard practice when evaluating the psychological functioning of a person who is incarcerated for a capital offence to conduct an assessment that includes a review of past and present psychological problems. Further the standard of practice requires the administration of interview-driven and self-report measures traumatic stress and psychosocial adversity and interviewer-driven measures of PTSD and other DSM-5 Axis I Disorders.

An initial review of Mr. McFadden's medical, mental health, and education records indicates exposure to extremely high levels of adversity throughout his childhood and adolescence. This is significant because it points to chronic exposure to traumatic stressors which would fulfill the PTSD Criteria A for "Traumatic Events" as stated in the fifth edition of the Diagnostic and Statistical Manual of the American Psychiatric Association. These included repeated exposure to traumatic stress in the form of community violence, childhood emotional and physical abuse, neglect and severe malnutrition, domestic violence, economic deprivation, loss of numerous close friends to violence and homicide, inadequate and unstable

2

housing, and substance abuse and crime. The proposed evaluation may yield information that explains exactly how Mr. McFadden's exposure to early life trauma and unrelenting traumatic stress and adversity developed into several DSM-5 trauma-related disorders that simultaneously increased his hyperarousal and emotional reactivity while crippling his ability to control or inhibit powerful emotions.

The increased emotional reactivity and loss of self-control and emotion dysregulation may explain Mr. McFadden's lossess of control. The observation that these crimes may have been a consequence of three interacting major mental disorders is consistent with neuropsychological and brain imaging data that showed damage to the executive functions (frontal lobes) that inhibits the rageful emotions amplified by Mr. McFadden's overactive limbic system. These frontal lobe and limbic system shortcomings may have impaired Mr. McFadden's ability to control strong emotions that limit his ability to adapt to an environment that is compromised by crime, violence, and homicide. This loss of function and neurobiological and behavioral control that occurred in an environment in which gang warfare was a frequent occurrence and provides a nexus between Mr. McFadden's background and impairments and the events that resulted in his conviction. The information from my proposed psychological evaluation will determine the extent to which Mr. McFadden's behavior on the day of Ms. Addison's death was due to the destabilizing effect of three trauma-related psychiatric disorders and a compromised brain that cannot moderate Mr. McFadden's emotional response to a threatening environment. The direct link between early life trauma and adversity and the development of three trauma-related mental disorders has not been properly explained to the court.

I have included some of the most profound examples of adversity and trauma experienced by Mr. McFadden as a child and adolescent in the following list, but it should be noted that this is by no means exhaustive:

1) During Mr. McFadden's first twelve years of life he was exposed to familial and environmental adversities and an often life-threatening and violent community environment that contributed to the development of brain abnormalities and reinforced trauma-related behavioral dysfunction that created the psychological problems that may have contributed to what Mr. McFadden is accused of.

   a) Mr. McFadden was born prematurely at only 5 pounds and 7 ounces. His low birth weight was probably caused by many adverse factors. His mother's life stress and quality of medical care are linked to birth weight. Negative developmental factors continued after birth. Mr. McFadden's

3

b) father was absent during late gestation and the first six months of Mr. McFadden's life limiting healthy brain development. His mother and maternal grandparents were left to serve as caregivers and his mother barely managed to survive poverty without her husband being absent. Research has shown that poverty and **stress** increase the chances of premature birth (born before 37 weeks of pregnancy) or **low** birthweight (weighing less than 5 pounds, 8 ounces). This adversity affected the early development of Mr. McFadden's brain and predicted future mental illness.

c) As an infant Mr. McFadden was cared for by his four grandparents and aunt. Other family members were unavailable and Mr. McFadden lacked the nurturance and bonding that are the foundation of stability and emotional control later in life. With his mother working up to twelve hours a day to attempt to stay out of poverty and his father in the military, no one was there to connect with their 6 month-old son. During the remainder of his early childhood, Mr. McFadden was shuffled back and forth among fifteen relatives, but he lacked that primary caregiver or parent that provides the bond that feeds future behavioral health.

d) As a baby, Mr. McFadden was shuffled between numerous households it was impossible for his family to consistently monitor his safety or tend to his health. During his second year of life, he was often left unsupervised. On one occasion he fell down several stairs and sustained a head injury that required treatment at the emergency room. On one occasion neighbors complained that Mr. McFaddenhad been left unattended; when relatives investigated, they found Mr. McFadden and his sibling were left unattended in his home with doors to the outside left unlocked and, in some cases, wide open.

e) Given the lack of bonding and sustained support in Mr. McFadden's childhood, he was introduced to stress and emotional deprivation a young age. He lacked a father figure or male role model to teach him about responsibility, healthy values, or social responsibility.

f) Mr. McFadden had few opportunities to develop coping skills or a positive self-image that would model love and self-care. No one was available to teach him problem solving or to teach him how develop healthy relationships, interpersonal boundaries, or social skills. Given this lack of support and positive mentoring it is not surprising that Mr. McFadden began drinking alcohol at age twelve. His family reported that he also became sexually active at the age of twelve. As he was about to enter his early teen years several family members reported that Mr. McFadden was

4

experiencing mood swings and was becoming angry and defiant when asked to control his emotions. No one taught him to tolerate negative emotions and nurture positive emotions.

2) Mr. McFadden emerged from the adversity of his childhood and adolescence with interpersonal deficits that left him unable to establish functional relationships and lacking the ability to control and regulate his emotions. It is likely that birth complications and head injuries sustained early in his life and a lack of socialization and social learning interacted with several highly destructive traumatic events to leave Mr. McFadden with emotion regulation and interpersonal deficits that left him defenseless in violent deteriorating neighborhoods that resembled war zones in Iraq. Drug gangs and other criminal elements preyed on the weak and passive. Those who refused to be bullied were often broken and destroyed. Mr. McFadden lacked the social skills and the emotional control to survive that violent chaos, and like other irreparably damaged trauma survivors he became overwhelmed by emotional pain and traumatic stress and became violent and self-destructive in his attempts to survive. It appears that the following sequence of economic deprivation and drug-gang warfare left Mr. McFadden unable to overcome the violence and duplicity of the drug-infested neighborhoods of St. Louis:

a) A consistent state of economic deprivation inside his home and the lack access to psychiatric care in his community contributed to Mr. McFadden's emotional decline and left him on the verge of losing emotional and behavioral control as he failed to complete high school and watched his friends and allies die at the hands of the criminal elements that ruled his neighborhoods. He tried to survive his emotional pain by using drugs and his PTSD and addiction gained power while the lack of access to mental health treatment left Mr. McFadden desperate for survival and angryenough to strike back at those who had killed so many of his friends by encouraging drug use and by taking many to their death.

b) By the time of his arrest in 2003 at the age of 23, Mr. McFadden had been exposed to the following traumatic events which included:

i) At the age of eleven Mr. McFadden had his first sexual encounter with a young woman named Tiffany.; Several months later Vincent was told that Tiffany was shot and killed by her boyfriend. Within a year Vincent learned that a close friend named Lerone Floyd had

5

ii) been killed in a car crash. Then at the age of fourteen Vincent McFadden was accosted by a group of young men who savagely beat him with baseball bats.

iii) When Mr. McFadden was sixteen years old three of his close friends Leonard Robinson, Casey Cuffie, and Michael Lock ("Big Bro") were all murdered over a period of one month. Mr. McFadden was deeply depressed and angry about these losses. One month after the last burial he became openly defiant of authority figures at his school and was expelled. This was the first of several times that Mr. McFadden, unable to regulate his own emotions during a time of intense grief discharged his angry affect by acting out against authorities and by becoming self-destructive. It was becoming increasingly clear that Mr. McFadden was emotionally dysregulated and showed symptoms of a complex form of PTSD.

iv) Over the next eighteen to twenty-four months Mr. McFadden became more involved in his community and violence resulting in PTSD, drinking and drug abuse. As his drug dependence and loss of behavioral controls led to further arrests, violations of parole, failure of drug treatment programs, and exacerbations of alcohol and cocaine use and apparent involvement in drug trade activity. Then in 2001 there was a surge community crime activity and the beginning of another cycle of Mr. McFadden enduring the killing of a number of his friends and acquaintances. Mr. McFadden was shot in the leg in an altercation and three of his friends died in gun violence. Once again, the cycle of violence and painful loss apparently led to exacerbation of PTSD and drug use.

v) Unfortunately, this cycle of violence and increased PTSD was closely followed by another cycle of even more devastating loss and the triggering of a downward spiral of addiction, PTSD, and a loss of behavioral and emotional control. As Mr. McFadden turned 22, he looked forward to the fact that his partner was pregnant and due to give birth to twins. He hoped it would be an opportunity for change but one of the twins died during birth and over a four-month period Vincent lost four of his friends to gun violence with one being shot in the chest and the other three shot in the head. Shootings, armed robbery, and murder were devastating the communities around St Louis, as evidenced by the fact between 1990 and September 2019 580 children in the St. Louis area were murdered. Mr. McFadden's community was among the most dangerous in the St Louis area. He had no support or opportunity for mental health

6

treatment, and he was at risk for arrest or assassination in a neighborhood that was devolving into lawlessness.

The neglect and trauma experienced by Mr. McFadden that is documented in the records that I have reviewed  appears to show that he has been exposed to trauma that far exceeds the DSM-5 criteria for PTSD Criteria A Traumatic Events and comorbid substance addition and mood disorder. Administering of the Adverse Childhood Experiences (ACEs) Scale would further document Mr. McFadden's exposure to extremely high levels of trauma and stress that would be expected to cause PTSD and other DSM-5 major mental disorders. It is important to conduct a direct examination with Mr. McFadden. There appears to be a reasonable likelihood that Mr. McFadden was not capable of controlling his emotions and behaviors at the time of the Addison homicide. It is crucial to conduct a full evaluation to assess Mr. McFadden.

Frederic Sautter, Ph.D.
Clinical Professor of Psychiatry

7

# Attachment G

# Segregation and Uneven Development in Greater St. Louis, St. Louis County, and Pine Lawn, Missouri

In Re Vincent McFadden

For Capital Habeas Unit, 1000 Walnut Street, Suite 600, Kansas City, Missouri 64106

Colin Gordon, Professor of History, University of Iowa

June 2021

1

*Professional Background*

I am a Professor of History at the University of Iowa.  I received a PhD from the University of Wisconsin in 1990.  My research focuses on the history of public policy and political economy in the United States since 1920.  I am the author of four books: *New Deals: Business, Labor and Politics, 1920-1935* (Cambridge University Press, 1994), *Dead on Arrival: The Politics of Health in Twentieth Century America* (Princeton University Press, 2003), *Mapping Decline: St. Louis and the Fate of the American City* (University of Pennsylvania Press, 2008), and *Citizen Brown: Race, Democracy, and Inequality in the St. Louis Suburbs* (University of Chicago Press, 2019).  I am a research associate in the social science group at the University of Iowa's Public Policy Center, and a senior research consultant at Common Good Iowa, a state-level think tank for which I have written reports on health coverage, economic development, and wages and working conditions.  I am an active member of the Organization of American Historians, the American Historical Association, the Urban History Association, and the Social Science History Association.

My extensive and ongoing research on the history, politics, and demographics of Greater St. Louis includes quantitative and spatial analysis of both historical and contemporary data, archival research in a wide array of political, social, and administrative collections, and an exhaustive reading of the relevant secondary literature.  This work has two books (*Mapping Decline*, 2008*; Citizen Brown*, 2019), and peer-reviewed articles on economic development policies, housing policy, segregation, and political fragmentation), and over 70 invited, academic, or local presentations.  My work on St. Louis has been featured in national news outlets, including *The New York Times, Business Week, Time, The Christian Science Monitor, Reuters, The Washington Post, The Los Angeles Times*, and *National Public Radio (All Things Considered)*.   A copy of my curriculum vitae is attached; I am being compensated at a rate of $150/hour for my expertise in this case, which is my usual rate of compensation for such work.

2



**Map 1: Greater St. Louis**

Case: 4:20-cv-01046-SEP    Doc. #: 15-1    Filed: 06/28/21    Page: 33 of 109 PageID #: 6376

Pine Lawn

St. Louis County

St. Louis

## Introduction

This brief traces the economic and demographic development of Greater St. Louis, with a particular focus on the inner suburbs of North St. Louis County, and on the municipality of Pine Lawn (see Map 1).  In large part, this is a history of systematic and sustained segregation, and of the ways in which that segregation has served as powerful engine of local inequality.  Across this history, racial and economic segregation has relied on a variety of mechanisms—including racial zoning, deed restrictions, private and public "redlining," urban redevelopment, and exclusive land use zoning. Across this history, the boundaries of that segregation have both hardened and shifted.  The infamous "Delmar Divide" in St. Louis held fast, and still marks the border between predominantly black north St. Louis and the predominantly white southside.  But the racial barrier between the City and neighboring St. Louis County crumbled after 1970 under the pressures of white flight to the outer suburbs, and black flight from north St. Louis.[1] The inner suburbs of North County (including Pine Lawn), developed and settled in the middle years of the last century as bastions of working-class white flight, underwent rapid racial transition. The patterns and mechanisms of segregation established on the city's north side drifted into North County and were reinvented there. In the bargain, the consequences of that segregation—including concentrated poverty, limited economic opportunity, a paucity of public services (except heavy-handed policing), and political disenfranchisement—moved to these "secondhand suburbs" as well.[2]

Understanding this history is important for three reasons:  First, it assigns causal weight and responsibility to the forces (and actors) which contributed to both segregation and to the ongoing urban crisis.  Second, such historical forces cast a long and dismal shadow: even if the explicitly racial policies and practices that created local segregation are no longer in place, their impact can still be seen in the built environment, in persistent racial gaps in wealth and income and educational attainment, and in the political legacy of sustained discrimination and disadvantage.  Third, such an understanding of causes and consequences helps to puncture the common (but mistaken) assumption that the persistence of concentrated African American poverty in the post-civil rights era can be attributed to the poor themselves.

4

This brief is organized in three parts.  Part I examines patterns of segregation and their historical development across the Greater St. Louis metropolitan area—focusing on the private and public policies which invented and sustained local segregation. Part II re-centers that history on the footprint of Pine Lawn, an inner suburb bounded by the City of St. Louis to the east, and the St. Louis County municipalities of Jennings (to the north), Northwoods (west) and Hilldale (south).[3] Over the middle years of the twentieth century, these inner suburbs employed the same tactics—including legal restrictions, systematic discrimination in private realty, and exclusionary zoning—as their neighbors.  Over time, however, those tactics failed.  Both disinvestment in north St. Louis (and with it the failure of local public goods like schools) and the dislocation caused by urban renewal (shouldered overwhelmingly by African Americans) in the City and in St. Louis County created immense pressures on the older, relatively affordable housing stock in the inner suburbs.  The net result, in settings such as Pine Lawn, was a sustained, yet fluid and transitional, pattern of racial segregation and local inequality.  Part III turns to the consequences; to the implications of local segregation for educational and economic opportunity, civic engagement, and social mobility

## Part I: Segregating St. Louis

To understand conditions in Pine Lawn and the other inner suburbs of North S. Louis County, we first need to understand the broader metropolitan context of racial segregation, political fragmentation, population flight, and economic decline. As a border city, Greater St. Louis bears a dual legacy: its race relations are essentially Southern, rooted in the institutions and ideology of Jim Crow, but its organization of property—reflected in private realty and in public policy—follows a Northern pattern in which the institutions and mechanisms of local segregation are particularly stark. The national pattern of white flight and inner-city decay, as one observer noted, could be found in St. Louis "in somewhat purer and less ambiguous form than almost anywhere else." St. Louis retained (decade after decade) its dubious distinction as one of the nation's most segregated metropolitan areas.[4]

In the early and middle decades of the last century, realtors, developers, and white property owners across Greater St. Louis erected elaborate obstacles to black property ownership and occupancy. These restrictions were, over time, adopted and formalized as an ethical obligation of private realtors, lenders, and insurers; as the organizing principle of both local zoning and federal housing policies; and as the key determinant of value whenever property was taxed, "blighted" for redevelopment, or redeveloped.[5] Segregation was accomplished and enforced by private and public strategies of exclusion that overlapped and reinforced one another. At the center of this story is the local realty industry, which lobbied for explicitly racial zoning in the World War I era, pursued and enforced race-restrictive deed covenants into the middle years of the century, pioneered the practice of residential security rating that governed both private mortgages and public mortgage guarantees, and—as a central precept of industry practice—actively discouraged desegregation of the private housing market.

At a time when cities were first exploring the politics and legality of zoning, St. Louis was one of a handful of cities to propose formalizing racial segregation. The St. Louis racial zoning ordinance (1916) and others like it were subject to immediate political challenge—both on "equal protection" grounds and as an unwarranted intrusion of the local police power onto private-property rights. The St. Louis law sat in legal limbo for about a year until it was struck down when the Supreme Court ruled against a similar Louisville law in *Buchanan v. Warley* (1917).[6] In the wake of *Buchanan*, local property and realty interests moved to segregate by other means. The solution was a combination of private realty practices and race-restrictive deed covenants that eventually formed a ragged, defensive quadrangle at the western boundary of the city's traditionally African American wards (see Map 2).[7]

In the mid-1940s, a flurry of challenges to restrictive agreements culminated in a St. Louis case that would ultimately end up in the Supreme Court: *Shelley v. Kraemer*. While the Missouri courts had sustained the agreement in question, the Supreme Court disagreed and decided in 1948 that "judicial enforcement by state courts of such covenants is inhibited by the equal protection clause." In the wake of the decision, private

6



# Map 2: Racial Restrictions in St. Louis, 1910-1950

- racial zoning ordinance (1916)
- race-restrictive deed covenants (ca 1950)
- Delmar Boulevard
- Black population (1930), one dot = 10 persons

Source: Gordon, *Mapping Decline* (2008)

parties were free to draft such agreements but could not turn to the courts for their enforcement.[8] Local interests instead turned to the practice of private realty to sustain segregation, and the boundary between black occupancy and white occupancy moved north as white homeowners abandoned neighborhoods now "unprotected."[9]

The practices and assumptions of private realtors distorted not only the market for housing but also the local and federal public policies that subsidized and regulated that market. In the 1930s, the new Home Owners Loan Corporation (HOLC) and Federal Housing Administration (FHA) established the basic framework (low down payment, long-term amortization) for modern homeownership by offering federal insurance on qualifying mortgages. To rate local properties and neighborhoods, the FHA and HOLC turned to the architects of racial zoning and restrictive deed covenants—local realtors and lenders—and echoed their assumption that neighborhoods "invaded" or "infiltrated" by African Americans had lost all value. At the core of the FHA rating system, parroting the same juxtaposition of "nuisances" found in many St. Louis deed covenants, was the prohibition of "undesirable buildings such as stables, pig pens, temporary dwellings, and high fences" and the "*prohibition of the occupancy of properties except by the race for which they are intended*" (italics added).[10]  The HOLC (Map 3) rated most of the City and its inner suburbs as "definitely declining" or "hazardous" for new investment.

All of this had a lasting and decisive impact on residential patterns and opportunities in Greater St. Louis. During the peak years of African American migration to the St. Louis area, all but a handful of the city's neighborhoods were off-limits. "Housing is desperately short-handed in St. Louis as it is in most other large cities," the St. Louis Urban League noted in the wake of World War II, "but the lack of housing facilities for Negroes in St. Louis is critical for peculiar reasons. Approximately 97% of the Negro population in St. Louis lives at the geographical heart of the city, surrounded on the east by commerce and business, and on the south, west, and north by neighborhood covenant agreements. There are no outlets to the open county for any kind of expansion. There is a complete circle of restriction."[11]



**Map 3: HOLC Ratings, 1940**

**HOLC Security Ratings**

A: "best"

B: "still desirable"

C: "definitely declining"

D: "hazardous"

Source: Division of Research and Statistics, Federal Home Loan Bank Board, National Archives (RG 195)

Segregation was abetted by local zoning.  Local governments have every incentive to sort the population by race and class in such a way as to maximize tax returns and minimize other demands on the public purse.[12] Where local governance is fragmented (the St. Louis metropolitan statistical area includes over 260 incorporated municipalities, more than a third of which are in St. Louis County alone), there is an exaggerated incentive and opportunity to use property zoning as a means of sorting and segregating populations. Outside the central city, the dominant practice (emerging in the mid-twentieth century) was "exclusionary zoning," land-use controls that ensured a pattern of predominantly low-density, single-family settlement through a combination of outright prohibitions (no heavy industry, no manufactured housing), effective prohibitions (no land zoned for multifamily housing), and area or density standards (for lot size, setbacks, and building size).[13] Older cities, by contrast, did not have the power to zone until long after local land use had been determined by private restrictions and market forces. Unable to compete with the suburbs for high-end residential development, central cities often ran in the other direction—designating large areas for commercial or industrial use and often "clearing" low-return residential tracts as part of the bargain.[14] From a metropolitan perspective, the results have not been pretty. Exclusive and fragmented zoning in the suburbs erased any semblance of residential diversity, sorting the white middle class into income-specific, single-family enclaves on the periphery and leaving African Americans, the elderly, and the poor to filter into older and higher-density housing stock (much of it unprotected by local zoning) in the central city and inner suburbs.[15]

The net effect of political fragmentation, real-estate restrictions, and exclusionary zoning was the virtual devastation of north and central St. Louis. City planners began taking stock of these conditions (substandard housing, abandoned commercial property, aging infrastructure) as early as World War I, but all that really changed over the following decades were the terms— "obsolescence," "decadence," "blight," "ghettoization," "decay"—used to label them. The prescription, in St. Louis and elsewhere, was urban renewal—a tangled combination of federal money, state-enabling laws, local initiative, quasi-public redevelopment corporations, and private investment.[16] Between 1954 and 2000, the city of St. Louis "blighted" hundreds of areas under Chapter 353, the Missouri

Urban Redevelopment Law, and Chapter 99, the Missouri Land Clearance Act.[17] Although the condition of the residential north side was often used to make the case for urban renewal, those neighborhoods received virtually none of the subsequent political attention, private investment, or public subsidies. Most of the attention instead flowed to commercial development—stadiums, retail, convention centers—in the city's central corridor (Map 4).

Urban renewal in St. Louis displaced thousands of families—some of whom were accommodated in new public-housing projects, most of whom simply moved west and north ahead of the bulldozer. Urban renewal in St. Louis County was both more modest and more pointed—blighting and razing pockets of African American settlement now surrounded by new suburban development. Underinvestment, underzoning, and the erosion of public services on the city's north side also encouraged population flight—although the outmigration of African Americans did not really take off until civil-rights jurisprudence began to pry open county housing markets. And the abject failure of "big-box" public housing (the city's infamous Pruitt-Igoe towers were razed in 1972) created yet another anxious diaspora.

On balance, federal housing and renewal policies did little to address the paucity of safe, affordable housing in Greater St. Louis and actually *deepened* patterns of residential segregation. FHA mortgage insurance flowed primarily to the suburbs, subsidizing white flight. Federal public-housing assistance flowed primarily to the inner city, cementing the region's spatial organization of race and poverty. Indeed, when the federal government—in the context of protracted litigation over school desegregation—set out to prove that the St. Louis Board of Education was defying the mandate of the 1954 *Brown* decision, both local officials and expert witnesses identified federal housing policies as the prime culprit. "The segregated black community was left to fester," as a city official observed, "while developers aided by the federal government rushed out to build new white enclaves on the city's edge."[18]

11



# Map 4: Renewal and Redevelopment, 1940-2000)

Urban Renewal and Economic Development Zones, 1950-2000

| | |
|---|---|
| 🟨 | MO Chapter 353 |
| 🟧 | MO Chapter 99 |
| 🟥 | Tax Increment Financing |

Source: Gordon, *Mapping Decline* (2008)

All of this—and the damage it entailed—was exaggerated by economic decline and dislocation. The multi-faceted urban crisis featured sustained losses in the local industrial and employment base, dramatic racial transition and depopulation, and a host of consequential economic and social challenges—including a collapsing tax base, a growing share of vacant or abandoned housing, rapid disinvestment, and spatially-concentrated threats to public safety and public health. By the 1970s, it became increasingly common to refer to the "bombed out" appearance of devastated central cities and their inner suburbs. This allusion held for cartographic snapshots of urban poverty, racial segregation, fiscal capacity, crime, and private investment—all of which identified a growing statistical crater, its epicenter in a city's oldest residential wards, its edges, by century's end, circumscribing not only most of the city but many of its inner-ring suburbs as well.

All of this was particularly severe in Greater St. Louis. Midwestern "rustbelt" cities sat at the leading edge of urban decline, bearing the brunt of both demobilization after World War II and the deindustrialization of later years. By the 1970s, St. Louis was an exemplar of the nation's unfolding urban crisis: "By almost any objective or subjective standard," the *New York Times* reported in the late 1970s, "St. Louis is still the premier example of urban abandonment in America." Patterns of racial conflict and racial segregation were also especially pronounced in St. Louis. The national pattern of white flight and inner-city decay, as one observer noted, could be found in St. Louis "in somewhat purer and less ambiguous form than almost anywhere else." St. Louis retained (decade after decade) its dubious distinction as one of the nation's most segregated metropolitan areas: of the top 100 metros by population, St. Louis ranked 12th on the "dissimilarity" index of segregation in 1980, 10th in 1990, 11th in 2000, and 11th in 2010.[19] And, for all these reasons, St. Louis was also the setting for a string of landmark civil rights litigation including *Shelley v. Kraemer* (the 1948 Supreme Court decision that outlawed state enforcement of restrictive deed covenants), *Jones v. Mayer* (the 1968 case that prohibited private discrimination in real estate transactions), and *Black Jack v. United States* (1974, one of the first "exclusionary zoning" cases).

## Part II: Pine Lawn and the Inner Suburbs

The private and public policies that shaped the urban crisis in Greater St. Louis, in the inner suburbs of north St. Louis County, and in Pine Lawn both entrenched patterns of residential segregation and disrupted them. In the middle years of the twentieth century, suburban developments like Pine Lawn employed many of the same discriminatory and exclusionary tactics but, in the long haul, did so less successfully. Disinvestment in north St. Louis, the dislocation caused by urban renewal in the city and in St. Louis County, and the yawning racial gap in local wealth created immense pressures on the housing stock of the inner suburbs.  Here, educational and employment opportunities were better than those in the city's crumbling north-side neighborhoods. And here, the older housing stock was more affordable—and the local zoning less exclusive—than it was in the outer and central county suburbs. Pine Lawn and the other inner suburbs of North County became a "second hand suburb" marked by white flight (now from the inner to the outer suburbs), rapid racial transition, falling property values, and a steady erosion of basic public goods and services.

As we re-center our attention from broader metropolitan patterns to the inner suburbs of north St. Louis County—including Pine Lawn—four elements of the story stand out: First, systematic discrimination and disinvestment in black neighborhoods produced a stark (and growing) disparity between black wealth and white wealth. Those barred from equal access to housing, federal subsidies, and home finance in the middle years of the twentieth century also lost the ability to pass housing equity on to the next generation. Second, in the developmental and demographic history of Greater St. Louis, the inner suburbs of North County (including Pine Lawn) had an uncertain and liminal status. They were, as early enclaves of white flight, much like the other suburbs that sprawled west from the city border. But they were, in the timing and pattern of their residential development and zoning, more like the city itself. Third, decline and disinvestment on the north side and redevelopment projects in the city and in the county generated immense pressures on affordable housing stock in the inner suburbs. And finally, the racial premises of both development and redevelopment created and sustained a particular pattern of population movement in Greater St. Louis, marked by "white flight" into St.

14

Louis County (and beyond) beginning in the 1940s and by black flight into North County a generation later. As a result, the black-white divide between north and south St. Louis extended out into St. Louis County, and local segregation was replicated in transitional neighborhoods—like Pine Lawn—in North County. Let's look at each of these elements in turn.

### i)      The Racial Wealth Gap

By almost any economic metric (unemployment, job quality, wages, incomes) the gap between white Americans and black Americans is sustained and substantial,[20] but the starkest gap, in this respect, is in wealth. While the median black worker earns about three-quarters of the wages of his or her white counterpart and the median black household claims about two-thirds the income of its white counterpart, the gap in wealth—with black net worth stuck at about 10 percent of white net worth—is dramatically wider.[21] The racial gap in wealth reflects gaps in the rate of homeownership,[22] in the tenure of homeownership,[23] and in the terms of homeownership.[24] Facing systematic discrimination in both private realty and private lending, fewer African Americans entered the housing market, they entered it later in life, and they entered it on relatively unfavorable terms. Federal incentives and subsidies sorted opportunity by race—not only for homeownership but also for the intergenerational accumulation of equity and wealth and for the other advantages (public services, good schools) that flow from homeownership.[25]

Income, wealth, and inequality are embedded in places—in the neighborhoods (deeply segregated across our history) where families buy homes, raise families, and pass assets and opportunities to the next generation.[26] Even as civil-rights and fair-housing legislation and litigation curbed the worst of these practices, substantial hurdles— including continued discrimination, systematic disadvantage, and late access to housing markets—slowed progress. What this meant, in St. Louis and its inner suburbs, was that a long history of discrimination and segregation effectively "lived on" in the form of the black-white wealth gap. This gap was widened by both discriminatory obstacles to homeownership, and by the dismal returns on homeownership for those who overcame

15

those obstacles.[27] As a result, when housing markets did open up after the 1970s, segregation by wealth (and income) both displaced and sustained segregation by race. Where African Americans would or could live was determined less by the legal triumphs of the civil-rights era than by the limited supply of affordable housing—much of it abandoned by white flight and rapidly depreciating in value.

### ii)    Uneven Development

Where was that affordable housing? Private development pressed westward from St. Louis, especially after World War II, relatively unconstrained by local or state limits on what we now call "sprawl." Like most Midwestern cities, St. Louis faced few geographic obstacles to growth. And, among Midwestern settings, Missouri was notoriously lax in exerting any regulatory control over the incorporation of new municipalities. Against a backdrop of systematic segregation, this pattern of suburban development had three important consequences: First, it meant that private development generally preceded municipal incorporation, so that, when it came, incorporation (and zoning) simply cemented private development patterns and choices. Second, it meant that such patterns sustained segregation—hardly surprising given that municipal incorporation was largely animated by the desire to seal exclusionary patterns of land use. And third, it meant that the municipal organization (especially in St. Louis County) was remarkably fragmented, with each of those fragments playing a particular role in sustaining and regulating patterns of land use and occupancy.

Much of the housing stock in Pine Lawn was built before its incorporation in 1947. When the Home Owners' Loan Corporation assessed the area in 1940 (giving at a "C" grade), it noted the presence of "some fairly good homes, some not so good, and some that could almost be classed as shacks" and "a very extensive amount of new development in the low price bracket."[28]  The decision to incorporate in 1947 came amidst a flurry of municipal incorporation and zoning in St. Louis County in response to the expiration, and tenuous legality, of the private racial restrictions that had sustained racial segregation to that point.  Pine Lawn's residential housing stock (Maps 5 and 6) was older and its lots smaller than those in the cul-de-sacs sprouting up in the cornfields

# Map 5: Residential by Year Built, St. Louis County (2003)



Source: St. Louis County Assessor, parcel files (2003)

# Map 6: Residential Square Footage, St. Louis County (2003)



Source: St. Louis County Assessor, parcel files (2003)

of Central and West County.  Affordable and accessible, the suburb became an early target of working-class "white flight" (see Maps 7 and 8) and, a generation later, an attractive option for black families leaving north St. Louis. In 1970 (see Figure 1), Pine Lawn was 70 percent white; a decade later it was over 80 percent black. By 2000, it had lost more than a quarter of its 1970 population and 96 percent of its residents identified as black alone.   Pine Lawn had become a "secondhand" suburb marked by dramatic racial transition, aging infrastructure, growing public-service needs, and persistent fiscal troubles.

**Figure 1: Racial Transition in Pine Lawn, 1970-2010**



Source: U.S Census 1970-2010 via NHGIS / IPUMS USA; www.nhgis.org

With racial transition, property values plummeted.  In 1970 (Figure 2), the median value of owner-occupied unites in Pine Lawn ($105, 017 in 2020 dollars) was about 70 percent that of St. Louis County as a whole.  By 2000, the median value in Pine Lawn ($64,249) had fallen dramatically and was now barely a third of median value in the rest of the County.  The cycle was a vicious one: Pine Lawn's older housing stock and smaller lots made it an attractive option for African Americans fleeing north St. Louis.  Racial transition, in turn, depressed housing values—encouraging white flight from the inner suburbs to the outer suburbs and ensuring that homeownership for new arrival would offer little security.

19



Case: 4:20-cv-01046-SEP    Doc. #:  15-1    Filed: 06/28/21    Page: 50 of 109 PageID #: 6393

**Map 7: Population Change, 1940-1950**

○ increase, 10 white persons

● increase, 10 black persons

● decrease, 10 white persons

● decrease, 10 black persons

Source: U.S Census 1940-2010 via NHGIS / IPUMS USA ; www.nhgis.org

Case: 4:20-cv-01046-SEP    Doc. #:  15-1    Filed: 06/28/21    Page: 51 of 109 PageID #: 6394

# Map 8: Population Change, 1950-1960



- ○ increase, 10 white persons
- ● increase, 10 black persons
- ● decrease, 10 white persons
- ● decrease, 10 black persons

Source: U.S Census 1940-2010 via NHGIS / IPUMS USA ; www.nhgis.org



**Figure 2: Median Owner-Occupied Housing Values, 1970-2010 (real 2020$)**

Source: U.S Census and ACS 1970-2010 via NHGIS / IPUMS USA; www.nhgis.org

### iii)    Urban Renewal and Redevelopment

Just as blacks fled the residential north side (for the same reasons as whites but a generation later), they were also being expelled from neighborhoods targeted for urban renewal. As we have seen, the city's first major projects were accompanied by cynical and haphazard plans for relocated residents. The haphazard movement of African Americans from cleared tracts—some into local public housing, but most into neighborhoods to the west and north—deepened segregation in many central city neighborhoods, created new demands for redevelopment in neighborhoods accommodating the refugees from the latest round of renewal, and encouraged white residents of north St. Louis out into the inner and outer suburbs.[29]

While the city's redevelopment and public-housing policies hardened segregation within St. Louis, those of the county and its municipalities hardened the racial divide between the city and its suburbs. Urban renewal in St. Louis County was often designed and pursued as a means of relocating suburban pockets of African American settlement "back" into the city. Relocations from these County projects, including Kinloch (just west of Ferguson) and Elmwood Park (between Olivette and Overland) put further pressure on the local housing stock.  Those displaced ended up in north City, in public housing

22

downtown, and in the increasingly segregated pockets of North County—including Wellston, Pine Lawn, Jennings, and Normandy.  When the City razed the Pruitt-Igoe public housing towers in the early 1970s, pressure on the inner suburbs only intensified.[30]

In turn, the investment and redevelopment--deeply-subsidized with public dollars— completely bypassed the inner suburbs. From the early 1950s into the early 1970s, urban renewal, accomplished largely with federal dollars, cleared large swaths of "blighted" property in central and downtown St. Louis—including the Mill Creek Valley, the footprints of the first Busch Stadium, Laclede's Landing, St. Louis Center, and Union Station (Map 4).  When the federal government ended its urban renewal program in 1974, local development interests turned to "tax-increment financing" (a property-tax sleight-of-hand that uses future revenues to underwrite redevelopment).  But TIF-financing leapfrogged the inner suburbs and was most extensively used for new retail projects in the outer suburbs.[31]

   *iv)*      *White, Flight, Black Flight*

The impact and implications of these patterns were dramatic and, in some respects, devastating. Disparate patterns of white and black settlement, of white and black wealth, and of white and black flight hardened racial segregation and isolation. Black flight from the north side opened a class rift in the black community, concentrating poverty in the central city and inner suburbs and eroding the middle-class institutions (hospitals, schools, churches) on which that community depended. By the 1980s and 1990s, these losses were underscored and exaggerated by dramatic patterns of local economic decline, disinvestment, vacancy, and property abandonment. Taken together, these trends began to exact tremendous social costs—captured by any regional assessment of educational attainment, public safety, or public health.[32]

The fragile line between white and black occupancy at the city-county line eroded over time as white settlement looked farther west and the collapse of formal racial restrictions finally opened county housing markets. But the north-south divide between black and white occupancy largely held, so that whites leaving the city (or its inner suburbs) moved

south and west, while blacks leaving the city (including the diaspora from the failure of the city's public-housing projects) settled largely in North County. This pattern is captured in Maps 9-11, tracing population shifts from 1970 to 2000.  Between 1970 and 1980 (Map 9), we see dramatic black flight from the north side of St. Louis into the inner suburbs North County, accompanied by white flight from the inner suburbs.  This pattern continues through 1980s and 1990s (Maps 10 and 11), although now some inner suburbs (including Pine Lawn) are losing black population as well,

By 2000 (Map 12), the contours of local segregation and had been recast.  In effect, the "Delmar Divide" between north and south St. Louis now pushed across the county, splitting University City and marking everything to the north—the twenty-five postage-stamp municipalities between the city boundary and Highway 170 and south of Lindbergh—as a zone of racial transition.  The patterns and mechanisms of segregation, invented and sustained in the city of St. Louis, migrated along this north-south line out into St. Louis County. In Pine Lawn and surrounding communities, this segregation was spatial: African Americans settled overwhelmingly in the rental properties and small-lot single family subdivisions north of University City, between the City border on the east and the airport to the west.  And this segregation was also political, reflected not just in residential patterns but in local schooling, policing, and service provision.

In turn, these patterns of racial discrimination and segregation played out against an inexorable collapse in economic opportunity.  Deindustrialization in Greater St. Louis, and with it the loss of secure, high-wage, career employment, was especially severe in north City and North County.  A steady stream of significant plant closings between the early 1970s and the early 1990s savaged employment in core sectors—including automobiles, chemicals, aerospace, and electrical goods.  Within close commuting distance from Pine Lawn, these losses included General Motors (1979) in North St. Louis; Wagner Electric (1983), General Electric (1986), and Abex Foundry (1982) in Wellston; and major layoffs at McDonnell-Douglas (1972, 1990), TWA (1984), and Boeing (1999) in the volatile aerospace industry surrounding Lambert Field.[33]  As in housing and zoning, the pattern in the inner suburbs of North County, like Pine Lawn,

24

Case: 4:20-cv-01046-SEP Doc. #: 15-1 Filed: 06/29/21 Page: 55 of 109 PageID #: 3393

# Map 9: Population Change, 1970–1980



- ○ increase, 10 white persons
- ● increase, 10 black persons
- ● decrease, 10 white persons
- ● decrease, 10 black persons

Source: U.S Census 1940-2010 via NHGIS / IPUMS USA ; www.nhgis.org



Case: 4:20-cv-01046-SEP   Doc. #: 16-1   Filed: 06/28/21   Page: 56 of 109 PageID #: 6399

# Map 10: Population Change, 1980-1990

- ⚪ increase, 10 white persons
- ⚫ increase, 10 black persons
- 🔴 decrease, 10 white persons
- 🟠 decrease, 10 black persons

Source: U.S Census 1940-2010 via NHGIS / IPUMS USA ; www.nhgis.org



# Map 11: Population Change, 1990-2000

**Legend:**
- ○ increase, 10 white persons
- ● increase, 10 black persons
- ● decrease, 10 white persons
- ● decrease, 10 black persons

Source: U.S Census 1940-2010 via NHGIS / IPUMS USA ; www.nhgis.org

Case: 4:20-cv-01046-SEP    Doc. #: 15-1    Filed: 06/28/21    Page: 58 of 109 PageID #: 6401



# Map 12: Population by Race (2000)

**Share black alone**

- over 90 percent
- 80 to 90 percent
- 70 to 80 percent
- 60 to 70 percent
- 50 to 60 percent
- 40 to 50 percent
- 30 to 40 percent
- 20 to 30 percent
- 10 to 20 percent
- under ten percent

Source: U.S Census 2000 via NHGIS / IPUMS USA ; www.nhgis.org

more closely resembled that of the central city: net job flight, and a growing paucity of local employment opportunities.  And they fell heavily on black shoulders: The unemployment rate for whites (population over 16) in St. Louis County in 1990 and 2000 hovered just over 3 percent.  The corresponding rate for African Americans was almost three times that: 11.5 percent in 1990 and 9 percent in 2000.

## PART III: Summary and Consequences

The history of Pine Lawn is a stark testament to the debilitating effects of sustained racial segregation and uneven metropolitan development.  In the early decades of the last century, realtors, developers, and white property owners erected elaborate obstacles to property ownership and occupancy.  These restrictions were, over time, adopted and formalized as an ethical obligation of private realtors, lenders, and insurers; as the organizing principle of both local zoning and federal home ownership policies; and as the key determinant of value whenever property was taxed, "blighted" for redevelopment, or redeveloped.  The net effect was not just the stark spatial segregation of metropolitan St. Louis by race and class, but also a cascade of disinvestment and disadvantage in the City's northside residential neighborhoods.  In turn, all of this bore most heavily on older inner suburbs like Pine Lawn that were caught between the sustained decline of the central city and the sustained flight of wealth and resources to the outer suburbs.

The social and economic consequences of regional and local racial and income segregation are clear.  With racial transition came a replication and extension of the tangled disadvantages long faced by African Americans on the northside of St. Louis.  While median family income rose steadily in St. Louis County, it plummeted in Pine Lawn (Figure 3).  In 1970, median family income in Pine Lawn ($74,443) was $16,306 higher than the national median; by 2000 it was $22,180 *lower*—and just 57 percent of median income in the rest of St. Louis County. Income inequality (Maps 13 and 14), measured as a share of the national median, underscored the growing gap between the City and its inner suburbs (where family incomes in most 1990 and 2000 block groups were less than half the national median) and the County's central and outer suburbs.  The same spatial pattern is evident in poverty rates.  In two of the three block groups making

29

# Map 13: Income by Block Group (1990)

Case: 4:20-cv-01046-SEP    Doc. #:  15    Filed: 06/28/21    Page: 60 of 109 PageID 6403



Median Family Income as share of national median ($35,353)

- under 50 percent
- 50 to 75 percent
- 75 to 100 percent
- 100 to 150 percent
- Over 150 percent

Source: U.S Census 1990 via NHGIS / IPUMS USA ; www.nhgis.org

30

# Map 14: Income by Block Group (2000)



Median Family Income as share of national median ($35,353)

- under 50 percent
- 50 to 75 percent
- 75 to 100 percent
- 100 to 150 percent
- Over 150 percent

Source: U.S Census 2000 via NHGIS / IPUMS USA ; www.nhgis.org

31

up Pine Lawn (Map 15), the poverty rate in 2000 was over 35 percent. Pine Lawn's overall family poverty rate in 2000 (27.8 percent) was almost two and half times the national rate, and more than five times the poverty rate of St. Louis County (Figure 4).

**Figure 3: Median Family Income, 1970-2010 ((real 2020$)**



Source: U.S Census 1970-2010 via NHGIS / IPUMS USA; www.nhgis.org

**Figure 4: Poverty Rates (Pine Lawn, St. Louis County, and US), 1970-2010**

Source: U.S Census 1970-2010 via NHGIS / IPUMS US; www.nhgis.org

Case: 4:20-cv-01046-SEP   Doc. #: 15-1   Filed: 06/28/21   Page: 63 of 109 PageID #: 6506

# Map 15: Poverty by Block Group (2000)



Family poverty rate

| | |
|---|---|
| 🟥 | over 30 percent |
| 🟧 | 20 to 30 percent |
| 🟨 | 10 to 20 percent |
| 🟩 | 5 to 10 percent |
| 🟩 | under 5 percent |

Source: U.S Census 2000 via NHGIS / IPUMS USA ; www.nhgis.org

33

Localized inequality, racial segregation, and concentrated poverty multiply the problems faced by both communities and poor families.[34] Such circumstances underlie social disorganization, increased crime, threats to public health, and further flight of population, investment, and resources. As population flees and property values plummet, local tax capacities collapse—a combination that yields baser public services, deteriorating public schools, *and* higher tax rates, all of which make new investment less likely and old investment less secure. To add insult to injury, the collapse of the local property-tax base has also encouraged struggling North County communities to backfill public coffers with court costs and fines.  In 2015, property taxes generated less than 2 percent of Pine Lawn revenue, while court fines and fees made up 63 percent—the largest share of any municipality in St. Louis County.[35]

These fiscal woes were felt most starkly by local schools and their students. The school districts of North County, including the Normandy District that encompasses Pine Lawn, combine property values well below the metropolitan average with tax rates well among the county average. "[H]ousing segregation in St. Louis County," as Dennis Judd concludes, "not only segregates Black students in the schools; it also segregates them into the school districts with the most meager resources."[36] In this respect, the plight of the Normandy School District is a notorious outlier.  It struggled as local property tax revenues fell through the 1980s and 1990s.  In 2010, it was forced to absorb students from the closing Wellston Districts.  In 2012, it was stripped of state accreditation.[37]

As the plight of the local schools suggests, segregation shapes not just residential options and opportunities, but all the advantages or disadvantages that accompany spatial concentrations of wealth or poverty.[38] Deindustrialization in segregated settings (that is, capital mobility without residential mobility) hardened the concentration of poverty and disadvantage.[39]  In struggling neighborhoods, disinvestment and redlining sustained exclusion while predatory finance and declining property values eroded (or destroyed) the returns to homeownership.[40]  Pervasive "neighborhood effects" both exaggerate local risks and undermine the policies and institutions that might mitigate them—affecting the health, safety, cognitive development, and civic engagement of neighborhood residents.[41]

34

These cumulative disadvantages, in turn, have dramatically curtailed social mobility, sustaining places that effectively penalize and imprison those who grow up in them. Recent research on economic mobility finds African Americans (and especially African American boys) both "stuck in place" when they grow up in poor neighborhoods, and with poorer outcomes than whites across all neighborhoods and parental incomes. "Race and property" as the sociologist Dalton Conley underscores, "are intimately linked and form the nexus of black-white inequality."[42]

The consequences of segregation, in this respect, also help account for its persistence and durability.  Racial segregation in most American cities (including St. Louis) was largely accomplished in first half of the last century, a process in which informal and private forms of exclusion or discrimination were emulated and entrenched by local and national housing policies.[43]  The resulting economic disparities, opportunity gaps, neighborhood perceptions—and perceptions of people who live in given neighborhoods—provided more than enough momentum to sustain that segregation well into the next century.[44]  Disparate access to housing, in the American context, also meant disparate access to public goods—especially schools—that followed residential patterns and were financed by local property taxes.[45]  It meant disparate access to public goods—sewers, streets, potable water—that were increasingly provided and paid for through private residential development and private housing investments.[46]  And it meant disparate access to private goods—including retail and employment—that accompanied wealthy neighborhoods and avoided poor ones.  Segregation in Greater St. Louis did not just curtail housing options—it curtailed opportunity.

35

ENDNOTES

[1] The material presented here—in the narrative and in the accompanying maps—draws on my 2008 study, *Mapping Decline: St. Louis and the Fate of the American City* (University of Pennsylvania Press) and on my 2019 study *Citizen Brown: Race, Democracy, and Inequality in the St. Louis Suburbs* (University of Chicago Pres) and on continuing and additional research on the social conditions and demographic trends of Greater St. Louis. Where the analysis draws directly on *Mapping Decline*, I refer to relevant pages rather than reproduce the background documentation found there.  Where the analysis incorporates new material, I have included parenthetic references to relevant sources, all of which are listed in the "references" appendix.

[2] Elizabeth Kneebone and Alan Berube, *Confronting Suburban Poverty in America* (Washington, DC: Brookings, 2014); Scott Allard, *Places in Need: The Changing Geography of Poverty* (New York: Russell Sage, 2017); Margaret Weir, "Creating Justice in the New American Metropolis," in *Justice and the American Metropolis*, ed. Clarissa Rile Hayward and Todd Swanstrom (Minneapolis: University of Minnesota Press, 2011), 251.

[3] Throughout this report, I refer to St. Louis County, the subset of municipalities that make up "North County" and to the metropolitan area's "inner suburbs."  These latter are overlapping spatial categories.  "North County" refers to all of St. Louis County north of Page Avenue, including 47 municipalities roughly centered on St. Louis Airport.  The "inner suburbs" refer to the first ring of suburban development in the County, including the North County municipalities immediately west of the City but east of the I-170 inner belt highway, as well as first-ring suburbs in central and south St. Louis County.

[4] John Logan, *Separate and Unequal: The Neighborhood Gap for Blacks, Hispanics and Asians in Metropolitan America* (2011); John Logan, *Diversities and Disparities*, American Communities Project, at http://www.s4.brown.edu/us2010/SegCitySorting/Default.aspx.

[5] Colin Gordon, *Mapping Decline: St. Louis and the Fate of the American City* (2008), 69–71; Gary Orfield, "The Housing Issues in the St. Louis Case," report to Judge William Hungate, US District Court (St. Louis, MO), Liddell v. Board of Education (1981).

[6] Gordon, *Mapping Decline*, 69–71.

[7] Gordon, *Mapping Decline*, 69-83.

[8] Gordon, *Mapping Decline*, 81–83.

[9] Yana Kucheva and Richard Sanders, "The Misunderstood Consequences of Shelley v. Kraemer," *Social Science History* 48 (2014): 212–33.

[10] Gordon, *Mapping Decline*, 89–91.

[11] Gordon, *Mapping Decline*, 78.

[12] Allison Shertzer, Tate Twinam, and Randall P. Walsh, "Race, Ethnicity, and Discriminatory Zoning" (NBER Working Paper 20108, Cambridge, MA, 2014).

[13] Douglas Massey and Nancy, *American Apartheid: Segregation and the Making of the Underclass* (19930; Richard Rothstein*, The Color of Law* (2019); Michael N. Danielson. "The Politics of Exclusionary Zoning in Suburbia." *Political Science Quarterly* 91: (1976); Thomas Hanchett, "The Other 'Subsidized Housing": Federal Aid to Suburbanization, 1940s to 1960s," in John Bauman, Rogers Biles, and Kristin Szylvian (eds), *From Tenements to the Taylor Homes: In Search of an Urban Housing Policy in Twentieth Century America* (2000), 163-179.

[14] Gordon, *Mapping Decline*, 112.

36

[15] Gordon, *Mapping Decline*, 131.

[16] Gordon, *Mapping Decline*, 153.

[17] Gordon, *Mapping Decline*, 164–67.

[18] Gordon, *Mapping Decline*, 98–99.

[19] The dissimilarity index measures the degree to which two groups are evenly distributed (by census tract) in a given setting.  In this measure, "evenness" is calibrated to the racial distribution in the whole city.  The dissimilarity index (values ranging from 0 to 100) is the percentage of one group who would have to move to achieve an even residential pattern in which each census tract replicates the city-wide distribution.  Segregation is considered high when the dissimilarity index is over 60.

[20] Sarah K. Bruch, Aaron J. Rosenthal, and Joe Soss. "Unequal Positions: A Relational Approach to Racial Inequality Trends in the US States, 1940–2010." *Social Science History* (published online, December 2018), 1–26; Robert Fairlie and William Sundstrom, "The Emergence, Persistence, and Recent Widening of the Racial Employment Gap," *Industrial and Labor Relations Review* 52:2 (1999): 252–70; Kevin Lang and Jee-Yeon K. Lehmann, "Racial Discrimination in the Labor Market: Theory and Empirics," *Journal of Economic Literature* 50:4 (2012): 959–1006; Kenneth Couch and Robert Fairlie, "'Last Hired, First Fired': Black-White Unemployment and the Business Cycle," *Demography* 47:1 (2010): 227–47.

[21] Paul Taylor, Rakesh Kochhar, Richard Fry, Gabriel Velasco, and Seth Motel, *Wealth Gaps Rise to Record Highs between Whites, Blacks and Hispanics* (Washington DC: Pew Research Center, 2011); Thomas Shapiro, Tatjana Meschede, and Sam Osoro, "The Roots of the Widening Racial Wealth Gap: Explaining the Black-White Economic Divide" (Brandeis University Institute of Assets and Social Policy, 2013).

[22] William Collins and Robert Margo, "Race and the Value of Owner-Occupied Housing, 1940–1990" (Levy Institute Working Paper 310, 2000); William Collins and Robert Margo, "Race and Home Ownership: A Century-Long View," *Explorations in Economic History* 38:1 (2001): 68–92; Daniel Fetter, "How Do Mortgage Subsidies Affect Home Ownership? Evidence from the Mid-Century GI Bills," *American Economic Journal: Economic Policy* 5: 2 (2013): 111–47; Ira Katznelson, *When Affirmative Action Was White* (2005), 115-141; Thomas A. Hirschl and Mark R. Rank, "Homeownership across the American Life Course: Estimating the Racial Divide" (Center for Social Development Working Paper 06–12, 2006), at Aahttps://openscholarship.wustl.edu/csd_research/237/

[23] Shapiro, Meschede, and Osoro, "Roots of the Widening Racial Wealth Gap."

[24] Fetter, "How Do Mortgage Subsidies Affect Home Ownership?,"; William Collins and Robert Margo, "Race and Home Ownership from the Civil War to the Present" (NBER Working Paper 16665, Cambridge, MA, 2011).

[25] See, on this point, Katznelson, *When Affirmative Action Was White*, 115-141; Melvin Oliver and Thomas Shapiro, *Black Wealth/White Wealth: A New Perspective on Racial Inequality* (1996).

[26] Patrick Sharkey, *Stuck in Place: Urban Neighborhoods and the End of Progress toward Racial Equality* (2013); Paul Jargowsky, *Poverty and Place: Ghettoes, Barrios, and the American City* (1997).

[27] Sarah Bruch and Colin Gordon "Home Inequity: Race, Wealth and Housing in St. Louis," *Housing Studies* 35:9 (2019).

[28] HOLC 1940 description for area C27, Records of the Home Owners' Loan Corporation (HOLC), 195.3, Records of the Federal Home Loan Bank Board [FHLBB], Record Group 195,

37

National Archives, College Park, Maryland..,

[29] Gordon, *Mapping Decline*, 206–11.

[30] Dennis Judd, "The Role of Governmental Policies in Promoting Residential Segregation in the St. Louis Metropolitan Area," *Journal of Negro Education* 66:3 (Summer 1997), 214-40; Lawrence Vale, *Purging the Poorest: Public Housing and the Design Politics of Twice-Cleared Communities* (2013).

[31] Gordon, *Mapping Decline*, 153-219.

[32] For a recent assessment, see For the Sake of All, *Segregation in St. Louis: Dismantling the Divide* (University City, MO: Brown School of Social Work, Washington University,2018), available at https://forthesakeofall.org/segregationinstlouis/.

[33] See Gordon, *Mapping Decline*, 13-22; Scott Cummings, "Racial Inequality and Developmental; Disparities in the St. Louis Region," in Brady Baybeck and Terrence Jones (eds), *St. Louis Metromorphosis* (2004), 99-142.

[34] William Julius Wilson, *More than Just Race: Being Black and Poor in the Inner City* (2009); William Julius Wilson, *When Work Disappears: The World of the New Urban Poor* (1996); Massey and Denton, *American Apartheid*; Christopher Jencks and Paul Peterson, eds., *The Urban Underclass* (Washington, DC: Brookings Institute, 1991).

[35] Better Together*, General Administration Study #2* (December 2015), available at https://drive.google.com/file/d/1pXeIjWycbcfB2yzC9l0Sz_r6fVYMM-no/view

[36] Judd, "The Role of Governmental Policies in Promoting Residential Segregation in the St. Louis Metropolitan Area," 226; Gary Orfield, "The Housing Issues in the St. Louis Case," Report to Judge William Hungate, U.S. District Court (St. Louis, Mo.), Liddell v. Board of Education (1981), 10-11.

[37] Nikole Hannah-Jones, "School Segregation, the Continuing Tragedy of Ferguson," *ProPublica*, (December 19, 2014).

[38] Elizabeth Anderson, *The Imperative of Integration* (2010), 2.

[39] William Julius Wilson, *The Truly Disadvantaged* (1987); Massey and Denton, *American Apartheid (*1993).

[40] Oliver and Shapiro, *Black Wealth, White Wealth*; Jacob Rugh and Douglas Massey, "Racial segregation and the American foreclosure crisis," *American Sociological Review* 75 (2010), 629–51; Keeanga-Yamahtta Taylor, *Race for Profit: How Banks and the Real Estate industry Undermined Black Homeownership* (2019); Bruch and Gordon, "Home Inequity."

[41] George Galster, and Patrick Sharkey. "Spatial Foundations of Inequality: A Conceptual Model and Empirical Overview." *RSF: Russell Sage Foundation Journal of the Social Sciences* 3:2 (2017): 1-33; Robert J. Sampson, *Great American City: Chicago and the Enduring Neighborhood Effect* (2017); Amy Widestrom, *Displacing Democracy: Economic Segregation in America* (2015).

[42] See Oliver and Shapiro, *Black Wealth, White Wealth;* Jacob Hacker*, The Great Risk Shift: The New Economic Insecurity and the Decline of the American Dream (*2008); Sharkey, *Stuck in Place*; Raj Chetty, Nathaniel Hendren, Maggie R. Jones, and Sonya R. Porter. 2020. "Race and Economic Opportunity in the United States: An Intergenerational Perspective." *Quarterly Journal of Economics* 135 :2 (2020),711-783; Dalton Conley, *Being Black, Living in the Red: Race, Wealth, and Social Policy in America* (1999), 5.

[43] Rothstein, *The Color of Law*; David Freund, *Colored Property: State Policy and White Racial Politics in Suburban America* (2007); Massey and Denton, *American Apartheid* (1993); Gordon, *Mapping Decline*.

38

[44] Camille Zubrinsky Charles, "The Dynamics of Racial Residential Segregation," *Annual Review of Sociology* 29:1 (2003): 167-207; Kyle Crowder and Maria Krysan, *Cycle of Segregation: Social Processes and Residential Stratification* (2017); Clarissa Rile Hayward, *How Americans Make Race: Stories, Institutions, Spaces* (2013).

[45] On schools, see Ainsley Erickson*, Making the Unequal Metropolis: School Desegregation and its Limits* (Chicago, 2016).

[46] See Jessica Trounstine, *Segregation by Design: Local Politics and Inequality in American Cities* (2018); Michelle Wilde Anderson, "Mapped out of Local Democracy," 62 *Stan. L. Rev.* 931 (2009), 940.

# Attachment H

**Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter**

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

**609.568.0358**

**To**: Federal Public Defender
Capital Habeas Unit
1000 Walnut Street, Suite 600
Kansas City, Missouri 64106

June 21, 2021

_____

### Evaluation Report Disclaimer

After reviewing the records documented below and conducting a comprehensive Speech and Language Evaluation, the information that follows highlights the potential areas of concern related to Mr. McFadden's cognitive and communication abilities. At this time, it is my clinical opinion that there are areas of noted record in which Mr. McFadden's cognitive and communication skills demonstrated impairments, breakdowns, and burdens related to his ability to functionally engage and interact in society, especially during heightened situations. It is important to note, my evaluative findings and clinical opinions are based on my education, clinical training, and clinical forensic experience in relation to these matters. These expressed opinions are limited to the information contained within the below referenced records and report reviews.

### SOURCES OF INFORMATION

At this time, the following sources of information was utilized:

1. **Medical Records**
   a. Saint Louis County Health Birth Records
   b. Barnes-Jewish Hospital Records
   c. Community Hospital Association
   d. Dr. Mary Tillman Records

2. **Clinical Records**
   a. Dr. Ruben Gur Report
   b. Dr. Gelbort Records
   c. Youth Services International, Inc. Records

3. **School Reports**
   a. Tarkio Academy School Records
   b. St. Louis City Schools Records
   c. Normandy School Transcript Records

4. **Evaluations (contained within reports)**
   a. Woodcock Mini Battery of Achievement, May 1995
   b. Woodcock Mini Battery of Achievement, December 1995

1

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
|---|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

  c. Woodcock Mini Battery of Achievement, May 1996

 **5. Evaluations Administered**
  a. The b Test
  b. Social Responsiveness Scale - Second Edition (SRS-2)
  c. Test of Adolescent and Adult Language - Fourth Edition - TOAL-4
  d. Brief Test of Head Injury - Normed Edition (BTHI)
  e. Test of Information Processing Skills (TIPS)
  f. Comprehensive Assessment of Spoken Language - Second Edition (CASL-2)
  g. Oral and Written Language Scales- Second Edition (OWLS-II)
  h. Informal Problem-Solving Test

**Assessment Modifications**

For the purposes of the administration of this assessment, it is important to note no accommodations or modifications were made to the format, response, setting, timing, or scheduling of the testing. More specifically, there have been no alterations to the assessments administered that in any way significantly change what the tests measured. However, secondary to the age of the client during some of the assessments administered, the results of some of the assessments will be reported qualitatively and not compared to the normative sample of other individuals who were administered the same assessment. As such, the results of those assessments will be compared only to his own reports and findings on similar and comparable assessments.

**Record Review Preliminary Findings**

This section focuses on preliminary information most relevant to understanding the underlying cognitive and communicative disorders Mr. McFadden may have suffered from in his developmental years (indicative of the records), and how their persistence currently may have impacted his processing, problem solving, and decision-making actions that lead to case on point. There are three primary areas of concern that require direct attention: 1) indication of history of multiple head injuries of which may have resulted in a significant Traumatic Brain Injury (TBI); 2) history of reported sustained alcohol use from a very young age of which can impact brain development and overall cognitive skills; and 3) moderately low IQ scores that impact language and learning skills on a global scale. In order to assess the impact of Mr. McFadden's documented cognitive and communication impairments on his actions, both related to the case at point and thereafter, it is important to discuss some key factors of his background history. Mr. McFadden's medical history reports a possible remarkable history of impaired development from birth. Specifically, Mr. McFadden's birth records from Saint Louis County Hospital report he was born one month premature. This is important to clarify, as prematurity can impact development cognitively and globally. This information supports a strong justification that Mr. McFadden experienced brain development impairments significantly early in life; these impairments were then compounded by other environmental factors (TBI, learning impairments/retention), which impacted

2

**Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter**

**Re: Vincent McFadden Forensic SLP Analysis**
P.O. Box 788 Silver Spring, MD 20918
juvforensicslp@gmail.com
609.568.0358

his cognitive ability; his culpability; and his ability to recognize, understand, and appreciate the consequences and impact of his actions.

Mr. McFadden's premature birth may be correlated with his diagnosis of positive cord blood. During the newborn testing, Dr. Keller reported that Mr. McFadden's cord blood tested positive. When cord blood in newborns tests positive, it could indicate that during labor, the baby was not getting enough oxygen secondary to complications with the umbilical cord. Further, a positive blood cord culture could also indicate a blood infection. This is documented as a possibility Dr. Keller sought to rule out in determining if Mr. McFadden had sepsis during birth. Overall, the presence of positive cord blood secondary to lack of oxygen or an affirmative diagnosis of sepsis has been demonstrated to impact brain development, especially in the areas of expressive and receptive language, cognition, and learning skills. Even the smallest amount of lost oxygen during birth can result in brain damage that will persist well into an individual's adulthood affecting functional social, vocational, academic, and overall behavioral abilities. There was a reported history of long-term alcohol consumption beginning at the age of approximately ten years old. In the discussion of excessive and long-term alcohol consumption, damage to the brain and long-term cognitive decline is a potential severe outcome. In addition, even moderate alcohol consumption can impact an individual's cognitive, learning, and societal success. As such, there is a significant possibility that Mr. McFadden may be experiencing brain damage that began during his younger years of life and played a role in his conduct during the case at point.

Due to Mr. McFadden's documented records of areas of difficulty in academics, his exposure to adverse activities (substance abuse), and history of TBIs, it is likely that areas of his brain needed for key skills in functional societal engagement developed atypically and at a delayed rate. It is also important to highlight the areas of the brain in discussion here that regulate social-emotional and verbal-emotion skills, problem-solving skills, and consequential thinking abilities that do not fully develop until the age of 25 or older (in some) (Johnson & Giedd, 2009)[1]. Research has demonstrated the frontal and temporal lobes where problem-solving, judgment, inhibition of behavior, understanding language, feelings, memory, etc. does not develop until well into an individual's late twenties (Haque, et. al. 2013)[2]. Therefore, removing the discussion of Mr. McFadden's impairments, of which persisted before the age of 25, his ability to rationalize, problem-solve, and control his impulsivity during the case in point would have been limited, as typically expected secondary to his young age and the limited neuromaturation of the brain at that time.

---

[1]

Johnson, S. B., Blum, R. W., & Giedd, J. N. (2009). Adolescent maturity and the brain: the promise and pitfalls of neuroscience research in adolescent health policy. *The Journal of adolescent health : official publication of the Society for Adolescent Medicine*, 45(3), 216–221. https://doi.org/10.1016/j.jadohealth.2009.05.016

[2] Arain, M., Haque, M., Johal, L., Mathur, P., Nel, W., Rais, A., Sandhu, R., & Sharma, S. (2013). Maturation of the adolescent brain. *Neuropsychiatric disease and treatment*, 9, 449–461. https://doi.org/10.2147/NDT.S39776

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
|---|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

## Judgment last to develop

The area of the brain that controls "executive functions" — including weighing long-term consequences and controlling impulses — is among the last to fully mature. Brain development from childhood to adulthood:

5-year-old brain    Preteen brain    Teen brain    20-year-old brain

*Dorsal lateral prefrontal cortex ("executive functions")*

Front

Top view

Back

**Red/yellow:** Parts of brain less fully mature

**Blue/purple:** Parts of brain more fully matured

Sources: National Institute of Mental Health; Paul Thompson, Ph.D., UCLA Laboratory of Neuro Imaging

Thomas McKay | The Denver Post

Overall, Mr. McFadden's cognitive and communication impairments, as evidenced in the records, can impair judgement, consequential thinking, and decision-making skills. They additionally can impair his inability to functionally regulate emotions and respond in what is considered a typical manner during emergency situations. The following speech-language evaluation provides a more detailed and concrete outlook of Mr. McFadden's cognitive functioning and communication.

## Clinical Evaluation

In my capacity as the Juvenile Forensic Speech-Language Pathologist, I had direct one-to-one contact with Mr. McFadden, and was able to administer a full cognitive and communication disorder battery. More specifically, the evaluation process included assessing the areas of cognition, expressive and receptive language, and executive functioning. The findings of each evaluation administered are listed below.

| EVALUATION INSTRUMENTS |
|---|

Mr. McFadden was specifically administered the following assessments:

**1. The b Test:** The b Test is designed to suspect test-taking effort in individuals ages 17 and older.

**2. Brief Test of Head Injury - Normed Edition (BTHI):** The BTHI is a cognitive-communicative assessment that aims to identify and measure the presence of deficits in the areas of cognition,

4

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
| --- |

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

memory, and language in individuals with possible acute and long-term traumatic brain injuries. This assessment is recommended to be administered by a certified speech-language pathologist, neuropsychologist, or specialist trained in the assessment of head injuries. The test administration age for this assessment is for adults up to 85+ years old.

**3. Informal Problem-Solving Test:** The Informal Problem-Solving Test assesses the ability to infer information from orthographically and verbally presented content, utilize theory of mind in identifying and explaining feelings, activate social problem-solving skills, and use paralinguistic and pragmatic observations to respond.

**4. Test of Adolescent and Adult Language - Fourth Edition - TOAL-4:** The TOAL-4 is a language assessment used to determine strengths and weaknesses in the language skills of Word Opposites, Word Derivations, Spoken Analogies, Word Similarities, Sentence Combining, and Orthographic Usage.

**5. Test of Information Processing Skills (TIPS):** The TIPS is an assessment that addresses executive functioning skills. This assessment provides information related to how individuals process information that's seen or heard; how much they retain (immediately and after a delay); how they retain it (in sequence or out of order); and how interference affects recall.

**6. Comprehensive Assessment of Spoken Language - Second Edition (CASL-2):** The CASL is an evaluation tool utilized to provide an in-depth analysis of an individual's oral language comprehension, expression, and retrieval skills:

    A. Oral language processing systems of auditory comprehension, oral expression, and word retrieval

    B. Knowledge and use of words and grammatical structures of language

    C. Ability to use language for special tasks requiring higher-level cognitive functions

    D. Knowledge and use of language in communicative contexts in the areas of: lexical/semantic, syntactic, supra-linguistic, and pragmatics.

**7. Oral and Written Language Scales- Second Edition (OWLS-II):** This section of the OWLS-II assesses expressive and receptive language skills.

<u>**Assessment Findings**</u>

Mr. McFadden's evaluation was administered at Potosi Correctional Facility in a private meeting room. During the administration of the test battery, Mr. McFadden was present in the

5

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
|:---:|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

room with just the clinician. The door was closed to reduce the presence of distractions and increase privacy. Mr. McFadden was seated in a chair directly across from the clinician, and the possibility of noise or visual distractions was addressed prior to the start of administering. For the purposes of adhering to COVID-19 protocols, the clinician wore a clear face mask and shield to allow for visualization and clarity of communication. In addition, Mr. McFadden also wore a face mask. The masks and shield were kept on for the duration of all testing. For the purposes of test administration, Mr. McFadden's hearing was deemed to be within normal limits. Mr. McFadden independently interacted with the clinician with minimal prompting, and a professional morale was built for clinical interaction immediately.  There were no outward signs of evasiveness during these interactions.

### The b Test Results

Mr. McFadden was first assessed using the b Test to rule out or determine the presence of malingering. During this assessment, Mr. McFadden was required to circle all the letter b's on each of the pages presented in the test booklet as quickly as possible matching the stimuli presented. The primary purpose of the b Test is to determine Mr. McFadden's effort and the validity of his performance on the cognitive ability measures presented. As such, the complexity of the target became more difficult as Mr. McFadden advanced page to page. Overall, Mr. McFadden's total response time for the completion of this assessment was eight minutes. He spent a mean total time of 53 seconds per stimulus. He presented with a total of 15 omission errors of which equates to an E-score of 15.53 - **normal effort interpretive range**. Mr. McFadden's results were analyzed to both comparison groups Learning Disability and Normal-Effort Groups Combined. Mr. McFadden's E-score of 15.53 indicates that an E-score of 50 or less is "very likely to represent a credible normal-effort performance." Research of the b Test has indicated that individuals motivated to exaggerate cognitive difficulties may use the b Test as an opportunity to demonstrate their impairment during the assessment. However, Mr. McFadden's results did not indicate an attempt to exaggerate wrong responses or feign incorrect answers.

Mr. McFadden did not malinger. He presented with maximum test effort throughout the assessment process. He demonstrated the desire to process and understand each expectation and requirement of the tests presented. This was evidenced by his presentation of sufficient time to process information, independent requests to have information repeated or explained, and his attempt to provide a response even when he was unsure of the correct answer or demonstrating difficulty comprehending the directions.

### Brief Test of Head Injury - Normed Edition Results

Secondly, Mr. McFadden was administered the Brief Test of Head Injury - Normed Edition (BTHI). This test was administered because Mr. McFadden reports a history of three or more head

6

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
| --- |

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

injuries beginning very early in life, which may impact cognition and communication. Please see the impact section for more details on how the presence of long-term head injuries and the results of this assessment affect daily living, cognition, and communication skills.

During this assessment, Mr. McFadden was assessed in the task requirements:

I.    **Orientation and Attention**
II.   **Following Commands\***
III.  **Linguistic Organization\***
IV.   **Reading Comprehension**
V.    **Naming**
VI.   **Memory**
VII.  **Visual-Spatial Skills**

On this assessment, Mr. McFadden's overall performance demonstrated a standard score of **114,** a percentile ranking of **82,** and a severity score of **16.** This placed his results in the **Borderline Normal** range for severity classification. Further, Mr. McFadden's score was **1 Standard Deviation** away from the **mild head-injured severity classification** which begins with a Severity score of 15. *Adjacent severity scores that fall in two different categories represent no greater difference than two adjacent scores in the same range (a score of 16 in borderline normal is no different than a score of 15 in mild head injury classification).* Therefore, specific performance in certain task requirements can be used to determine individual impaired abilities. As such, it is important to note that when analyzing individual task requirements, there were areas of impairment present within Mr. McFadden's cognitive-communicative skills.

In the task requirement cluster of **Following Commands,** Mr. McFadden yielded an accuracy score of **50% (n=8).** His score correlated to a standard score of 7 and a percentile rank of 16. Mr. McFadden demonstrated the ability to complete 4 out of 8 commands with significant impairments in the area of multi-step directives. He demonstrated difficulty recalling verbally presented information and required sufficient time to process the task before completing it. For example, Mr. McFadden would initiate the first part of the step and have to be prompted to follow through on the remainder of the task (as approved by the test administration guidelines).

On the task of **Linguistic Organization,** Mr. McFadden demonstrated deficits in his working memory skills. He yielded an accuracy score of **66% (n=9).** His score correlated to a standard score of **10** and a percentile rank of **50.** Mr. McFadden demonstrated the ability to complete only 4 out of 8 commands with significant impairments in the area of multi-step directives. For example, he demonstrated the inability to name another flower and utilized compensatory strategies to attempt and provide a response. Specifically, when prompted to *"Name another flower"* his response was, *"you know, that uh, yellow flower that you pick up."* Also, he provided incomplete explanations when asking him to explain the difference between two simple shapes (triangle and square). This indicates delays or deficits in his organizational and higher order thinking skills. Contrasting between two items requires the individual to organize presented information in a manner that can be

7

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
| --- |

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

understood or presented effectively. This requires the individual to have a stable baseline in the knowledge and understanding of the items being compared and contrasted. This skill is taught very early on academically and is most important during the prime educational years of third to fifth grade due to the higher-level thinking skills employed. Mr. McFadden demonstrating difficulty during this stimulus probe indicates impairments in his higher order thinking skills and delays in his ability to organize retained information, process the information, and express the outcome of that knowledge effectively for the person he is communicating with. Lastly, during this task, Mr. McFadden provided the clinician with an incomplete narrative of the street scene. He did not describe everything presented in the picture and focused on specific items despite the verbal prompt provided. Overall, delays in this area align to demonstrated difficulty with processing visually and verbally presented information and quickly and clearly conveying related information. The skills required to complete tasks like the ones presented above with minimal difficulty demonstrate strong executive functioning skills. At this time, Mr. McFadden's responses indicate some level of impairment in his executive functioning skills that will impact his social interactions and daily living.

In the area of Memory, Mr. McFadden yielded an accuracy score of **66% (n=1)**. His score correlated to a standard score of **12** and a percentile rank of **50**. Mr. McFadden demonstrated the ability to complete **8 out of 12** commands with significant impairments in his **immediate recall** skills of unrelated words, sentences, 3 or more visually presented objects, and recalling 4 facts. On the visual memory task, he demonstrated the ability to recall **3 out of 9** details (**33% accuracy**). Mr. McFadden's difficulties in this area of memory skills correlate with his noted impairments to recall and process information in the Following Commands and Linguistic Organization tasks. Immediate recall skills are necessary to access and remember information presented within 10 to 30 seconds before retrieval. The inability to retrieve and remember information presented immediately indicates impairments in intelligence or neurological impairments. To avoid overinterpretation of the scores in each subtask, the clinician analyzed and compared the confidence band for each standard score.

Differences of more than three points between clustered tasks should be considered meaningful. Within the assessment, Mr. McFadden presented with considerable meaningful and significantly different item cluster profiles for *Orientation/Attention v. Following Commands (Standard Score 12 v. 7), Memory v. Following Commands (Standard Score 12 v. 7), and Visual-Spatial Skills v. Following Commands (Standard Score 13 v. 7).* Overall, it is my clinical opinion that Mr. McFadden's deficits in this area of memory impacted all other areas of the tasks highlighted above. These deficits presented itself in accommodating behaviors, such as sufficient time needed to process and respond to stimuli in all task areas. In addition, Mr. McFadden requested items be repeated 65% of the time throughout the administration of the test. It was also noted when more than three words were presented to recall in any task, he demonstrated difficulty recalling the last items presented, would repeat back information with missing, added, and transposed words, or would respond with *"I don't know."*

8

**Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter**

## Re: Vincent McFadden Forensic SLP Analysis

P.O. Box 788 Silver Spring, MD 20918
juvforensicslp@gmail.com
609.568.0358

**Clinical Analysis of Impairment Impact:**

Mr. McFadden reported a history of three or more head injuries beginning very early in life. Specifically, Mr. McFadden reported experiencing his first head injury at the age of two. He reported the injury was an open head injury from falling down a flight of stairs, which required stitches. The clinician noted the scar on his head where he reported the injury occurred. The second injury reported occurred around the age of 10 or 11 years old. Here, Mr. McFadden reported falling off the monkey bars and hitting his head so severely he severed his tongue from the impact. This injury also required stitches in his tongue and resulted in a large knot on the head. He also reported somatic symptoms such as headaches and blurry vision for a period of time after. Lastly, Mr. McFadden reported a closed head injury when he was 13-years old. He reported being hit in the head with a baseball during a physical altercation. He reported his eye swelling closed, a knot on his head and headaches. It is important to note that Mr. McFadden reported he received no medical attention for this injury. He reported that he currently has difficulty remembering things and does better when it is written down or repeated more than once. In addition, he reported periods of frustration when he couldn't recall things immediately or with delays. He also reported feelings of anxiety when he was closed in spaces or touched without notice.

Considering Mr. McFadden's reported and documented history of multiple head injuries, Mr. McFadden demonstrating difficulty verbalizing his emotions or feelings, functional problem-solving, impulsivity, and "rigid in his thinking," should be noted as salient features that can be experienced in someone experiencing traumatic brain injury (TBI). Mr. McFadden has a history of moderate-severe TBIs, beginning at a very young age. As such, limitations and impairments associated with TBI should be considered as a confounding factor in his actions and behaviors. It should be recognized that given the early age of Mr. McFadden's first documented head injury (2 or 3 years old), the development of the brain and the effects should be discussed. Specifically, the development of the frontal lobe in a **typically developing** brain controls all the areas mentioned above, including problem-solving and impulsivity skills. However, as we know from years of scientific research about brain development, the brain and particularly the frontal lobe does not fully develop until approximately 25 years of age or older. Therefore, although Mr. McFadden may be considered able to intermittently regulate his emotions in a socially acceptable manner, because of his suspected longstanding, untreated cognitive and communication impairments, he will primarily rationalize and respond with the emotional parts of his brain. Further, pairing the potential TBIs from a history of head injuries with his reported history of substance abuse (alcohol intake), Mr. McFadden's state of expected cognitive ability to successfully navigate heightened situations would be compromised.

When an individual has experienced multiple head injuries and trauma to the brain, the likelihood of their brain's ability to return to normal decreases. In addition, the individual may experience long-term effects of traumatic brain injuries that can be persistent or intermittent depending on the situation. For example, long-term effects of consistent head injuries can result in

9

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
|---|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

headaches, changes to an individual's personality, memory deficits, agitation, anger, frustration, and depression. Overall, significant TBIs like the ones reported by Mr. McFadden can have long-term effects on cognitive-communicative skills such as problem-solving, reasoned judgment and decision making, and consequential thinking. It can also lead to the short-term memory and immediate recall deficits presented in Mr. McFadden's performance above. When there are head injuries that impact higher order thinking skills like recall and memory, the ability to retain and comprehend important details, skills, and lessons from the academic years of life will be compromised. When activating memory skills, an individual is tapping into their ability to re-access information from their past that is stored in their mind for optimal moments of social interaction, revision, and functional planning and problem-solving. When impaired, this in turn presents life altering impacts to an individual's social and vocational skills and every-day decision making and living. Deficits in this area secondary to brain injury can impact the ability to think flexibly, as well as find new ways to organize ideas, think, and approach situations rationally. In addition, when an individual has a head injury, other health factors may elevate their risk of damage to the brain and their cognitive skills.

Mr. McFadden's report of excessive and long-term alcohol consumption, in addition to the reported significant damage to the brain, increases the likelihood of long-term cognitive decline as a potential severe outcome. Even moderate alcohol consumption can impact an individual's cognitive, learning, and societal success. In this case, Mr. McFadden has a reported alcohol consumption history that began as early as ten-years old. As such, his deficits noted in memory, processing, and linguistic organization are secondary to the experience of brain damage that began during his younger years of life and played a role in his conduct during the case at point.

### Informal Problem-Solving Test Results

Following the completion of the BTHI assessment, Mr. McFadden was administered an informal problem-solving test. This test was administered to determine Mr. McFadden's ability to infer information from orthographically and verbally presented content, utilize theory of mind to identify and explain feelings, activate social problem-solving skills, and use paralinguistic and pragmatic observations to respond. It is important to note, Mr. McFadden was administered an informal assessment of the problem for two specific reasons. First, there currently is no standardized assessment that assesses individuals' problem-solving skills beyond the age of 17 in production. Second, no standardized assessments of problem-solving address all of the areas listed above. The findings from this assessment provide insight into Mr. McFadden's overall social language competence, as well as pragmatic and social cognitive abilities. Informal assessments can be beneficial during the administration of comprehensive assessments because individuals may obtain average or within normal limit scores on standardized language tests and still present with pervasive social language deficits that the tests may overlook. This makes it important to assess an individual's social communication skills independently.

10

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
|---|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

Within this assessment, Mr. McFadden presented with difficulty in the areas of inference skills, pragmatics, and social cognition. Mr. McFadden's solutions to presented problems tended to be limited in rationale and resulted in a detriment to himself or others. For example, *when asked what he could do if he was having friends over, and six show up but there are only enough drinks for five people;* his response was, *"give them the drinks and go without a drink"*. Although this response appears admirable and polite on the forefront, the rationale of going without demonstrates limitation in complete processing and problem solving to other functional solutions like, a) split the drinks so there is enough for everyone or b) run out to the store to get more drinks  Further, in the area of verbal reasoning, Mr. McFadden demonstrates difficulty explaining and expressing his thoughts and feelings when a problem is presented. In addition, he presented difficulty with being able to recognize or predict the feelings and behaviors of others, known as theory of mind. His responses demonstrate minimal ability utilizing prediction skills in conjunction with situational awareness to respond in an appropriate manner. Overall secondary to Mr. McFadden's reported difficulty with working memory, recall, and the impacts of TBI on retaining and activating skills, the areas of his brain that regulate language and learning skills, social-emotional and verbal-emotional skills, problem-solving skills, and consequential thinking will demonstrate delays and impairments. More specifically, his ability in this area is more conducive with that of a teenager and not an adult.

**Clinical Analysis of Impairment Impact:**

Mr. McFadden's problem-solving skills in this area appear to be immature and impaired. Although he may be considered able to intermittently regulate his emotions in a socially acceptable manner, secondary to his current level of longstanding untreated cognitive and communication impairments, he can be expected to primarily rationalize and respond with the emotional parts of his brain. This means that in the prefrontal and temporal cortices of his brain - that respond to and utilize good judgment and consequential thinking- expected activation is not consistently and automatically activated when problem-solving and consequential thinking is needed. Therefore, there may be areas of Mr. McFadden's brain that may not be fully developed or adequately formed, which will contribute to his inability to comprehend and functionally problem-solve (Johnson, Blum, & Geidd, 2009). This will impact his ability to detect, analyze and interpret the intentions of others. This means he may develop an inaccurate perception of social situations that impacts his problem-solving processing and ability to think beyond the immediate outcome he has surmised. In addition, Mr. McFadden's confounding head injuries, which can cause frustration, anxiety, and tension, increase the probability of his inability to make age-appropriate and rational decisions, especially during heightened situations. It is also important to note that Mr. McFadden's ability to functionally problem-solve, activating prediction and inference skills, is compromised when he is in a least restrictive environment. Based on the record review and his performance during the administration of this assessment, when structure, routine, concrete expectations are presented to Mr. McFadden, he demonstrates the ability to activate sufficient time to process information and the support of the restrictive environment to develop alternative solutions that are more favorable. Mr. McFadden's academic and clinical records indicate noted difficulties in the areas of reasoning, problem solving, vocabulary, processing, and abstract and concrete verbal reasoning. Within his records, there are

11

| **Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter** |
|---|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

documented notifications of average to below average grades in which language plays a significant role in success (writing, literature, consumer education, group communication skills). The highlighted areas are impairments that may have persisted into adulthood because there is no supporting documentation to indicate that Mr. McFadden ever received or was considered for special education. Special education would have been necessary to address Mr. McFadden's existing impairments, resources he never received. Difficulty in the academic setting may have contributed to his social cognition and social emotional skills impairments; these impairments impact Mr. McFadden's ability to process information, utilize information learned to problem-solve, activate functional alternative solutions during heightened situations, consequentially think, and appreciate the impacts and outcomes of his choices. This clinical opinion is supported by the Psychological Evaluation findings, which demonstrated that at the time of testing, Mr. McFadden lacked functional insight, judgment and reasoning, and the ability to appreciate detail presented in important information (Dr. Gelbort).

### Test of Adolescent and Adult Language Results-4

The TOAL-4 was administered following the completion of the Problem-Solving test. This assessment was analyzed using an item-analysis approach to determine his spoken language, written language, and general language skills. Knowledge of these skills is important to understand Mr. McFadden's language impairments and how they impact his ability to process, use, and store information presented to him in various settings. It is important to note that although the results of this assessment are primarily qualitatively presented (as Mr. McFadden's age group was not normed for this test), his performance fell significantly below the capped age of 24;11. Specifically, Mr. McFadden performed Poor and Very Poor in the areas of Spoken Language, Written Language, and General Language. Please see the table presented below:

| Subtest | McFadden's Raw Score | Mean Raw Score for 24;11-year old Norms | Scaled Score | Descriptive Performanc Rating |
|---|---|---|---|---|
| Word Opposite (WO) | 18 | 22 | 8 | Average |
| **Word Derivations (WD)** | 7 | 36 | 3 | **Very Poor** |
| **Spoken Analogies (SA** | **10** | **18** | **5** | **Poor** |
| Word | 14 | 18 | 8 | Average |

12

| **Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter** |
|---|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

| | | | | |
|---|---|---|---|---|
| Similarities (WS) | | | | |
| Sentence Combining (SC) | 11 | 19 | 5 | Poor |
| Orthographic Usage (OU) | 1 | 28 | 2 | Very Poor |

| Composite Performance | Sum of Scaled Score | Descriptive Rating |
|---|---|---|
| Spoken Language (WO, WD, SA) | 16 | Poor |
| Written Language (WS, SC, OU) | 15 | Very Poor |
| General Language (All Subtests) | 31 | Very Poor |

This indicates that despite Mr. McFadden's chronological age being beyond the normed age for this assessment, his performance demonstrates that his intellectual and cognitive age is significantly below the normed age for this assessment. He performed clinically significantly below youth at the chronological age of 24;11. Mr. McFadden's performance and language skills appear to be more conducive to an individual in the adolescent age range of 13-17 years old. The remaining discussion interprets Mr. McFadden's test results are based on the specific content and skills measured in each subtest.

In the area of **word opposites**, Mr. McFadden's knowledge of antonyms was assessed. This is important for determining his vocabulary skills and ability to word find and use words during expressive and receptive language with functional communicative intent. Impairments in this area will impact comprehension, cause communication breakdowns, and impair the individual's ability to process and appropriately respond. As indicated in the chart above, Mr. McFadden performed average on this task with an accuracy level of **53% (n=34).** Mr. McFadden demonstrated the ability to provide opposite words for terms that appear to be correlated with his life experiences. For example, words that can also be heard and used in the legal setting were all provided with an accurate antonym by Mr. McFadden. The exact words were, *death, guilty, reject, minor, permanent,* and *deliberate.* On the other hand, he demonstrated difficulty with common age-appropriate words like *expand, insult, optimistic, inferior, deceit,* and *concur.*

13

**Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter**

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

In the area of **word similarities,** Mr. McFadden's knowledge of synonyms was assessed. This is also important for determining his vocabulary skills and ability to word find and use alternative words during communication and to repair communication breakdowns. Impairments in this area will impact comprehension and impair the individual's ability to process and appropriately respond to verbally presented information. This would also indicate expressive and receptive language impairments. Mr. McFadden demonstrated the ability to provide a synonym for words visually presented with **35% accuracy (n=40).** Mr. McFadden demonstrated difficulty providing a synonym for age-appropriate and below age level words like *car (*his response was *"ride"), astonish (*his response was *"can't wait"), freedom (*his response was *"unleash").* He was unable to provide alternatives for words like *wince, barter, habitation,* and *suffice.*

**Clinical Analysis of Impairment Impact:**

Difficulty with common age-appropriate terms like the ones presented in both subtests may impact Mr, McFadden's ability to comprehend the intent and purpose of a message, follow verbal and written directions, and respond appropriately. Mr. McFadden's difficulties in this area of vocabulary may be attributed to limited academic exposure, secondary to discontinuing school in the tenth grade. This may also be attributed to exposure and lack of intervention to assist him in comprehending and processing content accurately. As such, this deficit may have impacted his ability to understand the consequences and severity of his actions as well as be an active member in his legal proceedings.

In the area of **word derivations,** Mr. McFadden's ability to attach complex derivational affixes to root words to generate new words was assessed. This is an important skill to possess, as it assists with perception and clarifying the meaning of a word in context. Without this skill, the meaning of a word and overall sentence can be lost or misunderstood resulting in maladaptive outcomes and responses. On this subtest, Mr. McFadden was prompted to use the word provided in a sentence by changing it to correctly fit within the sentence context (broke > broken). On this subtest, Mr. McFadden demonstrated significant difficulty and yielded an accuracy score of **14% (n = 51).** He benefited from sufficient time to process information and provide a response. In addition, he expressed that he did not know how to provide a new word from the root word provided after the seventh stimuli presented. He demonstrated difficulty with the derivation of the word and the meaning for words that are introduced in the middle school to high school academic curriculum. For example, Mr. McFadden demonstrated difficulty providing derivations for words even when sentences were presented. This also indicates that Mr. McFadden demonstrates difficulty utilizing context clues to assist him in understanding the meaning of verbally presented information and avoid communication breakdowns. For example, when provided with the word *glory,* and the sentence, *"The concert was spectacular. In fact, it was _____ (glorified)."* Mr. McFadden was unable to provide a response. Further, in the immediately following probe *spectacle,* in the sentence, *"The fireworks were amazing. They were quite _____ (spectacular)."* Mr. McFadden was unable to recall the word being used previously and providing it as a response. His response was, *"speculated."*

14

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
| --- |

## Re: Vincent McFadden Forensic SLP Analysis

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

## Clinical Analysis of Impairment Impact:

Difficulty in this area of language can result in communication breakdowns secondary to the receiver getting the wrong perception of the message. When an individual demonstrates vocabulary impairments similar to the ones presented by Mr. McFadden, information may be lost in communication misconstrued, or lack clarity. This level of impairment will over time impact comprehension and his response during communication. Mr. McFadden may demonstrate difficulty getting his point across and explaining information, resulting in frustration and anxiety. In addition, to avoid drawing attention to his deficits, Mr. McFadden may avoid expressing his thoughts, wants, and needs when he is unable to repair the communication breakdowns. Further, Mr. McFadden presents with difficulties recalling information and working memory. This impacts his ability to respond appropriately; complete tasks accurately; recall information necessary to infer, predict, and create functional outcomes; and understand the situation. Moreover, the length of information verbally presented with vocabulary that is considered age-appropriate for Mr. McFadden may impact his comprehension and ability to accurately answer WH-questions (what, where, who, why, when, and how). Overall, Mr. McFadden's demonstrated difficulties in an age-appropriate and stable vocabulary set and impairments in vocabulary skills may limit his ability to create alternative solutions to expressing his emotions. Therefore, his problem-solving skills and consequential thinking, which ultimately require functional vocabulary skills, critical thinking skills, and emotional intelligence, will be impacted secondary to his significant difficulties and impairments.

In the area of **spoken analogies**, Mr. McFadden's ability to understand and respond accordingly to analogies was assessed. This skill is important in developing the ability to develop new inductive inferences about novel situations. As such, impairments in the development of this skill that contributes to inferencing skills will also impair the ability to problem-solve and consequently think. On this subtest, Mr. McFadden was prompted to listen to a verbally presented analogical sentence and provide a word at the end of the sentence that would fit into the analogy. For example, *Day is to night as cold is to ___ (hot).* Mr. McFadden demonstrated significant difficulty in this area yielding an accuracy score of **38% (n=26).** Mr. McFadden provided responses like; *Rain is to drop as snow is to (fall).* The correct response was *flake.* During this subtest, he required sufficient time to process, and repetition of the sentence. It was noted that difficulty with this task may have also been secondary to Mr. McFadden's impaired vocabulary skills and memory deficits.

## Clinical Analysis of Impairment Impact:

Difficulty with analogies will impact Mr. McFadden's ability to form new inductive inferences and apply them to new situations as needed, thus affecting his ability to functionally see beyond the immediate situation to the consequences that may occur as a result of his impaired inference and perception. In addition, analogical thinking and skill requires high level flexible thinking. Based on the results from the assessments previously mentioned, Mr. McFadden presents with impaired executive functioning skills that will impact complex and abstract thinking. Difficulties

15

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
| --- |

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

in the ability to identify and understand analogies can impact an individual's understanding and ability to recognize the relation between two or more things. In this context, this means that impairment in this area will also impact Mr. McFadden's ability to recognize the cause and effect of his responses, outcomes, and thoughts readily and consistently. This in turn will impact decision making and his selection of problem-solving solutions during heightened situations or in environments with limited routine and structure. Being aware of the relationship between two things and recognizing analogies assists individuals in easily deducing the answers or responses in social situations.

Conversely, impairments in Mr. McFadden's analogical skills will also impact his ability to pay *attention to detail* (situational awareness), develop *age-appropriate vocabulary skills* (including synonyms and antonyms) and develop *deductive reasoning* and *logic skills*. Lastly, it is important to note that impairments in vocabulary skills will make it difficult to understand and use analogical reasoning successfully.

## Test of Information Processing Results

Mr. McFadden was administered the TIPs following the completion of the TOAL-4. The test was administered to determine the presence and effects of TBI and other head injuries on memory and information processing. This assessment provided pertinent information related to Mr. McFadden's executive functioning skills in the areas of acquisition of information, recall (immediate, short-term, and working memory), and retention of information orally and visually presented. From this assessment, it has been determined that Mr. McFadden presents with a mild impairment in his information processing skills. It was noted that Mr. McFadden demonstrated substantial deficits in his working memory skills and mild-moderate deficits in his short-term memory skills, particularly when the complexity and length of information increased. In the area of **visual modality** probes, Mr. McFadden was required to view a string of letters for two seconds and then immediately asked what letters he saw. As the task progressed, for each string of letters presented visually, Mr. McFadden was then presented with a distractor (count to ten slowly), and then asked again to verbally recall the letters he saw. Lastly, in each set, Mr. McFadden was presented with a second distractor to repeat a sentence and then probed for the letters he saw. The same approach was utilized during the **auditory modality** probes. He yielded a Standard score of 95 on the **visual modality** and 102 on the **auditory modality.** He did better with recalling information unordered. As a result, there was a significant difference in his scores for both auditory and visual ordered and unordered information. Overall, as previously mentioned, Mr. McFadden was able to immediately recall the letters visually presented. However, when distractors were presented, his ability to recall auditorily and verbally became significantly impaired.  Following the auditory and visual modalities, he was presented with a delayed recall modality that required him to recall the names of the animals and fruits presented in each sentence within the second distractor from each of the previous probes. Overall, Mr. McFadden was able to 11 out of 18 words (**61%**). Overall, Mr. McFadden presented with a mean testing age of 21;8 in the area of Short term and

16

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
|---|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918
juvforensicslp@gmail.com
609.568.0358

immediate recall. However, in the area of working memory with and without distractors, he presented with a mean testing age of 16;6 and 17;3 respectively.

**Clinical Analysis of Impairment Impact:**

Mr. McFadden's working memory skills and recall abilities are currently functioning well below his chronological age (41). On the other hand, his testing age correlates to his reported level of academic completion (discontinued school in the 10th grade).

It is important to highlight the areas of the brain in discussion here that regulate his executive functioning skills. This area of the brain also assists with the regulation of social-emotional and verbal-emotion skills, problem solving skills, and consequential thinking abilities. Research has demonstrated that these areas of brain development do not typically fully develop until approximately the age of 25. Conversely, secondary to Mr. McFadden's documented records of areas of difficulty in academics, his exposure in involvement in adverse activities (substance abuse), and the history of TBIs, there is a likelihood that areas of his brain like the frontal lobe needed for key skills in functional societal engagement developed atypically and at a delayed rate.

Thus, based on Mr. McFadden's testing age and working memory impairments, there appears to be some areas of brain development that are impacted and delayed. Therefore, impairments in the area of the brain that regulates working memory and other executive functioning skills, will also impact his ability to rationalize, problem-solve, and control his impulsivity. Mr. McFadden's working memory impairments (including social-emotional impairments) will impair sound/rationale judgement, consequential thinking, and decision-making skills. As well, it will impair his ability to functionally regulate emotions and respond in what is considered a typical manner during emergency situations. This means, in the prefrontal and temporal cortices of his brain - which respond to and utilize good judgment and consequential thinking- expected activation is not consistently and automatically activated when problem-solving and consequential thinking is needed for Mr. McFadden. Overall, in order for Mr. McFadden to be able to successfully utilize consequential thinking and problem-solving skills, he must possess stable working memory skills. His current working memory impairments will impact his ability to assess his choices consistently and effectively (inferencing and critical thinking), anticipate how others will react to his actions and responses (theory of mind), and follow up his intentions with positive outcomes (expressive language and age appropriate vocabulary) or redirect his intentions. At this time, the existing data has demonstrated that Mr. McFadden's executive functioning skills to include working memory and consequently thinking of all possible scenarios "thinking ahead" while utilizing age-appropriate vocabulary is impaired. It is also impacted by the presence of concomitant disorders (TBI) and learning difficulties (as reported in the academic records).

17

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
| --- |

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

### Comprehensive Assessment of Spoken Language Results

The second to last assessment administered was the **CASL-2.** Specifically, Mr. McFadden was tested in the areas of Receptive and Expressive Vocabulary, Antonyms and Synonyms, Sentence Expression, Sentence Comprehension, Nonliteral Language, Meaning from Context, Inference, Double Meaning, and Pragmatic Language. Overall, Mr. McFadden's scores in the area of Receptive and Expressive Vocabulary were consistent with the findings reported above. His accuracy scores range in the Average range with a test age equivalent 12;6 for Receptive Vocabulary and 18;11 for Expressive Vocabulary. In the area of **Sentence Expression and Sentence Comprehension**, Mr. McFadden performed in the average range with a test age equivalent of 12;6. In the area of **Nonliteral language and Meaning from Context**, Mr. McFadden performed in the average range. Mr. McFadden demonstrated the most difficulty in the areas of **Inference** and **Pragmatic Language.** His noted difficulties in these areas are consistent with the findings above specifically on the TOAL-4 and Informal Problem Solving Test. On the **Inference** subtest, Mr. McFadden yielded a test age equivalent of 11;6. Mr. McFadden demonstrated difficulty inferring the meaning of a statement or the intent of the communicator when required to infer using background knowledge **100%** of the time. Specifically, he presented with severe impairments using context clues and background knowledge to assist in inferring. This may also indicate impairment in his fluid reasoning skills.

Fluid reasoning skills are an executive functioning cognitive ability to be flexible in your thinking and problem solving. Individuals with impairments in their fluid reasoning skills will demonstrate difficulty with identifying patterns and relationships (**analogies),** drawing conclusions from the information presented (**inference),** and generalizing or transferring skills or knowledge from one situation to another. In combination, this will significantly impact problem-solving skills, activating and recalling strategies to provide positive alternative solutions, and thinking beyond the immediate reaction to the potential outcomes and impact. Mr. McFadden's demonstrated difficulties in all these areas have been well documented within this assessment (category in bold).

On the **pragmatic language** subtest, he yielded a test age equivalent of 7;3-7;5. This placed him significantly below average in the skill of pragmatics as compared to peers of like age. It is important to note that Mr. McFadden demonstrated the most difficulty with recognizing nonverbal cues and perceiving information accurately from peers. This can correlate to impairments in his theory of mind skills. Theory of mind is an important skill for social interaction and development. It requires the ability to understand that people don't share the same thoughts and feelings as you do. This requires baseline executive functioning and perception skills, the ability to understand concrete and abstract emotions, and inference and prediction skills. At this time, Mr. McFadden's difficulties impact his expressive language and complex sentence skills. Both necessary components to expressing wants and needs, repairing communication breakdowns, expressing emotion, and providing verbal resolutions during heightened situations.

18

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
|---|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

## Oral and Written Language Scales - Listening Comprehension and Oral Expression

Lastly, Mr. McFadden was administered the **OWLS-II** to determine his ability to understand and express language effectively. Mr. McFadden presented with 79% accuracy on the Listening Comprehension subtest and 84% on the Oral Expression subtest. His accuracy and raw scores were equivalent to a test age of 11;9 and 14;6 respectively. More specifically, Mr. McFadden demonstrated difficulty with the meaning of words. He presented with delayed processing and required sufficient time to respond. Mr. McFadden consistently talked himself through the steps and directions in order to comprehend and appropriately respond. Memory and recall were factors that impacted his ability to accurately respond and process information. In addition, as the complexity of the stimuli increased, including vocabulary words, Mr. McFadden's impairments became more persistent.

**Clinical Analysis of Impairment Impact:**

Consequently, it is common occurrence that individuals with cognitive and communication disorders like Mr. McFadden's will be unable to decipher what is expected of them, resulting in misunderstandings during their legal proceedings and counsel. Impairments and breakdowns will also become more prevalent when the individual is engaged in a situation that causes frustration, anxiety, tension distress. During heightened situations of distress, like being arrested or unexpected law enforcement interaction, individuals with cognitive and communication disorders like TBI, vocabulary impairments, and impaired problem-solving skills similar to Mr. McFadden's impairments will primarily rationalize and respond with the emotional parts of their brain. Thus, they present with a limited inability to process and recognize the outcomes of their decisions secondary to impaired comprehension skills.

## Phonology (Speech) Sounds and Oral Mechanism Exam

At this time, Mr. McFadden presents with age-appropriate articulation and speech sound production. There were no noted adverse effects to his production of words during communication that affected overall speech intelligibility. An informal Oral Motor Examination was performed on Mr. McFadden to identify or rule out the presence of any structural abnormalities presented within the oral cavity that may impact speech production and swallowing skills. An examination of his oral cavity and face presented with facial symmetry adequately aligned, labial and lingual strength considering age, and adequate dentition to masticate food. Mr. McFadden demonstrated the ability to protrude and retract his lips bilaterally and tongue with prompts and visual modeling. Overall, Mr. McFadden presented with no clefts, bifid uvulas or abnormal malocclusions/ aversions noted at this time.

19

**Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter**

Re: Vincent McFadden Forensic SLP Analysis

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

## Summary

*Reasonable Degree of Rational Understanding:*

Secondary to Mr. McFadden's documented communication disorders and cognitive limitations, he struggles with deducing the impact his actions may have on others (**theory of mind**), utilizing age appropriate and functional language and vocabulary (**antonyms, synonyms, receptive and expressive vocabulary**), and comprehending the severity of his actions/words (**oral expression, pragmatic language, meaning from context**). As a result, he demonstrates difficulty with consequential thinking and problem-solving effectively and consistently. Mr. McFadden also presents with delayed recall of information and comprehending information (including words and terms) and questions that are more abstract, as well as difficulty finding and functionally using socially age-appropriate words (secondary to possible vocabulary delays). Mr. McFadden also demonstrates below average executive functioning skills in the areas of reasoning, concept formation, and acquiring new knowledge (**fluid reasoning**), as well as difficulty understanding the meaning of and using certain words and terms. As a result, this will affect his ability to functionally put into his own words his frustration, anxiety, and stressors consistently. He may also demonstrate difficulty grasping concepts and hypothetical examples used to assist him in understanding age appropriate problem solving and consequential thinking techniques. In the area of rational understanding, Mr. McFadden's impairments will manifest in the following manners impacting social interaction and engagement.

A. In the area of **Cognition**, memory, reasoning, judgment, attention, and concentration will be impaired.

B. In the area of **Executive Functioning,** problem-solving, decision-making, organization, and planning will be impaired.

C. In the area of **Communication,** changes in thinking and processing, as well as difficulty speaking, will occur. The ability to functionally organize their thoughts and ideas, and track and functionally participate in conversations will be impaired.

D. In the area of **Social and Emotional Skills,** individuals can experience difficulty with changes in tone, pitch, or emphasis to express emotion. They may be perceived as monotone and have a flat affect. Minimal emotion is expressed despite the possibility that internally they are experiencing variations in their emotions. This difficulty is sometimes confused with the individual having no remorse, being callous, or having a lack of care for the severity of their actions.

20

| Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter |
|---|

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

E. In the area of **Behavior**, individuals experiencing a TBI will experience changes in their behavior such as: difficulty with self-control/impulsivity, engaging in risky behavior with a lack of awareness of abilities, difficulty in social situations, and verbal and/or physical outbursts.

## SUMMARY AND OPINION REGARDING REPORT ANALYSIS

In summation, Mr. McFadden is a forty-one-year-old man with a moderate communication disorder in the areas of expressive and receptive language and executive functioning. Regarding his cognitive *functioning* and untreated *communication disorder*, Mr. McFadden demonstrates difficulty to utilize consequential thinking,  as well as problem solving and decision-making skills rationally and consistently. He processes information in concrete terms and demonstrates limited capacity to weigh the impact and multitude of factors necessary to make complex decisions when engaged in heightened situations. In contrast, when in simple one-to-one situations with one person presenting a calm rationale, and in a restrictive environment, he demonstrates the potential to make appropriate decisions with guidance. Lastly, as a result of long-term untreated TBIs, he may demonstrate difficulties with frustration tolerance when situations escalate, impacting his ability to recall and present functional social skills and solutions to reduce negative peer engagement.

It is my clinical opinion that Mr. McFadden's current level of cognitive, expressive, and receptive communication impairments and knowledge at this point in time demonstrate his difficulty with consistently understanding the actions/words he selects during heightened situations. These impairments continue to impact his daily living and likely impacted his alleged actions. It is my clinical opinion that Mr. McFadden currently demonstrates difficulty making age-appropriate decisions and consistently using age-appropriate problem-solving, consequential thinking, and verbal reasoning to avoid potentially adverse situations. His current level of ability as evidenced within the report findings above are functioning at a chronological age range of 12;11 -21;11.  It is also my clinical impression that he currently lacks the adequate capacity to make complex decisions, utilize age appropriate social communication and cognitive-communication (executive functioning) skills, and access and use vocabulary terms that he consistently understands the meaning and impact of consistently and independently.

Mr. McFadden has never received therapy and intervention for all areas of his documented and reported disorders and difficulties - specifically in the area of addressing his language related cognitive and communication disorders. Without consistent intervention, a stable baseline, and functional vocabulary skills and strategies retained to express his feelings and emotions, Mr. McFadden has at times been resigned to express himself in ways that are considered averse to

21

**Forensic Speech-Language Pathology Independent Review and Clinical Opinion Letter**

**Re: Vincent McFadden Forensic SLP Analysis**

P.O. Box 788 Silver Spring, MD 20918

juvforensicslp@gmail.com

609.568.0358

societal norms for his age. It is my clinical opinion however that given the possibility for intensive and effective therapy and intervention Mr. McFadden may over time show improvements in his cognitive and communication development, improving his quality of life.

/s/ **Shameka Stanford, Ph.D., CCC-SLP**
**Juvenile Forensic Speech-Language Pathologist**
**ASHA # 12149414**

**CC: Laurence Komp**
**Sarah Topolski**

*The content of this report is* **confidential** *and intended for the recipient specified in the message only. It is strictly forbidden to* **share** *any part of this report with any third party, without a written consent of the sender or legal exception.*

22

# Attachment I

THE STATE OF MISSOURI          }

                               }

### AFFIDAVIT

Before me, the undersigned authority, personally appeared _Christine Reel_ ,

Who, being by me duly sworn, deposed as follows:

My name is _Christine A. Reel_ , I am of sound mind, capable of making this

Affidavit, and personally acquainted with the facts herein stated:

I am the custodian of records of _Vincent McFadden_ . Attached hereto are

the _11_ pages of records from Vincent McFadden,

These _11_ pages of records are kept by the Agency for an employee or representative of the

Agency with knowledge of the act, event, condition, opinion, or diagnosis recorded to make the

Record or to transmit information thereof to be included in such record; and the record was made

at or near the time of the act, event, condition, opinion or diagnosis.  The records attached hereto

are the original or exact duplicates of the original.

_Christine A Reel_
Affiant

In witness whereof I have hereunto subscribed my name and affixed my official seal

This _23_ day of _January_ 2012.

_Elizabeth Hall_
NOTARY PUBLIC

Notary Public State of Florida
Elizabeth Hall
My Commission EE131491
Expires 12/18/2015

OFFICIAL TRANSCRIPT

STUDENT NAME:     Vincent McFadden, Jr.
FATHER NAME:      Vincent McFadden, Sr.
MOTHER NAME:      Theresa Brown
DATE OF BIRTH:    ███80            S.S.N:    ███-██-6981
DATE ENTERED:     04/12/95         DATE WITHDRAWN:   05/17/96

### M-D Tri-A  Fall 1994

| Course | Grade | CR |
|---|---|---|
| Freshman English 100 | C | .25 |
| Spanish | C | .25 |
| Design | C | .25 |
| Sports | C | .25 |

Cum Credits Earned at Tri-A:  1.00

### TARKIO ACADEMY
### SPRING SEMESTER 1995

| COURSE TITLE | 3Q | 4Q | SEM | CR |
|---|---|---|---|---|
| Writing Skills I | | C | | .25 |
| General Science | | B | | .25 |
| Reading | | B | | .25 |
| Applied Math I | | A | | .25 |
| Health | | C | | .25 |
| Social Studies | | B | | .25 |
| Physical Education | | P | | .25 |

### SUMMER SEMESTER 1995

| COURSE TITLE | 1TERM | 2TERM | SEM | CR |
|---|---|---|---|---|
| Consumer Education | C | D | C | .50 |
| Physical Science | B | | | .25 |
| Health | C | | | .25 |
| Reading | | A | | .25 |
| Pre-Algebra | A | A | A | .50 |
| App. of Lit. | C | C | C | .50 |
| Physical Education | P | P | P | .50 |
| Creative Writing | | A | | .25 |

### FALL SEMESTER  1995

| COURSE TITLE | 1Q | 2Q | SEM | CR |
|---|---|---|---|---|
| Current Events | B | D | C | .50 |
| Algebra I | A | B | B | .50 |
| Earth Science | C | B | C | .50 |
| Geography | B | F | C | .50 |
| Positive Self Image | A | A | A | .50 |
| American Literature | C | D | D | .25 |
| Group Comm. Skills | P | P | P | .50 |

Page 2

Vincent McFadden

SPRING SEMESTER 1996

| COURSE TITLE | 3Q | 4Q | SEM | CR |
|---|---|---|---|---|
| Geography | C | | | .25 |
| Decision Making | A | | | .25 |
| Algebra II | D | | | .00 |
| Positive Self Image | A | A | A | .50 |
| Group Com. Skills | P | P | P | .50 |
| Biology | B | B | B | .50 |
| American History I | B | C | B | .50 |
| Keyboarding | | A | | .25 |
| Basic Reading & Writing | | B | | .25 |
| Chorus | | A | | .25 |

Cum Credits Earned at Tarkio Academy:   11.25        GPA at TA:   2.86
Cum Credits Earned:   12.25

Missouri Constitution Pass Date:

U.S. Constitution Pass Date:

Educational Test Records:
   Woodcock-McGrew-Werder Mini-Battery of Achievement

| Date Administered: | 05/03/95 | | 12/19/95 | | 05/20/96 | |
|---|---|---|---|---|---|---|
| | AE | GE | AE | GE | AE | GE |
| Basic Skills | 10-1 | 4.7 | 12-8 | 7.3 | 19 | 13.1 |
| Reading | 9-8 | 4.3 | 11-5 | 6.2 | 30 | 16.9 |
| Writing | 9-8 | 4.3 | 12-2 | 6.8 | 14-6 | 9.2 |
| Mathematics | 11-3 | 5.9 | 14-9 | 9.4 | 29 | 14.8 |
| Factual Knowledge | 8-4 | 3.0 | 12-1 | 6.7 | 14-5 | 9.2 |

Attendance Record at Tarkio Academy:
   1 Day equals 7.0 Hrs          Spring Semester 1995: 224.0 Hrs
   1 Day equals 7.5 Hrs          Summer Semester 1995:  360.0 Hrs
   1 Day equals 7.5 Hrs          Fall Semester 1995:  637.5 Hrs
   1 Day equals 7.5 Hrs          Spring Semester 1996:  682.5 Hrs

## MISCELLANEOUS INFORMATION

Generals Club

Director of Education *Ed Asst.*
Tarkio Academy

Date:   6.4.04

Official School Seal:



| | STUDENT NUMBER AND NAME | | | ADV. | GRADE | DATE | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 57312805    MCFADDEN VINCENT JR | | | 200 | 09 | 11/04/94 | | | | | | | UNITS |
| DEPT. | SUBJECT NAME | PER | TEACHER NAME | GRADE | ABSENCE | CIT. | GRADE | ABSENCE | CIT. | | | | |
| 05 | FRESHMAN ENG 100 - 1 | 6 | BROWN THE | C | 0 | 3 | | | | | | | |
| 15 | ELEMENTS OF MATH 110 - 1 | 1 | GRADY ALF | D | 0 | 3 | | | | | | | |
| 20 | EARTH SCIENCE - 1 | 5 | BADER ROB | D | 0 | 3 | | | | | | | |
| 25 | SPANISH - 1 | 4 | SMITH CAS | C | 0 | 3 | | | | | | | |
| 35 | DESIGN - 1 | 2 | BROOKS ER | C | 0 | 1 | | | | | | | |
| 90 | SPORTS - 1 | 3 | BATES RIC | C | 0 | 3 | | | | | | | |

SCHOOL ATTENDANCE
*INCLUDING DROPPED CLASSES.

MCFADDEN VINCENT JR

ST. LOUIS, MO.
63113

GR. 10 NM REV. 12/92

SCHOOL    N-D TRI-A
PRINCIPAL    NIKOLAISEN GE

| TOT. HRS. POSS | TOT. HRS. ABS.* | CURRENT UNITS | CURRENT GRD. PT. AVG. |
|---|---|---|---|
| 270.0 | 4.0 | | 1.667 |

| | TRANSFERRED UNITS | CUMULATIVE UNITS | CUMULATIVE GRD. PT. AVG. |
|---|---|---|---|



**TRI-A OUTREACH I**
**STUDENT DAILY ATTENDANCE**

**1994-1995 School Year**

NAME __McFADDEN, VINCENT__    ID# __57312805__    __2 0__
　　　Last　　　First　　Middle　　　　　　　　　　　　　Advisory

Absent __2__　　　Absent __15__　　　Absent __6__

Tardy __10__　　　Tardy __2__　　　Tardy __5__

| WEEK | | | 1st Quarter | | | | | 2nd Quarter | | | | | | 3rd Quarter | | | | | | 4th Quarter | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | M | T | W | T | F | M | T | W | T | F | M | T | W | T | F | | M | T | W | T | F |
| 1 | | | | | SEP 1 | E 2 | 7 | 8 | 9 | 10 | H | H | SIS | PE 18 | 19 | 20 | | 27 | 28 | 29 | 30 | 31 |
| 2 | | H | 6 | 7 | 8 | 9 | 14 | 15 | 16 | 17 | PCD | 23 | 24 | 25 | 26 | 27 | | APR 3 | 4 | 5 | 6 | 7 |
| 3 | | 12 | 13 | 14 | 15 | 16 | 21 | 22 | 23 | H | H | 30 | 31 | FEB 1 | 2 | 3 | | 10 | 11 | 12 | PCD | N |
| 4 | | 19 | 20 | 21 | 22 | 23 | 28 | 29 | 30 | PTC 1 | 2 | 6 | 7 | 8 | 9 | 10 | | SB | SB | SB | SB | SB |
| 5 | | 26 | 27 | 28 | 29 | 30 | 5 | 6 | 7 | 8 | 9 | 13 | 14 | 15 | 16 | 17 | | 24 | 25 | 26 | 27 | 28 |
| 6 | | OCT 3 | 4 | 5 | 6 | 7 | 12 | 13 | 14 | 15 | 16 | H | 21 | 22 | 23 | 24 | | MAY 1 | 2 | 3 | 4 | 5 |
| 7 | | 10 | 11 | 12 | 13 | 14 | 19 | 20 | 21 | 22 | 23 | 27 | 28 | MAR 1 | 2 | 3 | | 8 | 9 | 10 | 11 | 12 |
| 8 | | 17 | 18 | 19 | 20 | 21 | H | WB | WB | WB | WB | 6 | 7 | 8 | 9 | 10 | | 15 | 16 | 17 | 18 | 19 |
| 9 | | 24 | 25 | 26 | 27 | 28 | JAN H | 3 | 4 | 5 | SD 6 | 13 | 14 | 15 | 16 | 17 | | 22 | 23 | 24 | 25 | 26 |
| 10 | | 31 | NOV 1 | 2 | 3 | 4 | 9 | 10 | 11 | 12 | SIS X | 20 | 21 | 22 | 23 | 24 | | H | 30 | 31 | JUN 1 | LCD 2 |
| | | | | | | | | | | | | | | | | | | SIS | | | | |

```
MCFADDEN VINCENT JR          367-4482
  1-2   10 1019-04   SOC STUDIES 100        210   MTWHF   497685011-WOLF
  2-2   45 4554-04   CONSUMER EDUCATION     200   MTWHF   328401121-GRADY
  3-2   05 0502-02   ENGLISH 100            212   MTWHF   431763550-BROWN
  4-2   90 9065-09   SPORTS                 112   MTWHF   486549769-ACKLE
  5-2   15 1524-06   ELEMENTS OF MATH 110   200   MTWHF   328401121-GRADY
  6-2   20 2075-03   EARTH SCIENCE          209   MTWHF   490562680-BADER
```

### ATTENDANCE SYMBOLS

H   - Holiday
ED  - Early Dismissal
SIS - System Wide Inservice
PCD - Parent Conference Day
WB  - Winter Break
X   - No Classes (Elem & Middle)
N   - Schools Closed
SB  - Spring Break
SD  - Snow Day
LCD - Last Class Day



TRI-A OUTREACH
STUDENT DAILY ATTENDANCE

1993-1994 School Year

NAME  McFADDEN        VINCENT            ID# 57312805        304
      Last        First     Middle                          Advisory

DAILY ATTENDANCE CARD
1991-92 SCHOOL YEAR

ATTENDANCE SYMBOLS

H · HOLIDAY

ED · EARLY DISMISSAL

SIS · SYSTEM WIDE INSERVICE

PCD · PARENT CONFERENCE DAY

WB · WINTER BREAK

X · NO CLASSES (ELEM & MS)

Y · SCHOOLS CLOSED

SB · SPRING BREAK

SD · SNOW DAY

LCD · LAST CLASS DAY

REPORT OF ACHIEVEMENT TESTING

NAME: McFADDEN, VINCENT
DATE OF TESTING: 05/03/1995
DATE OF BIRTH: ████ 1980
AGE: 15 years 1 month

GRADE: 9.8
EXAMINER: T.CLARK
AGENCY/SCHOOL: TARKIO ACADEMY

SCORES: Woodcock-McGrew-Werder Mini-Battery of Achievement, based on Grade

| MEASURE | GE | PR | SS | SEM(SS) | NCE | T |
|---|---|---|---|---|---|---|
| BASIC SKILLS | 4.7 | 4 | 74 | 3 | 13 | 33 |
| Reading | 4.3 | 5 | 76 | 4 | 16 | 34 |
| Writing | 4.3 | 4 | 74 | 4 | 13 | 33 |
| Mathematics | 5.9 | 8 | 79 | 4 | 21 | 36 |
| Factual Knowledge | 3.0 | 2 | 69 | 4 | 6 | 29 |

Basic Skills is a combined measure of reading, writing, and mathematics skills. VINCENT's performance on Basic Skills is comparable to that of the average individual at grade 4.7 from the normative sample. This is within the low range of scores obtained by others at his grade level, as shown by his percentile rank (4) and standard score (74). VINCENT's Basic Skills score is an average of the following three academic skills:

Reading includes letter and word identification, vocabulary, and comprehension skills. VINCENT's performance on Reading is comparable to that of the average individual at grade 4.3 from the normative sample. This is within the low range of scores obtained by others at his grade level, as shown by his percentile rank (5) and standard score (76).

Writing includes punctuation, capitalization, spelling, and word usage skills. VINCENT's performance on Writing is comparable to that of the average individual at grade 4.3 from the normative sample. This is within the low range of scores obtained by others at his grade level, as shown by his percentile rank (4) and standard score (74).

Mathematics includes calculation, practical problems, and knowledge of mathematical concepts and vocabulary. VINCENT's performance on Mathematics is comparable to that of the average individual at grade 5.9 from the normative sample. This is within the low range of scores obtained by others at his grade level, as shown by his percentile rank (8) and standard score (79).

Factual Knowledge is a measure of science, social studies, and the humanities (art, music, and literature). VINCENT's performance on Factual Knowledge is comparable to that of the average individual at grade 3.0 from the normative sample. This is within the very low range of scores obtained by others at his grade level, as shown by his percentile rank (2) and standard score (69).

SUMMARY

When compared to others at his grade level, VINCENT's Basic Skills (a combined measure of reading, writing, and mathematics skills) is in the low range. VINCENT's performance is low in Reading, Writing, and Mathematics. His performance is very low in Factual Knowledge.

REPORT OF ACHIEVEMENT TESTING

NAME: MCFADDEN, VINCENT
DATE OF TESTING: 12/19/1995
DATE OF BIRTH: ▓▓▓▓▓1980
AGE: 15 years 9 months

GRADE: 10.4
EXAMINER: V. BURKE
AGENCY/SCHOOL: TARKIO ACADEMY

SCORES: Woodcock-McGrew-Werder Mini-Battery of Achievement, based on Grade

| MEASURE | GE | PR | SS | SEM(SS) | NCE | T |
|---|---|---|---|---|---|---|
| BASIC SKILLS | 7.3 | 21 | 88 | 3 | 33 | 42 |
| Reading | 6.2 | 16 | 85 | 4 | 29 | 40 |
| Writing | 6.8 | 19 | 87 | 4 | 32 | 41 |
| Mathematics | 9.4 | 42 | 97 | 4 | 46 | 48 |
| Factual Knowledge | 6.7 | 21 | 88 | 4 | 33 | 42 |

Basic Skills is a combined measure of reading, writing, and mathematics skills. VINCENT's performance on Basic Skills is comparable to that of the average individual at grade 7.3 from the normative sample. This is within the low average range of scores obtained by others at his grade level, as shown by his percentile rank (21) and standard score (88). VINCENT's Basic Skills score is an average of the following three academic skills:

Reading includes letter and word identification, vocabulary, and comprehension skills. VINCENT's performance on Reading is comparable to that of the average individual at grade 6.2 from the normative sample. This is within the low average range of scores obtained by others at his grade level, as shown by his percentile rank (16) and standard score (85).

Writing includes punctuation, capitalization, spelling, and word usage skills. VINCENT's performance on Writing is comparable to that of the average individual at grade 6.8 from the normative sample. This is within the low average range of scores obtained by others at his grade level, as shown by his percentile rank (19) and standard score (87).

Mathematics includes calculation, practical problems, and knowledge of mathematical concepts and vocabulary. VINCENT's performance on Mathematics is comparable to that of the average individual at grade 9.4 from the normative sample. This is within the average range of scores obtained by others at his grade level, as shown by his percentile rank (42) and standard score (97).

Factual Knowledge is a measure of science, social studies, and the humanities (art, music, and literature). VINCENT's performance on Factual Knowledge is comparable to that of the average individual at grade 6.7 from the normative sample. This is within the low average range of scores obtained by others at his grade level, as shown by his percentile rank (21) and standard score (88).

SUMMARY

When compared to others at his grade level, VINCENT's Basic Skills (a combined measure of reading, writing, and mathematics skills) is in the low average range. VINCENT's performance is average in Mathematics, and his performance is low average in Reading and Writing. His performance is low

REPORT OF ACHIEVEMENT TESTING

NAME: MCFADDEN, VINCENT                    GRADE: 10.8
DATE OF TESTING: 05/20/1996                EXAMINER: S. MCKIM
DATE OF BIRTH: ▓▓▓▓/1980                   AGENCY/SCHOOL: TARKIO ACADEMY
AGE: 16 years 2 months

SCORES: Woodcock-McGrew-Werder Mini-Battery of Achievement, based on Grade

| MEASURE | GE | PR | SS | SEM(SS) | NCE | T |
|---|---|---|---|---|---|---|
| BASIC SKILLS | 13.1 | 77 | 111 | 3 | 65 | 57 |
| Reading | 16.9 | 94 | 123 | 4 | 82 | 65 |
| Writing | 9.2 | 37 | 95 | 4 | 43 | 47 |
| Mathematics | 14.8 | 84 | 115 | 4 | 71 | 60 |
| Factual Knowledge | 9.2 | 37 | 95 | 4 | 43 | 47 |

Basic Skills is a combined measure of reading, writing, and mathematics skills. VINCENT's performance on Basic Skills is comparable to that of the average individual at grade 13.1 from the normative sample. This is within the high average range of scores obtained by others at his grade level, as shown by his percentile rank (77) and standard score (111). VINCENT's Basic Skills score is an average of the following three academic skills:

Reading includes letter and word identification, vocabulary, and comprehension skills. VINCENT's performance on Reading is comparable to that of the average individual at grade 16.9 from the normative sample. This is within the superior range of scores obtained by others at his grade level, as shown by his percentile rank (94) and standard score (123).

Writing includes punctuation, capitalization, spelling, and word usage skills. VINCENT's performance on Writing is comparable to that of the average individual at grade 9.2 from the normative sample. This is within the average range of scores obtained by others at his grade level, as shown by his percentile rank (37) and standard score (95).

Mathematics includes calculation, practical problems, and knowledge of mathematical concepts and vocabulary. VINCENT's performance on Mathematics is comparable to that of the average individual at grade 14.8 from the normative sample. This is within the high average range of scores obtained by others at his grade level, as shown by his percentile rank (84) and standard score (115).

Factual Knowledge is a measure of science, social studies, and the humanities (art, music, and literature). VINCENT's performance on Factual Knowledge is comparable to that of the average individual at grade 9.2 from the normative sample. This is within the average range of scores obtained by others at his grade level, as shown by his percentile rank (37) and standard score (95).

SUMMARY

When compared to others at his grade level, VINCENT's Basic Skills (a combined measure of reading, writing, and mathematics skills) is in the high average range. VINCENT's performance is superior in Reading, his performance is high average in Mathematics, and his performance is average

## 22-UNIT GRADUATION REQUIREMENT

## HIGH SCHOOL GRADUATION REQUIREMENTS, APPROVED BY THE ST. LOUIS BOARD OF EDUCATION, AUGUST 1992

Phase-in planned to occur as follows:

- Students who were members of the Freshman Class, September 1992, will be required to meet the standards indicated in Column 3 below labeled "St. Louis Board of Education," "Minimum."

- For students classified as sophomores, juniors, and seniors in 1992, the units will be reduced to 22, with the elimination of the foreign language requirement and the reduction of one elective. Other course requirements in effect when these students entered high school will remain. Students who meet the new requirements should not be obligated to go beyond the 22 units. Such students are immediately eligible for graduation.

|  | State of Missouri | | St. Louis Board of Education | |
|---|---|---|---|---|
|  | Minimum | College Bound | Minimum | College Bound** |
| English | 03 | 04 | 04 | 04 |
| Mathematics | 02 | 03 | 03 | 04 |
| Science | 02 | 03 | 03 | 03 |
| Social Studies | 02 | 03 | 03 | 03 |
| Fine Arts | 01 | 01 | 01 | 01 |
| Foreign Language | 00 | 00 | 00 | 02 |
| Practical Arts | 01 | 01 | 01 | 01 |
| Physical Education | 01 | 01 | 01 | 01 |
| Electives | 10 | 05 | 06 | 03 |
|  | 22 | 24* | 22 | 22 |

* Includes 3 from Foreign Language, Advanced English or Vocational Technology, Mathematics, Science or Social Studies

** Recommended

## 22 UNITS - STUDENT CREDIT HOUR CLASSIFICATIONS

| Freshman | 00.0 - 05.4 | (5.4) |
|---|---|---|
| Sophomore | 05.5 - 10.9 | (5.4) |
| Junior | 11.0 - 16.4 | (5.4) |
| Senior | 16.5 - 22.0 | (5.5) |

**TARKIO ACADEMY**

DATE 4/12/95    ADMISSIONS ASSESSMENT - INTAKE SUMMARY    ID: 013

STUDENT NAME Vincent McFadden Jr.    D.O.B. ███ /80 D.O.A. 4/12/9.

STUDENT SS# ███-6981 PLACE OF BIRTH Clayton    RELIGION Baptist ETHNICITY AFR

BUILD & IDENTIFYING MARKS Avg. Build   tatoo (L)arm "Vince"

HEIGHT 5'6" WEIGHT _____ HAIR Black EYES Brown GLASSES? no CHEMICAL DEP. ? n

MEDICAL HX (surgeries illness' etc.) none

CURRENT MEDICATIONS no

ALLERGIES, PHYSICAL PROBLEMS _____ ear ache

---

REFERRING AGENCY/STATE/COUNTY City of St. Louis    PHONE (314) 361-1771

REFERRING WORKER Rick Nelson    FAX (___) ___.

ADDRESS 920 N. Vandeventer
St. Louis, Mo. 63108

PLACEMENT AUTHORITY (RCST COORD., ETC.) _____ TITLE _____

---

FATHER: Vincent McFadden, Sr (Roosevelt)    MOTHER: Theresa Brown

ADDRESS: ███    ADDRESS: ███
St. Louis, Mo.    St. Louis, Mo. 63

PHONE (H): _____    PHONE (H): (314) 367-4482

PHONE (W): _____    PHONE (W): (314) 383-6260

OTHER FAMILY RESOURCES 2 sisters

REASONS FOR PLACEMENT Incorrigible, unlawful use of a weapon

GOALS OF TREATMENT Change delinquent behavior & way of thinking. Educati
al Advancement. Accept Accountability for Actio

FAMILY DYNAMICS dysfunctional - Parents divorced - sporadic conta
with Father, doesn't trust him

EXTRA-FAMILY RELATIONSHIPS

PEERS/YOUTH Has friends - enjoys being with them

ADULTS lack of respect for authority

BEHAVIOR PATTERNS Continuing delinquent behavior knows he's

Pg. 2                    ADMISSIONS ASSESSMENT - INTAKE SUMMARY                    ID# *0134*

DEVELOPMENTAL HISTORY _Normal - Born an Asthmatic_

SCHOOL HISTORY _Stevens M.S. - Stowe. MS. Tri-A_

EDUCATIONAL LEVEL _8th grade *9th grade_

PRIOR PLACEMENTS (REASONS) _no_

SPECIAL NEEDS _none_

PARENT/GUARDIAN UNDERSTANDING OF PLACEMENT _Supportive_

ANTICIPATED LENGTH OF PLACEMENT _9-12 Months_

STUDENT UNDERSTANDING OF PLACEMENT _work program so he can go home_

INITIAL CASEPLAN DUE _4/27/95_          1st QUARTERLY PROGRESS DUE _7/27/95_

2nd QUARTERLY PROGRESS DUE _10/27/95_

3rd QUARTERLY PROGRESS DUE _1/27/95_

4th QUARTERLY PROGRESS DUE _4/27/96_

ASSESSMENT COMPLETED BY:                    SUPERVISING ADMISSIONS OFFICER

name _Debra L. Martin_                     name    DAVID A. HARMON

title _Adm. Asst._                         title   DIRECTOR OF ADMISSIONS

education _____                 education   B. A. PSYCHOLOGY

signature _Debra L. Martin_                signature _____

note:    Information contained in this document is generated from historical and current evaluative material regarding this individual as well as interviews and verbal reports of the student, the student's parent/guardian, and the placing worker and agency.

# Attachment J

9/21/95

# 121 students on TA honor roll

Tarkio Academy in Tarkio recognized 121 students for achieving Honor Roll status at a recent all-school assembly held in the academy's Leitch Chapel. Two levels of achievement are recognized for academics at Tarkio Academy. There were 13 students who had a perfect 4.00 grade point average for the second summer quarter. Students with a grade point average of 3.50 to 4.00 are on the High Honor Roll and students with a grade point average of 3.00 to 3.49 are on the Honor Roll.

## Second Summer Quarter

HIGH HONOR ROLL: 4.00 - Torrey Banks, David Bishop, Kehen Clark, Greg Coleman, Galen Collins, Charles Johnson, Robert Lucero, Roberto Montoya, Edward Moore, Stevan Ramirez, Antjuan Sierra, Eric Taylor, and Armondo Valdespino; 3.80 - Isaac Bendavidez, Tyree Bronson, Robert Bucci, Joshua Dobbins, Gabriel Garrido, Josiah Hardy, Joe Hassard, Charles Jorgenson, Eddie Lara, Chris Miller, Troy Pratt, Horashio Pritchett, Fabian Rebreterano, Jerry Rutlin, Anthony Sawyer, Mike Seaney, Ben Shields, Cleo Williams, and Travis Williams; 3.60 - Alonzo Bass, Ronnie Carlton, Alvertis Cox, Cory DeLozier, Richard Enloe, Dennis Garner, Dan Garvin, Marc Gillian, Nathan Gines, James M. Johnson, Charles Lane, Johnnie Little, Leon Love, Gary Mahr, Jeremy McCasland, Kathon Moore, Andrew Morgan, Cassidy Rhoades, Vernon Reifle, Micah Smith, Jason Williams, and Percy Wimbs.

HONOR ROLL: 3.40 - Carllows Battle, Joseph Beatty, Ricardo Bryant, Cornelius Dukes, Shane Durham, Luke Gatlin, Luis Gentieu, Shawn Hall, Ombrey Harris, Demetrius Higgins, Larry Jackson, James A. Johnson, Johnny Kieffer, Paul Maestas, Dedric Mayfield, Undray Moaney, Joseph O'Neal, Frank Paul, Corey Robinson, Kevin Straub, Tony Strickland, Chris Suttles, Joseph Tabron, Jerry Thurman, Mike Tracy, Leonard Watson, and Jamal Williams; 3.20 - Antonio Davenport, Jesus Flores, Spencer Howell, Larry Jones, Anthony Klumpp, Larry Lett, Nathan Loftis, Thomas Massey, Brock Mitchell, James Mook, Greg Moore, Bryce Nicholson, John Peck, Chonn Phien, Aaron Segelson, Jeffrey Stillwell, Mark Vaughn, and Rydell Willis; 3.00 - Mike Burrage, Robert Clutter, Joseph Cole, Lonnie Conelly, Gerry Davis, Ronnie Dunn Chris Goforth, Hector Guzman, David

Alvertis Cox, Richard Enloe, Charles Johnson, James M. Johnson, Frank Paul, and Ben Shields; 3.66 - Antjuan Sierra; 3.60 - Alonzo Bass, Isaac Benavidez, Shane Durham, Marc Gilliam, Nathan Gines, Larry Jackson, Gary Mahr, Jeremy McCasland, Brock Mitchell, Kathon Moore, Horashio Pritchett, Fabian Rebreterano, Mike Tracy, Mark Vaughn, George White, and Jason Williams; 3.50 - Dennis Garner, Dan Gavin, Antonio Miguel Herrera, Paul Maestas, Andrew Morgan, Aaron Segelson, Kevin Straub, and Percy Wimbs.

HONOR ROLL: 3.40 - Carllows Battle, Ricardo Bryant, Robert Bucci, Mike Burrage, Antonio Davenport, Gerry Davis, Hector Guzman, James A. Johnson, Johnnie Little, Dedric Mayfield, Undray Moaney, Corey Robinson, Jerry Rutlin, and Jerry Thurman; 3.25 - Cornelius Dukes, Luke Gatlin, Dante Herring, Thomas Massey, Bryce Nicholson, Willie Reid, Chris Suttles, and Robby Terry; 3.20 - Darnell Bivens, Luis Gentieu, Shawn Hall, Johnny Kieffer, Anthony Klump, Greg Moore, John Peck, David Perry, Cassidy Rhoades, Joseph Tabron, and Christian Thomas; 3.00 - Kehen Clark, Robert Clutter, Lonnie Connelly, Charles Durley, Aaron Giffin, Douglas Hamilton, Charles Lane, Larry Lett, Leon Love, James Mook, Duianete Moore, Marvin Porter, Aaron Vaughn, Jamal Williams, and Rydell Willis.

In addition to the Honor Rolls being announced, the New Frontiers and Trailblazers each presented some special awards. In the New Frontiers Treatment Program, Most Improved and Most Positive Peers for each floor were announced. They were: Most Improved Peers - John Pock, Jackson Hall; and Joshua Reese, Washington Hall; Most Positive Peers - Joe Hassard, Jackson Hall; and Larry Jones, Washington Hall. Employees of the Month were Kathy Beattie, Washington Hall, and Bill White, Jackson Hall.

Most Improved and Most Positive Peers were also recognized in the Trailblazers program. They were: Most Positive Peers - Cory Delozier, Lafayette Hall; Dontay Downs, Hancock Hall; Marcus Hammond, MacArthur Hall; David Harris, Eisenhower Hall; Marc Kelly Pershing Hall; and Efiong Beard, Puller Hall. Most Improved Peers awards went to - Eddie Moore, Lafayette Hall; Lenny Robinson, Hancock Hall;

Mario Lewis, Eisenhower Hall; Robbie Terry, Mike Seaney, Duianete Moore and Aaron Giffin, Pershing Hall; and Torrey Banks, Josiah Hardy and Jesus Flores, Puller Hall. These new Generals put the membership of the Generals' Club near 50.

With the induction of new members into the Generals' Club, also announced were the names of the new pledges for membership into the elite club. Generals' Club pledges include: Cory Delozier, Cornelius Critten and Antione Jones, Lafayette Hall; Luis Romanowski, Hancock Hall; James Johnson, Chris Goforth and Rydell Willis, MacArthur Hall; David Harris, Ricardo Bryant and Larry Lett, Eisenhower Hall; Andrew Morgan, Lonnie Connelly, Lamont Handy, and Sean Nolden, Pershing Hall; and Jesse Johnson, Brock Mitchell, Vincent McFadden and Efiong Beard, Puller Hall.



Book Fair

LOOKING OVER THE BOOKS - The Tarkio place during the Open House held Thursday, swarmed the library to see the selection of bo

## Marriage licenses issued

The following marriage licenses were recorded in the office of Sharon Taylor, Circuit Clerk and Recorder, at the Atchison County Courthouse in Rock Port, Missouri:

Larry Franklin Rumery, age 54, and Linda Lee Mills, age 40, both of Fairfax, Missouri, were married on September 14, 1995, by Rev. Allan Bash, Rock Port.

Christopher Shad Forbey, age 23, and Christina Kay Brown, age 21, both of Craig, Missouri, were married on September 11, 1995, by Judge Kay F. Graves Rosenbohm at Rock Port.

Alvin John Owen, Jr., age 29, and Jeanne Beth Vawter, age 24, both of Omaha, Nebraska, were married on September 9, 1995, by Pastor Robert G.

Winger at Tarkio, Missouri.

Raymond Everett Owens, age 21, and Amy Jo Potter, age 18, both of Nebraska City, Nebraska, were married on September 12, 1995, by Judge Kay F. Graves Rosenbohm at Rock Port

Jody Ray Parsons, age 26, and Cristian Marie Ascheman, age 20, both of Rock Port, were married on September 14, 1995, by Judge Kay F. Graves Rosenbohm in Rock Port.

Douglas Leroy Waterbury, age 42, and Kimberly Ann Booher, age 26, both of Lincoln, Nebraska, were married on September 2, 1995, by Pastor Loren Richter in Hawk Point, Missouri.

## Kent starts for PSU



Debra Kent of Corning Missouri. His grandparents are Wally and Bette Kent, Tarkio, and De Wayne and Betty Covey of Curtis, Nebraska.

Clayton Kent, a 1993 gradu-

Uh (
Look '
Swee

Couples
Caree

At the Omaha H
people who play
for loving married
vide guidance and

- Competitive sta
- Free housing, m
- Paid vacation
- Partial reimburse
- Full medical ben
- Comprehensive

Call 1-800-408-HOME
THE OM
4343 N

SEPTEMBER U
TRUCK CLE

1995 DODGE INTREPID ES-
PROGRAM CAR

1995 DODGE INTREPID -
4 DOOR, 17,000 MILES
$16,995

1995 DODGE NE
4 DOOR, 14,000 MILE
$12,595

1995 DODGE CAR
V-6, 18,000 MIL

- Alonzo Bass, Ronnie Carlton, Alvertis Cox, Cory DeLozier, Richard Enloe, Dennis Garner, Dan Garvin, Marc Gillian, Nathan Gines, James M. Johnson, Charles Lane, Johnnie Little, Leon Love, Gary Mahr, Jeremy McCasland, Kathon Moore, Andrew Morgan, Cassidy Rhoades, Vernon Reifle, Micah Smith, Jason Williams, and Percy Wimbs.

**HONOR ROLL: 3.40** - Carllows Battle, Joseph Beatty, Ricardo Bryant, Cornelius Dukes, Shane Durham, Luke Gatlin, Luis Gentieu, Shawn Hall, Ombrey Harris, Demetrius Higgins, Larry Jackson, James A. Johnson, Johnny Kieffer, Paul Maestas, Dedric Mayfield, Undray Moancy, Joseph O'Neal, Frank Paul, Corey Robinson, Kevin Straub, Tony Strickland, Chris Suttles, Joseph Tabron, Jerry Thurman, Mike Tracy, Leonard Watson, and Jamal Williams; 3.20 - Antonio Davenport, Jesus Flores, Spencer Howell, Larry Jones, Anthony Klumpp, Larry Lett, Nathan Loftis, Thomas Massey, Brock Mitchell, James Mook, Greg Moore, Bryce Nicholson, John Peck, Chonn Phien, Aaron Segelson, Jeffrey Stillwell, Mark Vaughn, and Rydell Willis; 3.00 - Mike Burrage, Robert Clutter, Joseph Cole, Lonnie Conelly, Gerry Davis, Ronnie Dunn Chris Goforth, Hector Guzman, David Harris, Antonio Miguel Herrera, Deon Jamerson, Duianete Moore, Vincent McFadden, Sean Noldon, David Perry, Marvin Porter, Willie Reid, DeMario Sproaps, Robby Terry, Aaron Vaughn, Chauncey Watkins, and George White.

### Summer Semester

**HIGH HONOR ROLL: 4.00** - Torrey Banks, David Bishop, Greg Coleman, Gabriel Garrido, Josiah Hardy, Charles Jorgenson, Roberto Montoya, Edward Moore, Troy Pratt, Vernon Reifle, Eric Taylor, and Armando Valdespino; 3.80 - Cory DeLozier, Joshua Dobbins, Eddie Lara, Chris Miller, Anthony Sawyer, Mike Seaney, Micah Smith, Cleo Williams, and Travis Williams; 3.75 - Tyree Bronson, Ronnie Carlton,

Cassidy Rhoades, Joseph Tabron, and Christian Thomas; 3.00 - Kehen Clark, Robert Clutter, Lonnie Connelly, Charles Durley, Aaron Giffin, Douglas Hamilton, Charles Lane, Larry Lett, Leon Love, James Mook, Duianete Moore, Marvin Porter, Aaron Vaughn, Jamal Williams, and Rydell Willis.

In addition to the Honor Rolls being announced, the New Frontiers and Trailblazers each presented some special awards. In the New Frontiers Treatment Program, Most Improved and Most Positive Peers for each floor were announced. They were: **Most Improved Peers**- John Peck, Jackson Hall; and Joshua Reese, Washington Hall; **Most Positive Peers** - Joe Hassard, Jackson Hall; and Larry Jones, Washington Hall. Employees of the Month were Kathy Beattie, Washington Hall, and Bill White, Jackson Hall.

Most Improved and Most Positive Peers were also recognized in the Trailblazers program. They were: **Most Positive Peers** - Cory Delozier, Lafayette Hall; Dontay Downs, Hancock Hall; Marcus Hammond, MacArthur Hall; David Harris, Eisenhower Hall; Marc Kelly Pershing Hall; and Efiong Beard, Puller Hall. **Most Improved Peers** awards went to - Eddie Moore, Lafayette Hall; Lenney Robinson, Hancock Hall; Luis Gentieu, MacArthur Hall; Ricardo Bryant, Eisenhower Hall; Jimmy Helton, Pershing Hall; and Terrail Trotter, Puller Hall.

The names of 18 new members of the Generals' Club were announced at the assembly. They include: Terry Walker, Lafayette Hall; Armando Valdespino, Hancock Hall; Lorenzo Adams, Eric Taylor and Kathon Moore, MacArthur Hall; Robert Bradley, Cortez McClinton, Leon Love, Dennis Garner, Miguel Herrera and

Sharon Taylor, Circuit Clerk and Recorder, at the Atchison County Courthouse in Rock Port, Missouri:

Larry Franklin Rumery, age 54, and Linda Lee Mills, age 40, both of Fairfax, Missouri, were married on September 14, 1995, by Rev. Allan Bash, Rock Port.

Christopher Shad Forbey, age 23, and Christina Kay Brown, age 21, both of Craig, Missouri, were married on September 11, 1995, by Judge Kay F. Graves Rosenbohm at Rock Port.

Alvin John Owen, Jr., age 29, and Jeanne Beth Vawter, age 24, both of Omaha, Nebraska, were married on September 9, 1995, by Pastor Robert G.

21, and Amy Jo Potter, age 18, both of Nebraska City, Nebraska, were married on September 12, 1995, by Judge Kay F. Graves Rosenbohm at Rock Port.

Jody Ray Parsons, age 26, and Cristian Marie Ascheman, age 20, both of Rock Port, were married on September 14, 1995, by Judge Kay F. Graves Rosenbohm in Rock Port.

Douglas Leroy Waterbury, age 42, and Kimberly Ann Booher, age 26, both of Lincoln, Nebraska, were married on September 2, 1995, by Pastor Loren Richter in Hawk Point, Missouri.

## Kent starts for PSU



Clayton Kent, a 1993 graduate of Craig, Missouri, High School, started Saturday, September 9, 1995, as a defensive end and was on the specialty teams for Pittsburg, Kansas, State University (PSU) against Fort Hays State. The game ended in a 16-16 tie. He also started in the first PSU home game against Central Missouri State University (CMSU). The PSU Gorillas defeated the CMSU Mules, 36 to 21.

Kent, a red-shirt his freshman year, is a junior with a 3.43 grade point average as a Biology major. His parents are Ivan and

Debra Kent of Corning Missouri. His grandparents are Wally and Bette Kent, Tarkio, and De Wayne and Betty Covey of Curtis, Nebraska.

**Couple Care**

At the Omaha people who for loving man vide guidance
- Competitive
- Free housing
- Paid vacation
- Partial reimb
- Full medical
- Comprehens

Call 1-800-408-HON
THE C



**SEPTEMBER U TRUCK CLE**

| | |
|---|---|
| 1995 DODGE INTREPID ES - PROGRAM CAR | 1995 DODGE 4 DOOR, 14,000 MI $12,695 |
| 1995 DODGE INTREPID - 4 DOOR, 17,000 MILES $16,995 | 1995 DODGE CA V-6, 18,000 M $15,695 |
| 1995 CHEVY LUMINA - 4 DOOR, NICE CAR $14,995 | 1995 DODGE N 4 DOOR, 5 SP $11,995 |
| 1994 DODGE SHADOW ES - 4 DOOR, RED, BAL. OF 7/70 WARRANTY | 1994 CHEVY CAV RS, 4 DOOR |
| 1994 CHRYSLER NEW YORKER - $17,995 | 1993 JEEP CHER 4 DOOR, HUNTER |
| 1993 MERCURY VILLAGER MINI VAN - $12,995 | 1993 LEBARON 4 DOOR, 51,000 MILES |
| 1993 PLYMOUTH VOYAGER (3), V-6, 7 PASSENGER, WARRANTY | 1992 DODGE 1/2 4X4 - $9,995 |
| 1992 DAKOTA - 4X4, V-6, AUTO. | 1992 LEBARON 4 DOOR, SEDAN |
| 1992 GMC SONOMA - $8,495 | 1991 HONDA ACCO EX, COUPE, SUN ROO |
| 1992 DODGE DAKOTA - CLUB CAB, 2X4, V-6, AUTO. | 1991 CHRYSLER SUPER SAVER |
| 1991 DAKOTA 4X4 - V-6, AUTO., LE, NICE | 1991 DODGE SPIRI 4 DOOR, 100,000 MI ONLY $4,495 |
| 1990 LEBARON - 4 DOOR, LOADED & NICE $6,995 | 1990 FORD CROWN 4 DOOR, BLACK |
| 1990 CAMARO RS - RED - $4,995 | 1990 FORD AEROSTA MINIVAN |
| 1990 FORD 1/2 TON - 4X4 - $12,995 | 1989 HONDA ACCO 4 DOOR - |
| 1989 PONTIAC GRAND AM - 4 DOOR - $4,995 | 1989 MERCURY SABLE |

SIGN UP HERE TO WIN A NEW 1996 DODGE



**COKE**
12 Pack
$3.98

**WALTER BROTHERS**
Hwy. 136 & I-29

**Quality Auto Repair**
103 N. 2nd - Tarkio, Missouri

For All Your Automotive And Farm Truck Repairs
- Transmissions
- Brakes
- Engine Repairs
- Oil Changes

(816) 736-5561

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2021, I filed the foregoing electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing and its viewing and downloading are hereby provided to all counsel of record by operation of the CM/ECF system.

/s/ Laurence E. Komp
Laurence E. Komp
Counsel for Petitioner