**\*\*\*CAPITAL CASE\*\*\***

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI, EASTERN DIVISION

No. 4:20-CV-1046-SEP

VINCENT McFADDEN,                                                    Petitioner

v.

PAUL BLAIR, Warden,
    Potosi Correctional Center                                      Respondent

---

### INDEX TO PETITION FOR WRIT OF HABEAS CORPUS

### VOLUME 3-4

---

LAURENCE E. KOMP, MO Bar 40446
Capital Habeas Unit, Chief
Federal Public Defender
Western District of Missouri
1000 Walnut, Ste. 600
Kansas City, MO 64106
816-471-8282
laurence_komp@fd.org

SCOTT W. BRADEN, AR Bar 2007123
JOHN C. WILLIAMS, AR Bar 2013233
Assistant Federal Public Defenders
Federal Public Defender's Office
Eastern District of Arkansas
1401 West Capitol, Suite 490
Little Rock, AR 72201
501-324-6114
scott_braden@fd.org
john_c_williams@fd.org

*Counsel for Vincent McFadden*

TABLE OF CONTENTS

Attachment A..................................................Gregory Hazlett's Complaint 2002

Attachment B..................................................Gregory Hazlett's Complaint 2004

Attachment C.................................................. Gregory Hazlett's Complaint 2012

Attachment D .................... Michael Douglas' Certification Investigation Report

Attachment E.................. Edward Magee's Interview Report on Vaughn Shivers

Attachment F.............................................Dr. Fred Sautter's Preliminary Report

Attachment G .......................................................Dr. Collin Gordon's Report

Attachment H .................................................................. Dr. Stanford's Report

Attachment I.....................................Youth Services International, Inc. Records

Attachment J........................... September 1995 – 121 Students on TA Honor Roll

Attachment K...............................................Discharge Affidavit on JU594-00803J

Attachment L........................................................... Dr. Aaron Specht's Report

Attachment M................................................. Declaration of Lamika Covington

Attachment N .......................................................Declaration of Sandra Boles

Attachment O ..................................................... Declaration of Loyce Hamilton

Attachment P..................................................... Declaration of Valerie Leftwich

Attachment Q ........................................................Declaration of Robert Lundt

Attachment R.................................................. Normandy High School Records

Attachment S ......................................................................... 29.15 Exhibit 4

Attachment T.................................................................... 29.15 Exhibit 5

1

Attachment U ........................................................................ 29.15 Exhibit 6

Attachment V........................................................................ 29.15 Exhibit 7

Attachment W....................................................................... 29.15 Exhibit 9

Attachment X....................................................................29.15 Exhibit 31

Attachment Y...............................................................29.15 Exhibit 32A+B

Attachment Z.................................................................29.15 Exhibit 43

Attachment AA ..............................................................29.15 Exhibit 45

Attachment BB ..............................................................29.15 Exhibit 47

Attachment CC........................................... Dr. Colin Gordon Curriculum Vitae

Attachment DD ....................................... Dr. Frederic Sautter Curriculum Vitae

Attachment EE.............................................Dr. Aaron Specht Curriculum Vitae

Attachment FF ....................................Dr. Shameka Stanford Curriculum Vitae

Attachment GG............................................ Vincent McFadden's Birth Records

Attachment HH.......................................................David Lee's Police Reports

Attachment II ................................... Vincent McFadden Sr.'s Military Records

Attachment JJ ................. Detective Edwin Menzenwerth Deposition Page 10-11

# Attachment X


Mov. EXHIBIT # 31

**Norman A. White**

Saint Louis University
3550 Lindell Blvd
319 Tegler Hall
St. Louis, MO 63108

Office: (314) 977-2114
Cell:    (314) 603-1501
Fax:    (314) 977- 3623

## EDUCATION
Ph.D.    Criminology and Criminal Justice, State University of New York at Albany, 2000.
M.A.    Criminology and Criminal Justice, State University of New York at Albany, 1993.
M.P.A.   Concentration in Criminal Justice Administration, Marist College, 1989.
B.A.    History, Marist College, 1981.

## TEACHING POSITIONS
Saint Louis University School of Social Work Criminology and Criminal Justice
2012 -                              Associate Professor, Director of CCJ Undergraduate Program

Saint Louis University Department of Sociology and Criminal Justice
2007 – 2012              Associate Professor,
2004 – 2007              Assistant Professor
2004 – 2006              Assistant Professor, Director of Criminal Justice Programs

University of Missouri – St. Louis
1997 – 2003              Assistant Professor, Department of Criminology and Criminal Justice

## FELLOWSHIPS AND AFFILIATIONS
Faculty Affiliate, Center for Violence and Injury Prevention, George Warren Brown School of
        Social Work, Washington University 2011 – Present
Affiliated Faculty, Saint Louis University, African American Studies Program (2004 – present)

## PUBLICATIONS
**Refereed Articles**
Aldrich RM, White N (2012) Reconsidering violence: a response to Twinley and Addidle (2012)
        and Morris British Journal of Occupational Therapy, 75(11), 527-529.
White, Norman and Rolf Loeber (2008) "Special Education, Bullying, and Serious Delinquency"
        Journal of Research in Crime and Delinquency. 45:4.
White, Norman and Alex Piquero (2004) "Challenging Moffitt's Developmental Taxonomy: An
        Empirical Test of Silverthorn and Frick's Delayed-Onset Pathway in Girls" Criminal
        Behaviour and Mental Health 14:4
Miller, Jody and Norman White (2003) Gender and Adolescent Relationship Violence: A
        Contextual Examination. Criminology 43:1
Piquero, Alex and Norman White (2003) "On the Relationship Between Cognitive Abilities and
        Life-Course-Persistent Offending Among a Sample of African Americans: A
        Longitudinal Test of Moffitt's Hypothesis" Journal of Criminal Justice
Lauritsen, J. L. and White, N. A. (2001) "Putting Violence in its Place: The Effects
        Race, Ethnicity, Gender, and Place on the Risk for Violence." Criminology and Public
        Policy

1

Edwards, W., White, N.A., Bennett I. and Pezzella, F.  1998.  "The Pipeline:  Who has come out of it?  Minorities in the field of Criminology and Criminal Justice." Journal of Criminal Justice Education.  9(2).

Edwards, W., Bennett I., White, N.A. and Pezzella, F.  1998.  "The Pipeline:  A survey of African American students in doctoral programs of Criminology and Criminal Justice." Journal of Criminal Justice Education.  9(1).

**Books**

White, Norman (2010) Getting Derailed: School Performance and Delinquency. Lambert Academic Publishing.

**Refereed Book Chapters**

White, Norman (in press). "The Third World Near You:  The Challenge of Urban America" In Carol Camp- Yeakey, Vetta L. Sanders Thompson & Anjanette Wells (Editors) *Urban Ills:  Post-Recession Complexities of Urban Living in Global Contexts.* Lanham, MD: Lexington Books.

White, Norman (2011) "Serious Violent Juvenile Offenders" In Juvenile Crime and Justice. edited by Chambliss, William J. Sage Publishing Inc.

White, Norman (2003) "Social Networks and Illegitimate Opportunities: Finding Ways to Get Paid" In Crime and Employment: Issues in Crime Reduction for Corrections. edited by Krienert, Jessie, and Mark S. Fleisher. Walnut Creek, CA: Alta Mira Press.

Miller, Jody and Norman A. White  (2003). "Situational Effects of Gender Inequality on Girls' Participation in Violence." In *Girls' Violence?* edited by Christine Alder and Anne Worrall. SUNY Press.

**Book Chapters**

White, Norman (in press) Urbanization. In Jeffrey Ian Ross (Editor) Encyclopedia of Street Crime of America. Golson Publishing

White, Norman (2012) "Juvenile and Youthful Offenders" In The Encyclopedia of Community Corrections. edited by Barton-Bellessa, Shannon, Sage Publishing Inc.

**Books**

White, Norman (2010) Getting Derailed: School Performance and Delinquency. Lambert Academic Publishing.

**Technical Reports and Manuals**

Norman White (2002) "Boys & Girls Clubs of America's Delinquency Prevention Initiative Lessons Learned: A Summary of experiences from the Field"

Kempf Leonard, Kimberly and Norman A. White. (1999). "Assessing the Impact on Waiver of the 1995 Changes to the Missouri Juvenile Code." Final Report to the Department of Public Safety, State of Missouri.

**Book Reviews**

White, Norman (2012) It's Broke: We Must Fix It: A Selective Incapacitation Approach to Juvenile Justice. PsycCRITIQUES, 2012 Vol 57(12)

White, Norman (2011) "Raising the Child: A Users Guide to Building a Healthy Adult"

2

PsychCritiques,
White, Norman (2008) "The Society of Captives: Inside a Maximum Security Prison." PsychCritiques,
White, Norman (2008) Bringing Families Together: Restoring the Family in the Shadow of Death. PsychCritiques

## GRANTS AND AWARDS
### Grants
2112    Sharing Responsibility, Improving Community Health Presidents Research Fund, W/ Darcy Scharff and Stuart Slavin, Funded $46,723
2011    Justice Advocacy Fellowship, Justice Advocate Track 1 Open Society Foundation. ($75,000) Not Funded
2008    Co-Principal Investigator (W/M. Stouthamer-Loeber and R. Loeber)  "Conduct Disorder& Depression in Girls: Precursors, Development and Comorbidity" Proposal submitted to National Institute of Mental Health ($82,870) Funded
2007    Co-Principal Investigator (W/M. Stouthamer-Loeber and R. Loeber) "Conduct Disorder& Depression in Girls: Precursors, Development and Comorbidity" Proposal submitted to National Institute of Mental Health ($79,841) Not Funded

### Research in Progress
Papers:
    Age and Crime, Encyclopedia of Crime and Justice, Sage Publications
    A Quilt of Resources: Community Collaboration for Addressing Youth Violence
    Toward a Theory of Risk Immersion: Living in Stress and Delinquent Behavior
Research Projects:
The St Louis City Family Court Project:
    In the Best Interest of Children?: Disproportionate Minority Contact and Developmental Risk Factors.
    Evaluation of the Diversion Alternatives Program: Examining Mechanisms of Diversion.
Community-based Immersion
    How would a Fish Explain Water?: A View from Within, Living in Risk.
    Weaving a Resource Quilt: Social Networks and Community Collaborations

## INVITED TALKS
2012    Insulting the Public's Health: Community Violence and the Public's Health. Presentation at the Washington University Institute of Public Health. Rising to the Challenge: Public Health in the 21st Century. October 9.
2011    Working Together for Urban Success: Crafting a Resource Quilt. Presentation for the St. Louis Urban League Public Safety Committee, December 14
2011    Exercising the Spirit: The Mission to Engage Communities. Presentation for the College of Arts and Sciences Deans Advisory Committee, December 8.
2011    Rebuilding Community: Engaging the Other to Provide a Quilt of Hope. Presentation for the New Baptist Covenant Second National Meeting, November 18
2011    A Mission is not the Mission: Engaging Communities for Change. Presentation for Saint Louis University Mission and Ministry Brown Bag Series. November 10.

3

2011    Shared Despair, Common Solutions. Presentation for the Physicians for Human Rights, Saint Louis University, November 2.

2011    Weaving a Quilt of Providers: Collaboration and the Miracle on 34th Street. Presentation at Focus St. Louis, October 19.

2011    Coalescing to Address Youth Violence: The Structural Dimensions of the Resource Quilt. Presentation before the Mayors Commission of Youth and Families October 13.

2011    The Social Ecology of Youth Violence Prevention. Presentation for the Missouri Foundation for Health, September 19.

2011    Stitching a Resource Quilt: Collaborating for Safe Neighborhoods. Presented at STRYVE Membership meeting, September 7.

2011    Coming Together: Creating Alliances for Change. Presentation for STRYVE-VCR Leadership Teams, August 17.

2011    Death of the American Dream: The Making of an American Nightmare. Keynote address at Women in Vision's Christmas in July Banquet. July 23.

2011    The Blind Side: Invisible People and Places. Keynote presentation YWCA-Saint Louis University Stand Against Racism event May 13.

2011    The Third World Near You: The Challenge of Urban America. Presentation at Missouri Baptist College, April 13.

2011    The Third World Near You: America's Urban Challenge. Presentation at Saint Louis University, April 7.

2011    Engaging Communities and Building Communities: Should We be Our Brothers Keepers? Presentation at Kirkwood Baptist Church, March 13.


Professional Presentations

2008    White, N.A. and Loeber, R. "Special Education and Delinquency: Testing the Link." American Society of Criminology, St Louis, MO

2008    White N.A. and Loeber, R. "Race Differences and Parenting Practices." American Society of Criminology, St Louis, MO

2006    White, N. A., Thornberry, T, Krohn, M., and Lizotte, A "Ethnic Differences in Social Bonds: Testing Hirschi's Social Control Theory." 11th Biennial meeting of the Society for Research on Adolescence. San Francisco

2006    White, N. A., Thornberry, T, Krohn, M., and Lizotte, A "Ethnic Differences in Social Bonds: Testing Hirschi's Social Control Theory." 11th Biennial meeting of the Society for Research on Adolescence. San Francisco

2006    Gordon, R. A., Tita, G., White, N. A., Lahey, B. B., and Loeber, R. "Gang Participation and Drug Selling Among African American and White Adolescent Males." 11th Biennial meeting of the Society for Research on Adolescence. San Francisco

2004    White, N. A. "Testing Hirschi's Social Bond Theory: An empirical examination of race differences." Annual meeting of the American Society of Criminology

2004    White, N. A. and Loeber, R. "Bullying behavior, special education, and delinquent behavior." Annual meeting of the American Society of Criminology

2004    Gordon, R. A., White, N. A., Leahy, B. B., and R. Loeber "Do youth gangs produce race difference in adolescent drug selling?" Paper presented at annual meetings of American Sociological Association, refereed Crime, Law, and Deviance section (August 14 – 17)

2004    White, N. and Loeber R. " Special Education Placements, Bullying, and Serious

4

Delinquency" Paper presented at the bi-annual meetings for Society of Research on Child Development, Tampa, FL.

2003 White, N and Piquero A. "An empirical test of Silverthorn and Frick's delayed onset model of female antisocial behavior." Annual meeting of the American Society of Criminology, Denver, CO

2003 Fleisher, M, Kienert, J, and N White "The Effect of Structural Embeddedness on Gang Crime." Annual meeting of the American Society of Criminology, Denver, CO

2003 White, N and R Loeber "Special Education, Bullying, and Serious Delinquency" Society of Research on Child Development, Tampa, FL

2002 "Social Networks and Criminal Events: The Links Between Offenders, Victims, and Witnesses." Annual Meeting of the American Society of Criminology, Chicago, IL.

2002 "Criminal Networks Among Active Offenders: An Exploratory Analysis." Homicide Working Group Meetings, St. Louis

2002 "Using Social Network Analysis to Understand Offending Networks." National Consortium on Violence Research Summer Workshop, St Augustine, FL.

2002 "Boys & Girls Club of America Delinquency Prevention Initiative." Eighth Annual National Youth Gang Symposium. Orlando, FL.

2001 "Stages of Development: A Journey from Adolescence to Adulthood." Seventh Annual Symposium on Youth Gangs and Delinquency. (with Jenna St. Cyr)

2001 "Getting Played: Violence Against Young Women and Strategies for Intervention." Seventh Annual Symposium on Youth Gangs and Delinquency. (with Jody Miller and Toya Like)

2000 "The moderating effects of school failure in relation to early acting out behavior and cognitive ability." Annual meetings of the American Society of Criminology, San Francisco, California, November.

2000 "Violence against urban African American girls." Annual meetings of the American Society of Criminology, San Francisco, California, November. (with Toya Like and Jody Miller)

1999 "Race, social disadvantage, and early school failure." Annual meetings of the American Society of Criminology, Toronto, Canada, November.

1998 "The relative impact of temperament and academic ability on academic performance: A developmental approach." Annual meetings of the American Society of Criminology, Washington DC, November.

1998 "Getting derailed: Toward a developmental understanding of the nexus between school failure and delinquency." Annual meetings of the American Society of Criminology, Washington DC, November.

1998 "The operation of gender within street gangs: A comparison of male and female perceptions." Annual meetings of the American Society of Criminology, Washington DC, November. (with Jody Miller and Rod K. Brunson)

1996 "The Pipeline: A survey of African American students in doctoral program of Criminology and Criminal Justice." Annual meetings of the Academy of Criminal Justice Sciences, Las Vegas, Nevada, March. (with I. Bennett and F. Pezzella)

1994 "Child abuse and neglect, poor school performance and violence." Annual meetings of the American Society of Criminology, Miami, November. (with Cathy Spatz Widom)

5

**MEDIA/IMPACT**

2012    Stayed Tuned – Nine Network "Mental Health and Gun Violence" Dec. 20
2012    The Jaco Report – The Connection Between Crime & Legal Firearms July 27
2012    Shirley Washington "The Pulse-Gun Violence" July 29
2011    Sunday Morning Live and The Health Connection with Jade Harrell "Winter in America: A Resource Quilt to Warm Urban America" November, 27
2011    Sunday Morning Live with Jade Harrell "Crime and Public Health" November, 13
2011    Sunday Morning Live with Jade Harrell "Resource Fair: Missouri History Museum" October, 30
2011    The Jaco Report: What is the Knockout Game? October, 30
2011    The Riverfront Times: James Clark and Norm White want their Neighborhood Alliance to Save St. Louis' Worst Neighborhoods. Then they want to Save America." By Albert Samaha. September 15.

**PROFESSIONAL SERVICE AND MEMBERSHIP**

Member:  American Society of Criminology
         Academy of Criminal Justice Sciences

**Professional**

American Society of Criminology, Program Area Chair, Life-Course and Crime 2008 annual meeting Saint Louis, Missouri

Member review and selection committee for Summer Institute for Underrepresented Minority Faculty "Racial Democracy, Justice, Crime and Citizenship-Network" working group. (2006 -2007)

Peer reviewer: *Criminology, Justice Quarterly, Criminology and Public Policy*, Roxbury Publishing Company, Prentice Hall Publishing Company.

College and University

Member, Athletic Department Search Committee – Women's Basketball Coach, 2012
Member, Student Leadership Honoraria Awards Committee, 2008 – present
Member, Center for Service and Community Engagement, Advisory Board, 2011
Member, Athletic Department-Athletics Advisory Committee 2011
Member, NCAA Certification Steering Committee, 2010-2011
Advisory Board Member, School of Professional Studies, Saint Louis University (2005 – 2008)
Advisory Board Member, African American Studies, Saint Louis University, (2005 – Present)
Department Chair Search Committee, Department of Sociology and Criminal Justice, Saint Louis University, 2005- 2006
Assessment Committee, Department of Sociology and Criminal Justice, Saint Louis University, 2004-2006.

Department

Member, Search Committee, Assistant Professor -Anthropology 2011
Director, Criminal Justice Program- September 2010 – November 2011
Director Criminal Justice Programs- June, 2004- May 2006

6

<u>Community</u>
Member, Nine Network- American Graduate: Let's Make It Happen Ad Hoc Committee, 2011
Chair, Vision for Children at Risk, Safe Neighborhoods/Safe Communities, Youth Violence Prevention Initiative. 2011 -
Member Steering Committee, Striving To Reduce Youth Violence Everywhere, Center for Disease Control – City of St. Louis Department of Health 2011 -
National Advisory Board on Youth Gangs and Delinquency, Boys and Girls Clubs of America, 1999-2008.
Member, Missouri Department of Public Safety Ad Hoc Committee on Minority Over-representation, 1996-2000.

<u>Awards</u>
Who's Who in Black St. Louis (2011)
Kathy Humphrey Diversity Award (2010)
Who's Who in America (2008)

**OTHER SERVICE**
Invited talks at UM ST. Louis:
<u>Center for International Studies</u>. "An Overview of the American Juvenile Justice System."

<u>Multicultural Student Relations</u>
"Graduate Study as a Career Choice for Minority Students"
"Negotiating the University Environment."
"Choosing College: Continuing Education after High School."
"Getting Started at the University: A Strategy for Success."

**COURSES TAUGHT**
**Graduate Seminars**
*Saint Louis University*
Courses Developed:
Proseminar in Criminal Justice; Current Research in Criminal Justice
*University of Missouri-St. Louis*
Violent Crime; Juvenile Delinquency; Juvenile Justice Process

**Undergraduate Courses**
*Saint Louis University*
Courses developed:
Juvenile Delinquency; Juvenile Justice; Theories of Crime; Introduction to Criminal Justice; Corrections
*University of Missouri-St. Louis*
Courses Developed
Senior Seminar in Criminal Justice: (Developmental Theories and Research); Race, Crime and Justice; Juvenile Justice System
*SUNY-Albany*

7

Juvenile Justice Administration
*Marist College*
Criminology; Juvenile Delinquency; Internship in Criminal Justice
**Other Work Experience**
Teaching Assistant, SUNY Albany, 1995-1996
Senior Youth Division Counselor, New York State Division for Youth, 1984-1991.
Youth Division Counselor, New York State Division for Youth, 1981-1984.
LaSalle School for Boys, Albany, New York, 1977-1981.

8

# Attachment Y

The following report provides a social profile of the St. Louis Community Vincent McFadden was born into and the communities that surrounded Pine Lawn. It provides a picture of a community in distress; high levels of poverty, unemployment, single parent households, children living in poverty, along with crime and violence.  Pine Lawn and its surrounding neighbors were in, what some of the informants for this report described, a war zone. The interviews conducted describe the depths of perceived danger by community members. The danger was not only to the young men who were the "soldiers' in this war, no one was safe. Growing up in this environment represented a negotiation between two worlds a decent one and a street one. The issue though was that no matter which domain one resided in, you were immersed in a state of risk.

The report provides a statistical profile of the community and is followed by interviews that offer an understanding of growing up in such an environment. Special attention should be given to the normative nature of this process and what it did to the way individuals experienced that world. One had to become part of the environment to be safe. Of compelling interest was the interview with an Iraq War vet who described what life was like in a 'real' war zone and the parallels to growing up in social distressed communities that were at war.

**The Importance of Place**

A substantial body of literature describes the role neighborhoods play in the evolution of delinquency and violence (for example, Bursik and Grasmik, 1993; Loeber and Wikstrom, 2000; Sampson, 2013; Shaw and McKay, 1969; Wikstrom and Loeber, 1999; Sampson and Wilson, 1995). Among the earliest reported studies on social conditions and crime Guerry (1831) found that environmental factors to be highly correlated with crime. The social conditions he identified that had strong associations with the high rates of criminal offending were lack of education,

1


Mov. EXHIBIT #32A

poverty, illegitimate births, and urban environment. Using maps of social spaces, Guerry reported a clustering of conditions within cities that contributed to higher violent and property crime.

The salience of this early cartographic work is that it provided a foundation for nearly two hundred years of sociological research that has repeatedly found geographic differences in crime. The conditions that contribute to this social phenomenon are constant through time. Hence, low educational performance, single parent births, high levels of poverty, and population density to name some are the social structural inequalities that endure. Some sixty years after Guerry's seminal work, DuBois (1896) reported that these same factors clustered in the 17th ward of Philadelphia, home to the cities Negro population. DuBois concluded this landmark study by stating it was not the presence of single risk factor that represented the greatest challenge, rather it was the coalescing of so many risk factors in the space social space that represented the greatest challenge.

In a recent publication Robert Sampson (2013) describes the enduring nature of neighborhood effects on crime. Among the most important dimensions in this is the role that race plays in the concentrations of criminal activity. Massey and Denton (1996) have described the way that segregation in American cities emerged in response to the Negro migration of the 1940's and 50's, concentrating in neighborhoods high percentages of African Americans with few or no resources. Wilson (1996) argues that the communities that emerged in the American core became home to the "truly disadvantaged"; communities with high rates of educational deprivation, unemployment, and poverty. These communities are the direct result of urban policy that removed the manufacturing base from cities, leaving empty factory buildings and a surplus labor force. In the absence of manufacturing and a viable vibrant work force these communities

2

further suffered from disinvestment of most of the remaining resources, leaving them with little supportive infrastructure.

While crime seems to thrive in these communities that struggle with the social disadvantages of their lives, it is not sufficient as an explanatory model. The larger social conditions that might prove criminogenic in nature are wanting in the power to explain causal mechanisms that account for the engagement in, or variations in the risky behaviors of some in comparison to others. The social studies lacked an understanding of individual difference in the emergence of problem behavior. In the last thirty plus years there has been significant progress in the field of criminology in understanding these causal chains and mechanisms in offending.

Unlike the previous macro level explanations that attributed the majority, if not all the explanatory power to social forces, these contemporary models have turned to individual differences or micro level models that aid in understanding patterns of offending. The need for micro explanations of crime became clear in 1972 when Marvin Wolfgang and his colleagues reported the results of their birth cohort study of males born in Philadelphia in 1945. Of all males born that year one third had been arrested between the age of 10 and 18. But more significantly 6% of all boys in the sample committed more than half of the crimes committed by the entire cohort of 9,500 boys. These youth, whom they labeled chronic offenders, exhibited individual differences in the nature of their risk profiles. The results of Wolfgang and colleagues work were replicated in cohort studies worldwide leading to more focused attention on the individual predictors of offending. Some youth were subject to personal and environmental insults that heightened their risk for problem behavior.

Scholars pursued explanations for the presence of these high risk high rate offenders using longitudinal data to understand within individual characteristics of these youth. The

3

developmental or life-course perspective that guided their work produced a clear picture of the complexity of the lives high risk youth. The findings of the research showed that they experience significant difficulties in their lives across multiple domains.  These domains include family, neighborhoods, peers, community, and within individual bio-psycho- social factors. In other words highly troubled youth are surrounded by a host of factors that swirl around them. Young people were nested in a social/human ecology that provided the sources of their strength and their struggles (Figure 1).

**Figure 1. A Model of Human Ecology**



St. Louis Youth Community Collaborative (White, 2011)

Within these circles youth experienced a host of factors that prove to be predictive of delinquent offending (Figure 2). Research has shown that the more risk one experiences in their life the more likely they are to engage in offending.  The most serious offenders experience a barrage of risk from every quarter of their lives. It is the convergence of macro level stressors with micro level challenges that increases the likelihood of engagement in delinquency, gang activity, and street violence.

Figure 2. Individual Risk Environment



Research shows that a youth experiencing a wide ranging risk is in grave danger of exhibiting serious delinquent offending. Taken in isolation we might be able to identify and select these youth for prevention or intervention efforts. Yet the problem is greater than the individual youth who is confronted with high risk in his or her life. There are communities, particularly those identified as struggling with social and economic disadvantage where large numbers of youth with similar profiles live. Such a community would present a picture more like Figure 3.  The figure illustrates the clustering of large numbers of high risk youth in a single space in time. The similarity of profiles is important given the role of peers in delinquent behavior.

5



Figure 3. Risk Immersed Youth

Research shows that a substantial amount of delinquency during adolescence is driven by peer networks (Sarnecki, 2001; Warr, 2002). The influence of peers is further emphasized by Moffitt (1994) who argues that there are two trajectories of offending that include youth who engage in long-term problem behavior-Life-Course Persistent (LCP) and Adolescent-Limited (AL). The LCP youth are those who experience greater amounts of life risk, while the AL group includes youth who engage in delinquent behavior as part of their adolescent exploration and rebellion. The significance of these two is that they intersect and while the AL's do not normally encounter the LCP group early in life as friends, when they reach adolescence they try to emulate the adult-like independence of they perceive.

The clustering of high risk youth, youth immersed in risk, in the same social space places them *in-risk* rather than *at-risk*. Risk immersion becomes another variable that has to be considered. The density of large numbers of youth who are faced with extreme challenges from their own lives and the communities they reside in limits their options and increases vulnerability

6

beyond their personal control. Risk immersion represents the integration of macro and micro level predictors of delinquent and violent behavior. The presence of these external and internal

**Figure 4. A Risk Immersion Model**



stressors creates a climate in which youth who are at highest risk are in danger of involvement in serious offending and gang participation. However, this is true for those who experience mid to low risk as well. All who reside in a risk laden community are immersed in a dangerous environment confronted by a constellation of factors that require constant vigilance for survival.

This convergence of risk provides the foundation for the story of Vincent McFadden's life. And the social profile of the community he was raised in. The City of Pine Lawn is located on the northwest border of the City of St. Louis. The census bureau reported that the population of the city was 5,092 in 1990. Between 1990 and 2000 the population declined 17% and by 2010 there was a reduction of 35% in total population. The population was 93.1% African American in 1990, becoming slightly more segregated by 2010 at 96%. The City of Pine Lawn is bordered by Beverly Hills, Northwoods, Velda City, and Hillsdale all cities that are similarly populated.

7

Researchers have reported that this population distribution, described as hyper segregation, is often associated with a wide range of social stresses (Massey, 2000). Public health researchers describe the clustering in these communities of the social determinants of health disparity. The same groupings of variables at the macro level that produce health disparity are routinely reported to be linked to high rates of crime and violence.

In 1990 Pine Lawn had an unemployment rate of 17.7%. Between 1990 and 2010 the unemployment problem in the community remained high at 16% and 19.1%. The poverty rate was at a low of 22% in 1990, 36.9% in 2000 and 29.8% in 2010. Single parent households comprised a significant portion of the population in 1990 at 42.6% peaking in 2000 at 69.5%. Of special note within the single parent households in the community in 1990, 56.4 of those households had children under the age of 18. Slightly over two fifths of the total population in the community is comprised of young people between birth and 24. The percentage of adults 25 and older who had not graduated from high school was 37.4% in 1990, 37.1% in 2000, and 48% in 2010.

According to the Bureau of Justice Statistics data center the City of Pine Lawn did not report through the Uniform Crime Reporting system for all years in the ten year period. There were data available for 1993, 1994, 1996, and 1997. According to the records the total number of crimes committed in the city was 834, 612, 712, and 667 respectively for the years reported. The city experienced three homicides in 1993 and one in 1994. However, of note there were a number of aggravated assaults that were committed in each of the reporting years, 23, 14, 28 and 16 respectively.

The neighboring community of Jennings, located to the north of Pine Lawn, reported 12 homicides during the ten years between 1990 and 2000. During the same period they

8

experienced 710 aggravated assaults. St. Louis County level data does not allow the examination of the local police departments and the Uniform Crime Report is a voluntary reporting system. Even lacking direct data for the individual cities that is reliable, it is important that Vincent McFadden was growing up, in the midst a community in turmoil.

Bordering Pine Lawn were the City of St. Louis neighborhoods of Wells-Goodfellow, Walnut Park East, Walnut Park, and Hamilton Heights. These neighborhoods were mirrors of the county communities in North St Louis County they we and are similarly hyper-segregated and impoverished economically and socially (Decker and Van Winkle, 1996; White, 2013). During the 1990s and through the turn of the century these communities were experiencing substantial drug market and gang activity. During the 1990s the violent crime rate for the City of St. Louis reached a high of 3,874 per 100,000 in 1993 and a low in 1999 of 2,233 per 100,000. The murder rate during that time peaked at 69 per 100,000 in 1993 and 32.8 in 1998.

The communities in this part of the St. Louis Metropolitan area were physically declining, becoming increasingly racially segregated, impoverished, and home to large numbers of families headed by a single parent, usually a mother, who had children below the age of 18. Skogan (1992) described the process of community deterioration and the consequences of allowing physical decay and social disorder to exist unabated, the result is high crime rates and overall declining conditions that continue to fester. The community of Pine Lawn and its neighboring communities were experiencing decline that contributed to disorder in the form of gang formation, drug market development, and youth violence.  Sampson and Wilson (1996) have described the inability of communities like these to take on the challenges they face.  The residents become increasingly socially isolated, lacking the collective efficacy or social capital needed to make the needed changes.

9

In the next section, I use data from court transcripts and interviews conducted with Vincent McFadden and others to describe the challenges of growing up in these circumstances.

**Living in Risk**

According to the testimony of Dr. Wanda Draper, Vincent McFadden exhibited a substantial amount of developmental risk in his life. He was born premature. His birth weight of 5.6 pounds is in the range, leaving him vulnerable to developmental lags. Evidence has shown that infants born prematurely and low birth weight often manifest developmental neurological deficits (Moffitt, 1994; Piquero and White, 2004). These deficits often contribute to school based problems due to academic struggles as well as behavioral problems. Patterson, Reid, and Dishion (1993) argue that youth who experience these early troubles and cognitive deficits are more likely to engage in problem behavior in school including but not limited to fights. They also argue that youth manifesting these early difficulties are likely to be rejected by peers resulting in increasing interpersonal conflict.

Vincent's mother was a single parent who worked at two low paying jobs, working 16 hours a day. Dr. Draper diagnosed Vincent as having *disorganized attachment* missing out on developmentally important parental supervision and bonds. He was left with one caregiver or another, generally other family members, but still lacked consistency. Dr. Draper goes on to describe his lack of trust that was a function in her opinion of the limited reliance he could have on his mother or other caring adult. Although Vincent's father was in the picture it was not a warm or close relationship.

Vincent also experienced significant instability in his living arrangements, moving often resulting in changes in neighborhoods and peer groups. She notes that in addition to the significant amount of moving he changed schools frequently and lived in struggling high risk

10

neighborhoods.  The point that no matter where he moved it was into an unstable community was echoed by Richard Nelson, his Juvenile Officer. According to Mr. Nelson no matter which neighborhood he was living in, it was violent and experienced high criminal activity.

A review of Dr. Drapers testimony reflects the pattern of offending associated with the LCP group; early neuropsychologcal problems, behavior problems in school as well as school failure. His early involvement in delinquent activity and substance use are also consistent with Moffitt's (1994) description of long-term high risk youthful offenders. It is also consistent with Patterson, Reid and Dishion's work which describes early starters as youth who exhibit antisocial behavior in many quarters of their lives. Vincent certainly was a youth experiencing an extraordinary personal risk environment both in terms of direct insults in his family, school and social environment.  That risk was compounded by the environment he lived in.

Those factors are already known to the court as the evidence and fact pattern offered to mitigate his culpability and the sentence imposed.  However, there is another dimension that has not been adequately examined. That issue was what it meant to live with this risk in his life. How does that risk relate to the immersion in clusters of high risk youth?

I interviewed Vincent McFadden on two occasions.  His responses are important to the larger picture to be presented here. What follows are summaries of the interviews that were conducted with Vincent at Potosi Correctional facility.

**Interviews at Potosi Correctional**

*During the first interview we introduced ourselves to each other. The focus of the interview was to examine life growing up in Pine Lawn and the surrounding areas. Vincent described the general tone of the community as being one that was like being in a state of war. He indicated that any time he was outside of his house he had to post up. Posting up meant being*

11

*prepared for anything that might come his way, being attentive to cars on the street, foot traffic, any and everything.*

*He described a community divided by four gang sets when he was a youth. These groups were intergenerational for many youth. Fathers had been in the life. Although there was conflict between the groups, they would come together as a single group when invaded by outside groups. After all they were all from Pine Lawn. He did not indicate how often the boundaries were crossed by outsiders, but did note that in 2000 the neighborhood began to divide from within. What once was clear lines with community quartered, there began to be conflict in the neighborhoods within the city. There was static within the sets. This created a new level of danger because it eroded what were already low levels of trust between people that you knew. People you had grown up with.*

*Growing up he indicated that while he was in elementary school things were not so bad, but that he moved school and also when he entered the middle school years be began to have trouble with people bullying him. He was required by the codes of his community to protect himself. That not only required fighting back in the present it meant developing a reputation among others that he would and could fight back.*

*One result of the moves he experienced between homes and neighborhoods was that he had a reputation not only in Pine Lawn but in the 7th district neighborhoods of the City of St. Louis. It meant he had more area to roam. He was known in a wider community. Vincent saw that as a benefit.*

*When asked about the experiences of violence in his life, he indicated that his first close loss came at age 8 or 9 when a close friend was killed as a result of street violence. Probing further when asked how many of his friends had been victims of street violence he indicated that*

12

*they all had been. While not all had been shot, they ALL had been shot at. It was an environment that was perpetually dangerous from many directions.*

*The theme of war zone repeatedly arose. Vincent indicated that living in St. Louis/Pine Lawn had been like growing up in Iraq. He suggested that the violence was so common place that it was just part of life. You heard gunshots and would keep going. He suggested that a child growing up in Iraq walking down the street would hear gunshots and just keep walking, it was just normal. They would become immune as he described it.*

*When asked what it was like growing up in such a place, he responded that children are like water, they take the shape of the container they are in. In Pine Lawn the young people responded to what was going on around them.*

*He provided the names of several people that he suggested could explain growing up in Pine Lawn- Ms. Elaine Hood, Lisa Hubbard, and Janetta Hubbard. Ms. Hood he described as a lady in the neighborhood where he would go and stay sometimes or get something to eat. Janetta and Lisa were girls from the neighborhood whose brother he hung out with.*

*We talked about my work and the model of risk immersion. What it meant to be immersed in risk. He saw that maybe the work I was doing could help, although he indicated that it is hard for someone who was raised middle class or in a different type of community to understand. He described it as the way people dealt with stress. Middle class people he said (paraphrasing), when they get stressed they feel on edge. When people from communities like his are born they're already on edge, when they get stressed they go over the edge. He didn't think that people from other worlds could understand that.*

*He also mentioned Ricky Collins and a Dennis Epps (police) who could describe Pine Lawn.*

13

*We talked about his son and how he wished him something else. He hoped that people could understand his life. He also indicated that he and others like him could be the help that is needed to end the cycle of violence. They understood and they were in a place to speak from knowledge about the life and its dangers. He thought that programs needed to be present in his community and others because all kids have strengths and dreams. They just need to be found and nurtured. Music, art, whatever they dreamed people should be able to provide the resources to help them get there.*

*I ended out interview and let him know two things. One I would be back to see him in a few weeks as my other interviews might lead to more questions and two that I would share with him what I find and what I report.*

**Interview 2**

The second interview took place after I had conducted interviews with several other people trying to understand the community climate. I was joined by my Research Assistant, Nina McDonnell. During this interview Vincent seemed guarded, I believe that he was conscious of Nina's taking notes and was more guarded. In fact part way through our time together I indicated that I was going to leave as it did not seem he was being straight forward with me. He asked what I wanted to know and we continued.

The foundation for this interview was based on an interview I had conducted with an Iraq War veteran who had provided a picture of what being in a war zone was like. There had been so many references by people whom I spoke to that eluded to the war zone like quality of the community that I felt it important to understand what impact being in a war zone had on a person. The interview is summarized later in this report. However, information garnered led to several questions that needed to be explored with Vincent.

14

Briefly the thematic issues that I sought to understand revolved around the following issues. My informant stated that:

1. Being in a war zone means being on heightened alert all the time.

2. Being in a war zone means being prepared for whatever comes your way.

3. Being in a war zone meant being prepared to do whatever was necessary in response to aggression.

4. Being in a war zone meant that when attacked, you HAD to hit back harder and stronger.

5. These were rules and codes that people lived by.

6. A final note the interview garnered was that being vigilant at such heightened levels was unhealthy. The army knew that and they would make sure people had time away from the combat areas.

*The interview began with asking Vincent about rules or laws that he and others lived by. He indicated that everyone had morals and principles. One of the principles he lived by was that he and others had to hold down the neighborhood. Holding down the neighborhood meant protecting the neighborhood, protecting the children from the violence. If someone came shooting at you or the block, you had to shoot back. Residents in the neighborhood really only had each other. For many they had more love for the friends they lived with on the street then the family that they were born into.*

*He saw the community he lived in as offering only two real options: Prison or dying. The struggle each day was to avoid these two eventualities. When asked what the struggle meant he indicated it meant many things. For some people it was the struggle just to get by from day to day. Even the "good" (my term) struggled. They were always struggling trying to pay bills they couldn't pay, get food and a place to live.*

*I asked him about trusting people. He indicated that there were very few people he could trust. Few people he would let sit behind him in a car. When pressed on this he said that it was*

15

*hard because very few of the people he had grown up with were alive or not in prison. The people he could trust, were people he had been with for a long part of his life. Using the army analogy, he said that everybody in the neighborhood may be in the army but that he really could only trust the people in his platoon. Essentially those he had lived life most intimately with. Asked what it was like to always be on guard, he didn't respond very fully. He was then asked about what he did to relax. When was he not on guard? When was he not posting up? He hesitated a while and indicated that he could relax when he was somewhere else. When he left town got away from the neighborhood. He would go away at times for weekends. Or he would rent a hotel room out of the neighborhood where he and friends could just relax. But in the neighborhood you could not sleep. You had to be aware ALL the time. You had to watch the police and the people on the street. Then he said maybe he would be able to go to someone's house. To what sounded like safe houses in the neighborhood. Like Ms. Elaine's house. When asked what made that safe he indicated that people would not hang out around the house, they would not do stuff on the street near there. There were other houses like that in the neighborhood, older people who the guys in the community would make sure no one bothered or that no activity went on near their houses. This would avoid the shooting and stray bullets hurting someone. (Reminded of the rules of war mentioned earlier).*

*It should be mentioned that he indicated that in reality, the hood was the safest place to be. It was safe because it was known. It was safe because the people were known. Life no matter where he went was stressful. Again was asked what it was like to be under stress constantly. This time the response was that life was like chess. Every move carried life. He indicated that whether it was avoiding gun violence or any other activity he did it could mean life or death. If*

16

*the police got him he would get life, and if the other people in the street life got him and meant death, so everything move a life sentence.*

*He made the point that people from outside could not understand it. That if you are in it, it's normal and you become immune to it. Others are amazed by it, but it is normal-not shocking or not feared. What he noted was that there were things that happened in the neighborhood that were shocking.  When it was an innocent bystander people would be troubled.  The community would come together to help with the funeral by chipping in money.*

*He made a point that guys in the military are trained for war but it is not normal and they are not really ready until they get there and have to live in it.*

*We returned to the rules question and he commented that yes there were rules.  If someone shoots at you and you don't shoot back they will keep coming. Nonresponse would be viewed as your being soft or unprepared. It had to be clear that if you took one of ours than one of yours was getting taken. The issue here is that it is the basis for peace as well. If it is known that one cannot infringe on another's space than they are less likely to cross boundaries. If you get caught out of bounds you are in danger. If you get caught slipping you are in danger, slipping means relaxing not being vigilant.*

*What this meant was not being able to be outside without a weapon, always being prepared to do or die (my terms not his). Always being on post.*

*The reality of his community in his eyes was that "You are always behind." People in the neighborhood even if working lived from check to check.  They did not have good jobs so they were always trying to make a bill. The kids lived with parents who were struggling to survive, if you asked for money they had none to give. But they could see outside that there was a way to make money, to get the things that you wanted, to help your family.*

17

*He made an interesting point about motive and intentions. People talk about the behavior of people like him but they do not look further into the motive or intention. He gave an analogy of a young woman stripping to pay college tuition, he asked if she had a psychological problem or was she doing what was needed for survival. We judge before we know the whole story. We make negative judgments at first. You need to understand people's motive and intent before you judge them.*

*Are there any limits on what people will do to protect the neighborhood? The answer essentially said yes, but some people are impulsive, immortal, immature, and they just act. With others there are certain things they would never do. But people generally have good intentions for the neighborhood. They're not really bad people just having rough times because of decisions they made. People are good.*

\*\*\*\*\*\*\*

Summary

Vincent's life was one that involved the loss of a close friend very early in his life, prior to the age when Dr. Draper points out he began smoking marijuana. He lived in a community where violence was normal behavior. His comment about the child in Iraq becoming immune to the violence was telling. Violence was part of the fabric of his day to day life from an early age. He saw death as normative in many respects. After all he lived in a war zone. His description of life outside of his house or residence, of posting up, soldier like prepared for the potential violence that may come his way is telling. He lived in a community where he and others were required to fight to defend themselves from bullies and others who were a continuous threat. From an early age he was on guard, prepared to respond in whatever way he had to in order to respond to the threats presented in his environment. This climate suggests that he was required as

18

were many others in his community to be vigilant. I would suggest he was and remained hyper-vigilant at all times in the face of such dangerous conditions.

When asked about being able to rest or relax, it was clear in the community he lived in that concept was limited.  While there were safe houses, real relaxation meant having to leave the neighborhood and go to a hotel or leave town for a day or two. In other words for much of Vincent's life he was on guard.  He was vigilant, always assessing threats and taking needed actions in response to those threats. It was the basis for his life's interactions. He described the inability to trust others in his community. Trust could lead to death or prison in his mind, both life sentences.

This was true of all the neighborhoods he grew up in. Anderson (1999) describes the existence of competing cultures in communities like Vincent's: there are "decent and street families" that compete for the souls of children.  However, ultimately the streets dictate the social world of these hard pressed communities. They define relations based upon a code of the street, rules that individuals living in these high risk communities must negotiate each and every day.  The code of the street is based on honor and respect. Individuals for whom these street codes exist must defend their honor at all costs.  Any slight can be interpreted as a form of disrespect that must be responded to with strength. Anderson argues that no matter who you are in these communities you must understand these codes and in fact must be prepared to show that you knew them. Even the "decent" family must be prepared to code switch and show that they belonged and knew how to respond.

The importance of this is that Vincent did not invent the code nor did he create the reality in which he was raised. It existed as a birth right to being born poor and black America. A significant amount of social science research provides evidence that the enduring nature of

19

poverty and inequality in these American cities are related directly to historic racism and the racial discrimination that is tied to it in terms of housing patterns and social policy. Vincent was born into a community where the struggle each day was at the very base level of Maslow's hierarchy of need. That the residents of Pine Lawn were at the level of physiological and safety need is clear from the data that paints the demographic picture of the community.

**From other Eyes**

While Vincent's experience of the world is important, that may not serve in the minds of a reader to explain the extent to which the community was in struggle and the population in-risk. The next section adds to this report the voices of others and their perceptions of life in the communities they lived in during Vincent's life.

Vincent had suggested I speak to Ms. Elaine Hood who he thought could explain the Pine Lawn community. I met with Ms. Elaine as he calls her along with her daughter Sarah. When asked what the neighborhood had been like Ms. Elaine indicated she spent much of her time in the neighborhood with rug burns on her knees. When asked to explain she indicated that there was constant gun fire and she and her family spent their time crawling on the floor to reduce the chance of being shot. Asked how often that happened, she stated it was a lot. Not every day but many days during a week. It was like being in a war zone. The war theme had risen again without prodding and provided yet another example of the stress of living in this community. She was not a participant, but was caught in the reality it created.

Ms. Elaine indicated that Vincent visited her often. The other boys in the neighborhood also came around, she had three daughters. They were respectful and did not bring whatever it was they did into the house. At times newcomers were admonished for forgetting the "rule". She talked about how difficult it was to raise children there. She indicated it was not a place to raise

20

children. There was so much going on and she suggested whenever she left the house she would get baby sitters for her than teenage daughters. Sarah chimed and saying that was not true. When asked to follow up she said she did not want to be a part of the conversation. Shortly after that comment she asked what my effort could or would do for the other boys that were still out there struggling with the streets. After I explained she told her mother she needed to be more honest about life than because I was trying to help.

That led to a discussion of how the daughters too had succumbed to the streets and challenges faced in the neighborhood. They both said it was not like that before they moved into that community. They had lived in South St. Louis City and things changed dramatically in their lives when they got to Pine Lawn. Sarah spoke about going to Normandy High School and only attending for four months. The school had so much violence going on it was not safe. She explained that it was the bringing into the same building gangs from across so many localities. They were fighting the gang battles in the halls of the school. She stopped going to school, safety first. That led her and her sisters to becoming more involved in the street culture as it was part of the life in the community. Her older sister became such a problem for her mother at one point that she put her out of the house (recall Vincent was put out at 14).

Sara suggested that children become what they see and experience. The community created a picture that made fitting in very important from a safety stand point. It also offered ways to meet personal needs through drug selling. Parents could not meet the needs and material goods were important to respect and street credit. The parents were struggling in low paying jobs or on public assistance and as such there was little available beyond the most basic necessities, if that. Sarah's story was interesting because in the field of Criminology less attention has been paid to the delinquency of girls although that is changing.

21

In a closing question I asked about their personal experience with violence. How many funerals had they attended? Ms. Elaine said there may have been 5 or 6 kids who got killed. Sarah indicated it was in excess of 10 of her friends that died from street violence. They were constantly going to funerals. When asked how many of her friends had been killed or were victims of the streets she said **all** of them. The boys she grew up with, if they were not dead were in prison.

Sarah's description of life in that time was echoed by Monica Bradshaw, a young woman who was raised in the Walnut Park neighborhood of the City of St. Louis. Monica indicated that the gang culture was just what was happening in the community, it was hard to avoid. In many ways it was difficult to resist as there was available lots of money and street credit or respect that could be earned making life safer day to day. Monica described how the fact that she was a female made life easier in some respects as the police would be chasing the boys up and down the street and ignoring the girls who would be sitting on their porches watching. She too made the point that it was the community they lived in and kids are going to do what they need to in order to fit in.

Monica's younger brother Teddy was an active part of the street culture as well. Teddy described the nature of life in his community. The neighborhood required young men to post up (take a defensive position) and be prepared to do or die. They all knew what each other was capable of and they could not sleep as that could get you killed or sent to prison. Teddy described his progression into street culture as being a result of his being bullied regularly by guys on the block and at school. Recall Vincent was forced to fight to defend himself from bullies through much of his early life. Teddy indicated that at first he didn't want to fight and Monica would beat him up to make him tougher. He experienced the bullying at a heightened

22

level when his family was forced to move into a new community and fight to earn his respect every day. But he learned he could fight and was good with his hands.  He started winning the fights he had and began gaining respect from the old gang members on the block and the young guys he had been fighting with. It helped him fit in.

Initially Teddy was not involved in the street life as much as he was at least accepted by the guys in his neighborhood and they began to become friends.  While his friends were involved in more serious misconduct he was not engaged.  They began giving him money and things like clothes so he would not be seen as soft by others and so he would have street credit for looking like success.

He got into a conflict with his parents when they kicked his sister out of the house and he too left at age 14.  He had moved further into the life, the game. The reality of the stress in the community, the struggle of his home life where his father was alcoholic and abusive made that transition easier.

Teddy became involved in the gang life of Walnut Park and spoke about the extent to which in his youth the mid 1990's the proliferation of gangs made life very difficult.  You had to know the boundaries and the rules.  If you went into someone else's space you faced the danger of being shot, but you also realized that that was the law. They had every right to do what they had to protect their hood.  As the drug culture began to explode around the money available from crack cocaine it became even more dangerous because of the weapons available. One had to always be alert and aware of what was going on. The violence was such that it constrained Teddy's life to the neighborhood he lived in limiting freedom of movement.  There was no need to go anywhere else. Although Teddy is in his 30's now he indicated that while he has street credit he limits his time in the St. Louis area he grew up in. He noted that he knows what people

23

are capable of and there are young people who may want to make a reputation from doing him (killing or at least shooting him).

The story Teddy tells is important to understanding the enduring nature of street codes and the salience it has in day to day living. Codes that make it clear what is right or wrong within the environment that has been created. Teddy made a point of saying people from outside can't understand it. They judge but don't understand what it means to be in communities where there are children who live in homes with one or two parents who are barely surviving or capable of taking care of basic needs. The fact that the kids are hungry, have beat up clothing, and sometimes because of homelessness come to school smelling dirty. Their appearance contributes to their being picked on by others in the neighborhood. They struggle each day with trying to fit in and knowing that their parents can't provide even the basic needs let alone the sorts of things that would make the harassment go away. They turn to the streets and see guys out there that are making it. They have money and respect and that becomes what they see as the solution to their life problem. It is not a choice in many respects but what is required to exist, to fit in and not be bullied or harassed, a victim.

Teddy's description of the struggles of growing up in abject poverty was echoed by George Wills a young man that had grown up at some points in his life with Vincent, His words and life story are summarized below. The entirety of George's interview summary is included as he was a neighborhood peer of Vincent.

*George described a life that was extremely difficult, living deep in poverty moving from one rundown section 8 housing unit to another. He described lots of moves and extreme deprivation. He conveyed extraordinary hopelessness and a lack of any resources in the home or community. Life was good until his father got arrested and went to jail for bank robbery. He had*

24

*left the night before to go buy sugar and the next time George saw him he was on the tv. Apparently he and some friends had gotten dressed as women and went into a bank to rob it. He saw the picture on the news and knew immediately that it was his father. The event led to his mother having a major psychological break that made her not present for him throughout his life. She was repeatedly hospitalized for manic depression and schizophrenia.*

*He and his two sisters were often cared for by grandparents or other relatives. His grandfather was a mean man who verbally abused him all of the time. Told him he wasn't anything and never would be anything. He was a physically abusive man toward the women in the house, his mother or his grandmother. Because of this George felt he had to protect his sisters and the women in his life.*

*He indicated that every day in his neighborhood it was the fourth of July. By that he meant that there was always gunshots. It was men defending blocks not the neighborhoods. He said that growing up in St. Louis violence was the norm. Whether it was Pine Lawn, Pagedale, Welston.*

*He left home at 14 permanently. His mother had been hospitalized again. She was in hospitals as much as 7 months out of the year, every year. Because he had been so poor he saw drugs and drug dealing as a rite of passage in his community. How you became a man. Material things were what made you a man. Possessions mattered. Possessions meant people would respect you, it was the haves and have not's. If you were broke you got no respect.*
*He wasn't terrified by the violence, it was part of the community. In fact hearing the gunshots meant people were taking up for you, they were protecting the neighborhood.*
*He described the high school years as the place where it came to a head. Going to Normandy High School everyone came there. All the neighborhoods and all the gangs came to this school.*

25

*When he was 16 his brother was shot in the head and killed. Before that I could see him on the street look out the window and see him. When he died he wasn't there and everything went to hell.*

*The violence was such that you would think it would drive you away but he saw it as pushing you closer and toward it. Between the age of 10 – 18 he experienced the death of 7 friends. He had to live with that and there every day. It was not something he could get away from. Experiencing the stress was exhausting. You learned the routine and knew the code. Every day he would get up don his colors, his weapon (his sword), He saw it as patriotic defending his country (block). You had to hide it from the adults because it was not respectful to be in the gang. He seemed to see himself as living two lives. The one that he allowed family to see and the one he really lived.*

*As he entered adulthood 18, 19, 20 he was lost. He suggested that all the young men he was around were lost, they were all screaming at the top of their lungs for help and nobody heard them. In his case he thought that people would hear it through the violence but they didn't. Suggested the prison yard was full of young men screaming for help but not getting it. They were fearful and used violence to cover it up.*

*The lessons in his life had come from adults who showed him to fight and to use violence as the instrument he used. He saw drugs and guns as power. Weapons turned cowards into brave men. Much of the violence is driven by hopelessness.*

*George had a great deal of anger at the men in his life and carried it with a great deal of rage. Violence was his response to the hardships of his life. A great deal of anger. He described his anger as being much the same as the men walking around the prison yard. Filled with anger screaming at the top of their lungs.*

26

*Asked him how he relaxed?*

*He said he had always read. Reading allowed him to escape. In the neighborhood he lived in there were quiet places where people respected the homes on the street and they would not cause problems there. You could tell by the way people took care of their houses. Those were places you could relax, (my word they were like oasis' in the middle of the chaos.) He then mentioned that there was a lot of discomfort but was not sure anyone could understand, or we could understand. Explained the fish in water analogy, he went on.*

*The discomfort was like being caged, being in an inferno with no escape. No one kept promises. No place was safe. School was not safe. You can't move but you want to. He could not put a finger on what he experienced as a child, what the discomfort was about but everyone in his mind was exhausted. The adults were just trying to do what they could to survive. They were trying to make ends meet but struggling to do that.*

*Being good was not good enough. Good did not allow you to escape from the struggle of life. People want to get rid of the problem, but you're the problem, I'm the problem. You can't get away. They send people to prison but the prison in the destination but no one really experiences the journey.*

George's story was and is one of interminable struggle and harm that comes from experiencing chronic risk and violence in life. A life filled with anger and a need to make sense of the plight of a life that was the inherited, a birth right. He saw it in terms of the role that racial discrimination played in creating communities filled with despair and limits on life options. He described the hopelessness and despair that drove the violence and the behavior born of a need to survive in his eyes. His story is fitting of the description provided by Teddy about what life is

27

like in a community so challenged by their parent's struggles with poverty and the risk that surrounds them, where young people are just trying to fit in when they have nothing.

Another young man whom I contacted Aaron Morris provides a similar story. Aaron has written a book that describes quite vividly the struggle of a teenage mother, continuous poverty, constant movement from one residence to another, from family member to family member, and the lessons that are transferred intergenerationally. The book is attached as appendix 1. Aaron's story is compelling in that it further emphasizes the danger of living in a risk laden environment.

**Low Risk Youth**

Like Teddy, Thurman Shelton, a friend of Vincent's had what seemed other opportunities. He had a mother who tried hard to have life go well for him and his brother. But in Thurman's words they lived in a community that created a difficult environment to be safe and secure. Below is a summary of the interview we had in its entirety. Thurman's story is important to dispelling the notion that one might not have to be in risk.

*Thurman came to the visit ready to discuss the neighborhood. He indicated that he had moved into Pine Lawn when he was about 7 or 8 years old from Pagedale. Life changed dramatically for him. He had moved from a neighborhood that was Crip and where he was now was Bloods. He had to fight to prove himself. The fighting began fairly soon after moving in, at school in the neighborhood. All he wanted was to be accepted and fit in.*

*His mother tried hard to keep him out of trouble. He was made to stay in the house and babysit for his brother. On one occasion he described a group of kids came to his door when he opened it they started beating him up and he had to fight to get them out of the house. His mother was a single mother working two jobs and was not able to be there, although she was taking care of the family.*

28

*He was generally not into the street stuff, but there were kids who born into the streets. Their parents had reputations and they were born into it. They did not have a choice. He felt that he had options in his life. He had a choice because he had to earn his street credit.*

*When asked if he had a choice really he indicated that he did but if you didn't join in than you were in danger of victimization by people who were doing things that you might witness and they would be afraid you would tell on them. In other words you could not play in the streets and not be connected in some way.  Maybe not as much as some people but there was no getting away. If they thought you were the kind of person that would tell "they straight got rid of you." When asked what that meant he indicated they would kill you.*

*He also indicated that a lot of them were influenced by movies like the Godfather or Scarface.  They all wanted to be Tony Montana with lots of money that they could pass along to their kids. But in reality they did not realize the burdens they were passing on. Your rep or even your parents rep mattered.  If they knew your daddy was a rat than you were a rat.*
<u>The discussion seemed to provide a picture of legacy building for comfort in an environment that was dangerous and the only protection was the name you made for yourself.</u>

*So while he started out just trying to defend himself, as he got older he chose to start dealing drugs because there was no money at home and you couldn't go to school with worn out clothes and stuff that was out of style or you got picked on and bullied for that. The place where most of the problems happened was at school.*

*Asked if there were many people in the neighborhood that didn't go into the street activity he indicated that no matter what you ended up doing something because you were there (Referring back to the being around things that happened and having to be (my words) a stand up person so people knew you could be trusted).*

29

*He used a term that others also used. Some people jumped off the porch into the street and others jumped off the porch and landed in the grass, but either way you were off the porch. Even if you weren't active in the street life you were involved. People would ask you to hold drugs or guns. You ended up doing something. They would ask you because you were sort of safe.*

*He jumped off the porch around 13-14 years old. At that time his mother was working two jobs and could not support him or his needs. While she would ask where he got money from and the material stuff he was acquiring he would tell her people lent it to him or gave it to him. She did not have time to question because of her working so much. From the time he was 13 – 18 it was small time when he got to be 18 it became much more involved.*

*He indicated friends contributed to his ability to go into the life because he already had earned a reputation. He had earned respect. When they would ask if he needed money they would give him product. They would tell him he could get three times what they could give him and he only had to give them back to cover the package.*

*It was the same for both boys and girls. They would be involved and in some ways it might have been harder because they could become pregnant. Single mother at 16 in his words was a life sentence. He described that as another way people on the edge got involved. The girls would need money and they would have to take care of their baby so people would give them packages to hold or people would come and pick up from them. It was often friends of the baby's father who might be away in jail.*

*His first experience with violence personally was at 15 when a friend got killed. He had begged him not to go but he was in a bad way and needed the money and thought he could rob*

30

*this guy. It wasn't what he did but he was just in a bad way and went down the street and as soon as he got there the guy shot and killed him. He wanted what the guy had NOW.*

*He finally did move out of Pine Lawn and went to Moline Acres. And now things really escalated. He had a reputation that was earned and people started coming to him. They knew he was Pine Lawn and since they were the toughest area people looked up to him. Thurman indicated he did not go into many new areas. He had had to do that in Pine Lawn why would he do that again. He did not want or need to fight to earn street credit or reputation. He didn't know people in St. Louis city so no sense going there.*

*We then turned to the question of trust. He indicated that there were not many people he trusted. He trusted the people he had been in the streets with more than some family members. He responded that there were rules to be followed in the neighborhood. You did not go into other areas unless you had a reason, wear the correct colors, respectful, respect neighborhood. Asked whether he had ever thought about his future, where he would be ten years from then, he said no. He had never thought about ten years or five years. Although they had dreams they did not know how to get there. Didn't know the route, didn't have a vehicle. School was never a place to begin the journey. He skipped school a lot and when he was there would just sleep in the classroom.*

*Many of his friends didn't care about living or dying. He did. They all used to tell him he was scary because he would not go some places or do some things. Being terrified of death kept him from doing some things, like robbing or banging. While others knew death was a possibility of the life they were living, he clearly stated that death was a consequence of the things he was doing so he was always vigilant. You couldn't fight with someone who wasn't afraid of death, they wouldn't care if they died. He wore bullet proof vests.*

31

*He asked how all that stuff got into his neighborhood, the vests the uzies assault rifles. They don't make them there.*

*I explained to him the effort we were making. Trying to explain the water that he and the people lived in. Described how that focus came to be, in response to the question how would a fish explain water.*

*He saw that vividly and said that the porch, the yard, the grass the street, they were all the water and no matter where you were you were getting wet. His explanation was that some people were not made for the deep water, they could do some things that were happening but everybody was somewhere in that water. Some guys were deep water mammals and they went really deep into the deepest part of the water. But at the same time they could not breathe in the shallow parts. They did not know what to do there. It was all they knew. They were the ones who were born into the life they lived.*

*The reason all were in it was due in part to the fact that everyone had to go to school and everybody from different places mixed into together. The only difference was in school there were problems and fights, same as in the street. Except that in the street there were guns.*

**When could you relax?**

*"When I was with my kid." (He has one son) Thurman indicated that it was a rule of sorts or code. If someone saw you and you were with your kids they gave you a pass. No matter where even if you were driving through their hood. People don't want to hurt kids.*

*Before his son was born he rarely slept at all. Was always doing work: selling, bagging product. But generally there was really no time when he could relax. He was in it 24/7 Always had to be mindful of where he was.*

*Asked what being on all the time was like. What did that do to you?*

32

*Mentally destroys you. Like when a soldier comes back from war, they are not stable. They can't live on land. Some guys in Pine Lawn have no idea of any other life. They are the walking dead. They just live through it day to day. He said that the prison is full of walking dead. They have nothing else in life.*

*Thurman provides with clarity the significance of living life in risk. Even when one has different opportunities before them they are faced with having to negotiate the street codes and more importantly gain street credit by earning a reputation that makes it clear they are not going to be victim in the community they live in. He echoed Sarah's description of no safe place. Schools, the streets were one on the same. There was always danger and it required not being run over by someone who wanted to test you. Having had to earn the street credit and a reputation it became easier to transition into the life as it made you friends with people who were further immersed. As Thurman described it, you became friends with the deep water mammals. Being around, being able to have friends in the neighborhood meant having to live by the code as failure to adhere to it could mean death.*

**A Focus Group**

I will summarize this section with the results of a focus group that was conducted at Better Family Life with young men who were participants in their Men Claim the Neighborhood program. They were asked to describe their neighborhood. The young men used adjectives such as: dangerous and a jungle. The community they saw was one where everything they did was based on essential survival. It influenced where they could go and what they could do, who they talked to. Their lives were, like Aaron impacted by the colors they wore and the flag they flew, the war like symbolism. The wrong color got you killed. You defended your block and protected

33

the kids and people on that block.  If someone came into you area they had to have a good reason and even than it might not be enough.

They saw it as survival and the need to care for families.  The street involvement was driven by familial poverty and seeing mothers struggling to put food on the table or a roof over their heads. The struggle they witnessed made the street life enticing as it showed what success could mean.  Success was driven by the things one had and the money they could flash. It would not be manly to watch the struggle of family and not take care of them.  It would not be manly to not do what you had to do to get the money needed to care for children. It would be unmanly to be afraid to wear colors, your flag to represent who you were and where you were from. Even if that meant you became a target for those who saw that as an enemy's colors. They were in a war and they knew the rules of war.

**What is a War Zone?**

Having heard the war analogy So many times I decided to interview a young Iraq Veteran. Nick agreed to meet with me and discussed how as a soldier he went through training to prepare for war. But no matter what the training you are not ready. You can do what you are trained for but have to go through the process of becoming part of the war zone. It was not fear, it was not immune; it became recognition of what was.

Nick described how the initial involvement in the field was one where mortar shells came and you ducked into bunkers.  After the first month you just looked to see where the shells landed. A little longer you looked to see if anyone was hit. Then you just wanted to know if anyone had died. *It was life.* It was what was needed to survive.  Had to see it as a place where you just did your job.  You did not fear death, it did you no good.  You responded to the violence and condition by becoming always vigilant.  You reached a place where you were at 50%

34

readiness for aggression and response and that became your normal state. All those around you were in the same place and you had to make sure you matched the readiness of others or you were a liability.

When asked if everyone did that he indicated some didn't, they did everything they could do not to be there. Not to leave physically, they did their jobs, but they did all the things they could to take their mind off it: games, weight lifting, and mindless activity. Others went the other way and became more and more aggressive they would go beyond the 50% level of readiness even in their resting state. They were a problem because in theater you had to match the people around you. So when someone was at 70% all the time the people around them went to that level. The problem with that was you couldn't be at that level all of the time. Nick indicated that the army knew that and that was why they created opportunities to get away from it for a time. Otherwise it was not healthy.

His next comment was telling. Nick indicated that he saw the analogy to young men I work with in the community, but the difference between them and a soldier was that they NEVER get a break. They are always on. You can't be on like that without it doing harm to you mentally.

Nick mentioned that when someone got killed, as a soldier or a unit they had to make someone bleed, if they didn't it might make the enemy think they were in control of the theater. It sounded very much like the protection of the neighborhood. They had to be prepared to die, no matter what. It was the nature of life. Not running from it, not fearing it, living with it and accepting the lot one had in life. Vincent and the other young men I spoke with are on all the time. They cannot relax in "theater" because it can get them or others killed. They have to be

35

prepared continuously to respond to the enemy that surrounds them. They have to respond to the issues before them.

**Summary Interpretation**

Vincent McFadden, based on his developmental profile presented by Dr. Draper was born with vulnerability to the environment he was living in. He was, based on the criminological literature, born at risk due to his premature birth, low birth weight, and social circumstances. He exhibited the many challenges that many serious offenders are confronted with. Difficult home life, academic failure and behavior problems in school, aggressive behavior, peer conflicts and delinquent peers, and many of the constellation of predictors that are found to be predictive of delinquency and violence. Further, Vincent was born into an environment that nearly 200 years of research had shown was harmful to the residents that resided within such an environment. From the work of Quetelet in the early 1800's it has been repeatedly found that communities that were socially and economically disadvantaged exhibited high crime rates, violence, and gang formation in communities. It was a near perfect storm.

Jamala Rogers the Director of Youth Development Services in the City of St. Louis provided the key to the perfect storm. During the first decade of his life cities across America including St. Louis began to experience the crack cocaine epidemic. The introduction into poor communities of a commerce that allowed poor children to earn extraordinary amounts of money on the streets contributed a crisis of great magnitude. As crack took hold of communities violence began to become a dimension of the drug trade, gangs began to explode on the scene almost like a contagion. According to Ms. Rogers the problem became that gangs emerged and they claimed blocks around the region. It was a virtual war zone where the enemy territory was

36

right around the corner. Young people could not go two blocks from home without fear of attack, which could mean death.

The violence was such that all young men were in risk for involvement even when they were seeking to avoid involvement. This meant that even a youth who came from a low risk background was confronted by the street violence. Ms. Rogers suggested that the youth who might have been able to avoid this was the one whose parents could drive them from one place to another. In her words, if a youth had to travel alone on foot he had to be prepared to take on the challenge. Teddy Wilingham's interview made clear that gangs became part of the fabric of the community, an ever present danger.

A perfect storm existed where communities were not prepared to respond to the problems and had not seen anything like it, possibly with the exception of the street violence that was present during prohibition. There was money to be made, a product to sell, and young men who found that they could fulfill their needs for material objects of life easily and quickly by joining the storm. Vincent in another time might have had other possibilities, in the one he was born into and with his inherited vulnerabilities placed him on the edge, in his words "we were born on the edge, stress makes us go over the edge." Being born on the edge may be reason to consider the implications of placing children there to begin their lives.

**What Next?**

If we move forward I would like to continue to interview community members to further understand the implications of the challenges young people faced.

I would include:

Police; teachers, other community members; veterans of war;

Get data from the County juvenile court to present immersion scores for the neighborhoods surrounding Pine Lawn and North St. Louis City

37

# A Framework for Examining Social Mitigation

## Living in Risk and Life Decisions



# People, Places, and Crime

- ## Sociological Theories
- Social Disorganization
  - Discrimination
  - Hyper-segregation
  - Poverty
  - Instability -Mobility
  - Isolation
  - Low Social Capital
  - Limited Collective Efficacy

# Developmental Life-course models

- Multi-dimensional risk
  - Family
  - Peers
  - Schools
  - Neighborhoods
  - Individual factors

  Ecological Frameworks

# Conceptual Model of Human Ecology



St. Louis Youth Community Collaborative (White, 2011)

# Contextualizing

Communities that make contributions to the emergence of delinquency and violence are portrayed in the following two illustrative slides. The importance of these conditions is that they date back to the earliest scientific examinations of crime. In 1831 Adolphe Guerry mapped the moral conditions of cities in Europe and found crime to exist in the highest levels in those we now describe as socially disorganized. The presence of these problems has been documented repeatedly for nearly two hundred years.

## Economic Indicators in Selected North St. Louis City Census Tracts

|  | 1101 | 1102 | 1103 | 1104 | 1105 | 1111 | 1112 | 1113 | 1114 | 1115 | 1123 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Income** |  |  |  |  |  |  |  |  |  |  |  |
| Median household* | 21,548 | 25,384 | 25,094 | 27,371 | 23,125 | 27,948 | 20,227 | 15,833 | 16,654 | 29,038 | 15,227 |
| **Unemployment %** |  |  |  |  |  |  |  |  |  |  |  |
| Labor Force Unemployed** | 7.30 | 13.90 | 10.10 | 12.00 | 16.10 | 17.30 | 20.20 | 21.20 | 14.60 | 12.70 | 18.20 |
| Unemployed*** | 13.00 | 23.40 | 16.40 | 21.70 | 33.30 | 28.70 | 32.60 | 43.60 | 24.50 | 24.10 | 30.60 |
| Not in labor force | 44.10 | 40.60 | 38.40 | 44.70 | 51.70 | 39.60 | 37.90 | 51.40 | 40.40 | 47.50 | 40.60 |
| **Poverty %** |  |  |  |  |  |  |  |  |  |  |  |
| All families | 29.60 | 22.20 | 28.70 | 27.30 | 39.70 | 24.70 | 37.60 | 42.20 | 40.60 | 19.30 | 41.60 |
| children < 18 | 39.30 | 30.50 | 40.10 | 38.30 | 43.90 | 31.80 | 42.80 | 56.40 | 54.40 | 16.70 | 47.40 |
| Female headed | 42.30 | 33.30 | 43.90 | 35.80 | 53.80 | 21.30 | 39.40 | 46.90 | 48.40 | 24.00 | 43.80 |
| children < 18 | 47.20 | 44.80 | 46.30 | 41.30 | 63.30 | 29.00 | 46.90 | 56.90 | 60.90 | 18.20 | 50.30 |

Source U.S. Census Bureau, 2008-2010 American Community Survey
Note. Neighborhoods contained with the selected census tracts include: The Ville, The Greater Ville, Jeff Vanderlou, Fairground, O'Fallon, Vandeventer, Fountain Park, Lewis Place
Note * = St. Louis Metro Area Median income: All White-73, 077; African American-36,325; Single mother white 36,488; Single mother African American 24,979
**   =   Bureau of Labor Statistics Estimate
***  =   Current Population Survey

## Select Social and Economic Indicators for Pine Lawn and Adjacent Cities

| | St. Louis County | Pine Lawn city | Hillsdale village, | Jennings city, | Pagedale city | Wellston city |
|---|---|---|---|---|---|---|
| Median Income | 50,532 | 21,200 | 22,159 | 29,196 | 23,873 | 21,596 |
| Race African American | 19 | 96.0 | 95.4 | 78.6 | 92.1 | 92.1 |
| Population 10 - 24 | 20.1 | 29.1 | 24.7 | 23.1 | 25.3 | 29.2 |
| Single Parent w/Children | 7.4 | 23.6 | 22.5 | 19.6 | 21.4 | 25.2 |
| Population Mobility | | 35.3 | 29.8 | 40.3 | 32.9 | 37.7 |
| **Labor Force** | | | | | | |
| Education >25 | 12.1 | 37.1 | 35.5 | 23.8 | 34.8 | 39.2 |
| Unemployment | 3.1 | 9.0 | 9.0 | 6.8 | 8.9 | 8.3 |
| Not in Labor Force | 32.9 | 43.6 | 47.8 | 35.9 | 45.4 | 48 |
| **Poverty %** | | | | | | |
| Familes w/children <18 Poverty | 7.9 | 45.8 | 31.1 | 21.2 | 32.6 | 36.0 |
| Single Parent w/Children <18 | 23.1 | 56.1 | 37.8 | 30.7 | 39.3 | 44.7 |

# Intersecting People and Places

- Social theory that focuses on place is insufficient as it does not provide explanations for those who live in those spaces and don't engage in crime.
- Macro-Micro convergence
  - Youth living in-risk
  - Experience personal risk within their personal world
  - Live in communities that present extreme stress and risk

- The Theoretical Framework of Dynamic Risk

# Risk Immersion Score-Measures

- Risk Immersion Score is based on variables that were collected in risk and asset assessment by the juvenile court:
  - Family - parenting effectiveness, relationship, parent criminal, abusing parent, mental health, drug involvement;
  - School, achievement, behavior problems, learning problems, attendance;
  - Social skills, negative peer influence;
  - Individual : abused and/or neglected prior record, prior incarceration, person offense, employment.
- Risk Immersion Score based on the proportion of youth in a census tract that were high risk.

Source: N. White, 2013

9

# Conceptual Dynamic Risk Model

<u>Social Structural</u>

Social Disorganization
Community Isolation
Low Collective Efficacy
Cultural

<u>Multi-Dimensional Risk</u>

**Individual
Risk Environment**

Family
Peers
Schools
Individual

<u>Social Processual</u>

Social Learning
Opportunity
Delinquent Sub-cultures

# Conceptual Risk Immersion Model



Social Structural

Social Disorganization
Community Isolation
Low Collective
Efficacy
Cultural
Youth in Risk

**Individual
Risk Environment**

Multi-Dimensional Risk

Family
Peers
Schools
Individual

Social Processual

Social Learning
Opportunity
Delinquent Sub-cultures

# Risk Immersion Scores by Zip Code

Research and Data. Norm White. PhD



# Homicide Rate by Age and Race-Missouri

| | | | | | |
|---|---|---|---|---|---|
| White | 1.8 | * | * | 3.7 | 4.6 |
| Male | 2.0 | * | * | 5.2 | 6.4 |
| Female | 1.6 | * | * | 2.4 | * |
| African American | 16.2 | 25.9 | 55.7 | 46.1 | 68 |
| Male | 24.5 | 41.2 | 90.5 | 88.4 | 173.6 |
| Female | 7.7 | * | * | 10.8 | 19.2 |

Mortality by underlying cause, ages 18+: US/State, 2001-2009 (Source: NVSS),
Captured 4/21/2013 http://205.207.175.93/HDI/TableViewer/tableView.aspx?ReportId=673

# City of St. Louis Homicides by Neighborhood 2005-2012

### Risk Immersion Scores by Zip Code

Research and Data: Norm White, PhD



Map Created by Rachel Deloso 11/2/2012

| | | |
|---|---|---|
| Population | 160,592 | 140,376 |
| Income | $26,807 | $40,060 |
| No High School | 4% | 3% |
| High School | 19% | 16% |
| Bachelors + | 10% | 25% |
| Pct. White | 23% | 62% |
| Pct. Black | 75% | 35% |
| Under Age 20 | 30% | 22% |

MAJORITY BLACK
NEIGHBORHOOD

MAJORITY WHITE
NEIGHBORHOOD

10
5
2
1

# Perceptions of Stress and Mental Health in a Sample of Black Men

Nina M. McDonnell[1], Norman A. White[1], Eddie M. Clark[1], Wilma J. Calvert[2]

[1]Saint Louis University, [2]University of Missouri – St. Louis

## Background

Current theories of risk concentrate on the concept that vulnerable members of society are "at-risk"; however, new research supports a model of "in-risk", suggesting that risk encompasses the persons, causing them to live in constant, inescapable stress (N. White, personal communication, 2013). Research by White suggests that black males with low socioeconomic status and living in urban areas are particularly in-risk. According to a meta-study by Watkins, Walker, and Griffith (2010), Black males experience more psychological stressors, and have a higher risk for stress-related illnesses and psychological issues than other groups.



## Goals of the Current Study

The purpose of this qualitative study is to better conceptualize stressors faced by in-risk Black, urban males. Researchers were interested in the perception of stress in the participants' lives, with emphasis on indicated stressors, symptoms of stress, coping strategies, the effects of stress, and what role stress plays in their perceptions of mental health.

## Methods

This secondary data analysis examines transcripts of 28 focus group participants involved in a community father support group. Participants were Black males, fathers, and volunteers in the program. Researchers examined the answers to five questions first posed by the original study (Calvert, Issac. & Johnson, 2012). Researchers sought answers from participants which included mentions of stress, mental illness, and coping strategies. Finally, transcripts were examined in their entirety for mentions of stressors, or factors which lead to stress or mental illness.

## Results

**Q1: What does health mean to you?** 14.3% of participants mentioned mental health or stress when asked what health meant to them. One participant used the terms "stress" and "mental health" interchangeably and emphasized that black men experience greater stressors than other individuals.

**Q2: How important is it to be healthy?** 17.9% of participants responded that reducing stress and having improved mental states were important for their health. One participant suggested that good physical health lead to a reduction in stress, while another contended that being stress-free precipitated good physical health. Of note was a respondent who suggested that too much emphasis is placed on exercise and strength training for physical health, and believed that more information should be provided on how to strengthen and exercise the mind.

**Q3: What are the primary diseases, illnesses, and conditions that affect African American males?** 25% of responses included traditionally thought of illnesses: stress (2 participants), addiction (3 participants), and depression (2 participants). Two other participants suggested that unemployment and literacy, or lack thereof, were illnesses.

**Q4: If you wanted to exercise, could you do this easily in your neighborhood?** 25% participants responded that they would be unable to run or jog in their neighborhood due to the possibility of police harassment. One participant suggested that the only time they were exercising was when they were "dodging bullets."

**Q5: (After your experience at the Father Support Center's health classes) what is one question you still have about health?** 10.7% of participants had questions concerning mental illness including: ways to counteract stress, the length of depression, and not understanding commonly known illnesses, such as schizophrenia and bipolar disorder.

## Discussion

Participants in this study exhibited mental health illiteracy, but a desire to learn more about mental health, coping strategies, and stress-reducing exercises. Results also show that a wide range of stressors impact low-income, Black males, strengthening the theory of "in-risk" living, proposed by White (2013). Limitations of this study include a small sample size of participants. A strength of this research is the qualitative nature of the study, as suggested by Watkins, Walker and Griffith (2010). The fact that participants were not primed to consider mental heath is also advantageous. Future qualitative research should continue, concentrating on the physiological and psychological effects of stress caused by living "in-risk," specifically considering the plethora of stressors that low-income, Black, urban males contend with on a daily basis.



**Stressors and Risk Factors Cited by Participants**

Emotional Isolation · Teenage Pregnancy · Lack of Transportation · Personal Relationships · Legal Issues · Mental Health Illiteracy · Insufficient Education · Unemployment · Lack of Insurance · Individual · Racism & Oppression · Community Violence · Police Harassment · Physical Health Illiteracy · Financial Problems · Inability to Sleep · Addictions · Child Support

### In Their Own Words

"We just don't know a lot of things we should know…we can get pulled over by the police and not know our basic rights."
Participant, Focus Group

"Nobody really teaches you how to…do a mental exercise: how to build your mind up, how to stay focused, how to relax yourself. We don't have exercises for that."
Participant, Focus Group 2

"How do you counteract stress? I mean, after you have been stressed out for so long, what should you do to help your body out to recover from the stress? That's what I need to know, because (life) is stressful here."
Participant, Focus Group 1

# A Community Portrait in Risk

- Data collection and analysis
  - Community profiles
    - Social
    - Economic
    - Crime

- Personal Perceptions in risk
  - Individual Experiences
  - Neighborhood residents
  - Family environment

# Attachment Z



MOV EXHIBIT # 43

NORMAN WHITE,

having been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MS. LEFTWICH:

Q.    Can you please state your full name for the record.

A.    My name is Norman White.

Q.    And are you employed?

A.    Yes, I am employed.

Q.    How are you employed?

A.    I'm a professor at St. Louis University in the Department of Criminology and Criminal Justice and an

456

Associate Dean there.

Q.    And how long have you been at St. Louis University?

A.    Since 2004, going on 13 years.

Q.    You indicated that you were an associate dean. In what area are you an associate dean?

A.    I was appointed the Associate Dean for Community Engagement in Partnership.  Because of the work I do in the community and the University's interest in working in the community, I lead that work.

Q.    And when did that happen?

A.    Last spring.

Q.    Prior to teaching at St. Louis University, did you also teach at the University of Missouri at St. Louis?

A.    I taught at University of Missouri, St. Louis. I came to St. Louis in 1997 and was there until 2004 when I moved to SLU.

Q.    And was that teaching in the same area of criminology and criminal justice?

A.    Yes, it was.

Q.    Prior to obtaining your Ph.D and beginning to teach, what kind of work did you do?

A.    I worked for a number of years in New York state.  For 10 years I worked in -- for the Division

457

for Youth in New York state and institutions for children who had been -- young men who had been found to be delinquent. The part of that, a number of those years, were with young men who had been treated as adults and were doing adult time. Prior to that I worked for five years in private institutions for kids who had been found delinquent.

Q. And was your position of those places as a counselor or a mentor or something of that nature?

A. It was a variety of the childcare work. When I first started work, I became an administrator of living unit in the private institutions, and then when I moved to the state, I became a midlevel administrator so I ran several living units at a time.

Q. What is your educational background?

A. I have a Bachelor's Degree in History. I have a Master's Degree in Public Administration. I have a Ph.D in Criminology and Criminal Justice. I also have a Master's Degree in Criminology, Criminal Justice.

Q. You indicated that you are a professor at St. Louis University. What courses do you currently teach?

A. Currently I'm teaching a course on race and crime. Generally I teach courses on theory of crime, kind of the nature of crime courses, so theory, delinquency. Because of my experience, I teach courses

458

on juvenile justice.  I do some intro classes.

Q.   As you said currently, you said one class and then generally you do others.  Is that because the classes change from semester to semester?

A.   Yes, they do.  And I teach less now because of the dean position, so I have a grant that takes me out of the classroom so I'm teaching one class a year basically.

Q.   You talked about having a grant.  What is that in relation to?

A.   I got a grant through the Missouri Foundation for Health and a number of local foundations to look at the problem of school suspensions and issues around it, plus a bias racial equity, and I've been doing that for the last 2 years.  I have 2 more years to go.

Q.   That would be inclusive bias and racial equity in the school system?

A.   Yes.

Q.   Do you specialize in any area of research within your field?

A.   I am a developmental criminologist, so my interest is in how do young people come to be involved in the justice system and the factors that influence them.

Q.   In your research do you often focus on urban

459

at-risk communities and the effects on their children?

A.   Yes.

Q.   Have you published any books in your field?

A.   I have a book on schools and delinquency, but I have a book about to come out on homicide and violence in African-American communities.

Q.   You say about to come out.  Is it currently --

A.   It's in press.

Q.   And did you write that in conjunction with anyone?

A.   I worked with several co-authors.

Q.   And have you published any articles in your field?

A.   I have.

Q.   What types of articles?

A.   I have written on serious violent offenders, on the relationship between age and crime, on bullying, some stuff related to gender.

Q.   And is your research and the books you've written and the articles you've published, is that all as a result of your background and your experience in working in the criminal justice area as well as working in urban communities?

A.   That, plus I also think it's a function of having grown up in New York City in an urban

460

environment.

Q.    And do you have any professional memberships?

A.    I'm a member of the Association, the American Criminological Society.  I'm also ACS, the American Criminological Society of Criminology, and then the Academy of Criminal Justice Sciences.  I have recently been put into the Association of Public Health because of my appointment.  I gained membership in that.

Q.    Have you now or in the past been appointed to any state or community special task forces relating to your field?

A.    I was appointed by the mayor of the City of St. Louis to a task force on youth violence.  I was appointed by the health commissioner to a group that was working called Strive, striving to reduce youth violence everywhere, as part of the leadership of that. I have recently been appointed to a task force -- I can't remember the name of it, the exact name, but it's on health in St. Louis so it's a Department of Health task force to assess health in the City of St. Louis.

Q.    I'm going to show you what's been marked as Movant's Exhibit 31, if you could look at that.  Do you recognize that?

A.    Yes.

Q.    And what is that?

461

A.    That's my CV.

Q.    And does this CV -- excuse me.  Is this CV current?  It's the one we received a couple years ago.

A.    Actually it's not.

Q.    Okay.  Up until 2000 and say '12 or '13, was it current?

A.    Oh, yes, yes, it was.

Q.    And what types of things have you done since the writing of this?

A.    So what's missing on here for sure is the grant that I've gotten.  In fact, I got two grants.  One was from a consortium or a coalition of foundations headed by Missouri Foundation for Health, Incarnate Word, Deaconess.  I have --

Q.    Excuse me?

A.    There were eight foundations that funded it.  In the second year we got a larger grant from the Missouri Foundation for Health.  The book is not on here.  My most recent book is not on here.

Q.    Because it's just now currently in press, right?

A.    Yes.  Well it's not been undated.

Q.    Because this isn't updated.  Other than those updates, does this CV generally tell us your -- accurately your educational background and your work

experience and your research, publication, and books?

A.    Yes, generally.

MS. LEFTWICH:  Move for admission of Movant's Exhibit 31.

MR. WALDEMER:  No objection.

THE COURT:  Shall be received.

Q.    (By Ms. Leftwich)  Now, Professor White, you have used a concept known as risk immersion in your writings and your research.  What is risk immersion?

A.    So in the field, in my field, the developmental criminologists look at the factors that influence people to be involved in criminal behavior in what they call an ecological framework.  That framework is families and peers and institutions that they interact with, the communities they live in as well as kind of individual factors.  What that research generally has shown is that having a problem in one of those areas, while it may put somebody at risk to be involved in delinquency, it's not as bad as having stuff going on in all of the areas of one's life.

As I did work in the community more and more over the last probably 8 years, I came to the conclusion that people were not at risk but they were living in risk so I began to coin the phrase that I call risk immersion, that they are surrounded by factors that are

463

just present all the time and that have an impact on their -- I would say the choices that they make or the conditions that they have to experience.

Q.   I believe you started out talking about this risk immersion in terms of delinquency. What are you talking about there?

A.   Delinquency is things kids do during their teen years. It's -- some of it is real violations of laws, but some of it is status offenses, things that -- truancy, smoking, drinking, not paying attention to your parents, running away, but what the ones that -- the young people who are most involved in more serious kinds of offending are the ones who have challenges in many areas of their life, and the research tends to show that they are more -- they are at a greater risk to be involved in gang activity or in violence or serious offending in general.

Q.   So is what you've described as risk immersion, is this an area within your research and within your prior work with juveniles that you focused on throughout your career?

A.   It's something that I came to as a result of going back to school. When I worked in the institutions for kids in New York, we used to think we did really great work, and we would have guys that we

464

would work with for a number of years.  We would send them back down to -- mostly to New York City, and very often they came back to us and a lot of times they wound up getting killed on the streets, and I didn't understand it then in the way I do now.  When I went back to school and began this tract into developmental work, what I came to understand is that the forces around these young guys were so intense that it was really hard to keep themselves out of that, even when they wanted to make different choices, so I came to the risk immersion paradigm as maybe it would be called as a function of a growth of my experience.

Q.    And since the time you've gone back to school, you've used this concept in your teachings as well as your work within the community, etc.?

A.    Yes.  It's a core part of the book that's about to be published.

Q.    I want to direct your attention now to Vincent McFadden.  How and by whom were you contacted in regard to Vincent's post-conviction case, the case we're doing right now?

A.    I was initially contacted by Belinda Long I think her name was and Robert Lundt.

Q.    And would that have been a mitigation specialist and one of the attorneys at that time who

465

represented Vincent?

A.   Yes.

Q.   And when they contacted you, what were you asked to do with Vincent's case?

A.   They said that they wanted me to look at Pine Lawn.  They wanted me to kind of look at the social conditions that Vincent had grown up in and to create a profile around that.

Q.   And when you say profile, what do you mean by that?

A.   I guess in many ways to paint a picture of what it was --  life was like for him growing up and what that could have meant and what impact that might have had on him as an individual.

Q.   And so did that include what life was like in general in the Pine Lawn area and the surrounding community?

A.   Yes.  In fact, this was not really to be about Vincent, per se.  It was really about the environment that he grew up in and that many other kids were growing up in at that time.

Q.   And was there a particular time period you were looking at?

A.   It was during his youth, you know, from a developmental perspective, so in the 1980's, '90's,

during that formative period.

Q.   That would be up until perhaps he was 20, 21 years old?

A.   Yes.

Q.   Did you review any information or talk with anyone as a part of your work on this case?

A.   They shared with me some reports, some files, from I think it was a Dr. Draper's report and some additional -- some newspaper clippings about Pine Lawn back then.  I talked to a number of people.  I talked to Vincent a few times.  I talked to George Wells and Thurman -- I've given up.

Q.   Thurman Shelton?

A.   Yes.  So I spoke to them.  I spoke to Miss Elaine Hood and her daughter.  I spoke to some other people outside of Pine Lawn and that I had met through Better Family Life, work I was doing with Better Family Life, because there were a lot of people that had had previous lives in gang activity or crime.

Q.   And something like that, when you talk to people at other -- I would guess institutions or other communities, places such as a Better Family Life, was that something that the attorneys who hired you said as part of your -- as part of the scope of what you were looking at on this case, they kind of let you talk to

467

people you knew so you could get some information, or did they direct you to go to places?

A.   No.   I talked to people that I thought I needed to talk to.

Q.   Now you've talked about George Wells and Thurman Shelton.   Did you interview those two men in prison?

A.   Yes, I did.

Q.   And you also interviewed Vincent McFadden. That would have been in prison as well?

A.   At Potosi, yeah.

Q.   Now did you speak to other individuals in the Pine Lawn community, some who knew Vincent and some who do not?

A.   I did.   Some names I can't recall.   There was a group that came in that was doing a video that -- I was present for many of those.   I just don't remember names.

Q.   Did you speak with someone by the name of Tanesia Kirkman?

A.   Yes, I did.

Q.   Who is now Tanesia Clark I believe.   You may not know that.   Did you speak with an Al Jackson, also known as Gangsta?

A.   Yes.   I spoke to Gangsta.   I didn't know his

468

name was Al Jackson.

Q.   G-a-n-g-s-t-a, right?

A.   Yes.

Q.   So you only knew him by his street name?

A.   Yes.

Q.   And was that someone that you had found in Pine Lawn?

A.   He was introduced to me by Tanesia.

Q.   And did you speak with a James Hubbard?

A.   Yeah, I did.

Q.   And did you also speak with Jamala Rogers?

A.   Yes.

Q.   That's J-a-m --

A.   A-l-a.

Q.   A-l-a.   And who is that?

A.   Jamala was someone I've known for a number of years in St. Louis since I got here who worked in the mayor's office in the 1990's.  She was -- I don't know what her official title was, but she was involved in youth services in the City of St. Louis at the time when a lot of the gang activity was going on.  She was -- I met her through a program called Safe Futures that was an intervention that was designed to be place based to try to bring some change to the environment that it -- and it was in north St. Louis.  It was off Grand.  I

don't know what the catch-man area was.

Q.    So speaking with someone like Jamala Rogers, was that in an attempt to gather information on communities such as Pine Lawn and communities close to Pine Lawn over the years?

A.    Yes.

Q.    So why was it important to interview Vincent and other individuals from the Pine Lawn community who lived there during the time that Vincent was growing up, during that time period?

A.    Just wanted us to have an experience, one was experiencing it, what it was like there.  We can make assumptions.  One of the things -- one of the reasons I do this community engagement work is that I think a lot of time academics -- we read books and we read articles but we don't understand the lives that are impacted by that, and I tend to want to be in the community and listen to people and to listen how those factors matter.

Q.    In Vincent's case did you apply your education, your background, and your experience to what they were telling you to form conclusions and opinions in regard to this case?

A.    Yes.

Q.    And did all these interviews assist you in

470

coming to the conclusions about Vincent McFadden and about the community of Pine Lawn and the surrounding areas that are contained in a report that you wrote?

A.   Yes.

Q.   Now in regard to writing the report, were you asked to do that by the attorneys on the post-conviction case?

A.   Yes.

Q.   And prior to your work on this post-conviction case, had you prepared a PowerPoint type of report entitled a Framework for Examining Social Mitigation as part of your work in the communities?

A.   Yeah.  I prepared it because I was offering a proposal as to what I would try to do in terms of the work.

Q.   And do both the summary report that you wrote and this PowerPoint type of presentation contain research and information that you've obtained through your work on this case as well as your opinions and conclusions?

A.   Yes.

Q.   I'm going to show you what has been marked as Movant's Exhibit 32A and 32B.  Do you recognize Movant's 32A and 32B?

A.   Yeah.  This is the report I wrote.  This is

471

the --

Q.   When you say this is -- is 32A the report you wrote?

A.   I'm sorry.  32A is the report I wrote.  32B is the presentation I made to them.

Q.   When you say them, you are talking about --

A.   To Belinda -- well to the attorneys and Belinda.

Q.   And that's the presentation you made when you were first discussing work on the case?

A.   Yes.

        MS. LEFTWICH:  Move for admission of Movant's 32A and 32B.

        MR. WALDEMER:  No objection.

        THE COURT:  Shall be received.

Q.   (By Ms. Leftwich)  Just for the record, there is no cover page or title page on this report I've put in; is that correct?

A.   Yeah.  I submitted it, yeah.

Q.   Okay.  Just to make sure we're not missing a page, but this is the report you prepared?

A.   Yes.

Q.   Now after preparing your summary report, did you continue to do some additional interviewing and research after you wrote that report?

A.   Yes, I did.

Q.   And if you know, is part of the reason you continued to do research not only that you had more that you wanted to do but also the court dates in this case got put off?

A.   Yes, that's correct.

Q.   Let me ask you, based on your years of experience and research, what is the importance of place in regard to violence and delinquency in youth?

A.   Place matters.

Q.   And why is that?

A.   The conditions that exist, particularly in poor urban communities, poor black communities, in cities are significant predictors and factors in the presence of crime and violence and other social problems.  There's a clustering in those spaces in ways that they can have predictive value for social sciences.

Q.   Well in your research and background, have you found that environmental factors are highly correlated with crime?

A.   Yes.

Q.   And how about -- how are social conditions such as lack of education, poverty, illegitimate births, how are those things associated with high crime

473

rates for young black men in urban communities?

A. They all have varying levels of significance in terms of prediction, that they tend to be much more predictive at the kind of the macro level, so when you have a cluster of those things, they tend to be more predictive of crime rates for a community. At the individual level, it is variation.

Q. When you have many of those factors all mixed together, what impact does that have on the community and the individuals in that community?

A. In my work and what I've been proposing and what I've been writing about is that essentially it places everybody in risk. You are kind of -- it's the air you breathe almost. It's hard to escape. It's always present. It's present in different ways and at different times, so all those factors that are going on in somebody's life, and some may be important today; they may not be important tomorrow. They may rise and fall but they place an extraordinary burden on individuals.

Q. And is that part of your whole concept of risk immersion?

A. Yes.

Q. And that would be being immersed in all of these social ills and other problems. It creates a

474

specific risk to youth.

A. Individuals, but what's even more, and this is something that I have been -- we're trying to convey in this book we've just written, that that it's not only the young people or the individuals that are impacted. It's community as a whole and that those conditions are criminogenic in nature and they place everybody at or in risk. The challenge at this point, I just recently did a talk, a Ted Talk, where my point was that it's time to change those conditions, because if we don't change the conditions, we keep getting the same thing.

Historically, historically that there is research that dates back to the early 1800's that says, if you have these conditions, you get these kinds of outcomes. So in 1831 there was some social scientist in France and in Belgium who did research, and they showed that where poverty and the kind of clustering that we see here in our United States, when they were present, there were high levels of crime. There were high levels of illiteracy. There were high levels of social problems. In the late 1800's in Philadelphia, W.E.B. DuBois' work in that African-American community, there showed that in the areas of the Negro war where poverty clustered, crime was high. In the 1940's in Chicago there's some social scientist that said the same thing

475

about Chicago. When -- they actually, in fact, called the areas where crime happened natural areas of crime. It's a constant in terms of the impact it has. This isn't a black thing. It's not a white thing. It's a circumstance, set of circumstances, that make it very difficult for individuals to negotiate life on life's terms.

Q.   So you are saying that the presence of all those external and internal stressors create a climate in which youth are at high risk?

A.   Yes.

Q.   Let's talk specifically about Pine Lawn. Did you research information on such things as population, poverty, etc., for Pine Lawn and the surrounding communities for the time period when Vincent was growing up, between 1990 and 2000?

A.   Yes, I did.

Q.   And that would have been between the times he was 10 and 20. He was born in 1980, correct?

A.   (Nodded)

Q.   Is that yes?

A.   Yes. I'm sorry.

Q.   And would this time period and maybe the latter part of the 1980's be particularly relevant to your work on this case?

476

A.   For sure.

Q.   And why would that be?

A.   During that time across the country, there was an exploding problem of crack cocaine, and it was present in particularly black communities across the country.  As that began to -- as the crack epidemic as they called it began to increase, there was a growing pattern of gang proliferations.  There were lots of gangs developing.  There was a lot of violence associated with that.

Q.   Between 1980 when Vincent was born and 2003 when he was arrested for this case, would that time period be significant in you reaching your conclusions about Pine Lawn and that community during the time Vincent was growing up?

A.   Yes.

Q.   Now in your work on this case, did you research population and other statistics for the City of Pine Lawn for that particular time period?

A.   Yes.

Q.   Where did you get your information on those statistics about Pine Lawn over the years?

A.   The Census Bureau.

Q.   The U.S. Census Bureau?

A.   Yes.

Q. And what did your research tell you about the population in Pine Lawn during this time period? And if you need to refer to your report for exact numbers, it is contained on page 7 I believe of your summary report.

A. Well -- and I didn't necessarily need to look to tell you this, that in -- what was happening was that there was a concentration of hyper segregation, so Pine Lawn was a predominantly black community, and the surrounding areas were becoming similar to that. They were transitioning. They were going from having been white middle class to black poor or black middle class, and then there was this growth of poor people moving into the community. There were a lot of single parent households. There was a lot of unemployment. I think there was a lot of illiteracies so there were -- a lot of the adults were without high school education which contributed to the high unemployment pattern that existed there.

Q. Well to give us an idea, does your report indicate the population of the entire city of Pine Lawn in 1990?

A. Yes, it does. It was 5,092 people.

Q. So it's not a really large area; is that correct?

478

A.    No, no, relatively speaking.

Q.    And between 1990 and 2000 did the population decline?

A.    By about 35 percent.

Q.    Between --

A.    Oh, 17 percent.

Q.    And then after that by --

A.    35 percent.

Q.    And what was the primary racial makeup of Pine Lawn in 1990 according to the Census?

A.    93 percent.

Q.    93 percent African-American?

A.    Yes, African-American.

Q.    And then by 2010 was it --

A.    It was 96 percent by then, so it was becoming even more segregated.

Q.    So when you talk about this transitioning of these neighborhoods from white middle class to more segregated poor areas, that's continuing to happen?

A.    Yes.  But there is an issue that some of the other areas were also becoming, what, transitioning and becoming hyper segregated, so there were becoming more concentrated areas of African-American population in the surrounding areas as well.

Q.    What areas are you talking about?

479

Municipalities that border Pine Lawn?

A. Beverly Hills, Northwoods, Velda City, Hillsdale, those places around there.

Q. So they were all becoming similarly populated?

A. Yes.

Q. Now what is the importance of these population statistics to your overall conclusions and opinions about risk immersion as it relates to Vincent McFadden and the Pine Lawn community?

A. That it was, again, it was just a concentration of poverty. In the book that we have forthcoming, we call it ethnic spacial compression, so you have communities where people are -- of African-Americans in particular are concentrated there. They have less ability to move away from there, and with that suppression, what you get is the patterns of increasing poverty and other issues that are germane to crime.

Q. Is that when you are talking about when you previously talked about social stressors? Is that what you were talking about, things like health disparity in poor community, high rate crimes, and things like that?

A. Yes.

Q. Now in your research what did you find to be the unemployment rate in Pine Lawn between 1990 and

480

2000?

A.   In 1990 it was 17.7 percent.  It changed.  It went to 16 percent and then rolls again -- well it was 16 percent in 2000 and went back up to 19.1 in 2010.

Q.   What about Pine Lawn poverty rate during this period of time?

A.   The poverty rate was relatively high.  Well it was 22 percent in 1990, but then it went to 36.9 percent in 2000.

Q.   Over that ten-year span it rose quite rapidly?

A.   Yes.  And there were a lot of single-parent households.  So in 1990 there were 42.6 percent single parent households, and in 2000 there were 69 percent of the households were single parent.

Q.   So the single parent household, the numbers also shot up in that ten-year period between 1990 and 2000?

A.   Yes.

Q.   And in 1990 were there a lot of households that had children under the age of 18 in Pine Lawn as well?

A.   Let me see if I can find it.  Yes.  56 percent of the households had children under the age of 18.  That matters in -- it mattered for me in terms of what I was looking at, in that you had single parents trying

481

to raise kids.  In interviews that I had done with -- was doing with young people and in other meetings I had been to around town, a lot of the mothers that were raising those children were working multiple jobs so supervision was difficult for them, that kids in some respect were raising themselves, having to raise themselves because there was nobody around.

Q.   And all of those conclusions are borne out of the facts from the Census Bureau that you looked at; is that correct?

A.   Yes.

Q.   Now how much of the total population of Pine Lawn in 1990 consisted of young people between the ages of birth to 24 years old?

A.   Two-fifths of it.

Q.   What did you discover about the crime rate in the City of Pine Lawn during this time-frame or were you able to discover?

A.   I wasn't confident with creating a crime rate. I got numbers of crimes reported or committed in that area.  In 1993 what I was able to garner was that there were 834 crimes committed, total crimes.  612 the following year.  712 and 667.  The reason I'm not confident is that the Uniform Crime Report is a voluntary reporting system and Pine Lawn wasn't always

reporting what was going on in their city.

Q. But from the numbers that you were able to get, we're talking about a community of less than 6,000 people and you indicated in '94, 612 crimes. In '96, 712 crimes. Is that a fairly high rate of crime?

A. It would seem like that to me.

Q. In your experience?

A. Yes.

Q. And this would be reported crime?

A. Yes, it's reported crime. I'm sure there was a lot more that wasn't getting reported.

Q. Now in your experience working in the area of criminal justice -- sorry. I just asked you that question. I believe you indicated previously that you reviewed a report written by Dr. Wanda Draper and her previous testimony perhaps?

A. Uh-huh.

Q. Did you do that as part of your work on this case?

A. Yes.

Q. What did you find significant to your evaluation and conclusions in her report and testimony?

A. I remember reading that Vincent had been born low birth weight, and there was a lot of research that talks about low birth rate and its relationship to

violence and that sort of connection, that -- and serious offending in general.  There was a reference to his lack of bonding with his mother, which I actually was not so clear on given how much she was working.  It made sense that they may not have been as close as possible but she was working a lot, but the combination of those things just began to be red flags in my mind.

Q.  Did the report you reviewed and her testimony, previous testimony, did that -- was that consistent with your information regarding high-risk areas where he lived?

A.  Yes.  I think in her report -- maybe I'm wrong.  I can look -- that she talked about some of the impact because Vincent was small growing up and that he had been -- that there were other kids who bothered him because of his size.  He got into fights because of that, kind of defending himself.

Q.  And you indicated that you interviewed Vincent.  How many times did you meet with Vincent for your interviews?

A.  I think I met with him four times in total.

Q.  And how many times did you meet with him prior to writing your report?

A.  Twice.

Q.  And were both of those at Potosi Correctional

484

Center?

A.    Yes.

Q.    Now what was important for your part of the case -- what is the importance of interviewing Vincent in forming your conclusions and opinions about risk immersion and what was happening in the community?

A.    I need to hear about what his experience had been, what he -- how he had experienced the community. One of the things that he said a couple of times, and I think that it's important to recognize, is that people take -- kids take the shape of the container they're in, and that if you are in a container that has all that swirl around you, you have to figure out how to negotiate that, and that's consistent with writings by a guy by the name of Elijah Anderson who wrote a book called Code of the Streets. He's done a number of demographic studies, but the Code of the Streets stands out to me as an important book because what the Code of the Streets talks about is that even in a community where when they were kids who were trying to do the right thing, that are good kids, that they have to learn how to negotiate the world that they're in, that they have to know what the code of the streets is in order to survive, so you can't get away from it. You are immersed in it and you are present and it's present

485

on a regular basis.

Q.    Now what of significance to your evaluation in this case did you find in your interview with Vincent?

A.    Say that again.

Q.    What of significance to your evaluation in this case did you find in your interviews with Vincent? What kinds of things were significant to you?

A.    What was significant was -- I'm trying to think through -- that he was a guy who -- this was my interpretation.  Here was a guy who was a product of the storm he was in.  When we first met on our first meeting, I said to him, I didn't think that anything I could do was going to change the course of what was going on in his life and that he was free to talk to me.  In fact, that's why I said that I wanted to meet with him because I wasn't sure that he even wanted this case, this mitigation work to be done, and that I would only do it if he said that it was okay to do it.  When I met with him that first time, we talked about what the mitigation was going to be and the direction I was going to go in, and what -- we talked about his son a lot and that he has a young son that he had lots of hopes for, and what I suggested to him was that even if I couldn't change the course of what was happening for him that maybe the ability to make this story real for

486

people would help his son some day or help some other kid on the street, and he told me, please come back and let's do this.

Q.   So when you went back and you spoke to Vincent, what is significant to you?  Did he tell you about what living in Pine Lawn was like during the time he was growing up?

A.   He talked a lot about the danger of dealing with the police there, that the police were pretty -- I would suggest brutal.  There was a lot of what seemed like corruption, that there was a need to feel that they had to kind of fend for themselves.  Is there something I've said in here that I need to --

Q.   Well let me just ask you, what if anything did Vincent tell you it was like whenever he went outside of his house?

A.   Oh.  He suggested to be outside meant that they had to post up, that it was really unsafe.  It was a really unsafe place, and it wasn't just about the police.  It was about other people in the community, that if you were on your porch, you had to be posted in a way to make sure that you could see where people were coming from, that it was a lot of danger there, that you had to be vigilant, that you had to be on your toes.  Maybe not his words but that's what I

487

interpreted what he was saying, that that was a constant to the point of -- and this came later after some of the interviews I did.  I had been -- I had talked to a number of people, and they had described Pine Lawn as a war zone, and I needed to understand what that meant and what it meant to be in a place that was a war zone, in that I talked to a -- one of my students who was a vet from Iraq and talked about what it takes to be -- what experience in war is like and not so much what he said about the experience of that but what he said at the end of my interview with him was that the difference between a soldier and the young people that I was talking about and that I am looking at is that in -- when you are in the service that the Army knows you can't be on edge all the time so they send you away.  Every once in awhile they send you out of there so that you are not in a place where you are just always vigilant, because the people that are at that point, once they get to that point, they're dangerous because they -- it's hard for them to differentiate what's good around them.

So I went back, and actually one of the interviews I did with Vincent and I think with Thurman and George, I asked them what do they do to relax.  How did they relax in Pine Lawn, and all of them were like -- one of

488

them, Thurman, looked at me and didn't understand what the question meant. What do you mean relax, was kind of what he was saying, but they all suggested that the only time that they didn't have to be on their toes, the only time they didn't have to post up, the only time that they didn't feel in danger was when they left the area. I think that Vincent suggested that if he needed to breathe that he would go out of town. He would go out state and stay in a hotel for a little while, and then he would come back and he would have gotten some rest.

Q. When you say out state, you are not talking about --

A. Out of the Pine Lawn area, so he might have gone a little further out on 70. I'm not from here. I'm from New York so I don't know how far out he would have to -- he would have gone and I didn't ask him that.

Q. I want to make it clear. When you say out state --

A. In Missouri, out of St. Louis, out of Pine Lawn particularly.

Q. Now what if anything did Vincent tell you about gangs in that community?

A. I'm trying to remember. I think that there

489

was a presence.  We didn't talk a lot about the gang life, but that what it was about for him and for many was that they were protecting their community, that people would come in and bring violence into the community so they always had to be prepared to defend themselves against it, and, again, I don't know that he said that that was like a gang, but it was -- it was about being in a gang, but it was about, we are -- we have to protect the families and the kids that are here, and I'm not sure whether --

Q.   In talking to Vincent and spending time in Pine Lawn talking to other people, did you get any information in regard to sects or how these gangs or groups were made up in that community?

A.   Well what was happening during that time in the late '80's and early '90's, and I'm not saying it's continued into now, is that groups of young people came together in what they described as sects.  They were defending blocks.  It wasn't -- when we look into media and they talk about Crips and Bloods, you think of it as like some unified army, when, in fact, it's not that.  People may take colors but they're defending a small strip of land that's the block they live on, and what that did was it created boundaries that were really dangerous because you can be in your block, have

490

a group of people that are defending your block, and then the next block over there's a group of people defending that block which makes it really hard to function, because if you leave your block, you are in enemy territory.

One of my conversations with Vincent, he described it as being in a box, that if you are growing up in a place like that, that you are in a box and that that's who you are. He called it them and suggested that there are a lot of boxes around that are outside of the communities, but then even more importantly, and I think that this was a really, really important piece of what I got from him, was that even within that space that you grow up in, that there are boxes. There are other people who were trying to negotiate who the other them's are and who is safe to be around, and that stands out from an interview that was done with James Hubbard. James described how he was shot by a friend of his because somebody put a hit out on him, so a friend of his shot him, and after he was shot and got out of the hospital and was on crutches, he went and found the guy and shot him.

I asked -- at one point I asked Vincent about trust, an issue around trust and who can you trust, and his response -- I didn't understand it when he said it

491

but he said, who sits in the back seat of your car? I said, what do you mean? What do you mean? And what he suggested was, if you allow somebody to sit behind you, that's somebody you really trust because you turn your back on them essentially, and I asked him, who sits in the back seat of his car, and he said nobody.

Q. So in that area of trust and safety, were the people that you interviewed, particularly the ones you interviewed that were in prison, pretty consistent with those kinds of answers?

A. Yes, yes.

Q. And you did interview Thurman Shelton and George Wells in prison, correct?

A. Yes, I did.

Q. And were both of those individuals from Pine Lawn or closely surrounding communities?

A. Yes.

Q. Now in a high-risk community such as Pine Lawn, what are the options presented to young men growing up there for their futures, what if any?

A. There's not a lot. There's not a lot. You know, there's not a lot of employment. The kinds of jobs that are available don't pay a lot, and in many cases if you go back to what I said about the number of people who have no high school diploma in that

community, that even those jobs aren't available, because without a high school diploma, it's really hard to get a job, so the prospects of the future aren't great.

The schools that they were attending for that community was what one of the people I interviewed, Sarah Hubbard, suggested was probably it was worse than being on the street. It was worse than being on the street, that when she and her family moved from south St. Louis City to Pine Lawn because her mother was moving there to make their lives better, thinking that she was moving to what was the suburbs, and the first day of school she said she got to school and it was like being on the street because there was so much gang activity and so many fights between sects that within the first month of school, she stopped going to school, so the prospects for young people were poor.

Q.  Let me ask for the record for clarification. If your report indicates that that would have been Sarah Hood and not --

A.  Sarah Hood.  Yes.  I'm sorry.

Q.  I want to make sure we have it.  That's okay.

A.  I'm getting older, aren't I.

Q.  There's a lot of names to remember, but your report would be the accurate one, correct?

A.   Yes, she and her mother.

Q.   Now in your research for Pine Lawn and surrounding communities, in talking to Vincent and the other individuals who grew up there, what did you find out about men or of Vincent's current age in that community?  Where are they now?

A.   Almost everybody that I talked to said they were either dead or in prison.  So Sarah Hood, when I asked her and her mother about funerals, how many funerals had they attended, and her mother said that she thought it was like 5 or so, 5 to 10.  Sarah shook her head and said, no, that's not true.  Better than 20, and then she said that most of her friends, particularly the male friends, are either dead or in prison.  Death became common.

Q.   When you say Sarah's mother, you are talking about Elaine Hood?

A.   Elaine Hood, yes.

Q.   Now you said you interviewed Vincent twice before your report and maybe a couple times after you wrote your report.  Were all your interviews with Vincent consistent with your research and experience on living in high-risk communities and risk immersion?

A.   Yes.

Q.   Was that consistent with that?

A.   Yes.   The interview that I did after I finished the report, when I went back, because this was going on and I wanted to understand how did growing up in that space matter, so in one of the interviews --

MR. WALDEMER:   Well, Judge, I am going to object at this point.   We've been provided with absolutely no information about any further interviews or work done after the report was complete.

MS. LEFTWICH:   Judge, the end of the report indicates, If I have more time, I would like to do these other things.   And, in fact, I have offered up Professor White for deposition to Mr. Waldemer on more than one occasion.   People don't have to stop working on a case because they write a report, and nobody is required to write one report or more reports.   If he wanted to know what he was going to say in court, he should have deposed him.

MR. WALDEMER:   Well, your Honor, the rules of discovery regarding experts require that they provide the materials that the expert has looked at so that there's not surprise in trial.   There is no requirement that I depose anyone.   She's required to give me his opinion and any supplemental materials that he's viewed.   That's my point.   I haven't been given

495

those.

MS. LEFTWICH:  He has been given his opinion.  It's in his report.  Everything is in his report that he's testified to up to this time.

MR. WALDEMER:  That's why I didn't object before this.

MS. LEFTWICH:  And if he didn't have any written report of any interview he did after the report, there's nothing to turn over except for what Professor White has to say and can say by Mr. Waldemer taking the time and spending the money to question him.

THE COURT:  Mr. White, the subsequent interview that you did with Mr. McFadden, was the content of those memorialized in any way and given to defense counsel?

THE WITNESS:  No.

THE COURT:  And did those interviews change your opinion in any way of what you have discussed in your hard copy, which is Movant's 32A?

THE WITNESS:  They reinforced, your Honor.

THE COURT:  The objection will be sustained.  I understand.

MS. LEFTWICH:  So you're sustaining --

THE COURT:  I'm saying that since he did not memorialize in any manner his subsequent

discussions with Mr. McFadden and he says that they did not change his opinion in any way, if anything they reinforced it, that I'm going to sustain the objection because it was not turned over, and he said it didn't change his opinion, that we'll just move on.

MS. LEFTWICH: Okay, Judge.

Now, Professor White, did you also participate in some videotaped interviews about living in Pine Lawn and its surrounding communities as part of your work on Vincent's case?

A. Yes.

Q. (By Ms. Leftwich) And did many of those interviews actually take place in the community of Pine Lawn?

A. Yes. Some of them took place in a barbershop. I don't remember the name of it. Some were in a barbershop or near a barbershop. Some, at a park, yes.

Q. Were others at individuals' houses?

A. Some houses, yes.

Q. And have you reviewed this entire video that was done in regard to interviewing people about Pine Lawn?

A. Yes.

Q. Now were you there for all the interviews on that video?

A.   No.   There were a few people I didn't -- I wasn't at for.

Q.   Did you ever use all of the information from the entire video to form your opinions and conclusions in this case?

A.   Yes.

Q.   Was that yes?

A.   Yes.   I'm sorry.

Q.   And does that entire video assist in explaining your testimony here today and how you came to your opinions and conclusions?

A.   Yes.

MS. LEFTWICH:   Your Honor, I have Movant's Exhibit 37, which is the video that we are speaking about that Professor White used and was there for most of it and also used as part to form in his opinion.  I would like to play that video for the Court and for Professor White as part of his testimony, and it's marked as Movant's Exhibit 37.  I anticipate there will be an objection.

THE COURT:   How long is it?

MS. LEFTWICH:   Twenty-five minutes.

MR. WALDEMER:   Twenty-seven minutes.

THE COURT:   You gave me consent to see the others in camera.  If I -- first let's go over the

objection.  If there's no objection, I can always watch this tomorrow afternoon.

MS. LEFTWICH:  Your Honor, my intent is that it be watched during his testimony.  He may have some questions to ask him about things that are on the video in cross-examination, and I believe it would be helpful to the Court to have seen it.

MR. WALDEMER:  I don't have any cross-examination regarding the video.  I have an objection to it, but I'm not going to cross-examine.

THE COURT:  The objection is?

MR. WALDEMER:  My objection, your Honor, my objection is, is that there is a 27-minute video without any authenticity to it or credit to it as to how it was made.  It contains numerous opinions, inadmissible hearsay, allegations that have not been tested or that I have no way of verifying.  Many of the people on the video are not identified yet.  They go ahead and state their opinions.  They're not subject to cross-examination or testing of the validity of any of their opinions or facts.  They talk about a lot of unsubstantiated and irrelevant offenses, including crimes and police misconduct.  There are quotations and highlights from magazines, unidentified individuals from the defendant as well.  There's dramatic music on

499

the video added for effect. They talk about unproven allegations of government corruption and police misconduct that I can't cross-examine. It has a narrator that gives his opinion throughout the video, and none of that can I cross-examine. It's not a demonstrative exhibit. It's nothing different than any of the statistics that the professor has looked at which he can use to form his opinion. However, using that book or whatever it is when it's not subject to any cross-examination I think is improper. This is a video made by someone who I have no idea who made it. They're not here to be cross-examined.

MS. LEFTWICH: Your Honor, Professor White has indicated he was at those interviews that are on the video -- most of them. There may be two that he wasn't. Three of the people in the video -- there's only seven people in the video, three of whom are in the motions, listed in the motion as witnesses in regard to Pine Lawn and in the area. One person has passed away, Miss Clara Wings. She is contained in the amended motion, and she has since passed away.

Judge, there is no narrator. I don't know what he's talking about in regards to a narrator. There are quotes taken from things that people say in the video and written up there because it is a video of what you

would present to a jury at trial. Just as the State has -- the law indicates that the State is allowed and has in the past presented videos of victims singing around the Christmas tree after they've passed away, things of that nature, to the jury. There's nothing that says that such video cannot be presented from the defense side to assist the jury in understanding Professor White's testimony in determining what Professor White's credibility because they can see the people he talked to telling him these things about Pine Lawn. I don't see that there's any problem after his testimony, something he's used to base his opinion on and his conclusion. It's no different than what he is saying. He's already testified to individuals telling him about Pine Lawn, in fact, to assist the Court and the jury in determining the credibility of what these people are saying to him because they can see him while they're talking.

THE COURT: Well let me ask you this: I watched four plus hours of video of four individuals that were in the penitentiary; is that true?

MS. LEFTWICH: Yes.

THE COURT: I have heard from six live witnesses that have testified about the environment in or around Pine Lawn at or near the time that Mr.

501

McFadden was growing up.  I have heard a narrative of all of the interviews the professor had.  I have a feeling it's going to be repetitive.

Again, Professor, did this have a significant impact on the opinions you came to?  Did you -- at what point during your preparation of this report did you see this video?

THE WITNESS:  It's hard for me to remember.

THE COURT:  Did it change anything that was in here?  You interviewed a bunch of people.  I'm going to sustain the objection.

MS. LEFTWICH:  Your Honor, I'd like to make an offer of proof.  If the Court would like to watch it over lunch or whenever the Court needs to watch it, I would like to make it a part of the record and make the video an offer of proof.

THE COURT:  That will be fine.  I'll watch it over lunch.

MS. LEFTWICH:  Great.

THE COURT:  Is it a CD I hope?

MS. LEFTWICH:  It is a DVD, yes.  No, it's not.

(A discussion was had off the record.)

(End of Volume III)

502

NORMAN WHITE,

having retaken the stand, testified:

DIRECT EXAMINATION (cont.)

Q. (By Ms. Leftwich) Thank you. Professor White, I don't have that much more, so I know you don't believe me but I'll start now. We talked previously

about the fact that you spoke to Elaine Hood and her daughter, Sarah, and I think you've touched on that.

A.   Yes.

Q.   Just briefly what information significant to your conclusions and opinions did you get from Miss Hood and her daughter?

A.   Basically how dangerous it was to live in Pine Lawn during that time.  While I was interviewing them, Miss Hood said something about that they had rug burns on their knees a lot, and I didn't understand that, and I asked her what that meant, and she said that they had to crawl around the house because there was so much shooting that went on when they were afraid of bullets coming through windows and walls.  Again, it was just part of -- I had heard that before, and it just reinforced that Pine Lawn during that time was not a place that many people felt safe.

Q.   Now did Miss Hood, Elaine Hood -- I think they also called her Miss Elaine -- did she indicate to you that her house was a safe house?  And if you can say why she said it was a safe house.

A.   Well she suggested that there were rules of the -- in the community and that there were places that the stuff that was on the streets wouldn't come into the streets, so when guys came to visit their

daughters, that her daughters -- I think she had two or three daughters -- that they wouldn't come into the house, and her house wasn't the only one. There were other older community members that had that same respect from the guys on the street she said.

Q. Now we've talked about the fact that you interviewed George Wells who was in prison at the time you interviewed him. Did you recall at all what he was in prison for?

A. Actually I don't.

Q. Did you even talk to him about that?

A. I didn't ask him that. I didn't ask anybody.

Q. Well, I know we touched on briefly what he told you, but he's provided testimony to the Court through his deposition, so if you can state briefly how his interview assisted you in reaching your conclusions and opinions in the case.

A. Again, as I talked to him, what stood out to me was the level of pain that he was experiencing growing up there, that his family was pretty disrupted, that school wasn't a safe place, that I think he remembers -- he talked about, I think it was his brother getting killed. It may have been seeing the body, but it was just really painful, and that at one point he said to me that all of his life he had been

626

standing in the middle of the street screaming at the top of his lungs trying to get people to listen to him to how bad things were and that nobody had listened, and that that held true in the prison now, that in the yard there were guys standing there screaming at the top of their lungs, wanting people to understand how bad it was and that nobody was listening. For me that just reinforced that the struggle of living in risk and the pain that comes with that.

Q. When you say standing in the middle of the street yelling and screaming, do you mean literally?

A. Not literally but figuratively was talking about that.

Q. Did George Wells tell you that his father was sent to jail when he was young?

A. He might have. I don't recall.

Q. If your report indicates that, would that be accurate?

A. Yes.

Q. Now you also interviewed Thurman Shelton in prison?

A. Yes.

Q. Now what did you find significant in forming your conclusions and opinions about him?

A. What was interesting was that he had moved

627

into Pine Lawn at -- I forget what age it was, and his mother was working really hard. He was kind of the adult in the house. She was a single parent. He was watching his brothers and sisters, that the struggle of Pine Lawn for him began as soon as he started school, that he had to fight to defend himself, that he had to gain the respect of people in the community.

Q. Now you said after he moved there --

A. After he moved in, yes.

Q. As a new kid?

A. Yes. He also said something that kind of went to the work that I do, that even if you were trying to do the right thing, if you were at the basketball court, for example, and there was a basketball game going on and something happened at the court, the people in the court -- the people that were there had to know that you were trustworthy, that you weren't going to tell people about what happened, that you weren't going to put them or be a threat to them, because if you were a threat to them, that would be a problem, so over time he felt he gained the respect of people because he did the right thing. He would be quiet and just be present, and that he gained the respect because he fought back and he did what he had to do to be there.

Q.   So when he says, do the right thing, he means the right thing in regard to the norms and rules of the neighborhood?

A.   Right, the kind of the code of the street stuff that I talked about earlier.

Q.   Your report indicates -- all right.  You said you had an occasion to speak with Jamala Rogers, who is the Director of Youth Development Services in the City of St. Louis as part of your research, right?

A.   Yes.

Q.   You spoke to her because she was knowledgeable about the urban youth in the community in St. Louis?

A.   Yes.

Q.   And just briefly regarding -- we talked some about what she had to say.  What was the significant things that you got from that conversation in forming your opinions in this case?

A.   That during the time that Vincent was growing up, it was a tough time, that there were lots of gangs beginning to develop and that there was a lot of violence associated with it.  At one point I think she said something to the effect of that because she had a youth program as well and that they were training kids to hit the ground and when they heard gunshots, and that it became almost normal but it wasn't -- it

629

didn't -- it wasn't something they were aware of, that it was so normal it was like the water that they swam in or the air that they breathe, and that that just became an uncomfortable level of normalizing what was happening around them.

Q. In her words was she able to give you an indication of what she saw and what she knew it was like for young children trying to walk through these communities that were at risk, meaning move from one place to another to get to school, people's houses, etc.?

A. The issue that she raised was that because of the gangs beginning to I guess proliferate by the block, so it was a single block. It would be a gang, and trying to go from one place to another became difficult, that you couldn't -- they couldn't get to rec centers. They couldn't get to school. Sometimes they couldn't go to the store. Didn't matter what color clothes they were wearing. It was just a really difficult time.

Q. Professor White, based on your education, your background, your research and experience and your work on this case, did you reach conclusions and form an opinion as to how growing up in Pine Lawn and the surrounding communities impacted Vincent McFadden and

the other youth in those communities and placed their futures at risk?

A.    I think in the report I said that it was almost like a perfect storm, especially for Vincent, that he had had -- that there was some personal things that contributed, so the low birth weight issues, the levels of stress that he was experiencing, and the instability in household, combined with the violence that was beginning to occur with the drug markets and all that, that trying to negotiate that was really hard.  It's not that it was a guarantee.  I'm not saying that if you live there that you're guaranteed to go down that path but if you are -- if you're living in that kind of environment and in that situation, you have to figure out how to negotiate it so you can live.  Kids don't have the right to have -- the power to get an apartment and move out.  They don't get to go somewhere else because they don't like where it is or because it's not safe.  If their parents don't have jobs, if their parents aren't in a position to get other housing, it becomes a challenge.

As I said in the book that I just completed, we talk about this thing we call ethnic spacial compression, and essentially it's that there is racial staring and redlining, and while it may not be legal

631

any more, it is the way that our populations are moved around, so African-Americans are steered to certain parts of this community, and the concentrations become what they are.  You don't have to be poor to be put in that position, that realtors decide where you are going to go and look at a house or an apartment and it concentrates.  That's just the reality of life here.

Q.  So back in though 2007 and 2008, were you at SLU then?

A.  Yes.

Q.  Which is St. Louis University.  I'm sorry.  If you would have been contacted by the trial attorneys in Vincent McFadden's case in 2007 or 2008 and asked to do the same type of evaluation of Vincent McFadden and Pine Lawn and the surrounding communities, would you have been able to do that?

A.  I believe so.

Q.  I have nothing further.

CROSS-EXAMINATION

QUESTIONS BY MR. WALDEMER:

Q.  Professor, I will do my very best to be brief because I know it's been a long day for you.  I've seen a couple of different things in your report calling it a compilation report, a social profile.  What's the proper term to call your report that you submitted?

632

A.    I think it would be just a social profile.

Q.    Social profile.  Okay.  That one I got so I'll try to stick with that one.  Is this the first social profile you've done?

A.    In this kind of situation, yes.

Q.    Okay.  And so you've never done one of these before?

A.    No.  I have never been in court before.

Q.    Okay.  First time?

A.    Yes.

Q.    All right.  Let's talk a little bit about your background.  You've been in St. Louis since 1997?

A.    Yes.

Q.    Before that you were in your home of New York and you did a lot of work with juveniles?

A.    Yes.

Q.    All right.  I think you'd agree with me or at least I'd agree with you, at-risk communities are a huge problem not only in the St. Louis area but nationwide in almost every urban area?

A.    I agree with you.

Q.    Okay.  They are dangerous, they are violent, and there are a lot of people being hurt and killed. We agree?

A.    Yes.  I would agree with that.

Q.   And your experience in this area, and I know you said this on direct, but from when you started in New York until now has evolved?

A.   Yes.

Q.   A lot of studies, a lot of different groups of people in communities get involved in different ideas or tried and failed?

A.   Yes.

Q.   Some fail.  Some help, but there's no cure here.

A.   There hasn't seemed to be.

Q.   Okay.  But people like you and actually people like me, we hope that there can be a collaborative effort to resolve some of these issues so that my business isn't so good.

A.   I would hope so.

Q.   Okay.  But you said a moment ago, just being born into these situations does not guarantee or predestine someone to become a multiple murderer.

A.   That would be true.

Q.   Okay.  Now you are an educator?

A.   Yes.

Q.   And you said earlier you now have a grant and you're also a dean for community involvement, so you're very involved in the community, correct?

634

A.   Yes.

Q.   But you're not a psychiatrist or a psychologist?

A.   No.

Q.   That's a different field completely.

A.   Exactly.

Q.   All right.  Part of what you've done is you've gone out and talked to a bunch of people, including the defendant?

A.   Yes.

Q.   And you've gathered that information and you've relied on it to reach some of the conclusions that you have talked about today.  Would that be fair?

A.   Yes.

Q.   Now in reaching those conclusions based on that information, you have to assume or hope that people like Vincent McFadden and George Wells and Thurman Shelton are being truthful with you?

A.   Yes.

Q.   And I think at one point you felt he wasn't being truthful for you maybe in your second interview and you stopped it?

A.   Yes.

Q.   Now if he has lied to you --

A.   Could I say something?

Q.   Sure.

A.   I don't know that he wasn't being truthful.  I think he was not being forthcoming.  That's different.

Q.   Similar but different.  I'll grant you that.  Point is, is that if for some reason he's not being truthful with you or he's playing you, that could mean that your conclusions as they apply to him would be possibly incorrect.  Would you agree?

A.   That's true.

Q.   All right.  And that's true of anybody.  You talk to what their motivations and their biases and interest in the subject matter, that can influence their credibility?

A.   Yes.

Q.   And that's a determination that you have to make?

A.   Yes.

Q.   All right.  Now in -- this is your first time testifying, right?

A.   Yes.

Q.   All right.  So when were you first contacted in this case?

A.   I forget what year it was.  I think like 2013 maybe.

Q.   2013.  Okay.  And you understand that the

636

crime in this case that we're talking about today occurred on May 15, 2003. Leslie Addison was shot and killed?

A.   I understand that now.

Q.   So about ten years had gone by?

A.   Yes.

Q.   And in that ten years that had gone by, Vincent McFadden had been tried four times and had been convicted four times and had been sentenced to death four times; is that right?

A.   You're telling me that, yeah.

Q.   Okay. You're not disputing it but --

A.   I'm not, yeah.

Q.   The most recent one was in June of 2008 when he was sentenced to death on this particular case that we're here talking about today. Would you be okay with that?

A.   Okay.

Q.   All right. So when did you specifically go see him the first time? Do you remember?

A.   I think it was in the fall or winter in 2012 or '13 when I started.

Q.   In either 2012 or 2013?

A.   Yes.

Q.   And when you went to see him the first time,

did you go by yourself or did anybody go with you?

A.   I went by myself.

Q.   Okay.  And how did you introduce yourself to him?

A.   I told him that the lawyers had asked me to do a mitigation -- this demographic profile on him and that I had told them that I would not do it unless he was willing to allow me to do it.

Q.   Okay.  So he knew that you'd been hired by his lawyers more or less?

A.   Yes.

Q.   And I should ask, have you been paid for any of your time?

A.   Yes.

Q.   Can you tell us what you've been paid for up until this morning?

A.   I think the total is probably about 15,000 or $16,000.

Q.   15 or $16,000.  And is there a -- and I hate to say this or say it faster, but is there a going rate for your time here today?

A.   I charge $240 an hour.

Q.   240 an hour?

A.   Yes.

Q.   All right.  Now at the time that you went down

there, talked to him, you explained to him that you had been hired by the lawyers to help him if you could?

A.   Yes.

Q.   Okay.  And that your opinion would be based on a lot of things but especially the answers and the information that he gave you?

A.   Yes.

Q.   Okay.  Other than what he told you, you have no personal knowledge of Vincent McFadden?

A.   That's true.

Q.   You'd never met him before you went to Potosi?

A.   No.

Q.   I'm not going to ask you how lovely Potosi is because I've been there too.  When you went to see him, any knowledge of the facts of the crimes of which he had been convicted of?

A.   No.

Q.   All right.  Your report -- and it was admitted into evidence and probably maybe in front of you.  You have one.  I just couldn't remember what the number was.  32A.  That's the entire report, right?

A.   Yes.

Q.   All right.  I want to talk to you a little bit about your report because there are a couple of big words that I didn't understand.  All right.  The first

thing I want to ask you, you said -- you refer to him being immersed in a state of risk?

A. Yes.

Q. And you talked about it on direct, that it was risk immersion?

A. Yes.

Q. And I may have missed it, but on direct did I understand that is a term, risk immersion, that is your term?

A. Yes.

Q. That's what you came up with?

A. Yes.

Q. You said he's always immersed in this state of risk. My question to you is, isn't part of that state of risk that he's in something he's contributed to?

A. It might be.

Q. Okay. I mean, the conduct that he chooses to take in his every day life contributes to the risk factors that surround him?

A. It's not unidirectional. You're right.

Q. Okay. So somebody who's out selling drugs like he admitted to you that he did, they've got risks?

A. Yes.

Q. Somebody who's carrying a gun illegally, that comes with risks?

A.    Yes.

Q.    Somebody who is a gang member, that comes with risks?

A.    Yes.

Q.    Somebody who shoots at people, that comes with risks?

A.    I would guess.

Q.    Okay.  So all of these crimes that he's committing can make him feel at risk?

A.    Yes.

Q.    All right.  And we all see that police officer and we immediately check our speed limit.  That's one of the risks is that they're police out there?

A.    Yes.

Q.    All right.

A.    It would be one thing if it was static so more points that he's carrying the gun, but learning about the risks is something that happens through time, and from a developmental standpoint, people that I interviewed, we talked about when young people become aware of the risk in their lives -- and the pattern of that is important.  So a young person that's a toddler is around family members, around community, when they're beginning to understand, this is what this gang thing is that's going on.  This is what it means to be

641

those people, and at some point they begin to be able to differentiate between what would sound like good and bad and --

Q. Let me ask you this: You mentioned family. You have no information that his family, any member of his family, was involved in any criminal activity?

A. Yes.

Q. Okay. Did you investigate that?

A. No.

Q. Okay. Did you read the transcripts? I know you mentioned Dr. Draper in your report. Did you read the transcripts of the trial?

A. I read only those. The lawyers gave me a few things. They gave me Dr. Draper and I forget. There was some other, a couple other ones.

Q. So if I told you a lot of his family members talked about his life and how he was cared for and that they loved him, and that even though he went from home to home, it was always to another loving member of the family, that was information you didn't have?

A. Yes.

Q. Okay. Would that in any way affect your conclusions if his family had talked about him being loved and things like that?

A. I think that the problem that you're

642

presenting is that it's not -- he's not living in isolation, so all the other stuff going on in the community is still going on.

Q.    And my question --

A.    He was getting stopped on the way to school and beat up.  He was in school and having those kind of experiences.  It's not like those are absent in terms of his evaluation of safety and security.

Q.    Okay.  But what I'm saying is that some of the things that you've cited as problems he didn't necessarily have based on the testimony at trial?

A.    Okay.

Q.    Okay.  But you weren't aware of that?

A.    No, I wasn't.

Q.    All right.  Because, I mean, the family talked about, he was always with relatives.  He was never homeless.  He was never in foster care.  He was never physically abused.  He was never sexually abused.  He had three different homes that he went to with relatives, grandparents, grandparents, and others, and that he was loved, but that's not necessarily information that you had?

A.    But it was -- sounded like residential instability.  It wasn't like there was a solid place that was home, so he was moving from place to place.

He was staying with one family member, another family member, and that variation matters.

Q.   And you based that upon Dr. Draper's report that you were given?

A.   That's what I had.

Q.   You weren't given any of the family members' testimony at all?

A.   No.

Q.   So you have no idea about his mother working a couple of jobs and trying to provide the best she can?

A.   I think that he told me that.

Q.   Okay.  Did he tell you about, she kicked him out of the house when he was 14 because he pulled a shotgun on her?

A.   No, but I thought I read that somewhere, that he was put out of the house.

Q.   All right.  And he didn't talk to you about any of the role models that he had who testified on his behalf, Mr. Northern and Lisa Northern, those folks?

A.   No.

Q.   Okay.  On page 8 of your report you talk about some statistics, some crime statistics and things like that, and you list 1993 and 1994 homicides in Pine Lawn.  Now did you provide other crime statistics to defense counsel?

644

A.    As to what's in that paragraph?

Q.    Yeah.  Did you provide them with other crime statistics that you got in the Missouri Crime Summary, the Uniform Crime Reporting?  I know you talked about it in your report.

A.    I don't know that I did.

Q.    Okay.  Because I was interested in what I was given with the crime data.  I saw the '93 and '94 in your report, but in this folder I was given all the way up to 2004.  I looked back to the five-year period that surrounded these murders, okay, and what I found was, was that in Pine Lawn in the year of 2000 there was one murder, which was the murder of Cara Davenport, and she was killed on March 2nd, 2000.  In 2001 there were zero murders in Pine Lawn.  In 2002 there was one, which was the killing of Todd Franklin on July 3rd of that year.  In 2003 there was one, which was the killing of Leslie Addison on May 15, 2003, and then in 2004 there were zero.  Okay.  Now those three homicides that occurred during that five-year period, you're aware that he's been convicted of killing Leslie Addison?

A.    I am aware.

Q.    And he's been convicted of killing Todd Franklin?

A.    (Nodded)

645

Q.   Okay.  Were you aware that he was the main suspect in the killing of Cara Davenport?

A.   No.

Q.   If that were true, that he was the main suspect in that homicide and he's been convicted of the other two, would you agree with me that during those five years in Pine Lawn he was the only one murdering people based on those statistics?

A.   If it was true that he did.

Q.   Well he's been convicted of these other two.

A.   Well they're appealing them, so --

Q.   That's what everybody does, don't they?

A.   I would guess.

Q.   Okay.  All right.  So you interviewed him, and a few of the things that occurred during the interview you put in your report.  Did you take notes when you interviewed him any of those times?

A.   I didn't take notes.

Q.   So the --

A.   I was told not to take notes.

Q.   Who told you not to take notes?

A.   The lawyers said that I shouldn't -- I didn't need to write things down, jot stuff down.

Q.   Okay.  And you did what the lawyers said, right?

646

A.   Yes.

Q.   They're the ones paying the bill.

A.   You guys know the law.

Q.   Well, they're the ones paying the bill, right?

A.   Yes.

Q.   Now if you had taken notes, when you take notes and as an educator I know you've been to enough places you take notes, you get things down as accurately as possible, right?

A.   Uh-huh.

Q.   Okay.  That was yes, right?

A.   Yes.  I'm sorry.

Q.   Okay.  I know it's getting late and I apologize, but in this case you didn't take any notes?

A.   Yes.

Q.   All right.  The second time you went to see him, you took one of your graduate students?

A.   Yes.

Q.   And she took notes?

A.   Yes.

Q.   And even though I was told for awhile there were no notes --

A.   I found them.

Q.   You found these notes?

A.   Yes.

Q. All right. And the notes I'm holding up, do those look like the notes that she --

A. The ones I just --

Q. Okay. And that was from the second interview?

A. Yes.

Q. All right. If we can go through a couple of questions. He told you or at least you said on page 11 of your report that he never left the house without posting up, that he never left without carrying a gun; is that correct?

A. Did he say without carrying a gun or posting up? Posting up just meant being prepared.

Q. That's what I'm asking.

A. I took posting up to being prepared.

Q. Okay. Now you mentioned earlier that he told you that he was bullied as a child?

A. Yes. And I also read that somewhere.

Q. Okay. And would it be fair to say from your research that he clearly became a bully later based on what some of these other individuals said about him that you interviewed?

A. Nobody said that about him.

Q. They didn't say that he was a man to be feared, and some of them even said they were scared of him?

648

A.   I don't recall him saying that.

Q.   Okay.  Well let me ask you this:  Have you been provided with the depositions of all of the -- of George Wells?  And Thurman Shelton refused to do his deposition, but have you been provided with George Wells' deposition?

A.   I have depositions.

Q.   Okay.  You have all those depositions?

A.   I have them.

Q.   Okay.  And do you recall all of those people were friends of his, right?

A.   George was.  Thurman was, yeah.

Q.   Okay.  How about the other depositions that you read?

A.   I didn't read them all.

Q.   Okay.  And so you may not have read where other people said -- you had the depositions but you didn't read where they said he was to be feared and they feared him?

A.   Could you repeat the question.

Q.   So you did not read the depositions where the other people indicated that they were afraid of him and that he was a person to be feared?

A.   No.

Q.   Okay.  But he told you in your interview that

649

he was proud of his reputation for violence that spread beyond Pine Lawn?

A.    That he had respect.

Q.    Because he was known to be a violent person?

A.    That he had respect.

Q.    Now he suggested that you go talk to some people; is that correct?

A.    He did.  I didn't talk to all of them.

Q.    To all of them.  All right.  Is he the one who suggested you go talk to George Wells?

A.    No.  I think that Belinda Long did.  I think they set those up, Belinda and Bob.

Q.    Bob Lundt?

A.    Yes.

Q.    Okay.  So if they set it up, said --

A.    These are people that you should talk to.

Q.    Professor, we want you to go talk to these people?

A.    Yes.

Q.    Is that how most of your interviews were done?

A.    No.

Q.    Okay.  But the ones in the penitentiary certainly were?

A.    Yes.

Q.    Okay.  In your -- what was she?  Was she your

650

research assistant?

A.    Yeah, yes.

Q.    She said that he indicated that everybody in life had some morals and principles and those become the rules. Do you remember that?

A.    If it's there, yes.

Q.    Okay. So he understands what morals and principles are?

A.    I believe he does.

Q.    Okay. He used it correctly in that sentence?

A.    He used it correctly.

Q.    All right. I'm just asking you, is he familiar with the concept of morals and principles?

A.    Yes, I would believe so.

Q.    All right. And he talked about that later in your report, and he basically said there was this code, and the code was, if somebody shoots at you, by the code you have to shoot back.

A.    You have to defend yourself.

Q.    Okay. And that's what he talked about was defending himself and protecting the neighborhood?

A.    Yes.

Q.    Okay. When he killed Leslie Addison, she was unarmed and walking away from him. That doesn't sound like protecting the neighborhood to me. Does it to

you?

A.    I've kind of struggled with -- I don't know the particulars of that case, but I struggle with it in the context of being in a war zone.  If you're in a place that is a threat where everything becomes a threat, whether they're -- and I mentioned earlier about, I think it was James Hubbard saying he got shot by a friend, so trying to make sense of the senseless is difficult.  I think that -- again, I don't know the particulars of the case, but if for some reason he perceived a threat, that may be a whole other conversation to have.

Q.    How about if he had told this woman to leave Pine Lawn and she was walking out of Pine Lawn but apparently not fast enough for him and that's why he shot her, is that senseless?

A.    That would sound senseless.

Q.    Okay.  Is that part of the code?

A.    I think it may be.

Q.    Okay.

A.    And I'm not saying that the code is right or wrong.  I'm just telling you what the reality is.

Q.    Professor, you and I will agree a hundred percent the code is not right.  Okay.  We'll agree that the code and the senseless killings are wrong.  How is

652

that?

A.   No.  I think the code is important.  To simply say that the code of the street is wrong is to disregard the reality of life in those circumstances, that the reality is that you have to live by that code because that's what the code -- what the world says for you.  It's different -- you know, I grew up in a different time.  The code was different.  There was a different set of relationships.  For middle class, I live in a different kind of environment.  The code doesn't make sense to me, but I don't have to do that every day.  I don't have to deal with that every day.

Q.   Okay.  But the way he explained the code to you was that if somebody shoots at you, you shoot at them and you protect your neighborhood.  And my question to you was, was an unarmed woman who is trying to walk away from you, even under the code, she doesn't pose a threat.

A.   See, I don't know that that's true.  That's what I'm saying.

Q.   Okay.  How about this one:  An individual who has been shot and is laying on the ground, if somebody comes up and puts two more rounds into him and states, he isn't dead yet, but he's clearly on the ground not posing any threat, is that part of the code?

653

A.    In some respects this answer is not going to be something you are comfortable with, but I think for some people it is, and that's the sadness of it.  The levels of violence that we see in the communities is unfathomable.  Just last night, the night before last, some young girl sitting in a car --

Q.    15-year-old.

A.    And she gets killed by some guys who roll up on a car and it's not even clear what that was about.

Q.    And we don't know what that's about.

A.    You know, the world needs to change.  The world needs to change when people live and die by this thing that exists.

Q.    On that count, yeah.  That's why there has to be this partnership of community groups, citizens, law enforcement, government, correct?

A.    I'm shaking my head, yes, I agree with that.

Q.    Okay.  And without that collaborative effort, it's not going to work, any solution.  Would you agree?

A.    That's fully true.

Q.    Okay.  And one of the biggest problems in these at-risk areas is, law enforcement is handicapped because the victims and witnesses are scared to testify or cooperative with the police.  Isn't that a big problem?

654

A.    That's a problem.

Q.    Okay.  And that's all because of this cycle.  They don't want to cooperate because they're afraid of possible retribution?

A.    Without a doubt.

Q.    Okay.  And if there is not something that is going to take these violent and dangerous people out of this situation say, for instance, prosecution, they're going to continue to proliferate in these areas.

A.    This is not something -- the point of my report is that if there's not something that's going to change those conditions so that we don't have a continual feeder or pipeline into 15-year-olds who walk around with guns, then we will continue to see this, that the partnerships that you are talking about -- I think they're important partnerships -- require the addition of bringing resources and hope and -- into kids' lives in ways that allow a 5-year-old to actually see that they may actually get out of high school at some point as opposed to, many of the interviews I've done with young people, they talk about being surprised that they're going to live to be 21.  With that level of despair, that's a problem.

Q.    And that's -- and that was my point, is that the violence which has escalated in the last few years

655

-- would you agree with that?

A.   Yeah.  It's going back up but it went down for quite awhile.

Q.   A lot of shootings that involve innocent bystanders and a 15-year-old girl, senseless shootings, right?

A.   Uh-huh.  Yes.  I'm sorry.  It's getting late.

Q.   And I guess my question to you is, basically the community itself, unless there's a way to curtail the current violence, not the children, but I'm talking about the current violence, these older citizens who are carrying guns and committing violent crimes across this nation, those people need to be prosecuted.  Would you agree?

A.   I think something has to happen to them, yes.

Q.   Okay.  Now you talked about -- and your assistant took some notes and I tried to get this right.  He made the comment when he was talking about it --

A.   She.

Q.   He made the comment, if I can find it here.

A.   It's a she.

Q.   I'm talking about he, meaning McFadden made the comment.

A.   Excuse me.

656

Q.   No.   I got Nina was a she.   In the notes, he said, Every move you doing carrying life in prison or death but the same time we do these types of things because only way we know.

Okay.   My question about that is, is that doesn't he say in that he knows what he's doing is wrong, that committing these crimes are wrong?

A.   I think what he was saying is that there's really no choices.   He doesn't experience it as choices.

Q.   Well then let me ask it this way:   Wasn't he saying that he knows that they're crimes, that they're illegal?

A.   I think that's true.

Q.   Okay.   I mean, he recognizes the fact that what he's doing is committing crimes.   I guess that's my point.   The crimes may be part of the fabric of his community, but he knows he's committing a crime?

A.   Yes.

Q.   All right.   That's one of the reasons why he avoids the police.

A.   (No response)

Q.   All right.   One of the things I saw in her notes was where he described his normal day and he listed it as selling, I assume drugs, girls,

smoking/drinking. That's his typical day. Now that wasn't in your report. It was in her notes, right?

A. Yes.

Q. Okay. You'd agree that that kind of makes him look pretty bad if that's what he does every day, sells drugs, spends time with girls, smokes dope, and drinks.

A. I don't know that it makes him look bad. It makes him look real in relation to where he's at.

Q. Okay. And how he made his living is he told you was selling drugs, right?

A. I think he might have said that.

Q. Okay. And people who are selling drugs in these communities, that also contributes to people being at risk?

A. Without a doubt.

Q. People who are addicted to drugs can't hold jobs, can't take care of their families, and they commit crimes in order to buy their drugs?

A. Yes.

Q. All that, a vicious cycle?

A. It's a terrible cycle.

Q. And as a drug dealer, he's part of that?

A. Yes.

Q. All right. Now you spoke with Elaine Hood and her daughter?

658

A.    Yes.

Q.    But you never read Elaine Hood's testimony from trial?

A.    No.

Q.    They didn't give that to you?

A.    They didn't give that to me.

Q.    All right.  And Elaine Hood talked about when people came to my house, there were rules?

A.    Yes.

Q.    All right.  And when he came to her house, he followed those rules?

A.    Yeah, yes.

Q.    So he's capable of following rules if he needs to?

A.    Yes.

Q.    All right.  You didn't discuss with him the facts of these crimes?

A.    No.

Q.    So you don't know how he was feeling or what he was thinking at that time?

A.    No, and I'm not a psychiatrist or psychologist.

Q.    Okay.  The last line, and this was the thing that I wanted to ask you about, because I took it one way and --

659

A.    What page?

Q.    I'm trying to find it here if I can.  On page 20 at the top, the last line of that paragraph.

A.    First line?

Q.    The one that starts, that the residents.  Can you read that out loud for me.

A.    That the residents of Pine Lawn were at the level of physiological and safety need is clear from the data that paints the demographic picture of the community.  What I'm talking about is Maslow's hierarchy, the need that basically it's hands to mouth, that in the Maslow hierarchy, you can't self-actualize.  The highest level is self-actualization.  The lowest level is basically trying to feed yourself.  The next level is to find safety.  Maybe I should have cited that, and that was what that place was like.  That's what that community is like, what a lot of urban communities are like, that people are just trying to go hand to mouth and sustain themselves.

Q.    Okay.  And these people that are in these communities, they -- they're feeling the same stress that he's feeling.  Would you agree?

A.    Yes.

Q.    They're also feeling a stress that they're not safe because of people like him?

A.   That's probably true.

Q.   Okay.  Yet a lot of those people, they don't go out and commit murder, despite the stress they're under in the exact same situation.

A.   That's a good thing.

Q.   A tremendous thing.  A tremendous thing. Couple of things about these people you went to talk to.  George Wells, one of the things you relied on in your report was him being truthful with you?

A.   Yes.

Q.   Okay.  Did you know at the time he was doing life in prison for murder?

A.   No.  I didn't ask him.

Q.   Okay.  Did you know that he was a gang member just like the defendant?

A.   I didn't ask him.

Q.   All right.  Did you know that he was in communication with the defendant during the years and time leading up to his interview with you?

A.   They were in the same prison.

Q.   I'm sorry?

A.   They were in the same prison.

Q.   They were in the same prison.  Actually they shared a cell at Potosi, did they not?

A.   That, I don't know.

Q.    And he referred to Pine Lawn as baby Iraq.  Is that what you recall?

A.    I don't remember him saying that but --

Q.    If it's in your report, you don't quarrel with that?

A.    Yeah.

Q.    And that was something also that Vincent McFadden talked about, was the similarity with Iraq.

A.    The point of it being the war zone issue, that there's such levels of violence.

Q.    But they both talked about Iraq?

A.    Well that's the most recent war.  If it had been a different time, they might have said Vietnam.

Q.    I just found it interesting that they both came up with that same thing.  You don't think they talked about this, do you?

A.    I don't think so.  There's people talking about Chicago being Chiraq.

Q.    I've read that one.

A.    It's fairly common at this point.  It's a war zone.

Q.    Okay.  Now you also talked to Thurman Shelton, and did you know he was doing 67 years for murder when you talked to him?

A.    I knew he was doing a lot of time.  I didn't

662

ask him what he did.

Q. Okay. Well he refused to talk to me, but he did talk to you, right?

A. Yes.

Q. And he was another one of the guys who had been a cellmate of Vincent McFadden?

A. I didn't know they were cellmates.

Q. Did he tell you that he never joined a gang?

A. He described himself as being kind of on the periphery, that he was -- you know, he did what he had to do to kind of be there, you know, that he sold drugs and that, but I don't recall him saying he was part of a gang, but he saw himself as being an outsider in many respects.

Q. And he saw himself as a rather prolific drug dealer, right?

A. Yes.

Q. Okay. He told us in his deposition that the defendant is known to be a person you shouldn't mess with and he's feared in his reputation. Did he tell you that?

A. No. I don't recall him saying that.

MS. WILLIBEY: I am going to object, your Honor. Thurman Shelton, he just said we didn't take his deposition so --

663

MR. WALDEMER: Well that's in the summary of your notes.

MS. WILLIBEY: What do you mean, summary of my notes?

MR. WALDEMER: That you provided me before we went to Potosi for his deposition.

MS. WILLIBEY: You said in his deposition. I'm just trying to make it clear that he didn't have a deposition.

MR. WALDEMER: I said he just told us. If I said deposition, your Honor, I was incorrect. He refused to take his deposition.

When these at-risk neighborhoods, when somebody snitches, they become a tremendous target, don't they?

A. Yes.

Q. (By Mr. Waldemer) When they cooperate with the police, they can become a target of retribution?

A. Oh, yeah.

Q. And that's almost like a business decision. Somebody who is snitching on you, that's bad for business. You are going to get caught by the police if they snitch on you. Would you agree with me?

A. Yes, and that's the point I was making about the threat issue.

Q. All right. So if Todd Franklin had testified

664

against Vincent McFadden's fellow gang members causing them to be prosecuted and go to prison, if he was killed for that reason, that's a business decision on Mr. McFadden's part, to just kill the snitch?

A. I wouldn't know.

Q. Okay. When a snitch gets killed, it sends a message to everybody in the community, you shouldn't cooperate with the police and prosecution?

A. Yes.

Q. And that chills the ability of people to have people like Mr. McFadden removed from the neighborhood?

A. Say that again. I think I understood what you said. Say it again please.

Q. Killing a snitch tells everybody in that neighborhood, don't talk to the police, don't cooperate?

A. Yes.

Q. Okay. The actions he took in this case, they were of his own free will, correct?

A. I struggle with that free will thing but --

Q. Let me ask it another way. Did anybody coerce him to do that that he told you?

A. No.

Q. Now you do realize that in his family nobody else was a drug dealer or a criminal at all?

A.   You've told me that.

Q.   Okay.

A.   Actually we --

Q.   So would I be correct then in saying he's the only one who was affected by his environment who turned out to be a gang member, drug dealer, and murderer?

A.   I'm not clear on that.  You mean nobody else in his family?

Q.   Uh-huh.

A.   I don't know all his family members.

Q.   You didn't investigate any of that?

A.   No, I didn't.

Q.   Okay.  Are you suggesting that because of his environment and his upbringing that he was left with no alternative but to become a multiple murderer?

A.   No, I'm not trying to tell you that.

Q.   Okay.  He was able to make choices, albeit limited?

A.   Yes.

Q.   And many people with similar upbringings, they become productive citizens in our community?

A.   Yes.

Q.   A lot of people from Pine Lawn don't commit murder?

A.   Sure.

666

Q.   A lot of people from the Normandy School District end up being productive citizens?

A.   Yes.

Q.   All right.  You know I talked to your student, Mr. Genthen, and he indicated to me that you did have a great discussion about this and he did see the analogies but he said you and he had a tremendous disagreement.  Do you recall what that is?

A.   No.

Q.   He told me that you were vehemently and personally opposed to the death penalty; is that correct?

MS. WILLIBEY:  Objection, your Honor.  I think that's irrelevant.

THE COURT:  Overruled.

A.   I don't know we had a disagreement about it in that I'm vehemently.  I don't think that it is an appropriate sentence based on --

Q.   (By Mr. Waldemer)  Let me put it this way, Professor.  I don't want to get into that discussion, especially at this time.  You oppose the death penalty?

A.   Yes.

Q.   Okay.  That was all I wanted to ask, and you opposed it back in 2013 when you started your reports and your investigation, and you oppose it now?

A.    Yes.

Q.    Thank you very much, sir.  I appreciate your patience.

REDIRECT EXAMINATION

QUESTIONS BY MS. WILLIBEY:

Q.    Professor White, I will start where Mr. Waldemer ended.  As far as your opposition to the death penalty, is that at least in part based on your background and your understanding and your knowledge about the reasons that youth that are in at-risk environments commit crimes that subject them to the death penalty?

A.    It's that.  It's also the resource that shows racial disparities in terms of who gets the death penalty, and I have trouble with that.  It's based on my understanding of theory, the theory behind punishment that says the punishment should be enough to keep people from doing it again, not we should kill them but that we should have a place, punishments that will reduce the likelihood that it happens.  So this is a theoretical thing in some respects for me in terms of how I see the death penalty, that it has no value.

Q.    So did your findings, opinions, and conclusions on this case when you were doing your research and doing the work on this case, were those

668

findings and opinions based on the fact that you oppose the death penalty?

A.    No, not at all.

Q.    Were they instead based on the information that you've learned over the years with your background, your experience, education, and what you learned in investigating the area of Pine Lawn and the surrounding communities?

A.    That's what it was based on.  Also as I said in the beginning when I first met with Vincent, I was clear to him that I wasn't sure how much this work would do to keep him from -- that sentence from happening, so it wasn't like I was under the illusion that I was going to be the champion, a Don Quixote, and the death penalty with this work.

Q.    Now the idea of the fact that you grow up in a community such as Pine Lawn or at-risk environments such as the one that's in Pine Lawn and the surrounding communities doesn't guarantee to become a multiple murderer doesn't change the fact that it puts you at risk for committing crimes, correct?

A.    That's right, yes.

Q.    And again in addition to the information you gathered and you gathered and relied on to reach your conclusion, you also relied on your knowledge,

669

background, and experience in this area of criminal justice, correct?

A.    Yes.

Q.    And sociology in general.  And as far as making credibility determinations on the information that you got from Vincent and the other people that you interviewed, is that based on your being with them in person and making that determination when they're speaking to you?

A.    Yes.  And I've worked with people for a lot of years.  I think I'm a fairly good judge of -- I don't know if it's character, of people's sincerity.  I was a counselor in those institutions for a lot of years. I've done a lot of research where I've done qualitative interviews with people and I believe them to be true. I'll leave it at that.

Q.    As far as the facts of this particular case, the killing of Leslie Addison, whether or not you knew the facts of the case and the evidence that was presented at trial regarding the crime itself, did that matter in regard to the research and the investigation that you were doing, the actual facts of the crime, not the fact that he committed a crime and a violent crime but the actual facts?

A.    The crime itself wasn't the issue.  What I was

asked to do was to create a profile of what it was like to be in Pine Lawn and what -- in relation to the surrounding community work I've been doing.

Q.    Nobody asked you to investigate whether or not Vincent was guilty of murder in the First Degree?

A.    No.

Q.    And when you are talking about risk immersion and being at risk, you're not just talking about physical risk; is that right, like at risk to be shot or hit in the head, right?

A.    It's the burden of all that stuff going on. There's a whole literature about the impact of cumulative risk on things like brain development, so early on developmentally if kids are experiencing risk on an ongoing basis that what happens is that it's affected the degree to which their cortisone levels are being emitted, their epinephrine and in their body, that, in fact, there's a guy, Gary Evans from I think it's Cornell University, who's done some work that has indicated that even when sleeping, kids who are experiencing really significant risk in their life are emitting those same levels of epinephrine and cortisone, cortisol, as if they were running away from a lion or -- he didn't say that.  I'm saying that -- so that they were in danger, and what that does to them is

it's deteriorating them physically. It's having a negative impact on them over time.

Q. So the risk that you are talking about in the environment in the community of Pine Lawn is more than the risk that they're going to run into somebody on the street who has a gun and shoot them. You're talking about many other factors that are risks that create a risk to the way they grew up and whether or not they'll commit a crime?

A. That's contributed. My work right now, for example, in the city schools around suspensions and trying to figure out ways to reduce them, that the City of St. Louis is experiencing this phenomena where large numbers of very young kids are being suspended from school based on outbursts, impulsive behavior, the kinds of things that you would expect if somebody is experiencing that kind of stress in their life. My concern and the reason that I push -- not push -- the reason I focus on this issue of risk immersion is that it's taking a toll. The question I was asked earlier about, we need us all to work together, you know, the point for me is that we need to work together to try and ameliorate it earlier, because if we wait until they're 15 years old, we have a problem.

Q. Now the prosecutor asked you about the fact

672

that Vincent's immediate family, blood relatives, didn't have any criminal background. Is that what you're talking about is the risk of being around criminal element, or are you talking about the environment as well?

A.   The environment as well, but I also think that we also have to recognize that having a criminal record is not the only indicator of whether somebody has ever committed a crime. There's a lot of self-reports that people do stuff all the time, you know, that they just don't get caught by the police, and I'm not saying that to say that there's people in Vincent's family that are criminal. I'm just saying that to suggest that he's the only one that succumbs to something, that, you know, who knows?

Q.   When you are talking about the low number of homicides in this five-year period, I'm not sure exactly when it started and ended. I guess it started in 2000. Violence is more than just murder, correct? Would you say that?

A.   Yes.

Q.   Violent crimes that are not murder, correct?

A.   Yeah. There's a lot of aggravated assaults. I don't know the numbers, but the aggravated assaults to me is the bigger issue here in our community.

673

There's a lot of gun crimes. We just happen to have some good hospitals so people live.

Q. Also in your experience and in your research, people may die at the hands of another and it's not called a homicide; is that correct? There could be times when people are killed at the hands of someone else but it's not called a homicide because somebody doesn't get caught or --

MR. WALDEMER: Judge, let me object to the speculation that she's asking. I don't believe that in any of the Professor's background he's ever been a crime statistic reporter.

THE COURT: Rephrase the question.

Q. (By Ms. Willibey) Let me ask it another way. Would you agree it is possible that there are deaths that happen in communities such as Pine Lawn that aren't attributed to the homicide rate even though they were at the hands of another?

MR. WALDEMER: Judge, I really don't want to prolong this, but that's calling for complete speculation.

THE COURT: Professor, can you answer that?

Q. (By Ms. Willibey) If you can't, that's fine.

A. I'm not sure I can answer that.

674

Q. When we are talking about morals and principles and the fact that Mr. Waldemer asked you if Vincent McFadden had morals and principles, morals and principles are different things for different people, the actual moral and the actual principle. Would you agree with me there?

A. Yes.

Q. Someone can have morals and principles that aren't the same as yours, correct?

A. That's clear to me. In some respects this code thing is -- and I hate to say it that way -- but this code thing is a set of morals and principles. They're just not ours.

Q. But they're the ones that existed for Vincent in his community?

A. Yes, it would seem.

Q. When we were talking about your interviews that you did in 2012 or 2013 of Vincent McFadden where he realized that what he had done was wrong, that was at that time in 2013 or 2012 when you were talking to him, correct? The realization that he had.

A. What he had done was wrong?

Q. That he knows right from wrong.

A. Oh, yes, yes.

Q. I'm sorry. I didn't mean the crime. I'm

675

sorry. That was misleading. I'll ask it again. In your conversation with Mr. Waldemer you were talking about codes and principles and morals, and in your conversations with what Vincent was thinking, that was in 2012 and 2013?

A. Yes.

Q. When Mr. Waldemer asked you, knowing that George Wells and Thurman Shelton, the way they grew up in the community they grew up in, when Mr. Waldemer asked you about their crimes, that they were both in prison for murder and for life and I think 60 some odd years for Thurman Shelton, was that surprising to you with the knowledge and background you had of them?

A. No, not really.

Q. I have nothing further.

MR. WALDEMER: No.

THE COURT: Professor, thank you.

(Court was adjourned to Friday, January 20, 2017.)


(End of Volume IV)

## CERTIFICATE OF SERVICE

I hereby certify that on June 28, 2021, I filed the foregoing electronically with the Clerk of the Court using the CM/ECF system. Notice of this filing and its viewing and downloading are hereby provided to all counsel of record by operation of the CM/ECF system.

*/s/ Laurence E. Komp*
Laurence E. Komp
Counsel for Petitioner