**\*\*\* CAPITAL CASE \*\*\***

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MISSOURI

---

No. 4:20-cv-1046

---

VINCENT McFADDEN,

*Petitioner*,

v.

PAUL BLAIR, Warden,

*Respondent.*

---

## BRIEF *AMICUS CURIAE* OF RODERICK & SOLANGE MACARTHUR JUSTICE CENTER IN SUPPORT OF PETITIONER

---

Megan G. Crane, Bar #71624(MO)
RODERICK & SOLANGE
 MACARTHUR JUSTICE CENTER
906 Olive Street, Suite 420
St. Louis, MO 63101
(314) 341-7728
megan.crane@macarthurjustice.or

*Counsel for Amicus Curiae*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ...........................................................................................iii

INTEREST OF AMICUS CURIAE ................................................................................ 1

INTRODUCTION AND SUMMARY OF THE ARGUMENT .................................... 2

STATEMENT OF FACTS/STATEMENT OF THE CASE ......................................... 4

I.    Racial Discrimination in Jury Selection Undermines our Democracy ................................. 7

II.   Vincent McFadden's Trial was Corrupted by Racial Discrimination ................................ 11

   A.    Larner violated *Batson v. Kentucky* in striking Wanda Bryant from the jury.................. 11

   B.    Larner's Overall Comportment Confirms the Racial Animus with which he Approached this Prosecution .................................................................................................... 13

      1.    The Prosecutor Dehumanized Mr. McFadden Drawing on Slavery-Era Racial Stereotypes Throughout the Trial ...................................................................... 14

      2.    Larner's Prosecutorial Misconduct Underscored that the Prosecution Viewed Mr. McFadden as Less Deserving of Constitutional Protections ................................ 15

III.   Keith Larner Has Previously Admitted Racist Jury Selection, Has a Track Record of Other *Batson* Violations and Racist Conduct in His Prosecutions, and He was Not an Exception in the St. Louis County Prosecutor's Office at The Time................................. 17

   A.    Keith Larner's *Batson* Admission in Marcellus Williams' Case..................................... 18

   B.    Keith Larner's Problematic History of Racist Prosecutions............................................. 19

   C.    The Prosecutor's Misconduct at Mr. McFadden's Trial is Part of a Pattern of Overt Racism at the St. Louis County District Attorney's Office ..................................... 23

IV.   Allowing McFadden's Death Sentence to Stand would Sanction Racist and Unconstitutional Prosecutorial Behavior and Degrade the Integrity of the Federal Judiciary ..... 27

V.   Vincent McFadden was a Youth at Time of Crime and His Execution Would Violate the Spirt of *Roper v. Simmons* ............................................................................................ 28

   A.    Youth Under and Above 18 Years of Age Are Developmentally Similar and Merit Similar Sentencing Considerations. ..................................................................... 29

   B.    The Law and Societal Norms Have Also Extended The Line Demarcating Childhood And Adulthood Past Age 18. .................................................................................... 34

      1.    Juvenile Court Jurisdiction ........................................................................... 35

      2.    Youthful Offender Statutes ........................................................................... 36

      3.    Healthcare Benefits....................................................................................... 37

      4.    Alcohol and Tobacco .................................................................................... 38

5.    Foster Care ................................................................................................. 38

CONCLUSION ................................................................................................................ 39

CERTIFICATE OF SERVICE

**TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Allen v. Wright*,
   468 U.S. 737 (1984)...........................................................................................................9

*Ballard v. United States*,
   329 U.S. 187 (1946)..........................................................................................................28

*Batson v. Kentucky*,
   476 U.S. 79 (1986)...........................................................................................3, 8, 18, 19

*Blakely v. Washington*,
   542 U.S. 296 (2004)............................................................................................................7

*Buck v. Davis*,
   580 U.S. 100 (2017)........................................................................................................7, 10

*Carter v. Jury Comm'n of Greene Cnty*,
   396 U.S. 320 (1070)............................................................................................................7

*City of Kansas v. Baird*,
   11 S.W. 243 (Mo. 1889) ..................................................................................................17

*Commonwealth v. Mattis*,
   493 Mass. 216 (2024) ......................................................................................................33

*Cruz v. United States*,
   No. 11-CV-787 (JCH), 2018 WL 1541898 (D. Conn. Mar. 29, 2018), *vacated
   and remanded*, 826 F. App'x 49 (2d Cir. 2020) ........................................................33

*Dawson v. Delaware*,
   503 U.S. 159 (1992)..........................................................................................................14

*Dred Scott v. Sanford*,
   60 U.S. 393 (1857)............................................................................................................14

*Elem v. Purkett*,
   25 F.3d 679 (8th Cir. 1994) ............................................................................................20

*Flowers v. Mississippi*,
   588 U.S. 284 (2019)..........................................................................................2, 11, 13, 19

*Graham v. Florida*,
   560 U.S. 48 (2010)...............................................................................................29, 31, 34

*Hernandez v. New York*,
500 U.S. 352 (1991) (plurality opinion) ...................................................18

*J.E.B. v. Alabama ex rel. T.B.*,
511 U.S. 127 (1994)...................................................................................7

*James v. Bowersox*,
187 F.3d 866 (8th Cir. 1999) ...................................................................22

*Kyles v. Whitney*,
514 U.S. 419 (1995)..................................................................................16

*Loving v. Virginia*,
388 U.S. 1 (1967)......................................................................................28

*McFadden v. State*,
369 S.W.3d 727 (Mo. 2012) (*en banc*) ....................................................4

*Miller v. Alabama*,
567 U.S. 460 (2012)......................................................................29, 30, 31

*Miller-El v. Dretke*,
545 U.S. 231 (2005)........................................................................ *passim*

*In re Monschke*,
197 Wash. 2d 305 (2021)..........................................................................33

*Montgomery v. Louisiana*,
577 U.S. 190 (2016).............................................................................29, 30

*People v. Parks*,
987 N.W.2d 161 (Mich. 2022)..................................................................34

*People v. Poole*,
No. 166813, --- N.W.3d ---, 2025 WL 978646 (Mich. 2025).....................34

*People v. Taylor*,
No. 166428, --- N.W.3d ---, 2025 WL 1085247 (Mich. 2025)...................33

*Powers v. Ohio*,
499 U.S. 400 (1991)..........................................................................7, 10, 19

*Purkett v. Elem*,
514 U.S. 765 (1995)..................................................................................20

*Roper v. Simmons*,
543 U.S. 551 (2005)........................................................................ *passim*

*Rose v. Mitchell*,
     443 U.S. 545 (1979)...........................................................................................28

*Smith v. Texas*,
     311 U.S. 128 (1940)..............................................................................................7

*Smulls v. Roper*,
     535 F.3d 853 (8th Cir. 2008) ........................................................................23, 24

*Snyder v. Louisiana*,
     552 U.S. 472 (2008)...............................................................................................6

*St. Mary's Honor Center v. Hicks*,
     509 U.S. 502 (1993*)*...............................................................................................5

*State v. Bellamy*,
     468 N.J. Super. 29 (2021) ...................................................................................34

*State v. Canfield*,
     470 N.J. Super. 234 (App. Div. 2022) ................................................................34

*State v. Edwards*,
     116 S.W.3d 511 (Mo. 2003) (*en banc*) ...............................................................25

*State v. Hudson*,
     822 S.W.2d 477 (Mo. Ct. App. E.D. 1991) ........................................................25

*State v. Jackson*,
     746 S.W.2d 429 (Mo. Ct. App. E.D. 1988) ........................................................25

*State v. McFadden*,
     191 S.W.3d 648 (Mo. 2006) (*en banc*) ...........................................4, 11, 18, 26

*State v. Payton*,
     747 S.W.2d 290 (Mo. Ct. App. E.D. 1988) ........................................................25

*State v. Pepper*,
     855 S.W.2d 500 (Mo. Ct. App. E.D. 1993) ........................................................25

**Statutes**

21 U.S.C. § 387f(d)(5) .................................................................................................38

23 U.S.C. § 158.............................................................................................................38

Cal. Penal Code Ann. § 3051.......................................................................................37

Federal Fostering Connections to Success and Increasing Adoptions Act of 2008
     (Pub. L. No. 110-351).......................................................................................38

Further Consolidated Appropriations Act, Pub. L. No. 116-94, § 603, 133 Stat. 2534, 3123 (2019)................................................................................................38

Ga. Code Ann. § 42-7-2(7) .....................................................................................36

Ga. Code Ann. § 42-7-3(a) .....................................................................................36

La. Stat. Ann. § 22:1003 (2009) .............................................................................37

Mass. Gen. Laws ch. 119, § 23 ...............................................................................38

Mich. Comp. Laws. Ann. 712A.2(a) .......................................................................35

N.Y. Ins. Law § 3216 (McKinney 2010) .................................................................37

S.C. Code. Ann. § 24-19-10(d)(ii) ..........................................................................36

Vt. Stat. Ann. tit. 33, § 5102(2)(C).........................................................................35

Vt. Stat. Ann. tit. 33, § 5103 ..................................................................................35

**Other Authorities**

45 C.F.R. § 147.120 ...............................................................................................37

Adolf Pfefferbaum et al., *Variation in Longitudinal Trajectories of Regional Brain Volumes of Healthy Men and Women (Ages 0 to 85 Years) Measured with Atlas-Based Parcellation of MRI*, 65 NeuroImage 176 (2013) ......................................31

Alexandra O. Cohen et al., *When Does a Juvenile Become an Adult? Implications for Law and Policy*, 88 Temp. L. Rev. 769 (2016)....................................39

Catherine Lebel & Christian Beaulieu, *Longitudinal Development of Human Brain Wiring Continues from Childhood into Adulthood*, 31 J. Neuroscience 10937 (2011).........................................................................31

Death Penalty Info. Ctr., *Compromised Justice: How A Legacy of Racial Violence Informs Missouri's Death Penalty Today* (December 2023)....................................10

Death Penalty Info. Ctr., *Compromised Justice: How A Legacy of Racial Violence Informs Missouri's Death Penalty Today* (December 2023)....................................10, 12, 13

Elizabeth S. Scott, Richard J. Bonnie & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641 (2016).........................................................................32

Equal Just. Initiative, *Race and the Jury: Illegal Discrimination in Jury Selection* (2021) ..........................................................................................8, 9

Fed. R. Evid. 402 ..................................................................................................................17

Frank R. Baumgartner, *Homicides, Capital Prosecutions, and Death Sentences in St. Louis County, Missouri, 1991-2018* (2022).................................................................26, 27

*Governor Cuomo Signs Legislation Raising the Age of Criminal Responsibility to 18-Years-Old in New York* (Apr. 10, 2017) ..................................................................35

House Fiscal Agency, *Legislative Analysis* (2019)..........................................................36

Inst. of Med. of the Nat'l Academies, *Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products* (2015)......................................38

Karen U. Lindell & Katrina L. Goodjoint, Juv. L. Ctr., *Rethinking Justice for Emerging Adults: Spotlight on the Great Lakes Region* (2020) .......................................36, 37

Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psych. 1009 (2003) .................................................................30

Laurence Steinberg, *Does Recent Research on Adolescent Brain Development Inform the Mature Minor Doctrine?*, 38 J. Med. & Phil. 256 (2013).....................................32

Manka Nkimbeng, et. al., *The Person Beneath the Hair: Hair Discrimination, Health, and Well-Being*, 7.1 Health Equity 406 (2023)..............................................21

Martin Childs IV, *Who Told You Your Hair Was Nappy?: A Proposal for Replacing an Ineffective Standard for Determining Racially Discriminatory Employment Practices*, 2019 Mich. St. L. Rev. 287 (2019) .....................................21

Nadijah Campbell, *Protecting the Black Crowning Glory: Why Legislation is Needed to Make Up for Federal Discrimination Statutes' Failure to Protect Black Hair*, 13 Drexel L. Rev. 143 (2020) ...............................................................21

Nat'l Acads. of Scis., Eng'g & Med., *The Promise of Adolescence: Realizing Opportunity for All Youth* (2019)...............................................................................33, 39

New York State Raise the Age Implementation Task Force, *Final Report* (2020).....................35

*Reviewed After Prosecutors Discover Evidence of Prosecutorial Misconduct Excluding Jewish and Black Residents from Jury Service in Death Penalty Cases* (April 22, 2024)..........................................................................................8

Rigel C. Oliveri, *Setting the Stage for Ferguson: Housing Discrimination and Segregation in St. Louis*, 80 MO. L. REV. 1053 (2015)............................................10

Ronald F. Wright et. al., *The Jury Sunshine Project: Jury Selection Data as a Political Issue*, 2018 U. ILL. L. REV. 1407 (2018) ...................................................8

Ryan Krull, *Bob McCulloch's Most Lasting Legacy May Be His Insistence on the Death Penalty*, St. Louis Public Radio (Nov. 10, 2022)........................23

Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberates*, 90 J. PERSONALITY & SOC. PSYCH. 597 (2006)..........................8

Sara Rosenbaum et al., *Implementing Health Reform in an Era of Semi-Cooperative Federalism: Lessons from the Age 26 Expansion*, 10 J. Health & Biomedical L. 327 (2015)..........................37

Shamena Anwar, et al., *The Impact of Jury Race in Criminal Trials*, 127 QUART. J. OF ECON. 1017 (2012) ..........................8

U.S. Dep't of Health & Hum. Servs., *Extension of Foster Care Beyond Age 18* (2017)..........................38

Vincent Schiraldi & Bruce Western, *Why 21 Year-Old Offenders Should Be Tried in Family Court*, Wash. Post (Oct. 2, 2015) ..........................32

Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55 (2016) ...............37, 39

William C. Lhotka, *Jury Votes Death Penalty for Woman's Murder*, St. Louis Post-Dispatch, June 20, 2001..........................22

William C. Lhotka, *Trial Opens for St. Louis Man Charged in Ex-wife's Killing*, St. Louis Post-Dispatch, Apr. 23, 2002 ..........................25

William J. Bowers, et al., *Crossing Racial Boundaries: A Closer Look at the Roots of Racial Bias in Capital Sentencing When the Defendant is Black the Victim is White*, 53 DEPAUL L. REV. 1497 (2004)..........................9

William J. Bowers, et al., *Death Sentencing in Black and White: An Empirical Analysis of Jurors' Race and Jury Racial Composition*, 3 U. PA. J. CONST. L. 171 (2001) ..........................8

**INTEREST OF AMICUS CURIAE**

The Roderick and Solange MacArthur Justice Center (RSMJC) is a civil rights organization founded in 1985 by the family of J. Roderick MacArthur to advocate for human rights and social justice through litigation. RSMJC attorneys have played a key role in advocacy on criminal legal system issues including the rights of the indigent in the criminal justice system, compensation for the wrongfully convicted, and the treatment of incarcerated people. In addition to direct representation on behalf of its clients, RSMJC frequently files amicus briefs related to these issues through the federal circuits and in state supreme courts.

*In the eyes of the Constitution, one racially discriminatory peremptory strike is one too many.*

*Flowers v. Mississippi*, 588 U.S. 284, 299 (2019)

### INTRODUCTION AND SUMMARY OF THE ARGUMENT

In 2007, Wanda Bryant reported for jury duty ready and willing to serve. Instead, she was unconstitutionally struck from Vincent McFadden's jury. The state sought to seek every single Black juror in this case. This was not an anomaly; instead, it was standard operating procedure for the office that prosecuted Mr. McFadden. In fact, Mr. McFadden's 2007 trial was a retrial after his first conviction was overturned due to a *Batson* violation. The St. Louis County Prosecutor's Office assigned a new prosecutor for the retrial, but that did not cure the racism. The new prosecutor assigned to Mr. McFadden's case, Keith Larner, had a proven track record of racist prosecution and *Batson* violations. This is no longer debatable; Larner himself admitted it. In 2024, Larner testified under oath that he committed a *Batson* violation in another capital prosecution of a young black man, Marcellus Williams: testifying that he struck the juror simply because, like the defendant, the juror was a young black man.

In both Marcellus Williams' case and this case, Larner's notes from jury selection are mysteriously missing from his trial file. Last year, St. Louis County prosecutor Jessica Hathaway, Chief of the Conviction and Integrity Review Unit (CRU), signed an affidavit stating that she reviewed prosecutor Larner's trial file from this case to examine the notes from jury selection, but the juror notes are missing. Hathaway noted that the file does include attorney notes related to the trial and other aspects of trial preparation. Hathaway confirmed that the jury selection notes were also missing from Larner's trial file for Marcellus Williams, where Larner admitted committing a *Batson* violation.

2

This amicus brief calls attention to the racism routinely exhibited by the St. Louis County Prosecutor's Office during the period in which Mr. McFadden was prosecuted, particularly in capital prosecutions. This prejudice is evident in the *Batson* violation involving Venireperson Bryant at Mr. McFadden's 2007 trial, and the prosecutor's attempt to strike 100% of Black jurors from Mr. McFadden's jury. It is further illustrated by Larner's language, conduct, and tactics throughout the trial, and from investigation into the longstanding practices of Larner and the St. Louis County Prosecuting Attorney's Office writ large. Prosecutor Larner routinely weaponized deeply harmful racial tropes, from repeatedly using the complete form of the word "n***er" in front of the jury, to characterizing Mr. McFadden as more base and depraved than an animal—as someone who "kills for pleasure" and not for "food." Beyond violating *Batson* on four occasions, he withheld exculpatory evidence from the defense and frequently misstated the law, revealing the impropriety pervading his prosecutorial strategy. Recent investigation also reveals that the racist conduct tainting Mr. McFadden's conviction was passed down and sanctioned by supervisors at the St. Louis County Prosecuting Attorney's Office.

The trial prosecutor's admitted history of violating *Batson* by striking jurors for being black, combined with the disappearance of his notes from jury selection in this case, and the St. Louis County Prosecutor Office's demonstrated record of racist prosecution, require that this Court grant relief on Mr. McFadden's *Batson* claim or, at a minimum, order an evidentiary hearing on this claim. Allowing the federal judiciary to be an accessory to the racist execution of Mr. McFadden would only degrade the integrity of our criminal legal system and aggravate the injustices our courts are constitutionally mandated to guard against. *See Batson v. Kentucky*, 476 U.S. 79, 99 (1986).

3

This amicus also calls attention to the science, public policy, and law that has developed since Mr. McFadden's conviction and death sentence that militates against executing young adults, and asks the Court to overturn Mr. McFadden's death sentence for the additional reason of the mitigating nature of his youth and still developing brain.

## STATEMENT OF FACTS/STATEMENT OF THE CASE

Amicus adopts Petitioner's Procedural History and summary of the facts in his Petition. ECF 15. Amicus will provide only a brief summary of the facts relevant to trial prosecutor Keith Larner's striking of Wanda Bryant.

Vincent McFadden was tried and convicted of capital murder in 2005 for a crime committed when Mr. McFadden was 22 years old. That conviction was overturned on direct appeal due to *Batson* violations, whereby 5 of the 6 Black jurors were unconstitutionally struck. *State v. McFadden*, 191 S.W.3d 648, 657 (Mo. 2006) (*en banc*) ("in light of the totality of the facts and circumstances, it becomes obvious that these explanations were merely pretextual for the State's exercise of its peremptory strikes for racially discriminatory reasons.")

Mr. McFadden was tried again in 2007 by a different prosecutor from the same office, Keith Larner.[1] There were seventeen Black venirepersons at the 2007 trial. *McFadden v. State*, 369 S.W.3d 727, 739 (Mo. 2012) (*en banc*). The State successfully removed over 50% of the Black jurors, challenging nine of these jurors for cause, and the court removed three others for

---

[1] Keith Larner worked at the St. Louis County Prosecuting Attorney's Office from 1982 to 2017. His tenure significantly overlapped with that of Mark Bishop, who worked in the Prosecuting Attorney's Office from 1996 to 2007. Mark Bishop initially tried Mr. McFadden. That conviction was vacated, however, after the Missouri Supreme Court determined that Bishop violated *Batson v. Kentucky* in striking Black venirepersons, even including those who would have been helpful jurors for the State. *See State v. McFadden*, 191 S.W. 3d 648, 651–53 (Mo. 2006) (*en banc*). At the time of Mr. McFadden's second trial, Larner had been working as a prosecutor for twenty-five consecutive years. Larner's decades of experience, along with his continued proximity to Mark Bishop, inevitably provided him with insight into how to avoid *Batson* challenges. Yet Larner still injected racial prejudice into Mr. McFadden's trial and utilized his peremptory strikes to attempt to strike every African American venireperson from the jury.

4

sequestration and conflict reasons.[2] One other Black juror was excused due to her position at the end of the venire.[3] That left four Black venirepersons in the pool. The prosecutor attempted to strike all four of the remaining Black jurors: numbers 16, 17, 30, and 37.[4] When the trial court went through each of the strikes individually and asked Larner to provide a race-neutral justification, he asserted, every time, that the relevant juror would require the State to prove its case beyond a reasonable doubt.[5] The trial judge flatly rejected this reason as pretextual as to jurors 16, 17, and 30, finding that the venirepersons were each able to follow all instructions of law.[6] The trial judge further noted that Larner's questions on the burden of proof were "confusing and not clear," suggesting that his elusive phrasing was intentional.[7]

When asked to provide a race-neutral reason for striking Ms. Bryant, Larner admitted that he was repeating a losing argument: "As a peremptory challenge, I strike Number 37, because she said, like the other jurors, 16, 17, 30, that she would require proof beyond all doubt."[8] But the trial court had already rejected that rationale *three times* when it was held out as a justification for striking Black jurors. That Larner reused the very same justification—which the trial court continuously rejected as pretextual—for the three jurors struck prior to Ms. Bryant already raises an inference of discrimination pointing strongly toward a *Batson* violation. *See St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 511, 113 (1993*)* (explaining that "rejection of the defendant's proffered [nondiscriminatory] reasons will *permit* the trier of fact to infer the ultimate fact of intentional discrimination").

---

[2] *See* Doc. 14-20, p. 48; Doc. 14-22, p. 52; Doc. 14-20, p. 81; Doc. 14-20, p. 92; Doc. 14-21, p. 48; Doc. 14-21, p. 69; Doc. 14-21, p. 85; Doc. 14-21, p. 102; *id.*; Doc. 14-20, p. 70; Doc. 14-20, p. 109; Doc. 14-21, p. 47.
[3] *See* Doc 14-22, trial transcript page 924.
[4] *See id.* at p. 89.
[5] *See id.* at 90, 92, 94, 96.
[6] *See id.* at 92, 94, 96.
[7] *Id.* at 94.
[8] *Id.* at 96.

Larner then turned to another tactic: claiming that the juror was hesitating for too long. Larner alleged that Ms. Bryant "hesitated" for twenty seconds before answering a question about whether she could apply the death penalty in the proper case.[9] This excuse was also recycled: Larner gave the exact same "20 second" explanation for two other Black jurors. And Larner only asked Black jurors whether they had any hesitation about their ability to impose the death penalty. *See Miller-El II*, 545 U.S. at 260 (the "reasonable inference" from different questioning is that race was major consideration in strikes). *See also Snyder v. Louisiana*, 552 U.S. 472, 481-84 (2008) (condemning a state's use of disparate lines of questioning with white and black veniremembers). Defense counsel firmly disputed that Ms. Bryant hesitated for twenty seconds.[10] And the transcript itself belies this. At no point during the interaction did Larner contemporaneously note that Ms. Bryant paused for *twenty seconds*. Notably, Larner contemporaneously recorded that Venireperson Kerr, another Black juror, had "hesitated about twenty seconds,"[11] indicating he knew how to make a record of such hesitation. But he did not make such a record for Bryant.

The trial court found that the *only* racially neutral reason for applying a peremptory strike toward Ms. Bryant was because she expressed "quite a bit of reservation," which apparently suggested that she would not impose the death penalty.[12] Notably, however, Ms. Bryant stated that nothing would keep her from considering both sentences and she could vote for the death penalty.[13]

---

[9] *See id.*
[10] *See id.* at 96–97.
[11] *Id.* at 38.
[12] Doc. 14-22, p. 97.
[13] *Id.* at 484-86.

6

**ARGUMENT**

**I.      Racial Discrimination in Jury Selection Undermines our Democracy**

Juries are central to the expression of our democracy. "Just as suffrage ensures the people's ultimate control in the legislative and executive branches, jury trial is meant to ensure their control in the judiciary." *Blakely v. Washington*, 542 U.S. 296, 306 (2004). In this respect, striking Black Americans from a jury is tantamount to denying their right to participate in elections. It silences the voices and perspectives of an entire segment of the American population, unequivocally threatening the "democratic ideal reflected in the processes of our courts." *Buck v. Davis*, 580 U.S. 100, 124 (2017). Discrimination in the selection of jurors for a criminal trial can therefore only be described as incompatible "with our basic concepts of a democratic society and a representative government." *Smith v. Texas*, 311 U.S. 128, 130 (1940).

For decades, the U.S. Supreme Court has recognized that all citizens have a right not to be excluded from juries based on their race. *See Powers*, 499 U.S. at 407. Indeed, people who are "excluded from juries because of their race are as much aggrieved as those indicted and tried by juries chosen under a system of racial exclusion." *Carter v. Jury Comm'n of Greene Cnty*, 396 U.S. 320, 329 (1070). Accordingly, the Supreme Court's cases recognize and protect the rights of "potential jurors" as much as defendants. *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994). Yet, state officials have denied Black people this "valuable opportunity to participate in a process of [G]overnment" throughout our nation's history. *Powers*, 499 U.S. at 407 (citation omitted). Peremptory strikes have been a key tool in states' ongoing battle to undermine the U.S. Supreme Court's efforts to end systemic exclusion. To this day, "the discriminatory use of peremptory challenges remains a problem." *Miller-El*, 545 U.S. at 268 (Breyer, J., concurring); *see Powers*, 499 U.S. at 267-69 (collecting studies and evidence regarding the persistence of

7

discriminatory peremptory strikes).[14] Such "[e]xclusion of Black citizens from service as jurors constitutes a primary example of the evil the Fourteenth Amendment was designed to cure." *Batson*, 472 U.S. at 85.

Our democracy is only as strong as the legal processes so constituting it. When juries are corrupted by racial discrimination, the very efficacy of jury verdicts suffers. The harms of all-white or nearly-all white juries are numerous and well-documented. Nonrepresentative juries consistently return higher rates of guilty verdicts for Black defendants, and they result in convictions for counts bearing heavier penalties.[15] All-white juries also make more mistakes in evaluating the evidence presented to them: one study found that juries composed of only white individuals were more likely than any other group to make factually inaccurate statements during deliberations.[16] All-white groups were also more likely to leave factual errors uncorrected, and they were less likely to consider possible sources of missing evidence.[17] They are also more likely to view Black defendants as "less redeemable, more cold-hearted, more remorseless, and

---

[14] For example, in California, the Alameda County District Attorney's Office is now reviewing 35 death penalty cases after locating "handwritten notes by prosecutors which appear to show that they intentionally excluded Jewish and Black female jurors from the jury pool." *Reviewed After Prosecutors Discover Evidence of Prosecutorial Misconduct Excluding Jewish and Black Residents from Jury Service in Death Penalty Cases* (April 22, 2024), https://www.alcoda.org/alameda-county-death-penalty-cases-are-reviewed-after-prosecutors-discover-evidence-of-prosecutorial-misconduct-excluding-jewish-and-black-residents-from-jury-service-in-death-penalty-cases.

As another example, 2018 study, examined 1,306 North Carolina felony trials in 2011 alone and found that prosecutors exercised peremptory strikes against Black jurors "at more than twice the rate that they excluded white jurors[.]" Ronald F. Wright et. al., *The Jury Sunshine Project: Jury Selection Data as a Political Issue*, 2018 U. ILL. L. REV. 1407, 1419, 1422, 1426 (2018).
A 2021 report by the the nonprofit Equal Justice Initiative detailed how prosecutors often use, and are trained to use, disingenuous "neutral" reasons, such as demeanor and appearance. Equal Just. Initiative, *Race and the Jury: Illegal Discrimination in Jury Selection*, ch. 5 (2021), available at https://eji.org/report/race-and-the-jury/ (noting for example that "a study of illegal racial discrimination in California courts found that prosecutors used racial stereotypes about demeanor to justify peremptory strikes in more than 40% of cases").

[15] *See, e.g.*, Shamena Anwar, et al., *The Impact of Jury Race in Criminal Trials*, 127 QUART. J. OF ECON. 1017 (2012); William J. Bowers, et al., *Death Sentencing in Black and White: An Empirical Analysis of Jurors' Race and Jury Racial Composition*, 3 U. PA. J. CONST. L. 171 (2001).

[16] *See, e.g.*, Samuel R. Sommers, *On Racial Diversity and Group Decision Making: Identifying Multiple Effects of Racial Composition on Jury Deliberates*, 90 J. PERSONALITY & SOC. PSYCH. 597, 600–606 (2006).

[17] *See id.*

8

more likely to reoffend." [18] These statistical differences are highly salient to capital trials, where the consideration of mitigating evidence is central to a jury's ultimate penalty decision. When white individuals were placed in racially diverse juries, however, they were more likely to offer factually accurate statements in deliberations and to point out evidentiary flaws in a case.[19] Indeed, diverse juries are far more likely to hold prosecutors to their standard of proof and discuss problems—such as racial profiling and stereotyping—that are often overlooked by homogenous juries.[20] Representative juries are also better able to assess the credibility of witnesses.[21]

Beyond weakening the accuracy of the verdicts reached, racial discrimination in jury selection undermines the social fabric of our democracy. One Black juror struck from a capital trial in Georgia recounted how demeaning it felt to be questioned by the prosecutor about why she had to work two jobs.[22] She reported feeling humiliated, like "she had been treated like a criminal during jury questioning."[23] She even stated that she "never wanted to be on a jury [again] because of the way [she] was treated."[24] This testimony heartbreakingly reveals the social deterioration emerging out of racial discrimination in *voir dire.* The "stigmatizing injury" caused by racial discrimination "is one of the most serious consequences of discriminatory state action. *Allen v. Wright*, 468 U.S. 737, 755 (1984). When individuals are made to feel like the State does not want them to participate in the democratic process, our communities splinter, and distrust of government surges. Because of the important role that juries play in our democracy, racial

---

[18] Equal Just. Initiative, Race and the Jury: Illegal Discrimination in Jury Selection, Ch. 5 (2021), available at https://eji.org/report/race-and-the-jury/.

[19] *See id.*

[20] *See id.*

[21] William J. Bowers, et al., *Crossing Racial Boundaries: A Closer Look at the Roots of Racial Bias in Capital Sentencing When the Defendant is Black the Victim is White*, 53 DEPAUL L. REV. 1497, 1507-08, 1511, 1531 (2004).

[22] *See id.*

[23] *See id.*

[24] *See id.*

discrimination in jury selection is "especially pernicious" because it "injures not just the defendant," but rather "the community at large." *Buck v. Davis*, 580 U.S. 100, 124 2017 (quoting *Rose v. Mitchell*, 443 U.S. 545, 556 (1979)).  The effects ripple throughout our criminal legal system, aggravating existing tensions between marginalized groups and police, prosecutors, and courts.

Racial discrimination in the judicial process is especially concerning in Missouri, and in St. Louis County in particular. The St. Louis Metropolitan area is "one of the most racially segregated places in the United States"[25] and the outlier jurisdiction responsible for the vast majority of executions in the state.[26] 18 of the 35 people who have been exonerated for murder in Missouri are Black,[27] and "death-sentenced Black men [in Missouri] are overrepresented among cases that were reversed or resulted in exonerations due to official misconduct."[28] Given the extensive evidence of racial prejudice in the St. Louis County Prosecuting Attorney's Office, *Batson* adjudications implicate the very democratic aspirations of St. Louis County. Judicial failure to recognize the blatant racial discrimination in Mr. McFadden's prosecution would condone "violations of the United States Constitution within the very institution entrusted with its enforcement" and invite "cynicism respecting the jury's neutrality and its obligation to adhere to the law." *Powers v. Ohio*, 499 U.S. 400, 412 (1991). The people of St. Louis, to say nothing of Mr. McFadden himself, deserve better than this outcome.

---

[25] Rigel C. Oliveri, *Setting the Stage for Ferguson: Housing Discrimination and Segregation in St. Louis*, 80 MO. L. REV. 1053, 1053–4, 1065–66 (2015), available at scholarship.law.missouri.edu/cgi/viewcontent.cgi?article=4166&context=mlr.

[26] *See,* Death Penalty Info. Ctr., *Compromised Justice: How A Legacy of Racial Violence Informs Missouri's Death Penalty Today* at 18 (December 2023), available at https://dpic-cdn.org/production/documents/pdf/Final-Compromised-Justice-DPIC-Report.pdf?dm=1701802738

[27] *See* https://exonerationregistry.org/Exonerations-in-the-United-States-Map#crimeState (last accessed April 2, 2026).

[28] *See* Death Penalty Info. Ctr., *Compromised Justice: How A Legacy of Racial Violence Informs Missouri's Death Penalty Today* at 24 (December 2023), available at https://dpiccdn.org/production/documents/pdf/Final-Compromised-Justice-DPIC-Report.pdf?dm=1701802738.

## II.    Vincent McFadden's Trial was Corrupted by Racial Discrimination

### A.    Larner violated *Batson v. Kentucky* in striking Wanda Bryant from the jury.

By the time of Mr. McFadden's second trial, the Supreme Court of Missouri had already expressly disavowed the first prosecutor Mark Bishop's race-based discrimination in Mr. McFadden's first trial. *See State v. McFadden* 191 S.W. 3d 648 (Mo. 2006) (*en banc*). But venire tactics rooted in prejudice are not so easily eradicated, especially when the same office is responsible for subsequent prosecutions of the same defendant. Mr. McFadden's second trial, with prosecutor Keith Larner, was equally ridden by—and the jury's ultimate verdict therefore tainted by—racial discrimination at voir dire.

As summarized above, Keith Larner attempted to strike every single Black veniremember from Mr. McFadden's jury, 100% of Black jurors. These numbers alone "speak loudly." See *Flowers,* 588 U.S. at 305; see also *Miller-El v. Dretke*, 545 U.S. 231, 241 (2005) ("The prosecutors used their peremptory strikes to exclude 91% of the eligible African-American venire members. . . . Happenstance is unlikely to produce that disparity.") While the trial court sustained defense counsel's Batson objections to three Black jurors, the court unconstitutionally allowed the State to strike Ms. Bryant despite her unequivocal statements that she would consider both sentences and she could impose the death penalty.

Examining the details of Ms. Bryant's own *voir dire*, against the backdrop of the established pattern of racism in selection of the jury in Mr. McFadden's case (including both trials) as required, compels the conclusion that Ms. Bryant was also struck for purely pretextual reasons. When asked to provide a race-neutral reason for striking Ms. Bryant, even Larner himself recognized that he was repeating a losing argument that the trial court had already thrice rejected for the other Black jurors. Larner then turned to a tactic the Supreme Court itself has denounced as pretextual: claiming that the juror was hesitating for too long. *See Miller-El v.*

11

*Dretke*, 545 U.S. 231, 255 (2005) (finding that references to a juror's supposed hesitation were designed to "elicit plausibly neutral grounds for a peremptory strike" rooted in racial bias).

Larner alleged that Ms. Bryant "hesitated" for twenty seconds before answering a question about whether she could apply the death penalty in the proper case.[29] The accuracy of this allegation is disputed and not supported by the record, as explained above. Moreover, every time Larner raised the notion of hesitation, he was referring to Black jurors. This second purported justification for striking Ms. Bryant was therefore not only factually inaccurate but also racially discriminatory. First, he pressed Venireperson Slaughter, juror number 17, if he "had any hesitation" on whether he could impose the death penalty.[30] Next, Larner and another prosecutor accused Venireperson Kerr twice of pausing for twenty seconds.[31] Prosecutors doubled down on this bogus suggestion, adding that Mr. Kerr "again hesitated" in explaining his beliefs on the death penalty and what he understood proof beyond a reasonable doubt to mean.[32] Finally, Larner accused Ms. Bryant of similarly hesitating.[33] Larner never even uttered the word "hesitate" when questioning white venirepersons. He reserved that insinuation for one race of jurors only. In so doing, Larner exposed his own striking "patterns of practice" of discrimination. *Miller-El*, 545 U.S. at 233.

The trial court found that the *only* racially neutral reason for applying a peremptory strike toward Ms. Bryant was because she expressed "quite a bit of reservation," which apparently suggested that she would not impose the death penalty.[34] The trial judge's proposition that Ms. Bryant ever hesitated at all was purely the product of the psychological priming that Larner

---

[29] *See id.*
[30] Doc. 14-20, p. 73.
[31] Doc. 14-21, p. 38, 47.
[32] *Id.* at 47-48.
[33] *See id.* at 58, 68.
[34] Doc. 14-22, p. 97.

injected into the *voir dire*. And though the judge failed to recognize it at the time, this reasoning was nothing more than a cheap veneer for racial animus.

Venireperson Wanda Bryant reported to court, ready and willing to fulfill her civic duty as a juror in Mr. McFadden's case. She told the court that she was equally able to weigh sentences for death and life without parole.[35] She reiterated that there was nothing that would keep her from considering one punishment or another.[36] Yet because of her race, she was denied the responsibility of serving on Mr. McFadden's jury, of engaging in the "most substantial opportunity that most citizens have to participate in the democratic process" beyond voting. *Flowers v. Mississippi*, 588 U.S. 284, 293 (2019). An execution cannot stand when it is founded on such an egregious constitutional violation.

**B.    Larner's Overall Comportment Confirms the Racial Animus with which he Approached this Prosecution**

*Miller-El* requires this Court consider "the totality of relevant facts" regarding the prosecutor's conduct throughout the trial when a peremptory strike is challenged on the basis of *Batson*. 545 U.S. at 232. Here, throughout the trial, Larner made increasingly vile, discriminatory remarks, inviting the jurors to activate their potential racial prejudices as he revealed his own. Despite there being no evidence that the crime for which Mr. McFadden was charged was at all related to a gang dispute, Larner overtly alluded to Mr. McFadden's alleged gang membership in his opening statement. He framed McFadden's friends as "buddies, two guys that he hangs out in the same ground of friends," who, when impugned by the victim, were entitled to "pay back."[37] In so doing, Larner skirted the constitutional protections against irrelevant and overly prejudicial

---

[35] Doc. 14-21, p. 58.
[36] *Id.*
[37] Doc. 14-23, p. 30–31.

13

suggestions of gang membership enunciated in *Dawson v. Delaware,* 503 U.S. 159, 166–67 (1992).

> 1.    *The Prosecutor Dehumanized Mr. McFadden Drawing on Slavery-Era Racial Stereotypes Throughout the Trial*

The prosecutor also repeatedly compared Mr. McFadden to an animal, or worse. During his closing argument, Larner, then referring to Mr. McFadden and his co-defendant Michael Douglas, stated that they

> wanted part of the kill. They both wanted to kill the deer... They don't look at him as a human being. They don't look at life that way.... You got to understand the mentality of what we're talking about in this case. I think you understand the mentality here. They don't think the way we think.[38]

By characterizing Mr. McFadden as some thoughtless entity bent on securing "part of the kill," the prosecutor invited jurors to conceive of Mr. McFadden as less than human. What is more, in framing Mr. McFadden's mentality as belonging to some inanimate object ("*what* we're talking about")—and not a human being ("*who* we are talking about")—Larner encouraged jurors to degrade and dehumanize McFadden. And the prosecutor took it further, suggesting Mr. McFadden is *worse* than an animal, stating Mr. McFadden:

> kills for power, control, status. Those are his reasons to kill. You know, even animals don't kill for those reasons. What they do is they kill for food. He kills for pleasure.[39]

These disturbing characterizations brutalized the jurors' conception of Mr. McFadden, drawing on centuries of racial stereotypes that frame Black individuals as savage non-entities incomparable to living beings. *See Dred Scott v. Sanford*, 60 U.S. 393, 407 (1857) (explaining that Blacks may "justly and lawfully be reduced to slavery... and treated as an ordinary article of *traffic* and *merchandise*") (emphasis added).

---

[38] Doc. 14-25, p. 49.
[39] Doc. 14-27, p. 68.

14

Perhaps most disturbingly, the prosecutor insisted on using the complete pronunciation of the word "n***er" when ostensibly "quoting" Mr. McFadden during his closing arguments.[40] Even using this form of the word once would be unethical and inappropriate. But Larner said "n***er" *four times* in front of the jury.[41] To make matters worse, McFadden himself did not pronounce the word that way in his own quotation; rather, Mr. McFadden said "n***a," the form he regularly used when corresponding amicably with familiar Black men.[42] Provoking the violent imagery associated with the word "n***er" was not only gratuitous but misleading, as McFadden never used that word himself. Once more, Larner weaponized racial allusions, wrought with centuries of pain from the memory of enslavement, to ensure jurors would dehumanize Mr. McFadden.

### 2.    *Larner's Prosecutorial Misconduct Underscored that the Prosecution Viewed Mr. McFadden as Less Deserving of Constitutional Protections*

Two codas of prosecutorial misconduct further demonstrate that Larner did not view Mr. McFadden as deserving of the full panoply of protections for criminal defendants, underscoring the racial animus with which he approached this prosecution. First, in clear violation of *Brady v. Maryland*, the prosecution did not disclose necessary context concerning the truthfulness and credibility of state witnesses. Gregory Hazlett, for instance, was one of the State's star witnesses. He testified that he saw Mr. McFadden shoot Mr. Franklin.[43] The prosecutor told the jurors, "I don't care what Hazlett's criminal record [is] or whatever, it's not that bad. I did him a favor. I didn't charge him with a DWI."[44] But Larner failed to explain that Hazlett's other charges of

---

[40] *See* Doc. 14-25, p. 37–38; Doc. 14-27, p. 64, 65.
[41] *See id.*
[42] *See* Doc. 14-23, p. 41, 69.
[43] *See id.* at 80.
[44] Doc. 14-25, p. 39.

15

rape, sodomy, and armed criminal action from 2002 were also dismissed.[45] Larner's distortion of the full picture of Hazlett's criminal history, which was never disclosed to defense counsel, raises the specter of an unsavory consideration for his testimony.

The prosecutor also did not disclose exculpatory details concerning Vaughn Shivers.[46] Mr. Shivers saw two adult men running "directly towards him" near the scene of the crime.[47] The prosecutor did not disclose that, when they presented Mr. Shivers with a lineup, he could not identify either of the men he saw that day.[48] This evidence would have enabled the defense to fully test and cast doubt upon the State's version of events, but it was never provided to Mr. McFadden's counsel. Because the suppression of the Shivers and Hazlett evidence prohibited defense counsel from effectively probing the veracity of the State's key witnesses, Larner's conduct undermined confidence in the eventual verdict and violated *Kyles v. Whitney*, 514 U.S. 419 (1995).

Second, Larner misstated the appropriate legal standards at key phases throughout the trial. At *voir dire*, Larner inaccurately told veniremen that, to impose a sentence of life without parole, the jury must be unanimous.[49] It is implausible that an experienced attorney such as Larner would be unaware of the relevant requirements to secure the desired verdict in *any* case, let alone in a capital case. Inaccurately raising the standard for a life without parole sentence primed potential jurors to be more open to the "easier" or less controverted outcome of death.

Larner also misrepresented the burden of proof in closing statement, and encouraged them to disregard reasonable doubt. There, he told jurors, "between the police report, the prior

---

[45] *See id.* Attachment A.
[46] *See id.* Attachments E, JJ.
[47] *See id.*
[48] *See id.*
[49] *See* Doc. 14-20, p. 37, 62–86, 88; Doc. 14-21, p. 44, 81, 93.

16

testimony, and all of that" of conflicting accounts of what a witness saw and heard, that "if you have a reasonable doubt about that—so do I—I don't care."[50] Larner functionally counseled jurors to cast aside any doubt they had in reviewing the evidence and to resign themselves to the conclusion that Mr. McFadden simply must have been guilty. Suggesting that jurors can disregard any doubts they may have when evaluating the evidence invites jurors to abandon their responsibility to our judicial system.

Later in his closing, Larner added that, "it doesn't matter what [witness] Silas says in court. His statement has been set in stone."[51] Again, the prosecutor ignored a foundational evidentiary reality that admissible oral testimony is by definition relevant; if it was irrelevant, it would not be admissible. *See* Fed. R. Evid. 402. A prosecutor cannot instruct jurors to completely ignore evidence that the trial court has deemed relevant and admissible. *See City of Kansas v. Baird*, 11 S.W. 243, 244 (Mo. 1889).  But Larner did exactly that.

The prosecutorial misconduct here is inextricably tied to the discriminatory practices that emerged throughout Mr. McFadden's trial. Racial animus infected the full scope of prosecutorial conduct during this trial. These incidents of misconduct are further evidence that Mr. McFadden's trial was tainted by unconstitutional racial discrimination.

III.    **Keith Larner Has Previously Admitted Racist Jury Selection, Has a Track Record of Other *Batson* Violations and Racist Conduct in His Prosecutions, and He was Not an Exception in the St. Louis County Prosecutor's Office at The Time**

Keith Larner admitted that he struck a prospective juror in another Missouri capital case for being a young black man. This damning admission cannot be isolated from this case and this Court's analysis of Mr. McFadden's *Batson* claim. Neither can Larner's track record of racist prosecution of other capital and non-capital cases.

---

[50] Doc. 14-25, p. 35.
[51] *Id.* at 40.

17

## A.    Keith Larner's *Batson* Admission in Marcellus Williams' Case

In 2024, the St. Louis Prosecutor's Office filed a motion to vacate the conviction of Marcellus Williams and halt his execution because the prosecutor's office admitted it had committed a *Batson* violation at Mr. Williams' trial.[52] Larner, the trial prosecutor in Mr. McFadden's case, was the trial prosecutor in Mr. Williams' case and the one who committed the *Batson* violation.[53] At the evidentiary hearing on the prosecutor's motion, Larner took the stand and admitted under oath that he struck a juror because he was a young black man, like the defendant Marcellus Williams. Larner's testimony proved that his reason for striking the prospective juror was not "race-neutral"; instead "discriminatory intent is inherent in the prosecutor's explanation" for the strike. *Hernandez v. New York*, 500 U.S. 352, 358–60 (1991) (plurality opinion).  Any other conclusion would leave prosecutors' use of peremptory strikes "largely immune from constitutional scrutiny." *Batson*, 472 U.S. at 92–93. Larner's testimony was particularly concerning because it indicated he struck the juror based on an impermissible stereotype—that this juror would be more likely to favor the defendant because they were both young black men.

---

[52] Doc. 56-1, p. 53-62 *In re Prosecuting Attorney, 21st Judicial Circuit of Missouri, Ex rel. Marcellus Williams*, Case No. 24SL-CC00422, First Motion to Vacate or Set Aside Judgment and Suggestions in Support, pp. 53-62  (filed January 26, 2024)

[53] Keith Larner worked at the St. Louis County Prosecuting Attorney's Office from 1982 to 2017. His tenure significantly overlapped with that of Mark Bishop, who worked in the Prosecuting Attorney's Office from 1996 to 2007. Mark Bishop initially tried Mr. McFadden. That conviction was vacated, however, after the Missouri Supreme Court determined that Bishop violated *Batson v. Kentucky* in striking Black venirepersons, even including those who would have been helpful jurors for the State. *See McFadden*, 191 S.W.3d at 651–53. At the time of Mr. McFadden's second trial, Larner had been working as a prosecutor for twenty-five consecutive years. Larner's decades of experience, along with his continued proximity to Mark Bishop, inevitably provided him with insight into how to avoid *Batson* challenges. Yet Larner still injected racial prejudice into Mr. McFadden's trial and utilized his peremptory strikes to attempt to strike every African American venireperson from the jury.

18

This kind of insidious stereotype undermines our nation's most cherished and fundamental constitutional principles. As Justice Thurgood Marshall articulated in his concurring opinion in *Batson*,

> [e]xclusion of blacks from a jury, solely because of race, can no more be justified by a belief that blacks are less likely than whites to consider fairly or sympathetically the State's case against a black defendant than it can be justified by the notion that blacks lack the intelligence, experience, or moral integrity to be entrusted with that role.

476 U.S. at 104–05 (Marshall, J., concurring) (internal quotation marks and citations omitted); *see also Powers v. Ohio*, 499 U.S. 400, 416 (1991) (describing "[r]acial identity between the defendant and the excused person[s]" as relevant factor under *Batson* that "may provide one of the easier cases to establish both a prima facie case and a conclusive showing that wrongful discrimination has occurred").

This Court forcefully reaffirmed these principles in *Flowers*. As Justice Kavanaugh explained the Equal Protection Clause "forbids the States to strike black veniremen on the assumption that they will be biased in a particular case simply because the defendant is black." *Flowers v. Mississippi*, 588 U.S. 284, 299 (2019) (quoting *Batson*, 472 U.S. at 97–98.). A contrary holding would render "[t]he core guarantee of equal protection . . . meaningless." *Batson*, 472 U.S. at 97–98.

## B.      Keith Larner's Problematic History of Racist Prosecutions

The racial discrimination targeted at Mr. McFadden during his 2007 trial was not simply a perfunctory prosecutorial misstep, but rather illustrative of racial animus that tainted the proceedings from start to finish. To reiterate, the trial court found that 75% of the peremptory strikes Larner used were racially motivated; his fourth strike was also used in an attempt to strike a Black member from the jury; he threw around the racial slur "n***er" unnecessarily, where Mr. McFadden himself did not even use that word; and, among other problematic comments, he

19

referred to Mr. McFadden as less than an "animal." These choices were not made innocently; instead, viewed in context, they illustrate exactly how Larner's misconduct contaminated Mr. McFadden's trial—indeed, contaminated it just the same as in Mr. McFadden's first trial under prosecutor Mark Bishop, which the Missouri Supreme Court found had been irreparably tainted by racism.

But Larner's improper and racially discriminatory behavior did not simply come to existence at Mr. McFadden's trial. Rather, this conduct tracks throughout Larner's lengthy career as a prosecutor in St. Louis County. Notably, the Eighth Circuit found in *Elem v. Purkett*, 25 F.3d 679 (8th Cir. 1994), that Larner had violated *Batson* in his peremptory strike of a Black jury member whose "mustache[]" and "beard[]" looked "suspicious" to him. *Id.* at 681. Such reasons were "facially irrelevant" to the question of a juror's qualification to serve and thus could not be "legitimate[ly] race-neutral." *Id.* at 683.

Larner took great pains to correct the record on this point—stating he ultimately "won that one"[54] when the Supreme Court reversed the Eighth Circuit's decision a year later in *Purkett v. Elem*, 514 U.S. 765 (1995). However, the Supreme Court never ruled on whether Larner's reason for striking *was* or *was not* race neutral; instead, the Court reversed the Eighth Circuit for erroneously combining *Batson*'s second and third steps when it held the second-step's race-neutral reasoning must also be at least "minimally persuasive." *Id.* at 768. Though the Court did say that beards and hair are not race-specific, and thus Larner's reasoning satisfied step two of *Batson*, the Court held that the lower court never conducted *Batson*'s third-step analysis in determining whether Larner's strike was pretextual. *Id.* at 769. It is therefore unclear what exactly Larner "won" in *Purkett*, and his insistence on hiding behind *Purkett*'s flimsy veil as

---

[54] Doc. 56-1, p. 85 (Marcellus Williams August 2024 post-conviction hearing, Larner testimony), at 250.

justification for his behavior is telling. Referring to the hair of a Black man as "long" and "unkempt," while simultaneously describing him as "suspicious," reeks of racial pretext, and Larner's language describing it as such was neither subtle in its racism, nor unfamiliar.[55]

Larner utilized similar pretextual excuses in the case of Marcellus "Khaliifah" Williams. There, however, it was not a Black man's "unkempt" hair which perturbed him. Instead, it was the fact that a Black juror had the same "piercing eyes" as Mr. Williams—and in fact, that the two young Black men looked like "familial brothers."[56] During the August 2024 evidentiary hearing in Mr. Williams's case, Larner immediately attempted to clarify this "brothers" comment: "I don't mean black people. I mean . . . you got the same mother, you got the same father. You know, you're brothers, you're both men, you're brothers."[57] His explanation did little to obfuscate the larger point he testified to: that he struck a Black juror simply because he bore a passing resemblance to Mr. Williams and, impliedly, because they were both Black. To put it more even more clearly, he struck this juror because, to him, Black men were indistinguishable from one another, so much so that they must be related. Such vitriolic logic is endemic to white supremacy.

And further, out of 130 venirepersons, only one—a Black man—had "piercing eyes" so distracting that Larner had no choice but to strike him. To add insult to injury, Larner also took

---

[55] The Black community has long since faced discrimination in all facets of daily life when it comes to wearing their hair naturally—whether that be afros, locs, braids, etc. Much research has been conducted illustrating the level of racist backlash Black people face when they choose to forgo Eurocentric standards and wear their hair naturally. The language Larner has used continually throughout his career to describe the hair of Black jurors is reminiscent of this discriminatory view on Black hair. *See* Martin Childs IV, *Who Told You Your Hair Was Nappy?: A Proposal for Replacing an Ineffective Standard for Determining Racially Discriminatory Employment Practices*, 2019 Mich. St. L. Rev. 287 (2019); Nadijah Campbell, *Protecting the Black Crowning Glory: Why Legislation is Needed to Make Up for Federal Discrimination Statutes' Failure to Protect Black Hair*, 13 Drexel L. Rev. 143 (2020); Manka Nkimbeng, et. al., *The Person Beneath the Hair: Hair Discrimination, Health, and Well-Being*, 7.1 Health Equity 406 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10457631/pdf/heq.2022.0118.pdf.

[56] Ex. 56-1, p. 47 (Marcellus Williams August 2024 post-conviction hearing, Larner testimony), at 212.

[57] *Id.*

issue with this juror's choice of fashion, describing him wearing an "ostentatious" gold cross and a "wild shirt."[58] None of these qualities are relevant to a juror's ability to serve and apply the law. Instead, these comments are much better understood as pretext used to wrongfully and unlawfully strike Black jurors.

Larner's tactics are not new, and neither is his tendency to stoop to name-calling. In *James v. Bowersox*, Larner was chastised by the Eighth Circuit for the "distasteful" use of the word "slime" when he said in his opening statement that Steffano James, a Black man, was "a big time, drug dealing, murdering, robbing slime." 187 F.3d 866, 870 (8th Cir. 1999)*.* Though the Eighth Circuit did not find these comments violated James's due process rights, they asserted it was "wrong for the State to refer to any citizen in such a contemptuous manner." *Id.* They further described the epithet as "inappropriate" and "back-alley name calling." *Id.* Yet, despite the Eighth Circuit's reprimand, Larner found no issue in continuing with this kind of snarky and bombastic commentary. During the penalty phase of Mr. Williams's 2001 case, when responding to defense counsel's comments about Mr. Williams's family, Larner sarcastically stated that Mr. Williams could "call [his children] and write them from death row."[59] We should expect more than petty name-calling and mocking remarks from those tasked with delivering the State's justice, most especially when lives are literally on the line. The Eighth Circuit put it best when it stated this type of behavior is "beneath the dignity of an officer of the court." *James*, 187 F.3d at 870. It reflects poorly on both Larner and the St. Louis County prosecutorial system that Larner's behavior went unchecked and largely unreprimanded during his career. This merely emboldened Larner to violate Mr. McFadden's constitutional rights when it came time for trial.

---

[58] Doc. 56-1, pp. 49-50. (Marcellus Williams August 2024 post-conviction hearing, Larner testimony), at 214–15.
[59] William C. Lhotka, *Jury Votes Death Penalty for Woman's Murder*, St. Louis Post-Dispatch, June 20, 2001, at B3.

22

C.      **The Prosecutor's Misconduct at Mr. McFadden's Trial is Part of a Pattern of Overt Racism at the St. Louis County District Attorney's Office**

It may be tempting to isolate Larner's behavior and chalk up his misconduct to his own individualized faults. But Larner did not exist in a vacuum. Rather, Larner was a product of the institution created by Robert McCulloch during his reign as St. Louis County Prosecuting Attorney. Those prosecutors under McCulloch, who colloquially referred to themselves as the "McBoys,"[60] perpetrated a number of pretextual and racist gimmicks to achieve their larger ends of aggressively prosecuting death penalty cases in St. Louis County—and, by consequence, carrying out a disturbing number of executions targeted at Black Missourians.

The most infamous of these gimmicks is the "Postman Gambit,"[61] and its use is best illustrated in the case of *Smulls v. Roper*, 535 F.3d 853 (8th Cir. 2008). Veteran prosecutor Dean Waldemer[62] was accused at trial by defense counsel of improperly striking Margaret Sidney—the last remaining Black juror on the venire panel. *Id.* at 856. Striking Ms. Sidney meant Herbert Smulls, a Black man facing the death penalty, would be tried by an all-white jury. *Id.* When the *Batson* issue was raised, Waldemer defended his choice to strike Ms. Sidney on the basis of her job as a mail sorter:

> She indicated that she is a mail sorter for Monsanto Company. That she sorts mail for, I believe she said, 5,000 people. And her husband works for the post office. . . . It's been my experience in the nine years that I've been a prosecutor that I treat people who work as mail sorters and as mail carriers, letter carriers and people who work for the U.S. Post Office with great suspicion in that they have generally—in my experience in many of the trials that I've had—are very disgruntled, unhappy people with the system and make every effort to strike back.

---

[60] Ryan Krull, *Bob McCulloch's Most Lasting Legacy May Be His Insistence on the Death Penalty*, St. Louis Public Radio (Nov. 10, 2022), https://www.stlpr.org/law-order/2022-11-10/bob-mccullochs-most-lasting-legacy-may-be-his-insistence-on-the-death-penalty.

[61] Ex. 1 (Joseph Luby affidavit from *Smulls*), at 2.

[62] Waldemer was an Assistant Prosecuting Attorney from 1984 to 1991, after which he became Chief Trial attorney until 2004. Waldemer then served as a municipal judge until 2017, when he became a circuit judge in Division 8 of the 21st Judicial Circuit of St. Louis County.

23

*Id.* at 868–69. The American Postal Workers Union, AFL-CIO, felt compelled to respond to such a claim by filing an *amicus curiae* brief in the case. There, the Union pointed out that not only did St. Louis prosecutors "regularly assert a right to strike postal employees peremptorily,"[63] but also that—conveniently—Black people constituted more than 50% of the postal service workforce in St. Louis at the time *Smulls* was litigated.[64] And while the majority in *Smulls* ultimately did not overrule the state court's judgment, the dissent took great issue with the trial court's "perfunctory and cavalier," and indeed "repugnant" dismissal of Smulls's *Batson* claim. *Smulls*, 535 F.3d at 871, 874. Notably, while the Eighth Circuit did leave the strike in place, it did so *not* because it found the strike was truly race-neutral, but rather because it had not met the incredibly high bar set by § 2254(d) of the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA). *See id.* To overturn the state court's judgment, the Eighth Circuit must have been able to find that the state court's findings were "contrary to" or involved an "unreasonable application" of "clearly established Federal law"—or, alternatively, that their decision was "based on an unreasonable determination of the facts." *See* 28 U.S.C. § 2254(d). In fact, the Eighth Circuit stated specifically: "We are not permitted to grant habeas relief to a state prisoner because we might have ruled differently on the *Batson* objection." *Smulls*, 535 F.3d at 868. Thus, because of the AEDPA bar, the Eighth Circuit made no individual determination about whether the strike was, in fact, pretextual under *Batson*. *See id.* at 868.

It is important to recognize Waldemer's tactic in striking Ms. Sidney was just that—a tactic. This "postal worker" rationale for striking Black jurors was one commonly used by the St. Louis Prosecutor's Office, so much so that it was nicknamed the "Postman Gambit." The Gambit was Waldemer's creation, an unwritten guidebook for other prosecutors to follow as they aimed

---

[63] Ex. 2 (*Smulls* American Postal Workers Union amicus brief), at 12.
[64] *Id.* at 13.

24

to wrongfully strike Black jurors—and it spread like wildfire throughout the prosecutor's office.[65] In 1993, a St. Louis County prosecutor admitted that he was immediately advised upon joining the prosecutor's office to strike postal workers from juries:

> One of the things that I got when I first started in this office was a list of people that are typically bad for the State versus people that are good for the State. One of the people they had listed there was post office employees. I am not quite sure why. But they are listed.

*State v. Pepper*, 855 S.W.2d 500, 503 (Mo. Ct. App. E.D. 1993).

In these early inceptions of the Gambit, its use was widely litigated among the Missouri courts, who at first found the rationale to be legitimate on its face. *See State v. Jackson*, 746 S.W.2d 429, 430 (Mo. Ct. App. E.D. 1988); *State v. Payton*, 747 S.W.2d 290, 293 (Mo. Ct. App. E.D. 1988); *State v. Hudson*, 822 S.W.2d 477, 480–81 (Mo. Ct. App. E.D. 1991). The Missouri Court of Appeals' decision-making in this context is unsurprising. Part of the tactic involved, by necessity, hiding pretext in plain sight—and it would take repeated use of the Gambit to uncover the broader scheme being perpetuated. Still, some courts caught on to the trick quickly; as early as 1992, a St. Louis trial court itself ruled that the "postal worker" excuse was pretext for racial discrimination.[66] And just over a decade later, the Missouri Supreme Court affirmed that same principle in *State v. Edwards* when it found the prosecutor's "postal worker" explanation to be insufficient under a *Batson* challenge: "If the mere incantation of the phrase 'he is a postal worker' were sufficient to overcome any showing of pretext, the third step of the *Batson* test would be illusory."[67] 116 S.W.3d 511, 526 (Mo. 2003) (*en banc*).

---

[65] Ex. 1 (Joseph Luby affidavit from *Smulls*), at 2–3.

[66] *See* Ex. 2 (*Smulls* American Postal Workers Union amicus brief), at 12 (citing *State v. Anderson*, No. FCR-8905528 (Wiesman, J., R.L.F. 733–56)).

[67] The prosecutor in the *Edwards* case was Doug Sidel. *See* William C. Lhotka, *Trial Opens for St. Louis Man Charged in Ex-wife's Killing*, St. Louis Post-Dispatch, Apr. 23, 2002, at B4.

Similar tricks were employed in Mr. McFadden's 2006 trial, when prosecutor Mark Bishop attempted to strike a Black juror because she worked in the St. Louis City School District. *State v. McFadden*, 191 S.W.3d at 654. The Missouri Supreme Court cited its *Edwards* rationale in finding the strike violated *Batson*, as Bishop provided no "basis for his opinion," no detailed "prior experiences," and no "specific reasons" as to why this St. Louis School District employee would be a bad juror for the State. *Id.* Of course, this served as only one of a litany of pretextual reasons that Bishop used to strike five out of six Black venirepersons from the jury. *Id.* at 658.

Waldemer, Bishop, and Larner all served as prominent prosecutors in St. Louis County. Their careers largely overlapped with one another and flourished under the guidance of Bob McCulloch. And they all prosecuted death penalty cases with the same toolbox at their disposal—breeding the same inequitable and unjust results. A recent study showed that during McCulloch's twenty-seven-year tenure as St. Louis County Prosecuting Attorney, the death penalty was imposed at a rate 3.5 times greater when the victim was white, compared to when the victim was Black.[68] Out of 408 death-eligible cases which arose from 1991 to 2018, 68.4% involved a Black victim, while only 31.6% involved a white victim.[69] Yet, by the time prosecutors secured a conviction, that statistic essentially reversed: 62.1% of those cases involving a white victim resulted in a death sentence, compared to only 37.9% involving a Black victim.[70] The study highlights the fact that the inversion of these statistics occurred at the most discretionary stages for prosecutors: the charging of a defendant and the notice of intent to seek

---

[68] *See* Frank R. Baumgartner, *Homicides, Capital Prosecutions, and Death Sentences in St. Louis County, Missouri, 1991-2018*, at 24 (2022).
[69] *Id.* at 8.
[70] *Id.*

26

death.[71] Thus, this reversal cannot simply be dismissed as a product of factors outside prosecutorial control; rather, it occurred purposefully and systematically, setting a standard which valued white lives—whether they be victims or criminal defendants—more than Black ones. The study's author was later quoted as saying, "McCulloch qualifies as one of the most active users of the death penalty."[72]

When Mr. McFadden was retried by Larner, the St. Louis County Prosecutor's Office was not dealing fairly. Following in that same, familiar pattern of racial discrimination and cheap *voir dire* ploys, Larner attempted to improperly strike three Black jurors—and was rightfully found to violate *Batson* in so doing. That context itself establishes Larner's racial animus in his jury selection, which carried over in his strike of the fourth Black juror. It is imperative, however, to understand Larner as one piece of a larger, dysfunctional system. This better represents the reality that Mr. McFadden faced as a Black man on trial for the death penalty in St. Louis County.

## IV.  Allowing McFadden's Death Sentence to Stand would Sanction Racist and Unconstitutional Prosecutorial Behavior and Degrade the Integrity of the Federal Judiciary

Permitting Mr. McFadden to be executed after a trial tainted by racist misconduct passed down through generations of St. Louis County prosecutors degrades the integrity of our judicial system. As the Supreme Court provided in *Miller-El v. Dretke*, "prosecutors drawing racial lines in picking juries establish 'state-sponsored group stereotypes rooted in, and reflective of, historical prejudice.'" *Miller-El*, 545 U.S. at 238 (*quoting J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 (1994)). When state action, such as the prosecutor's conduct here, is so visibly demonstrative of some the most dishonorable moments of our nation's past, the public is left to

---

[71] *Id.* at 8–9.
[72] Krull, *supra* note 41.

question the sincerity with which the judiciary purports to condemn racial discrimination. When the federal judiciary stands by idly, allowing a Black man to be put to death after the prosecutor attempted to strike all Black people from the jury and then referred to the defendant as *less than an animal*, how can the public be expected to believe the Court when it says that we are each entitled to constitutional protections against discrimination? *See, e.g., Loving v. Virginia*, 388 U.S. 1 (1967)*.* To give Mr. McFadden's death sentence a stamp of approval would be to deny the premise that the protections of our Constitution indeed extend to each of us, regardless of race.

Sanctioning Mr. McFadden's execution would betray the ideals of our constitutional system. It would require this court to shield its eyes and cover its ears from the Supreme Court's proclamation that "equal protection of the laws is something more than an abstract right. It is a command which the state must respect, the benefits of which every person may demand." *Rose v. Mitchell*, 443 U.S. 545, 557 (1979). The very reason the federal judiciary is entitled to habeas review is because state courts, reviewing the actions of their own personnel, may not be able to adequately recognize constitutional violations where they occur. *See id.* at 563. As the Supreme Court itself has explained, where invidious discrimination at trial is ratified, there is injury to "the law as an institution, to the community at large, and to the democratic ideal reflected in the processes of our courts." *Ballard v. United States*, 329 U.S. 187, 195 (1946).

## V.    Vincent McFadden was a Youth at Time of Crime and His Execution Would Violate the Spirt of *Roper v. Simmons*

Science, public policy, law and common-sense principles have developed since *Roper v. Simmons*, 543 U.S. 551, 574 (2005), demonstrating that the very same attributes of youth that render the death penalty unconstitutional for youth under 18, apply to their older adolescent and young adult peers. It is now well-established that brain development is not complete until twenty-

28

five years of age.[73] Mr. McFadden was twenty-two at the time of this crime. Thus, all of the reasons that the U.S. Supreme Court held the death penalty to be cruel an unusual punishment for youth under 18 apply equally to Mr. McFadden.

>    A.    **Youth Under and Above 18 Years of Age Are Developmentally Similar and Merit Similar Sentencing Considerations.**

The Federal and State Constitutions bar punishments that are disproportionate to the crime committed and the characteristics of the offender. *Graham v. Florida*, 560 U.S. 48, 59 (2010); *Miller*, 567 U.S. at 469 (citing the "basic 'precept of justice that punishment . . . should be graduated and proportioned' to both the offender and the offense") (quoting *Roper v. Simmons*, 543 U.S. 551, 560 (2005) (citation omitted)). The "[p]rotection against disproportionate punishment is the central substantive guarantee of the Eighth Amendment." *Montgomery v. Louisiana*, 577 U.S. 190, 206 (2016), as revised (Jan. 27, 2016).

Since the U.S. Supreme Court's decision in *Roper v. Simmons*, it has been settled constitutional law that children are developmentally different from adults, and thus require individualized consideration of their youthful characteristics before receiving harsh adult punishments. *See*, *e.g.*, *Roper*, 543 U.S. at 578 (banning the death penalty for individuals convicted of murder under the age of 18); *Graham v. Florida*, 560 U.S. 48, 82 (2010) (banning life without parole sentences on juveniles convicted of non-homicide offenses); *Miller v. Alabama*, 567 U.S. 460, 465 (2012) (banning mandatory life without parole sentences for juveniles convicted of homicide).

The U.S. Supreme Court decided to limit constitutional sentencing protections to individuals under age 18, based on its measure of society's "evolving standards of decency." *Roper*, 543 U.S. at 563. A key conclusion that the Court reached in this analysis was that the unique,

---

[73] *See* Laurence Steinberg, Age of Opportunity: Lessons from the New Science of Adolescence.

natural attributes of youth "diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes." *Miller*, 567 U.S. at 472. The same characteristics of youth continue past age 18, so the same reasoning applies.

Citing scientific and sociological studies, the U.S. Supreme Court relied on three key developmental characteristics of youth in reaching its conclusions: (1) youth's lack of maturity, impulsivity, and impetuosity; (2) youth's susceptibility to outside influences; and (3) youth's capacity for change. *Roper,* 543 U.S. at 569-70; *see also Montgomery v. Louisiana*, 577 U.S. 190, 206-07 (2016) (quoting *Miller,* 567 U.S. at 471). These developmental differences make youth less culpable; their "conduct is not as morally reprehensible as that of an adult," *Roper*, 543 U.S. at 570 (quoting *Thompson v. Oklahoma*, 487 U.S. 815, 835 (1988) (plurality opinion)), making them "less deserving of the most severe punishments," *Miller*, 567 U.S. at 471 (quoting *Graham*, 560 U.S. at 68).

The *Roper* Court relied upon scholars who had linked the behavioral characteristics of youth to brain development—i.e., mounting evidence suggested that the differences between adults and adolescents had "neuropsychological and neurobiological underpinnings." Laurence Steinberg & Elizabeth S. Scott, *Less Guilty by Reason of Adolescence: Developmental Immaturity, Diminished Responsibility, and the Juvenile Death Penalty*, 58 Am. Psych. 1009, 1013 (2003). Studies on adolescent brain development indicated that important changes occur in regions of the brain "that are implicated in processes of long-term planning, the regulation of emotion, impulse control, and the evaluation of risk and reward." *Id.* (citing Linda Spear, *The Adolescent Brain and Age-Related Behavioral Manifestations*, 24 Neuroscience & Biobehavioral Revs. 417 (2000)). Thus, youth have diminished decision making capacity because of psychosocial differences that are biological in origin. *Id.* In later decisions, the U.S. Supreme Court further recognized that brain

30

science continued to develop, finding that "parts of the brain involved in behavior control continue to mature through late adolescence." *Graham*, 560 U.S at 68.

In considering the differences between youth and adults, the *Roper* Court drew the line at age 18 because that was "the point where society draws the line for many purposes between childhood and adulthood." *Roper*, 543 U.S. at 574. Also, the youth in those cases were under 18 and the scientific research relied on applied to that cohort. *See Roper*, 543 U.S. at 569-74 (first citing Jeffrey Arnett, *Reckless Behavior in Adolescence: A Developmental Perspective*, 12 Developmental Rev. 339, 339 (1992); then citing Steinberg & Scott, *supra,* at 1014-16; and then citing Erik Erikson, *Identity: Youth and Crisis* (1968)). Furthermore, brain maturation research that proved critical in *Graham* and *Miller* to determine reduced culpability focused predominantly on youth under 18. *See id.* at 569-72 (first citing Arnett, *supra* at 339; then citing Steinberg & Scott, *supra,* at 1014; and then citing Erikson, *supra*); *Miller*, 567 U.S. at 471-72, 472 n. 5; *Graham*, 560 U.S. at 68.

While the U.S. Supreme Court struck the death penalty and mandatory life without parole sentences for youth under 18, *see Roper*, 543 U.S. at 578; *Graham*, 560 U.S. at 82; *Miller*, 567 U.S. at 465, it also recognized that "the qualities that distinguish juveniles from adults do not disappear when an individual turns 18." *Roper*, 543 U.S. at 574. Research now shows that older adolescents share these same physiological and psychological traits, making them equally less culpable and less deserving of the most serious punishments meted out for adults. Indeed, researchers have established that the regions of the brain associated with the characteristics relied on in *Graham* and *Miller* continue to develop beyond age 18. *See* Catherine Lebel & Christian Beaulieu, *Longitudinal Development of Human Brain Wiring Continues from Childhood into Adulthood*, 31 J. Neuroscience 10937, 10937 (2011); Adolf Pfefferbaum et al., *Variation in*

31

*Longitudinal Trajectories of Regional Brain Volumes of Healthy Men and Women (Ages 0 to 85 Years) Measured with Atlas-Based Parcellation of MRI*, 65 NeuroImage 176, 189 (2013). Older adolescents are now understood to be more like younger adolescents than adults, in that older adolescents are "more susceptible to peer pressure, less future-oriented and more volatile in emotionally charged settings." Vincent Schiraldi & Bruce Western, *Why 21 Year-Old Offenders Should Be Tried in Family Court*, Wash. Post (Oct. 2, 2015), https://www.washingtonpost.com/opinions/time-to-raise-the-juvenile-age-limit/2015/10/02/948e317c-6862-11e5-9ef3-fde182507eac_story.html.

In the twenty-three years since their 2003 article, Steinberg and Scott have also published numerous papers concluding that research now shows that the parts of the brain active in most crime situations, including those associated with characteristics of impulse control, propensity for risky behavior, vulnerability, and susceptibility to peer pressure, are still developing well into late adolescence and even for individuals above age 20. Elizabeth S. Scott, Richard J. Bonnie & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 Fordham L. Rev. 641, 642 (2016) ("Over the past decade, developmental psychologists and neuroscientists have found that biological and psychological development continues into the early twenties, well beyond the age of majority." (citing Laurence Steinberg, *Age of Opportunity: Lessons from the New Science of Adolescence* 5 (2014))); *see also* Laurence Steinberg, *Does Recent Research on Adolescent Brain Development Inform the Mature Minor Doctrine?*, 38 J. Med. & Phil. 256, 263 (2013). In testimony before the United States District Court for the District of Connecticut in *Cruz v. United States*, Dr. Steinberg explained that "we didn't know a great deal about brain development during late adolescence" until recently, but that now he is "absolutely confident" that the developmental characteristics underpinning *Roper*, *Miller*,

32

and *Graham* also apply to 18-year-olds. *Cruz v. United States*, No. 11-CV-787 (JCH), 2018 WL 1541898, at *24-25 (D. Conn. Mar. 29, 2018), *vacated and remanded*, 826 F. App'x 49 (2d Cir. 2020).

Additionally, a comprehensive 2019 report from the National Academies of Sciences explains this shift in the understanding of adolescence, noting that "the unique period of brain development and heightened brain plasticity. . . continues into the mid-20s," and that "most 18–25-year-olds experience a prolonged period of transition to independent adulthood, a worldwide trend that blurs the boundary between adolescence and 'young adulthood,' developmentally speaking." Nat'l Acads. of Scis., Eng'g & Med., *The Promise of Adolescence: Realizing Opportunity for All Youth* 22 (2019) (emphasis omitted), https://nap.nationalacademies.org/read/25388/. The report concludes it would be "arbitrary in developmental terms to draw a cut-off line at age 18." *Id.*

Courts and legislatures in other states have cited this brain science and recognized that young people's continuing development after 18 must be accounted for in sentencing. *See People v. Taylor*, No. 166428, --- N.W.3d ---, 2025 WL 1085247,*7 (Mich. 2025) ("Stated differently, as a class, 19- and 20-year-old late adolescents are more similar to juveniles in neurological terms than they are to older adults."); *In re Monschke*, 197 Wash. 2d 305, 325-28 (2021) (reasoning that "no meaningful neurological bright line exists between . . . age 17 on the one hand, and ages 19 and 20 on the other hand" such that the mitigating qualities of youth outlined in *Miller* and related watershed cases matter when sentencing youth older than 18); *Commonwealth v. Mattis*, 493 Mass. 216 (2024) (holding that LWOP sentences for late adolescents violate the state constitution because people 18, 19, and 20 are not substantially different from people younger than 18 with regard to their immaturity and still developing brains); *People v. Parks*, 987 N.W.2d 161 (Mich.

33

2022) (omitting internal citation and quotation marks) (extending *Miller v. Alabama* protections relating to individualized sentencing procedure to 18-year-old because the court was "left with inescapable conclusion that mandatorily condemning 18-year-olds to die in prison, without consideration of the attributes of youth that 18-year-olds and juveniles share, no longer comports with evolving standards of decency"); *People v. Poole*, No. 166813, --- N.W.3d ---, 2025 WL 978646 (Mich. 2025) (applying *Parks* retroactively to overturn mandatory life without parole sentence for 18-year-old); *State v. Canfield*, 470 N.J. Super. 234 (App. Div. 2022), aff'd as modified 252 N.J. 497 (2023) (quoting N.J.S.A. C:44-1b(14)) (recognizing that state law required the court to consider as a mitigating circumstance that "[t]he defendant was under 26 years of age at the time of the commission of the offense"); *State v. Bellamy*, 468 N.J. Super. 29, 46 n.3 (2021) (citations and internal quotations omitted) (youth matters in sentencing for people up to 26 because "developments in psychology and brain science" showing that "the parts of the brain involved in behavior control continue to mature through late adolescence.").

     **B.**    **The Law and Societal Norms Have Also Extended The Line Demarcating Childhood And Adulthood Past Age 18.**

In limiting federal sentencing protections to children, the *Roper* Court recognized society's "evolving standards of decency." *Roper*, 543 U.S. at 563. The Court explained that analysis should begin with "a review of objective indicia of consensus, as expressed in particular by the enactments of legislatures that have addressed the question." *Id.; see also Graham*, 560 U.S. at 62 ("The analysis begins with objective indicia of national consensus."). Looking at the national consensus at the time around voting, jury service, and marriage, the Court recognized that youth could not independently partake in these rights before age 18. *Roper*, 543 U.S. at 569. This consensus moved the Court to rule that 18 was the point where society drew the line between childhood and adulthood. *Id.* at 574.

A review of current national legislation demonstrates that standards have evolved in the 21 years since *Roper*, and society no longer draws the line clearly at 18 when distinguishing between childhood and adulthood. Across the nation, both state and federal courts have raised the age of majority in different contexts to reflect this evolution.

### 1.    Juvenile Court Jurisdiction

Responding to developmental research, several jurisdictions have passed legislation raising the age at which youth phase out of juvenile court jurisdiction. Vermont, beginning in 2023, extends the jurisdiction of the juvenile court to individuals aged 18, as well as youth between ages 19 and 21 if certain conditions are met, to be implemented in coming years. Vt. Stat. Ann. tit. 33, § 5103. Vermont also defines a "child" as an individual who commits a delinquent act between the ages of 10 and 22. Vt. Stat. Ann. tit. 33, § 5102(2)(C). Also noteworthy are those states who recently raised the age of juvenile court jurisdiction to 18. Even for these states, conversations surrounding the legislation incorporated the research extending adolescence beyond age 18. For instance, in 2018 New York's "Raise the Age" legislation raised the age of criminal responsibility to 18 (to be phased in over two years). *Governor Cuomo Signs Legislation Raising the Age of Criminal Responsibility to 18-Years-Old in New York*, NY.gov (Apr. 10, 2017), https://ocfs.ny.gov/main/news/article.php?idx=1486. The legislation was meant to create a system that responds in "more age-appropriate ways to the behaviors and needs of older adolescents*."* New York State Raise the Age Implementation Task Force, *Final Report* 3 (2020), https://www.ny.gov/sites/default/files/atoms/files/FINAL_Report_Raise_the_Age_Task_Force_122220.pdf. The following year, Michigan raised the age of juvenile court jurisdiction from 17 to 18 years of age. Mich. Comp. Laws. Ann. 712A.2(a). The legislative analysis recognized that at the time Michigan was one of only four states to automatically send 17-year-olds to adult prison. House Fiscal Agency, *Legislative*

35

*Analysis*                                    2                                    (2019),

http://www.legislature.mi.gov/documents/20192020/billanalysis/House/pdf/2019-HLA-4133-

67514053.pdf. The analysis noted that "research . . . overwhelmingly documents that adolescent

brains do not fully develop until closer to 25 years of age." *Id.*

### 2.    *Youthful Offender Statutes*

The emergence of youthful offender statutes also signal that states understand that late

adolescents lack maturity. Through these statutes, several jurisdictions have created specialized

adult courts, implemented diversion programs or limited sanctions to recognize and accommodate

emerging adults. Karen U. Lindell & Katrina L. Goodjoint, Juv. L. Ctr., *Rethinking Justice for*

*Emerging Adults: Spotlight on the Great Lakes Region* 14 (2020), https://jlc.org/sites/default/files/

attachments/2020-09/JLC-Emerging-Adults-9-2.pdf. Some youthful offender statutes "carve out

exceptions to standard criminal justice processes for younger offenders or create 'hybrid'

approaches that blend juvenile and adult criminal processes or sanctions." *Id.* at 15. Examples

include:

- South Carolina: Youthful offender statute extends protections to youth age 17-24 based on specific offenses. S.C. Code. Ann. § 24-19-10(d)(ii).

- Georgia: Male youth between age 17 and 24 who have "the potential and desire for rehabilitation," and are convicted under this statute, are subject to "treatment" which includes corrective incarceration, guidance, and training (at vocational schools, farms, hospitals, etc.). Ga. Code Ann. § 42-7-2(7); Ga. Code Ann. § 42-7-3(a).

- California: "Allows parole consideration for youth who were 25 years or younger at the time of their crimes and sentenced to a long determinate sentence or life imprisonment." Lindell & Goodjoint, *supra*, at 91; Cal. Penal Code Ann. § 3051.

### 3.     Healthcare Benefits

With the imposition of the Affordable Care Act of 2010, healthcare plans and issuers that offered dependent child coverage were required to make coverage available to dependents between the ages of 19 and 26. 45 C.F.R. § 147.120. This expansion "highlight[ed] the ongoing dependence that now characterizes the early years of adulthood." Vivian E. Hamilton, *Adulthood in Law and Culture*, 91 Tul. L. Rev. 55, 59 (2016). This change extended a benefit "long associated with minor and dependent status" to individuals up to age 26, suggesting that they "lack the independence that is one of the characteristic markers of adulthood." *Id.* at 80.

Prior to the enactment of the Affordable Care Act, thirty-four states had already implemented plans that in some way extended coverage to dependents beyond age 18. Sara Rosenbaum et al., *Implementing Health Reform in an Era of Semi-Cooperative Federalism: Lessons from the Age 26 Expansion*, 10 J. Health & Biomedical L. 327, 334-335 (2015) (citing Alexander B. Blum et al., *Impact of State Laws That Extend Eligibility for Parents' Health Insurance Coverage to Young Adults*. 129 Pediatrics 426, 426-32 (2012)). Some of this coverage was based on qualifiers such as student status, financial dependency, and marital status, all of which suggest the retention of youth and dependency beyond age 18. *See id.* For example, New York extended coverage to dependents from age 23-29 based on qualifiers such as marital status, enrollment in an accredited institution, by way of mental illness and physical handicap, and/or residence. N.Y. Ins. Law § 3216 (McKinney 2010). Similarly, Louisiana extended coverage to dependents up to age 24 if they were unmarried, enrolled as full-time students and dependent on the insured. La. Stat. Ann. § 22:1003 (2009).

### 4.    *Alcohol and Tobacco*

Under federal law, it is illegal for anyone under age 21 to possess or buy alcohol. Pub. L. 116-94. Many states have also passed law raising the smoking age to 21. This mirrors the national minimum drinking age for alcohol. 23 U.S.C. § 158.  In 2015, the National Academies of Sciences concluded that raising the national minimum tobacco purchase age from 18 to 21 would be beneficial because "the parts of the brain most responsible for decision making, impulse control, sensation seeking, future perspective taking, and peer susceptibility and conformity continue to develop and change through young adulthood." Inst. of Med. of the Nat'l Academies, *Public Health Implications of Raising the Minimum Age of Legal Access to Tobacco Products* 3, 7 (2015), https://www.nap.edu/read/18997/chapter/2. Following these conclusions, federal legislation was passed in 2019 restricting the lawful sale of tobacco to any person younger than 21 years of age. 21 U.S.C. § 387f(d)(5); Further Consolidated Appropriations Act, Pub. L. No. 116-94, § 603, 133 Stat. 2534, 3123 (2019).

### 5.    *Foster Care*

In recognition of the lack of independence for most youth at age 18, the foster care system extends benefits to older youth. With the passing of the Federal Fostering Connections to Success and Increasing Adoptions Act of 2008 (Pub. L. No. 110-351), states have the option to allow youth to remain in foster care after age 18. U.S. Dep't of Health & Hum. Servs., *Extension of Foster Care Beyond Age 18* 1 (2017), https://www.childwelfare.gov/pubPDFs/extensionfc.pdf. Massachusetts is among these states and extends care to youth until age 22. *Id.* at 2 n.2; Mass. Gen. Laws ch. 119, § 23. The near universal extension of foster care beyond age 18 reflects researchers' conclusions that there is "nothing magical about age 18 or even age 21 as a marker of adulthood, and few children outside the child welfare system are expected to be 'independent' once they reach

38

the age of majority." Nat'l Acads. of Scis., Eng'g & Med., *The Promise of Adolescence*, *supra*, at 267.

It is arbitrary to draw a clear line for the age of majority as individuals "acquire different capabilities across the course of their development and exercise them with varying levels of competence in different contexts." *See* Hamilton, *supra*, at 57-58; Alexandra O. Cohen et al., *When Does a Juvenile Become an Adult? Implications for Law and Policy*, 88 Temp. L. Rev. 769, 776 (2016). It logically follows, then, that criminal courts should likewise recognize how brain development affects the actions of older adolescents beyond the age of 18 and extend constitutionally protected rights to this age group.

## CONCLUSION

Prosecutor Keith Larner unconstitutionally struck Venireperson Wanda Bryant from Mr. Vincent McFadden's jury, irreversibly tarnishing his trial and compromising the jury's ultimate verdict. Larner's conduct throughout every stage Mr. McFadden's trial, from *voir dire* to his closing statement, further demonstrates that Mr. McFadden's prosecution was motivated by flagrant racial discrimination.

Mr. McFadden's case implicates more than his own life. It is paradigmatic of the racism practiced and promoted by the St. Louis County Prosecuting Attorney's Office. It is the product of callous disregard for the dignity and constitutional rights of Black and Brown individuals, especially youth, living in Missouri. And it is emblematic of the centuries of struggle for equal protection under the law in America. The federal judiciary must not allow its integrity to be so corroded by the misconduct of the State of Missouri's own agents. Mr. McFadden's conviction cannot stand.

Date: May 1, 2026

Respectfully Submitted,

*/s/ Megan G. Crane*
Megan G. Crane, Bar #71624(MO)
RODERICK & SOLANGE
  MACARTHUR JUSTICE CENTER
906 Olive Street, Suite 420
St. Louis, MO 63101
(314) 341-7728
megan.crane@macarthurjustice.org

### Index of Exhibits

Exhibit 1:     Affidavit of Joseph Luby, *Missouri v. Smulls*, 12/19/03

Exhibit 2:     Brief of Amicus Curiae American Postal Workers Union, filed in *Smulls v. Missouri*, 5/17/95