# EXHIBIT 2

IN THE SUPREME COURT
STATE OF MISSOURI

HERBERT SMULLS,                    )
                                   )
        Petitioner-Appellant,      )
                                   )
              vs.                  )   Case No. 75511
                                   )
STATE OF MISSOURI,                 )
                                   )
        Respondent-Appellee.       )

Appeal to the Supreme Court of Missouri
From the Circuit Court of St. Louis County, Missouri
Twenty-First Judicial Circuit, Division #7
The Honorable William M. Corrigan, Judge

BRIEF OF AMICUS CURIAE AMERICAN POSTAL WORKERS UNION, AFL-CIO,
IN SUPPORT OF APPELLANT HERBERT SMULLS

O'DONNELL, SCHWARTZ & ANDERSON, P.C.
DARRYL J. ANDERSON, ESQUIRE
1300 L STREET, NW., SUITE 1200
WASHINGTON, D.C.  20005-4178
(202) 898-1707

FELDACKER & COHEN
BRUCE C. COHEN, ESQUIRE
720 OLIVE STREET, SUITE 2222
ST. LOUIS, MO  63101
(314) 231-2970

DATE:  MAY 17, 1995

ATTORNEYS FOR AMICUS CURIAE
AMERICAN POSTAL WORKERS UNION,
AFL-CIO

<u>**TABLE OF AUTHORITIES**</u>

<u>**Page**</u>

**FEDERAL CASES:**

<u>American Postal Workers Union, AFL-CIO v. United States</u>,
925 F.2d 480, 485 (D.C. Cir. 1991) . . . . . . . . . . . . . . 1

<u>Batson v. Kentucky</u>, 476 U.S. 479 (1986) . . . . . . . . 2, 13-15

<u>Blaze v. Payne</u>, 819 F.2d 128, 130 (5th Cir. 1987) . . . . . . . 7

<u>Holland v. Illinois</u>, 493 U.S. 474, 488,
107 L.Ed.2d 905, 921 (1989) . . . . . . . . . . . . . . . . 13

<u>Malone v. United States Postal Service</u>, 526 F.2d 1099
(6th Cir. 1975) . . . . . . . . . . . . . . . . . . . . . . . 7

<u>Powers v. Ohio</u>, 499 U.S. 400, 406, 113 L.Ed.2d
411, 422 (1991) . . . . . . . . . . . . . . . . . . . 1, 2, 5, 13

<u>Purkett v. Jimmy Elem</u>, No. 94-802, 1995 U.S. WL 28345 . . . 13-15

<u>Texas Dept. of Community Affairs v. Burdine</u>,
450 U.S. 248, 258 (1981) . . . . . . . . . . . . . . . . . 14

<u>United States v. Uwaezhoke</u>, 995 F.2d 388, 391
(3d Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . 15

**MISSOURI CASES:**

<u>State v. Anderson</u>, No. FCR-8905528 . . . . . . . . . . . . . . 6

<u>State v. Antwine</u>, 743 S.W.2d 51, 65 (1987) (<u>en banc</u>) . . . . 15

<u>State v. Hudson</u>, 822 S.W.2d 477, 480-81 (Mo.App.,
E.D. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 6

<u>State v. Jackson</u>, 746 S.W.2d 429, 430
(Mo.App. E.D. 1988) . . . . . . . . . . . . . . . . . . . . 6

<u>State v. Payton</u>, 747 S.W.2d 290, 293 (Mo.App.,
E.D. 1988) . . . . . . . . . . . . . . . . . . . . . . . . 6, 15

<u>State v. Pepper</u>, 855 S.W.2d 500, 502-3
(Mo.App., E.D. 1993) . . . . . . . . . . . . . . . . . . . . 6

<u>State v. Williams</u>, No. 59234 (Mo.App., E.D.
June 16, 1992) . . . . . . . . . . . . . . . . . . . . . . . 6

i

MISCELLANEOUS AUTHORITIES:

"Handbook EL-311" (April 1990 Edition)  . . . . . . . . . . . . . 9

Employee and Labor Relations Manual,
    United States Postal Service, 660 et seq. (1989)  . . . . . 10

General Accounting Office Report No. GGD-94-201B
    Volume II, "Labor-Management Problems Persist
    on the Workroom Floor" (September 1994) . . . . . . . . . . 7, 11

Hearings on "Violence in the U.S. Postal Service
    Before the Subcomm. on Census, Statistics &
    Postal Personnel & Subcommittee on Postal
    Operations & Services, 103d Cong., 1 Sess. (1993)
    (Testimony of Marvin Runyon, Chief Executive
    Officer & Postmaster General) . . . . . . . . . . . . . . . 6

Hearings on "Violence in the U.S. Postal Service
    Before the Subcomm. on Census, Statistics &
    Postal Personnel & Subcommittee on Postal
    Operations & Services, 103d Cong., 1 Sess. (1993)
    (Testimony of Moe Biller, President,
    American Postal Workers Union)  . . . . . . . . . . . . . . 9

USPS and National Association of Letter Carriers
    and American Postal Workers Union, (1984)
    (Kerr, Arb.)  . . . . . . . . . . . . . . . . . . . . . . 11

## THE INTEREST OF THE AMERICAN POSTAL WORKERS UNION, AFL-CIO, AS AMICUS CURIAE

The American Postal Workers Union, AFL-CIO (hereinafter the "APWU") is the nation's largest postal workers union. The APWU represents approximately 335,000 employees of the United States Postal Service in four nationwide bargaining units: Clerks, Maintenance Workers, Special Delivery Messengers, and Motor Vehicle Operators. The APWU also represents several smaller bargaining units of postal employees, including employees at postal data centers.

The APWU is a voluntary association. Its purposes are not limited to collective bargaining, but include legislative, political education, civic, welfare and other activities which further, directly or indirectly, the joint interests of the membership of the Union in the improvement of general economic and social conditions in the United States. See American Postal Workers Union, AFL-CIO v. United States, 925 F.2d 480, 485 (D.C. Cir. 1991) (App. p.2).

The rights implicated in this case are not only the constitutional rights of Appellant Smulls, but the rights of postal workers represented by the APWU to be free from discriminatory exclusion from service as jurors. As the Court observed in Powers v. Ohio, 499 U.S. 400, 406, 113 L.Ed.2d 411, 422 (1991), "a prosecutor's discriminatory use of peremptory challenges harms the excluded jurors and the community at large." [Citation omitted]. . . . "[B]oth the excluded juror and the criminal defendant have a common interest in eliminating racial discrimination from the

courtroom.   A venireperson excluded from jury service because of race suffers a profound personal humiliation heightened by its public character."  Powers, 499 U.S. at 414, 113 L.Ed.2d at 427.

As the U.S. Supreme Court has recognized, although individual jurors subjected to racial exclusion from service on juries have a theoretical right to seek redress in the courts, "[a]s a practical matter,...these challenges are rare. . . .   And, there exist considerable practical barriers to suit by the excluded juror...." Powers, 499 U.S. at 414-415, 113 L.Ed.2d at 427-428.   Thus, it is important for employees of the United States Postal Service represented by the APWU to have an opportunity to present their views to this Court through an Amicus Curiae brief prepared by their Union.   The APWU also wishes to bring to the Court's attention the fact that this case implicates broader issues arising from the unfair stigmatization of postal employees as an occupational group.   See Powers, 499 U.S. at 423, 113 L.Ed.2d at 434 (Scalia, J., dissenting).

In part I of this Brief, we present to the Court substantial information bearing on the nature of postal employees and postal employment pertinent to the prosecutor's assertion of a right to strike postal employees categorically.

In part II, we focus on the discriminatory impact of excluding postal employees from juries and urge the Court to hold that a prosecutor who explains a peremptory challenge by relying on a consistent policy of excluding employees of the United States Postal service fails to meet the step 2 requirement of Batson v.

<u>Kentucky</u>, 476 U.S. 479 (1986), because postal employment is not a race-neutral explanation. The Court should further hold that a practice of peremptorily striking all postal employees may be found to be pretextual absent a logical connection between postal employment and the case at bar.

## STATEMENT OF THE CASE

This appeal concerns the conviction of Appellant Herbert Smulls of several criminal offenses, including first degree murder, in connection with the robbery of a jewelry store. Mr. Smulls has been sentenced to death.

Mr. Smulls contends that the Assistant Prosecutor who represented the State in the jury-selection process in this case unconstitutionally exercised a peremptory strike to remove a black woman venireperson, Margret Sidney.

In response to defense counsel's objections to the striking of Ms. Sidney, the Assistant Prosecutor offered explanations for his decision to strike Ms. Sidney that revolve primarily around her employment as the Supervisor of the Mail Operations Center at Monsanto. The Assistant Prosecutor stated (Tr. II 368-370):

> ...she indicated that she is a mail sorter for Monsanto Company. That she sorts mail for, I believe she said, 5,000 people. And her husband works for the Post Office. And I believe she listed him as a custodian.

> ...I treat people who work as mail sorters and as mail carriers, letter carriers and people who work for the U.S. Post Office with great suspicion in that they have generally--in my experience in many of the trials that I've had--are very disgruntled, unhappy people with the system and make every effort to strike back.

3

> In my experience as a prosecutor, in trying cases where I have had several cases and left mail people on the jury, had them result in a hung jury. The most recent of which was a murder case in this Courthouse last September, <u>State v. Dana Ruff</u> (phonetically) where a mail carrier was the holdout for a hung jury in that case.
>
> I also have several in-laws who are employees of the postal department and even though they are somewhat relatives, I share the same opinion of them. So I treat them with great suspicion.
>
> ...and I also would point out to the Court that I struck juror no. 8, Ms. Dillard. I struck her for the very same reason in that she is a letter carrier and works delivering mail. . . .
>
> Ms. Dillard, I would point out, is a white female. . . . [1]

Defense counsel objected to the striking of Ms. Sidney and asserted that the assistant prosecutor's proffered reasons were pretextual, and that the real reason for the strike was Ms. Sidney's race. Counsel pointed out that the reasons offered by the assistant prosecuting Attorney "in no way were fact specific to this case." (Tr. II 379). The assistant prosecuting attorney responded (Tr. II 379-380):

> ...but my point [sic] people who work with the mail and work in the mailroom are with the U.S. Postal Service, it has been my experience that those people are at the bottom of the employment ladder. I'm not talking about in terms of income, I'm talking about in terms of ambition, in terms of job challenge, in terms of actually whether or not they are good--I guess I want to say aggressive. Is it a citizen who would consider seriously a case where the state is seeking the death penalty?

---

[1] In the passages omitted from this quotation, the Assistant Prosecutor also stated that Ms. Sidney "glared at me" and that he was concerned about "her general attitude, which included her outfit--which yesterday, I believe, included a beret and today was a ball cap with sequins on it. . . ."

\*          \*          \*          \*

> I do not see any advantage in this case nor would I ever, and I think the Court has known me for a long time and knows full well that I would not strike an individual for a racially discriminatory purpose. And I did not do so in this case.

The American Postal Workers Union, AFL-CIO files this Brief as amicus curiae because the position taken by the Assistant Prosecutor in this case implicates the constitutional rights of the 335,000 employees of the United States Postal Service represented by the APWU.[2/] See Powers v. Ohio, 499 U.S. 409 (1991). As we explain below, the view of postal employees expressed by the Assistant Prosecutor in this case is sharply at odds with the facts. Appellant Smulls argues that the Assistant Prosecutor's proffered reasons were pretextual and that the failure of the Assistant Prosecutor to proffer reasons for striking Ms. Sidney related to the facts of this case renders the Assistant Prosecutor's proffered reasons legally insufficient.

The APWU considers Appellant's arguments to be sound and supports them. We also wish to emphasize a further point. If the erroneous assertions by the Assistant Prosecutor are legally sufficient to support disqualification of postal employees from service as jurors, then an important constitutional right of many thousands of APWU members is in jeopardy, and postal employees will

---

[2/]    The APWU is the largest of several unions representing employees of the United States Postal Service. The principal bargaining units represented by the APWU include clerks, maintenance employees, motor vehicle service employees, and special delivery messengers. The APWU also represents employees in several bargaining units not directly responsible for processing mail, such as the Postal Data Centers.

5

continue to be stigmatized and discriminated against as Ms. Sidney was in this case.[3/]

## I.   THERE IS NO FACTUAL BASIS FOR DISQUALIFICATION OF POSTAL EMPLOYEES FROM SERVICE AS JURORS

The American Postal Workers Union does not contend that there are no labor-management problems in the United States Postal Service.  Quite the contrary, the APWU has acknowledged problems and has expressed criticism of postal management.  See generally, Hearings on "Violence in the U.S. Postal Service Before the Subcomm. on Census, Statistics & Postal Personnel & Subcommittee on Postal Operations & Services, 103d Cong., 1 Sess. (1993) (Testimony of Moe Biller, President, American Postal Workers Union).  This is not to say, however, that postal employees fairly may be described as "disgruntled, unhappy people with the system and make every effort to strike back," as the Assistant Prosecutor would have it. On the contrary, recent employee opinion surveys conducted in 1992 and 1993 show that, over all, postal employees are satisfied with

---

[3/]   Although Ms. Sidney is not herself a postal employee, the Assistant Prosecutor made it clear that he was treating her as someone who "sorts mail," and he observed that "her husband works for the Post Office."  He explained that he was treating her as he treats people who work for the Postal Service.  (Tr. II 368-369). See also State v. Anderson, No. FCR-8905528 (use of Postal Worker explanations not allowed) (Wiesman, J., R.L.F. 733-46); State v. Pepper, 855 S.W.2d 500, 502-3 (Mo.App., E.D. 1993) (St. Louis City); State v. Hudson, 822 S.W.2d 477, 480-81 (Mo.App., E.D. 1991) (St. Louis County); State v. Jackson, 746 S.W.2d 429, 430 (Mo.App. E.D. 1988); State v. Payton, 747 S.W.2d 290, 293 (Mo.App., E.D. 1988) (St. Louis City); State v. Williams, No. 59234 (Mo.App., E.D. June 16, 1992) at pp. 3-6 Memorandum Opinion Order reported at 840 S.W.2d 249 (St. Louis City) (R.L.F. 140-41).

6

their employment.   When asked about the kind of work they do, 78% stated that they like the kind of work they do, and 77% stated that they are proud to work for the United States Postal Service.   Most importantly, 90% of those surveyed stated that they are personally committed to the success of the United States Postal Service.[4/] See also General Accounting Office Report No. GGD-94-201B Volume II, "Labor-Management Problems Persist on the Workroom Floor" (September 1994) (hereinafter "GAO Report").

In its recent report, the GAO described labor-management relations in mail processing operations as "tense and confrontational."   It is important to observe, however, that only 32.1% of career postal employees are assigned to mail processing and distribution.   Moreover, as the GAO Report points out, this situation does not distinguish postal mail distribution employment from other work:   "to some extent, the work environment is similar to traditional assembly line work found in many manufacturing industries. . . ."   GAO Report at 47.[5/]

---

[4/]   As of September 1993, 612,826 employees were represented by postal unions.   The 1993 survey was responded to by 512,818 employees.   The 1992 survey was responded to by 586,436 employees. GAO Report, pp 41-46.

[5/]   As part of the Postal Reorganization Act of 1970 (39 U.S.C. §1 et seq.) Congress established the United States Postal Service as an Independent Establishment of the Federal Government and created for it a labor relations framework modeled after the private sector.   39 U.S.C. §§1201-09; H.R. Rep. No. 91-1104, 91st Cong. 2d Sess. 2, reprinted in 1970 U.S.Code Cong. & Admin. News 3659, 3662; See Blaze v. Payne, 819 F.2d 128, 130 (5th Cir. 1987). Congress provided postal employees with full rights to bargain collectively over their wages, hours, and conditions of employment, through their exclusive bargaining representatives.   39 U.S.C. §§1202-06; See Malone v. United States Postal Service, 526 F.2d
(continued...)

Thus, a majority of postal employees are not engaged in the type of industrial work that GAO found to be comparable to traditional assembly line work in manufacturing. And, insofar as some postal employees are so employed, and insofar as that type of employment may create tensions, postal employees may not fairly be distinguished from many other employees in other industries.

In this regard, it is worth noting that recent publicity resulting from notorious shooting incidents at postal facilities does not reflect an underlying problem among postal workers. The fact that there have been several such incidents reflects the size and scope of postal operations, not the incidence of violence among postal employees. A survey by the National Institute of Occupational Safety and Health (NIOSH) found that postal workers faced a smaller risk of being killed by work-related homicides from 1980 to 1989 than did most workers. The death rate from such homicides among postal workers was 0.63 per 100,000 workers, compared to a rate of 0.71 for all workers. August 5, 1993,

---

[5]/(...continued)
1099 (6th Cir. 1975).

In 1970, Congress recognized that postal employees were dedicated to the mission of the Post Office Department but were frustrated by an impossible situation. As the Senate Committee reported:

> The fact that the Department is able to carry its massive burden - handicapped as it is by an archaic organizational arrangement and inadequately equipped with a creaking physical plant forty years out of date - is a tribute to the perseverance and loyalty of the rank-and-file postal employee. It now looks to Congress for better days.

S. Rep. No. 91-912, 91st Cong. 2d Sess. 2.

<u>Hearings on "Violence in the U.S. Postal Service Before the Subcomm. on Census, Statistics & Postal Personnel & Subcommittee on Postal Operations & Services</u>, 103d Cong., 1 Sess. (1993) (Testimony of Marvin Runyon, Chief Executive Officer & Postmaster General).

As an employer, the United States Postal Service is demanding, and highly selective. The employment policy and criteria employed by the Postal Service are spelled out in an official Postal Service Handbook known as the "Handbook EL-311" (April 1990 Edition). As that handbook states:

> The U.S. Postal Service is obligated to maintain the security of the mail and to assure public trust and confidence in the reliability and integrity of its employees. To discharge these obligations, the Postal Service must evaluate, in addition to such matters as education and work experience, the overall suitability of an applicant for postal employment. . . .It is also their responsibility to ensure that the suitability determinations and appointments are made without discrimination on account of any nonmerit factor such as race. . . .

Handbook EL-311, Section 311.1 Policy. (April 1990 Edition.)

Applicants for postal employment must take and pass an examination. Moreover, postal officials who select employees are required to select the best qualified applicants from their register of eligibles. In order to do this, they must use the "rule of three" when making selections; that is, they generally must select from among the top three applicants on the ranked applicant roster. <u>Id</u>. Section 265.2.

Applicants are also subjected to a rigorous personal suitability review. "In making selections for any type of accession, determination must be made whether an eligible or

applicant might be disqualified for reasons such as the following:

a.   Dismissal from prior employment for cause.

b.   Criminal or other conduct of such a nature which would undermine the efficiency of the Postal Service, if engaged in by a postal employee.

c.   Intentionally false statements, deception, or fraud in application, examination or information furnished incident to employment by the Postal Service.

d.   Refusal to furnish requested testimony or information to the Postal Service, or the appointing officer, which has been requested pursuant to applicable laws, rules and regulations.

e.   Habitual use of intoxicating beverages to excess.

f.   Abuse of narcotics or dangerous drugs.

g.   Reasonable doubt as to the loyalty of the eligible to the Government of the United States.

h.   Conviction for theft or embezzlement.

i.   Conviction of crimes of violence, including assault with a deadly weapon.

j.   Discharge for illegal strike activity.   (For exceptions, See Postmaster General Memorandum dated July 16, 1982.)

k.   Any legal or other disqualification which makes the applicant unfit for the Postal Service.

Id. at 313.2.

Unlike workers in the private sector, postal employees take an oath of office upon employment, swearing to uphold the laws of the United States and to protect the sanctity of the U.S. Mail. Throughout their postal employment, they are subject to a rigorous code of ethics.  Violations of that code can, and do, lead to discipline up to and including discharge.  Employee and Labor Relations Manual, United States Postal Service, 660 et seq. (1989).

10

From these facts, it is readily apparent that the Assistant Prosecutor's view of postal employees is unfounded and wrong.  It is also noteworthy that the Assistant Prosecutor's negative view of postal employees is not reflected in the attitude of the public toward the Postal Service.  In the first quarter of fiscal year 1994, customer satisfaction data compiled for the Postal Service by Opinion Research Corporation "showed that 88% of the nation's households rated their overall satisfaction with the Postal Service as 'excellent,' 'very good,' or 'good' in the first quarter of fiscal year 1994."  GAO Report at 27.

From a different perspective, two nationally-recognized neutral experts on labor management relations who have detailed personal knowledge about labor management relations in the Postal Service have given the Unions and management high marks.  In a 1984 interest arbitration award establishing the terms of the parties' nationwide collective bargaining agreement, neutral arbitrator Clark Kerr, commenting on the experience of the Postal Service under the Postal Reorganization Act of 1970 stated (Arbitration Award at 15, 16):

> The postal reorganization has been a great, but too little appreciated success.  We were impressed by many accomplishments.
>
> . . .They [Postal Management and Unions] all deserve a vote of confidence from the American people.

USPS and National Association of Letter Carriers and American

_Postal Workers Union_, (1984) (Kerr, Arb.).[6/]

In 1991, another neutral arbitrator called upon to serve as an interest arbitrator in collective bargaining, Richard Mittenthal, stated in his Award (at 7):

> This institution, the Postal Service and its workers, has served the nation well. It is unquestionably the most effective postal business in the world. ...It is a marvel of dedication and ingenuity.

_Arbitration and Collective Bargaining Agreement Between APWU and USPS_, (1991) (Mittenthal, Arb.).[7/]

II.  A _PRIMA FACIE_ CASE OF RACIAL DISCRIMINATION IN PEREMPTORY CHALLENGES IS NOT REBUTTED BY RELIANCE UPON A POLICY OF STRIKING EMPLOYEES OF THE UNITED STATES POSTAL SERVICE, AND UNIFORM APPLICATION OF SUCH A POLICY OF PEREMPTORY STRIKES MAY BE FOUND TO BE PRETEXTUAL WITHOUT ANY FURTHER EVIDENCE

Section I of this Brief explains why there is no racially neutral basis for disqualification of postal employees from service as jurors. It is readily apparent, however, that prosecutors in St. Louis regularly assert a right to strike postal employees peremptorily. _See_ n.3, _supra_.

---

[6/]  Dr. Kerr's distinguished career as a labor economist, a labor arbitrator, and an educator, has included service as Chancellor of the University of California at Berkley, President of the University of California, and President of the Industrial Relations Research Association. Labor Arbitration Reports Arbitrators' Biographies, Labor Relations Reporter (Bureau of National Affairs 1995).

[7/]  Richard Mittenthal is a past president of the National Academy of Arbitrators and a nationally-known labor arbitrator. _See_ Arbitration 1994, Controversy and Continuity, Proceedings of the 47th Annual Meeting, National Academy of Arbitrators (Bureau of National Affairs 1994), at 184.

The Supreme Court has repeatedly recognized and protected the right of citizens to serve as jurors without discriminatory exclusion.  The importance of that right was explained at length by the Court in <u>Powers v. Ohio</u>, 499 U.S. 400, 406-407, 409, 413-414, 113 L.Ed.2d 411, 422-423, 424, 427 (1991), <u>see</u> <u>Holland v. Illinois</u>, 493 U.S. 474, 488, 107 L.Ed.2d 905, 921 (1989) (Kennedy, J., concurring).

> A venireperson excluded from jury service because of race suffers a profound personal humiliation heightened by its public character.

499 U.S. at 413-414, 113 L.Ed.2d at 427.

In the case of postal employment, peremptory challenges based upon occupation exclude a disproportionately large number of black citizens.  This point is made specific by the affidavit of Grace Corbin, a Senior Equal Employment Opportunity Specialist employed by the United States Postal Service in St. Louis.  As Ms. Corbin states (Affidavit at 2-3), blacks comprise more than 50% of the Postal Service workforce in St. Louis.  Given that fact, and given the fact that there is no objective non-discriminatory basis for excluding postal employees from juries, reliance by a prosecutor on postal employment status as a basis for a peremptory strike, absent special circumstances in the particular case, cannot rebut a <u>prima facia</u> case of discrimination.

In its May 15, 1995 decision in <u>Purkett v. Jimmy Elem</u>, No. 94-802, 1995 U.S. WL 28345, the United States Supreme Court explained the three-step analysis required by <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986).  The Court explained <u>Batson's</u> requirement that "the

13

proponent of a strike 'must give a clear and reasonably specific explanation of his legitimate reasons for exercising the challenges,' Batson, 476 U.S., at 98, n.20 (quoting Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 258 (1981)), and that the reason must be 'related to the particular case to be tried,' 476 U.S., at 98. See 25 F.3d, at 682, 683." As the Purkett court explained (1995 U.S. WL 28345) at 2:

> This warning was meant to refute the notion that a prosecutor could satisfy his burden of production by merely denying that he had a discriminatory motive or by merely affirming his good faith. What it means by a "legitimate reason" is not a reason that makes sense, but a reason that does not deny equal protection. See Hernandez, supra, at 359; Cf. Burdine, supra, at 255 ("the explanation provided must be legally sufficient to justify a judgment for the defendant.)"

A consistent policy or practice of excluding postal employees from juries is not racially neutral because its impact falls disproportionally upon black citizens, and the characteristic of postal employment is "entirely unrelated to the case to be tried." Purkett, at 7 (Dissenting Opinion of Justice Stevens). As Justice Stevens explains in Purkett a "consistent policy of excluding all Spanish speaking jurors" would violate Batson if that characteristic was "entirely unrelated to the case to be tried." Similarly, here, we have a pattern of prosecutors in St. Louis peremptorily striking postal workers. (See n.3, supra.) That policy operates so that more than 50 percent of the citizens it excludes from juries are black. Given that pattern, the postal workers rationale should, in Justice Stevens' words, be found to be

14

so "implausible, fantastic and silly" as to "be found to be pretextual without further evidence." Purkett at 7.  Such a policy fails to meet the Step Two requirement of Batson and Purkett that the reason offered to explain a challenge must be legitimate.  See United States v. Uwaezhoke, 995 F.2d 388, 391 (3d Cir. 1993) (the Court of Appeals observed that the District Court Judge was "incredulous" about the existence of a policy excluding postal workers per se).

In State v. Antwine, 743 S.W.2d 51, 65 (1987) (en banc), this Court expressed its concern that prosecutors could "adopt rote 'neutral explanations' which bear facial legitimacy but conceal a discriminatory motive."  See also State v. Payton, 742 S.W.2d, 290, 291 (Mo.App. 1988).  We submit that by offering a step two peremptory challenge explanation that both prompts incredulity and results in racial exclusion, the prosecutor has not met his burden.  This Court should, therefore, reverse the judgment of the court below on the ground that the prosecutor failed to satisfy the step two requirement of Batson.  See Purkett at 6 (Stevens, J., Dissenting, approving of the majority's implicit decision to "evaluate on its own whether the prosecutor had satisfied step two").

15

## CONCLUSION

For the foregoing reasons, Appellant's retrial convictions should be reversed and a new trial ordered.

Respectfully submitted,

O'DONNELL, SCHWARTZ & ANDERSON, P.C.

By:_____
Darryl J. Anderson
Bar No. #154567
O'DONNELL, SCHWARTZ & ANDERSON
1300 L Street, NW, Suite 200
Washington, D.C.  20005-4178
(202) 898-1707

FELDACKER & COHEN

By:_____
Bruce C. Cohen, Esquire
# 33353
720 Olive Street, Suite 2222
St. Louis, MO  63101
(314) 231-2970

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing was mailed, postage prepaid, this 17th day of May, 1995, to:

Jeremiah W. Nixon
Office of the Attorney General
Supreme Court Building
Corner of High and Washington Streets
Jefferson City, MO 65102

Counsel for Respondent-Appellee
William J. Swift
Office of Public Defender
3402 Buttonwood Drive
Columbia, MO  65203

Counsel for Petitioner-Appellant

_____
Attorney for APWU

16